# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | ) | Case No.06-25454 (MBM) |
|  | ) |  |
| LE-NATURE'S, INC., et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## FIFTH AMENDED VERIFIED STATEMENT OF BROWN RUDNICK BERLACK ISRAELS LLP AND MANION MCDONOUGH & LUCAS, P.C. PURSUANT TO FED. R. BANKR. P. 2019(a)

Brown Rudnick Berlack Israels LLP ("Brown Rudnick") and Manion McDonough & Lucas, P.C. (together with Brown Rudnick, "Counsel") hereby submit this fifth amended verified statement (the "Verified Statement") pursuant to Fed. R. Bankr. P. 2019(a), and respectfully state as follows:

1.      Brown Rudnick is a law firm that maintains offices at, among other locations, Seven Times Square, New York, New York 10036.

2.      Manion McDonough & Lucas, P.C. is a law firm that maintains offices at Suite 1414, 600 Grant Street, Pittsburgh, Pennsylvania 15219.

3.      Counsel appears in these above-captioned jointly administered cases (the "Chapter 11 Cases") on behalf of an *ad hoc* committee (the "*Ad Hoc* Lenders' Committee") of secured lenders to Le-Nature's, Inc. ("Le-Nature's"), whose members consist of the entities whose names and addresses are set forth on Exhibit A attached hereto.

4.      As of the date hereof, the members of the *Ad Hoc* Lenders' Committee hold or manage funds or accounts that hold, in the aggregate, $171,939,850 of the outstanding

indebtedness under that certain *Amended and Restated Credit Agreement* dated as of September 1, 2006 among Le-Nature's, Wachovia Bank, N.A. and certain other parties (the "Bank Debt"), representing approximately 62% of the outstanding principal amount of the Bank Debt. The amount of Bank Debt held as of the date hereof by each member of the *Ad Hoc* Lenders Committee, the dates on which an agreement to acquire such Bank Debt was entered, the price paid therefor, and any sales or other disposition thereof are identified on Exhibit A.

5.      In addition, as of the date hereof, the members of the *Ad Hoc* Lenders' Committee own or manage funds or accounts that own, in the aggregate, $70,000,000 of the 9% Senior Subordinated Notes due 2013 issued by Le-Nature's (the "Notes"), representing approximately 47% of the outstanding principal amount of the Notes. The amount of Notes held by each member of the *Ad Hoc* Lenders' Committee as of the date hereof, the dates on which an agreement to acquire such Notes was entered, the price paid therefor, and any sales or other disposition thereof are identified on Exhibit A.

6.      Counsel was approached on or around November 10, 2006 by the members of the *Ad Hoc* Lenders' Committee to represent them solely in connection with their Bank Debt holdings. Counsel holds no claims against or interests in the above-captioned Debtors.

7.      Counsel is empowered to act on behalf of the members of the *Ad Hoc* Lenders' Committee by the executed engagement letters attached hereto as Exhibit B.

8.      On November 20, 2006, Counsel filed the Verified Statement of Brown Rudnick Berlack Israels LLP and Manion McDonough & Lucas, P.C. Pursuant To Fed. R. Bankr. P. 2019(a).

9.     On or about December 14, 2006, Counsel filed the First Amended Verified Statement of Brown Rudnick Berlack Israels LLP and Manion McDonough & Lucas, P.C. Pursuant To Fed. R. Bankr. P. 2019(a).

10.     On or about February 21, 2007, Counsel filed the Second Amended Verified Statement of Brown Rudnick Berlack Israels LLP and Manion McDonough & Lucas, P.C. Pursuant To Fed. R. Bankr. P. 2019(a).

11.     On or about April 25, 2007, Counsel filed the Third Amended Verified Statement of Brown Rudnick Berlack Israels LLP and Manion McDonough & Lucas, P.C. Pursuant To Fed. R. Bankr. P. 2019(a).

12.     On or about May 29, 2007, Counsel filed the Fourth Amended Verified Statement of Brown Rudnick Berlack Israels LLP and Manion McDonough & Lucas, P.C. Pursuant To Fed. R. Bankr. P. 2019(a).

13.     Counsel will be compensated by the members of the *Ad Hoc* Lenders' Committee listed on Exhibit A.  However, *Ad Hoc* Lenders' Committee may request that Counsel's fees and disbursements be paid by the Debtors' estates pursuant to applicable provisions of the Bankruptcy Code.

14.     The undersigned hereby verifies that this Verified Statement is true and accurate, to the best of the undersigned's knowledge and belief.

3

15.    Counsel reserves the right to revise and supplement this Verified Statement.


Dated: Pittsburgh, Pennsylvania          MANION McDONOUGH & LUCAS, P.C.
       June 20, 2007

                                         /s/ James G. McLean
                                         James G. McLean
                                         600 Grant Street, Suite 1414
                                         Pittsburgh, PA 15219
                                         Telephone:    (412) 232-0200
                                         Facsimile:    (412) 232-0206

                                         -and-

                                         BROWN RUDNICK BERLACK ISRAELS LLP
                                         Edward S. Weisfelner (admitted *pro hac vice*)
                                         Robert J. Stark (admitted *pro hac vice*)
                                         Andrew Dash (admitted *pro hac vice*)
                                         Seven Times Square
                                         New York, NY 10036
                                         Telephone:    (212) 209-4800
                                         Facsimile:    (212) 209-4801

                                         Co-Counsel for the *Ad Hoc* Lenders' Committee

# 8162392

4

**EXHIBIT A**

| COMMITTEE MEMBER NAME AND ADDRESS | CLAIM INFORMATION | | | | |
| --- | --- | --- | --- | --- | --- |
| | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| **AURELIUS CAPITAL MANAGEMENT, LP** | BANK | 11/2/2006 | BUY | 3,000,000 | 0.2800 |
| 53 Forest Avenue, Suite 202 | BANK | 11/2/2006 | BUY | 2,000,000 | 0.3000 |
| Old Greenwich, CT 06870 | BANK | 11/2/2006 | BUY | 3,000,000 | 0.4000 |
| | BANK | 11/2/2006 | BUY | 1,000,000 | 0.4800 |
| | BANK | 11/3/2006 | BUY | 2,000,000 | 0.3400 |
| | BANK | 11/3/2006 | BUY | 2,000,000 | 0.3950 |
| | BANK | 11/3/2006 | BUY | 2,000,000 | 0.4000 |
| | BANK | 11/3/2006 | BUY | 4,000,000 | 0.4200 |
| | BANK | 11/6/2006 | BUY | 2,000,000 | 0.4500 |
| | BANK | 11/7/2006 | BUY | 2,000,000 | 0.4900 |
| | BANK | 11/7/2006 | BUY | 4,500,000 | 0.4925 |
| | BANK | 11/7/2006 | BUY | 2,000,000 | 0.5000 |
| | BANK | 11/13/2006 | SELL | 5,000,000 | 0.4500 |
| | BANK | 11/13/2006 | SELL | 5,000,000 | 0.4450 |
| | BANK | 11/14/2006 | SELL | 3,000,000 | 0.4650 |
| | BANK | 1/26/2007 | BUY | 2,000,000 | 0.5325 |
| | BANK | 1/26/2007 | BUY | 2,000,000 | 0.5350 |
| | **TOTAL BANK** | | | **20,500,000** | |
| | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| **BLACKROCK ADVISORS** | BANK | 9/12/2006 | BUY | 1,250,000 | 1.0000 |
| 40 East 52nd Street, 4th Floor | BANK | 11/1/2006 | SELL | 250,000 | 0.6800 |
| New York, NY 10022 | BANK | 9/12/2006 | BUY | 1,250,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 250,000 | 0.6800 |
| | BANK | 9/12/2006 | BUY | 1,500,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 300,000 | 0.6800 |

| COMMITTEE MEMBER NAME AND ADDRESS | CLAIM INFORMATION | | | |
|---|---|---|---|---|
| **BLACKROCK ADVISORS (CONTINUED)** | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| | BANK | 9/12/2006 | BUY | 1,500,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 400,000 | 0.6800 |
| | BANK | 9/12/2006 | BUY | 1,500,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 325,000 | 0.6800 |
| | BANK | 9/12/2006 | BUY | 1,500,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 400,000 | 0.6800 |
| | BANK | 2/6/2007 | SELL | 1,100,000 | 0.6000 |
| | BANK | 9/12/2006 | BUY | 1,500,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 400,000 | 0.6800 |
| | BANK | 1/16/2007 | SELL | 1,100,000 | 0.4700 |
| | BANK | 9/12/2006 | BUY | 1,250,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 275,000 | 0.6800 |
| | BANK | 9/12/2006 | BUY | 1,250,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 200,000 | 0.6800 |
| | BANK | 9/12/2006 | BUY | 500,000 | 1.0000 |
| | BANK | 11/1/2006 | SELL | 200,000 | 0.6800 |
| | **TOTAL BANK** | | | 7,800,000 | |
| **BOND STREET CAPITAL, LLC** | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| 700 Palisade Avenue | BANK | 11/1/2006 | BUY | 3,000,000 | 0.6700 |
| Englewood Cliffs, NJ 07632 | BANK | 11/1/2006 | BUY | 2,000,000 | 0.6500 |
| | BANK | 11/1/2006 | BUY | 5,000,000 | 0.6800 |
| | BANK | 11/2/2006 | BUY | 5,000,000 | 0.3025 |
| | BANK | 11/2/2006 | BUY | 2,500,000 | 0.4200 |
| | **TOTAL BANK** | | | 17,500,000 | |
| **DEUTSCHE BANK SECURITIES, INC.** | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| 60 Wall Street | BANK | 11/1/2006 | BUY | 2,000,000 | 0.3800 |
| New York, NY 10005 | BANK | 11/1/2006 | BUY | 1,000,000 | 0.3050 |
| | BANK | 11/1/2006 | BUY | 1,000,000 | 0.3100 |
| | BANK | 11/1/2006 | BUY | 2,000,000 | 0.4500 |

| COMMITTEE MEMBER NAME AND ADDRESS | CLAIM INFORMATION | | | | |
|---|---|---|---|---|---|
| DEUTSCHE BANK SECURITIES, INC. (CONTINUED) | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| | BANK | 11/1/2006 | BUY | 3,000,000 | 0.3100 |
| | BANK | 11/1/2006 | SELL | 500,000 | 0.3500 |
| | BANK | 11/1/2006 | SELL | 2,000,000 | 0.3400 |
| | BANK | 11/1/2006 | SELL | 2,000,000 | 0.3500 |
| | BANK | 11/1/2006 | SELL | 1,000,000 | 0.3300 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.5200 |
| | BANK | 11/2/2006 | BUY | 5,000,000 | 0.2300 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.3800 |
| | BANK | 11/2/2006 | BUY | 5,000,000 | 0.2900 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.5000 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.5100 |
| | BANK | 11/2/2006 | SELL | 2,500,000 | 0.4200 |
| | BANK | 11/2/2006 | SELL | 500,000 | 0.2400 |
| | BANK | 11/2/2006 | SELL | 2,000,000 | 0.5300 |
| | BANK | 11/2/2006 | SELL | 2,000,000 | 0.2500 |
| | BANK | 11/2/2006 | SELL | 1,000,000 | 0.5300 |
| | BANK | 11/2/2006 | SELL | 2,000,000 | 0.4500 |
| | BANK | 11/6/2006 | SELL | 6,500,000 | 0.4300 |
| | BANK | 11/7/2006 | BUY | 2,000,000 | 0.4800 |
| | BANK | 11/7/2006 | BUY | 1,000,000 | 0.4900 |
| | BANK | 11/7/2006 | SELL | 4,500,000 | 0.4925 |
| | BANK | 11/7/2006 | SELL | 2,000,000 | 0.4900 |
| | BANK | 11/13/2006 | BUY | 5,000,000 | 0.4450 |
| | BANK | 11/13/2006 | SELL | 5,000,000 | 0.4500 |
| | BANK | 11/16/2006 | SELL | 1,500,000 | 0.4300 |
| | BANK | 11/30/2006 | BUY | 2,000,000 | 0.4300 |
| | BANK | 12/14/2006 | SELL | 1,000,000 | 0.4000 |
| | TOTAL BANK | | | 1,000,000 | |

3

| COMMITTEE MEMBER NAME AND ADDRESS | CLAIM INFORMATION | | | | |
|---|---|---|---|---|---|
| | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| **HARBINGER CAPITAL PARTNERS**<br>555 Madison Avenue, 16th Floor<br>New York, NY 10022 | BANK | 11/01/06 | BUY | 12,500,000 | 0.7500 |
| | BANK | 11/01/06 | BUY | 5,000,000 | 0.7000 |
| | BANK | 11/01/06 | BUY | 6,000,000 | 0.7000 |
| | BANK | 11/01/06 | BUY | 2,000,000 | 0.6900 |
| | BANK | 11/01/06 | BUY | 1,000,000 | 0.7000 |
| | BANK | 11/01/06 | BUY | 2,000,000 | 0.6800 |
| | BANK | 11/01/06 | BUY | 2,000,000 | 0.7000 |
| | BANK | 11/01/06 | BUY | 2,000,000 | 0.6950 |
| | BANK | 11/01/06 | BUY | 2,000,000 | 0.7000 |
| | BANK | 11/01/06 | BUY | 2,000,000 | 0.7000 |
| | BANK | 11/01/06 | BUY | 5,000,000 | 0.3000 |
| | BANK | 11/02/06 | BUY | 3,000,000 | 0.2400 |
| | BANK | 11/02/06 | BUY | 2,000,000 | 0.2700 |
| | BANK | 11/02/06 | BUY | 2,000,000 | 0.2800 |
| | BANK | 11/02/06 | BUY | 7,000,000 | 0.3000 |
| | BANK | 11/02/06 | BUY | 2,000,000 | 0.3100 |
| | BANK | 11/02/06 | BUY | 2,000,000 | 0.3200 |
| | BANK | 11/03/06 | BUY | 2,000,000 | 0.3600 |
| | BANK | 11/03/06 | BUY | 2,000,000 | 0.3800 |
| | BANK | 11/03/06 | BUY | 1,000,000 | 0.4100 |
| | BANK | 11/03/06 | BUY | 5,000,000 | 0.4350 |

4

**COMMITTEE MEMBER NAME AND ADDRESS** — **CLAIM INFORMATION**

**HARBINGER CAPITAL PARTNERS (CONTINUED)**

| Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
|---|---|---|---|---|
| BANK | 11/03/06 | BUY | 3,000,000 | 0.4300 |
| BANK | 11/03/06 | BUY | 1,000,000 | 0.3800 |
| BANK | 11/06/06 | BUY | 3,000,000 | 0.4350 |
| BANK | 11/06/06 | BUY | 6,500,000 | 0.4300 |
| BANK | 11/08/06 | BUY | 3,000,000 | 0.4300 |
| BANK | 11/13/06 | BUY | 2,000,000 | 0.4600 |
| BANK | 11/13/06 | BUY | 5,000,000 | 0.4500 |
| BANK | 11/3/06 | BUY | 650,000 | 0.4100 |
| **TOTAL BANK** | | | **93,000,000** | |
| NOTES | 11/1/06 | BUY | 15,975,000 | 0.7500 |
| NOTES | 11/1/06 | BUY | 11,120,000 | 0.7000 |
| NOTES | 11/1/06 | BUY | 15,000,000 | 0.6500 |
| NOTES | 11/1/06 | BUY | 12,870,000 | 0.4100 |
| NOTES | 11/1/06 | BUY | 1,000,000 | 0.3000 |
| NOTES | 11/1/06 | BUY | 2,000,000 | 0.3100 |
| NOTES | 11/1/06 | BUY | 9,590,000 | 0.2800 |
| NOTES | 11/1/06 | BUY | 2,000,000 | 0.2400 |
| NOTES | 11/1/06 | BUY | 1,000,000 | 0.2200 |
| NOTES | 11/3/06 | BUY | 2,000,000 | 0.0900 |
| NOTES | 11/3/06 | BUY | 2,000,000 | 0.0900 |
| NOTES | 11/3/06 | BUY | 2,000,000 | 0.0950 |
| NOTES | 11/21/06 | SELL | 6,555,000 | 0.129375 |
| **TOTAL NOTES** | | | **70,000,000** | |

5

| COMMITTEE MEMBER NAME AND ADDRESS | CLAIM INFORMATION | | | | |
|---|---|---|---|---|---|
| **LATIGO PARTNERS, L.P.** | **Debt Type** | **Trade Date** | **Activity** | **Face Amount ($)** | **Price (per $)** |
| 590 Madison Avenue, 9th Floor | BANK | 11/10/2006 | BUY | 2,275,000 | 0.4400 |
| New York, NY 10022 | BANK | 1/10/2007 | BUY | 3,250,000 | 0.4525 |
| | BANK | 11/10/2006 | BUY | 2,000,000 | 0.4400 |
| | BANK | 11/10/2006 | BUY | 1,984,850 | 0.4400 |
| | BANK | 1/10/2007 | BUY | 1,980,000 | 0.4525 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.3300 |
| | BANK | 11/6/2006 | BUY | 2,000,000 | 0.4700 |
| | BANK | 1/9/2007 | BUY | 2,000,000 | 0.4375 |
| | BANK | 2/13/2007 | BUY | 2,000,000 | 0.6000 |
| | BANK | 3/14/2007 | BUY | 2,000,000 | 0.66375 |
| | **TOTAL BANK** | | | **21,489,850** | |
| **ORE HILL PARTNERS LLC** | **Debt Type** | **Trade Date** | **Activity** | **Face Amount ($)** | **Price (per $)** |
| 650 Fifth Avenue, 9th Floor | BANK | 11/1/2006 | BUY | 1,500,000 | 0.3600 |
| New York, NY 10019 | BANK | 11/2/2006 | SELL | 2,000,000 | 0.5400 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.5450 |
| | BANK | 11/6/2006 | BUY | 2,000,000 | 0.4700 |
| | BANK | 11/1/2006 | BUY | 2,000,000 | 0.3500 |
| | BANK | 11/2/2006 | BUY | 2,000,000 | 0.3300 |
| | BANK | 11/2/2006 | BUY | 1,500,000 | 0.4800 |
| | BANK | 11/13/2006 | SELL | 2,000,000 | 0.4550 |
| | BANK | 11/28/2006 | SELL | 1,500,000 | 0.4200 |
| | BANK | 11/30/2006 | SELL | 2,000,000 | 0.4300 |

| COMMITTEE MEMBER NAME AND ADDRESS | CLAIM INFORMATION | | | | |
|---|---|---|---|---|---|
| | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| **ORE HILL PARTNERS LLC (CONTINUED)** | BANK | 1/25/2007 | SELL | 1,500,000 | 0.5150 |
| | BANK | 2/2/2007 | SELL | 1,500,000 | 0.5700 |
| | BANK | 11/1/2006 | BUY | 1,500,000 | 0.3600 |
| | **TOTAL BANK** | | | **500,000** | |
| **RZB FINANCE LLC** 1133 Avenue of the Americas New York, NY 10036 | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| | BANK | 9/20/2006 | BUY | 1,000,000 | 1.000 |
| | BANK | 9/20/2006 | BUY | 650,000 | 1.000 |
| | **TOTAL BANK** | | | **1,650,000** | |
| **SCHULTZE ASSET MANAGEMENT, LLC** 3000 Westchester Avenue Purchase, NY 10577 | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| | BANK | 11/2/2006 | BUY | 200,000 | 0.3633 |
| | BANK | 11/2/2006 | BUY | 133,000 | 0.5300 |
| | BANK | 11/2/2006 | BUY | 2,800,000 | 0.3633 |
| | BANK | 11/2/2006 | BUY | 1,867,000 | 0.5300 |
| | **TOTAL BANK** | | | **5,000,000** | |
| **WHITE HORSE CAPITAL PARTNERS, L.P.** 200 Crescent Court, Suite 1414 Dallas, TX 75201 | Debt Type | Trade Date | Activity | Face Amount ($) | Price (per $) |
| | BANK | 9/8/2006 | BUY | 2,000,000 | 1.0000 |
| | BANK | 11/27/2006 | SELL | 1,000,000 | 0.4200 |
| | BANK | 9/8/2006 | BUY | 2,000,000 | 1.0000 |
| | BANK | 11/27/2006 | SELL | 1,000,000 | 0.4200 |
| | BANK | 9/8/2006 | BUY | 2,500,000 | 1.0000 |
| | BANK | 11/27/2006 | SELL | 1,000,000 | 0.4200 |
| | **TOTAL BANK** | | | **3,500,000** | |

7

# 8162376



ROBERT J. STARK
direct dial: (212) 209-4862
rstark@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

November 20, 2006

To: Members of *Ad Hoc* Committee of Le-Nature's, Inc. Secured Lenders

Re:    In re Le-Nature's, Inc. - Terms of Engagement

Ladies and Gentlemen:

We are pleased that you have engaged Brown Rudnick Berlack Israels LLP ("Brown Rudnick") in your capacity as members of an *ad hoc* committee of secured lenders of Le-Nature's, Inc. (the "*Ad Hoc* Committee"). This letter is intended to set forth the basis on which Brown Rudnick will provide legal services to the *Ad Hoc* Committee, the scope of such services and the terms on which we will perform them.

### Scope of Engagement.

We have agreed to represent the *Ad Hoc* Committee, as of November 10, 2006 (the "Effective Date"), in connection with its members' (the "Members") interests as secured bank debt holders of Le-Nature's, Inc. ("Le-Nature's"). It is presently contemplated that this engagement shall include representation of the *Ad Hoc* Committee in the Le-Nature's bankruptcy proceedings and in any litigation commenced by the *Ad Hoc* Committee arising from their holdings of Le-Nature's bank debt. It is understood that, in connection with this engagement, Brown Rudnick will represent the *Ad Hoc* Committee as a whole, and not any of its individual Members, which such individual Members may retain individual counsel, in their discretion.

### Primary Responsibility/Staffing.

Edward Weisfelner and I will be the attorneys principally responsible for your representation, but we will be assisted on a day-to-day basis by our partners William Dolan and Andrew Dash. From time to time, Mr. Weisfelner or I may ask other Brown Rudnick attorneys and paralegals to assist us as necessary to meet our agreed upon objectives, or to take advantage of special expertise. If, at any time, you have questions, concerns, or criticism concerning our staffing or performance, please contact Mr. Weisfelner or me at once. We will determine which attorneys or paralegals to assign to various tasks so that each attorney's and paralegal's expertise and experience will be at the level most appropriate for the particular task.

### Fees and Expenses.

Fees for our services will be based on the time expended by each attorney and paralegal (including personnel we may temporarily engage) on your matter, multiplied by that lawyer's or paralegal's hourly rate. Each attorney and paralegal is assigned a particular hourly rate determined generally by the experience of such attorney or paralegal and the level of expertise in a particular field of law. Currently, our hourly rates for partners vary from $505 to $870, for associates from $215 to $540, and for paralegals from $175 to $255. Other staff hourly rates



range from $100 to $225. Mr. Weisfelner's current hourly rate is $870, and my current hourly rate is $635. These hourly rates are subject to change on a periodic basis, usually in September of each year. Brown Rudnick will send you reasonable notices of adjustments in hourly rates before they occur. Enclosed is a list of some of the more common expenses and the basis on which we will bill you for them.

We will bill you for all reasonable costs and expenses we incur on your behalf during the course of the engagement. We reserve the right to bill you in advance for reasonable costs and expenses to be incurred on your behalf, and we reserve the right to defer performing legal services on your behalf until receipt of these funds. In the event we believe it necessary to retain additional counsel in order to properly execute this engagement, including, without limitation, local Pennsylvania counsel, we will obtain your prior consent to same and, thereafter, will include fees and expenses related to such retention as an expense line item (with detailed backup) on our invoices to you, although it is understood that the responsibility for such invoices shall be borne by the *Ad Hoc* Committee (not Brown Rudnick), and the *Ad Hoc* Committee will be the client (not Brown Rudnick) for all such engagements. Brown Rudnick agrees to take reasonable actions under the Bankruptcy Code and applicable law to have its fees, costs and expenses paid and/or reimbursed, as applicable, by Le-Nature's bankruptcy estate and/or other parties, and to the extent successful will reimburse you for any fees, costs and expenses which you have paid to Brown Rudnick in respect of this engagement, either in full or on a pro rata basis, as applicable.

In order to apportion its hourly fees and expenses among the Members, Brown Rudnick will divide the full amount of each invoice among the Members on a pro rata basis determined by each Member's pro rata percentage of all bank debt which we have been advised are owned by the Members ("Pro Rata Share") as of close of business on November 15, 2006, subject to monthly adjustments, as specifically set forth below. If any Member withdraws from the *Ad Hoc* Committee or fails to pay its share of fees and expenses, the remaining Members' share of Brown Rudnick's fees and expenses shall be recalculated to ensure that the remaining Members are responsible for the full amount of Brown Rudnick's fees and expenses.

By the tenth day of each month hereafter, each Member will advise Brown Rudnick the amount of its bank debt holdings as of the first of the month. Brown Rudnick will use such updated holdings information to recalculate each Member's Pro Rata Share for that month. Brown Rudnick's invoice for that month will be apportioned to each Members in accordance with that month's updated Pro Rata Share.

We ask that the Members deposit with us their Pro Rata Share of an up-front $100,000 retainer (the "Retainer"). The Retainer will be deposited and serve as security for the payment of any future invoices.

Our bills to you will be rendered not more often than every two weeks and not less often than every thirty (30) days. We will charge the Retainer five (5) days after the date of any invoice.



Whenever possible, we will provide you with an estimate of our fees and disbursements that you may incur, based on our best judgment. Such estimates, however, are by their nature inexact and are not intended to be binding upon Brown Rudnick.

*Conflict of Interest and Waiver.*

Nothing contained herein shall prevent any Member from withdrawing from the *Ad Hoc* Committee at any time, or from discontinuing its affiliation with the *Ad Hoc* Committee, subject only to fulfillment of such Member's funding obligation as set forth herein up through the effective date of such withdrawal. In the event of any withdrawals or if new Members join the *Ad Hoc* Committee or existing Members change the amount of their bank debt holdings, Brown Rudnick shall recalculate the percentages applicable to Members based on the above-described formula. New Members will be responsible for monthly Pro Rata Shares retroactive to the commencement of Brown Rudnick's engagement and will be required to make an initial payment in an amount necessary to fund their Pro Rata Share of Brown Rudnick invoices rendered prior to the new Member joining the *Ad Hoc* Committee (the "Catch-Up Payment"); provided, however, that a new Member shall not be required to make a Catch-Up Payment respecting bank debt acquired from a pre-existing Member that is current on its obligations under this Agreement respecting such debt. Brown Rudnick will remit all Catch-Up Payments to the Members in accordance with their monthly Pro Rata Shares.

Similar to this engagement, Brown Rudnick is frequently engaged by various parties in commercial lending; insolvency; debt and capital restructuring; trading bank debt, trade claims and other types of obligations; bankruptcy, or creditors' rights matters and litigations concerning such matters, including representing committees (both ad hoc and official) of bondholders, unsecured creditors, equity holders and others (collectively, the "Other Parties"). This letter will confirm our mutual agreement that Brown Rudnick may represent Other Parties, whether or not on a basis adverse to the *Ad Hoc* Committee or any Member (including, without limitation, as any Member may be an agent or a lender in a syndicate of lenders), in pre-existing matters unrelated to this engagement. The *Ad Hoc* Committee and each Member agrees that it will not assert that Brown Rudnick's representation of the *Ad Hoc* Committee as a basis for disqualifying Brown Rudnick from representing Other Parties in pre-existing matters unrelated to this engagement, and agrees that such representation does not constitute a breach of duty. Subject to Brown Rudnick's adherence to its agreement not to disclose any confidential information or use confidential information for another party's benefit without a Member's consent, each Member will not for itself or any other parties assert that Brown Rudnick's possession of such information is a basis for disqualifying Brown Rudnick from representing Other Parties in matters unrelated to this engagement, or constitutes a breach of any duty owed by Brown Rudnick. Whenever the rules of ethical conduct to which Brown Rudnick is bound require a conflict waiver of the *Ad Hoc* Committee, this letter will constitute such a waiver as to matters pre-existing on the Effective Date. No conflict waiver shall be deemed to have been granted as to future matters, although each Member agrees that if such a waiver is later requested, that its consent to same will not be unreasonably withheld.

Brown Rudnick is also frequently engaged by various parties that buy and sell bank debt ("distressed" and "par/near par") as well as debt instruments of various kinds (collectively, "Other Debt-Trading Clients"). This letter confirms our mutual agreement that Brown Rudnick



may represent Other Debt-Trading Clients in such activities, whether or not any Member may be in the chain of title with respect to any particular subject indebtedness ("upstream" or "downstream"). The *Ad Hoc* Committee and each Member agrees: (i) that it will not, on its own behalf or for any fund or other person or entity, assert Brown Rudnick's representation of the *Ad Hoc* Committee as a basis for disqualifying Brown Rudnick from representing Other Debt-Trading Clients, and (ii) that such representation, in and of itself, does not constitute a breach of duty.

### *Other Issues.*

Subject to ethical rules by which we are bound, we reserve the right to withdraw from the engagement described in this letter at any time, but barring unusual circumstances we will discuss such withdrawal with you before doing so and expect to do so only if there are good reasons for such withdrawal, such as non-payment of fees, significant differences between our professional judgment and your judgment, or concerns which may arise under the ethical rules by which we are bound. Notwithstanding the above, it is expressly understood and acknowledged that Brown Rudnick may withdraw from this engagement if its fees and expenses are not paid in accordance with the terms of this letter. In the event Brown Rudnick withdraws from this engagement, we will have no obligation to find replacement counsel, although Brown Rudnick will reasonably cooperate with any replacement counsel.

Brown Rudnick can provide communications in various modes, depending upon your requirements. In addition to the telephone and fax numbers listed on our letterhead, each attorney has an electronic mail address. It may be accessed from mail accounts on the Internet and other electronic networks. These communication services, including fax, are used with your understanding that while our firm will use appropriate measures to protect client confidentiality, these mediums may be subject to security risks. Should you not wish our firm to use any of the above methods, you agree to immediately advise us of such in writing, and our firm will use the communications services you specify. We will prepare a contact list of all Members and Brown Rudnick professionals working on this engagement and distribute such list to you.

At the end of the engagement, our policy is to return to you the originals of all documents and other materials that you might have supplied to us. Our policy is to destroy client files at various times after the completion of matters, normally after two (2) years, unless otherwise notified by you.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

BANK:            EASTERN BANK
ABA:             011301798
CITY:            LYNN
STATE:           MASSACHUSETTS
ACCOUNT #:       600242556
ACCOUNT NAME:    BROWN RUDNICK BERLACK ISRAELS
                 LLP CLIENT TRUST FUND
ATTORNEY NAME:   Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: RZB Finance LLC

By _____

Name:  **JOHN A. VALISKA**          DAN DOBRJANSKYJ
Title: First Vice President           VICE PRESIDENT

Dated: 2/9/07

$1,650,000.⁰⁰/ₓₓ
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _____

By: _____

Name: SCOTT MARTIN

Title: MANAGING DIRECTOR

Dated: 12/4/06

$2 million
_____
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _LA TICO PARTNERS, L.P._

By: _Paul Mill_

Name: PAUL MILLER

Title: Le Natures

Dated: 11/29/06

_$10 million_

Bank Debt Holdings (Face Amount in USD)

If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

|  |  |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so. .

Very truly yours,

**BROWN RUDNICK BERLACK ISRAELS LLP**

By: _____
        Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member:   Harbinger Capital Partners Master Fund I, Ltd.

By: Harbinger Capital Partners Offshore Manager, L.L.C., as investment manager

By: _____
    Name:     Philip A. Falcone
    Title:      Senior Managing Director

Dated: November 21, 2006

$ 93,000,000.⁰⁰/₀₀

Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS |
| | LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: AURELIUS CAPITAL MANAGEMENT, LP, for itself and its managed funds

By: _____

Name: Mark D. Brodsky, Chairman

Title:

Dated: November 30, 2006

$16.5MM

Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

BANK:              EASTERN BANK
ABA:               011301798
CITY:              LYNN
STATE:             MASSACHUSETTS
ACCOUNT #:         600242556
ACCOUNT NAME:      BROWN RUDNICK BERLACK ISRAELS
                   LLP CLIENT TRUST FUND
ATTORNEY NAME: Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Schultze Asset Management, LLC_
                              (on behalf of
                              various client
                              accounts.)
By: _____
Name:
Title: George Schultze
       Managing Member

Dated: _4/27/06_____

_____$5.0 million_____
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | .011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: Whitebox Capital Partners, L.P.

By: _____

Name: _____
Title: _____

Dated: 11/21/06

$65mm
Bank Debt Holdings (Face Amount in USD)

11/20/2006  13:41    2015675050    BOND STREET CAPITAL    PAGE 02/02



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter.  This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members.  Our wire instructions are as follows:

|  |  |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me.  We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

    Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: Bond Street Capital, LLC/
                VBS Willow Fund, LLC

By: _____
    Name: Nicholas DeLeonardis
    Title: Authorized Signatory

Dated: 11/21/06

    17,500,000
_____
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
        Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: Senior Loan Portfolio

By: _____

Name:

Title: Philip J. Brendel
        Authorized Signatory

Dated: 12/4/06

$300,000.00
_____
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

BANK:            EASTERN BANK
ABA:             011301798
CITY:            LYNN
STATE:           MASSACHUSETTS
ACCOUNT #:       600242556
ACCOUNT NAME:    BROWN RUDNICK BERLACK ISRAELS
                 LLP CLIENT TRUST FUND
ATTORNEY NAME:   Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
        Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Missouri State Employees' Retirement System_

By: _____
Name:        Philip Y. Bresdel
Title:       Authorized Signatory

Dated: _12/4/06_

$ _975,000.00_
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

|  |  |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Magnetite VCLO, Limited_

By: _____
Name: Philip J. Brendel
Title: Authorized Signatory

Dated: _12/4/06_

$ _1,050,000.00_
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

> **BANK:** EASTERN BANK
> **ABA:** 011301798
> **CITY:** LYNN
> **STATE:** MASSACHUSETTS
> **ACCOUNT #:** 600242556
> **ACCOUNT NAME:** BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND
> **ATTORNEY NAME:** Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Flagship IV CLO, limited_

By: _____

Name:

Title: Philip J. Brendel
Authorized Signatory

Dated: _12/4/06_

$1,100,000.00

Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

BANK:             EASTERN BANK
ABA:              011301798
CITY:             LYNN
STATE:            MASSACHUSETTS
ACCOUNT #:        600242556
ACCOUNT NAME:     BROWN RUDNICK BERLACK ISRAELS
                  LLP CLIENT TRUST FUND
ATTORNEY NAME:    Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
    Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Granite Finance Limited_

By: _Philip J Brendel_

Name:
Title:            Philip J. Brendel
                  Authorized Signatory

Dated: _12/4/06_

_$ 1,100,000 00_
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Black Rock Senior Income Series III_

By: _____

Name: _____  Phillip J. Brendel
Title: _____  Authorized Signatory

Dated: _12/4/06_____

_$1,175,000.00_____
Bank Debt Holdings (Face Amount in USD)

Dec-04-06  06:23pm    From-BLACKROCK HIGH YIELD              +2127549756          T-864   P.07/10   F-026



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242356 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Lo-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _BlackRock Ship-Income Series II____

By: _____

Name: Philip J. Brendel

Title: Authorized Signatory

Dated: 12/4/06___

$/ 100,000 00
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

| | |
|---|---|
| BANK: | EASTERN BANK |
| ABA: | 011301798 |
| CITY: | LYNN |
| STATE: | MASSACHUSETTS |
| ACCOUNT #: | 600242556 |
| ACCOUNT NAME: | BROWN RUDNICK BERLACK ISRAELS LLP CLIENT TRUST FUND |
| ATTORNEY NAME: | Edward S. Weisfelner/Le-Nature's |

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Black Rock Snr-Inves Sies_

By: _____

Name: Philip J. Brendel
Title: Authorized Signatory

Dated: _12/4/06_

_1,200,000._
Bank Debt Holdings (Face Amount in USD)

Dec-04-06  08:24pm    From-BLACKROCK HIGH YIELD                    +2127548756              T-964  P.09/10  F-026



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

BANK:            EASTERN BANK
ABA:             011301798
CITY:            LYNN
STATE:           MASSACHUSETTS
ACCOUNT #:       600242556
ACCOUNT NAME:    BROWN RUDNICK BERLACK ISRAELS
                 LLP CLIENT TRUST FUND
ATTORNEY NAME: Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
       Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: _Black Rock Limited Duration Trust_

By: _____
    Name: _____  Philip J. Brendel
    Title:         Authorized Signatory

Dated: _12/4/06_

$ _1,000,000.00_
Bank Debt Holdings (Face Amount in USD)



If the foregoing correctly reflects our understanding, please sign, date, and return to me the enclosed copy of this letter. This agreement shall become effective upon our receipt of signed counterparts hereof from each of the Members. Our wire instructions are as follows:

BANK:                EASTERN BANK
ABA:                 011301798
CITY:                LYNN
STATE:               MASSACHUSETTS
ACCOUNT #:           600242556
ACCOUNT NAME:        BROWN RUDNICK BERLACK ISRAELS
                     LLP CLIENT TRUST FUND
ATTORNEY NAME: Edward S. Weisfelner/Le-Nature's

If you have any questions regarding this engagement letter or any aspects of our representation, please do not hesitate to call me. We look forward to representing you and are pleased that you have chosen us to do so.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____

Robert J. Stark

CONSENTED AND AGREED TO:

Name of Member: Black Rock Global Floating Rate Income Trust

By: _____

Name:                    Philip J. Brendel
Title:                   Authorized Signatory

Dated: 12/4/06

$ 1,000,000.00
Bank Debt Holdings (Face Amount in USD)



| BROWN RUDNICK BERLACK ISRAELS LLP | |
|---|---|
| *Schedule of Disbursement Charges* | |
| **TYPE** | **RATE** |
| Photocopying or Laser Printing Oversized/Color Copies or Color Laser Printing | 25¢  per page $1.25 per page |
| Telecopy | $2.00 per page |
| Binding | $3.00 11¢ per tab 20¢ per pocket |
| Federal Express | $30.00  minimum |
| Secretarial Overtime | $60.00  per hour for time and one half $80.00  per hour for double time |
| Paralegal Overtime | $30.00  per hour for time and one half $40.00  per hour for double time |
| Document Production Services | $50.00  per hour |
| Imaging Costs | **Electronic Binder:** Document Imaging 29¢ per page Document Indexing $1.75 per bookmark Oversized Documents $1.80 per document Master CD $60.00 Additional Copies $30.00 each  **Summation:** Single TIF Imaging 11¢ each Single TIF OCR 3¢ each TIF to PDF conversion 5¢ each |
| Mileage Allowances | 44.5¢  per mile |
| Outgoing Long Distance Telephone | 34¢ per minute |
| Lexis/Westlaw or other document retrieval | Usage Charge as assessed by Service Provider[1] |
| Messenger Services | $20 minimum |
| Postage | Actual Cost |
| Taxi Services | Actual Cost |
| Supplies | Actual Cost |
| Food Services | Actual Cost |
| Travel Expenses | Actual Cost |
| Corporate Watch and Profile Services | **News Watch email alerts:** Weekly @ $50 per week; Daily @ $45 per day **New Corporate Profile Web Page:** $300 one time setup **Corporate Profile Page Maintenance:** $115 per monthly update |

---

[1] The Firm may benefit from a different, bulk pricing formula.

MANION McDONOUGH & LUCAS, P.C.
ATTORNEYS AT LAW

600 GRANT STREET
SUITE 1414
PITTSBURGH, PENNSYLVANIA 15219-2702

(412) 232-0200

FAX (412) 232-6655

November 22, 2006

Robert J. Stark, Esquire
BROWN RUDNICK BERLACK ISRAELS LLP
Seven Times Square
New York, NY 10036

Re:    Le-Nature's, Inc.: Engagement Letter - Manion McDonough & Lucas, P.C.

Dear Mr. Stark:

      In accordance with our standard practice for retention by new clients, this letter will confirm the terms on which we have agreed to undertake representation as co-counsel to the ad hoc committee of secured lenders of Le-Nature's, Inc., the members of which are listed on Exhibit A as of the date of this letter (the "Ad Hoc Committee"):

      1.    We have been engaged to represent the Ad Hoc Committee as co-counsel with Brown Rudnick Berlack Israels LLP ("Brown Rudnick") in the bankruptcy case of Le-Nature's, Inc. pending in the United States Bankruptcy Court for the Western District of Pennsylvania and related matters. We are being retained as Pennsylvania counsel as contemplated in the Terms of Engagement of Brown Rudnick dated November 20, 2006, and the retention of our Firm has been approved by the members of the Ad Hoc Committee. It is presently contemplated that this engagement shall include representation of the Ad Hoc Committee in the Le-Nature's bankruptcy proceedings and in any litigation commenced by the Ad Hoc Committee arising from their holdings of Le-Nature's bank debt. The Ad Hoc Committee will be our client and is responsible for payment of our fees and expenses. We understand that this engagement does not establish an attorney-client relationship between us and Brown Rudnick and that Brown Rudnick is not responsible for payment of our invoices. It is understood that, in connection with this engagement, we will represent the Ad Hoc Committee as a whole, and not any of its individual Members, which such individual Members may retain individual counsel, in their discretion.

      2.    Our charges for legal services provided to the Ad Hoc Committee will be based upon an hourly rate. The services required will be provided by me and other attorneys of our Firm who practice in the bankruptcy area, assisted, if and when appropriate, by other members of our Firm. My current hourly rate is $350 an hour and the hourly rate of other members of our Firm range between $225 and $425 an hour. The hourly rate for our paralegals is $98 an hour. Rates are subject to adjustment from time to time (usually annually).

MANION McDONOUGH & LUCAS, P.C.
November 22, 2006
Page 2

3.    Our standard policy for clients on matters such as this requires an advance payment of a $50,000 retainer. Invoices for services rendered by us will be forwarded monthly to Brown Rudnick for inclusion on the bills and statements sent to the *Ad Hoc* Committee by Brown Rudnick and are payable by the *Ad Hoc* Committee in full within 30 days of receipt in accordance with each members' pro rata share as determined in accordance with the Brown Rudnick Terms of Engagement dated November 20, 2006. (Obviously, the *Ad Hoc* Committee is not in any manner precluded from asking questions or seeking adjustments on an invoice if appropriate). At the conclusion of our engagement, the $50,000 retainer will be subtracted from a final bill with a corresponding invoice or a refund (depending upon the amount of the final bill).

4.    In addition to charges for legal services, we will charge for expenses relating to photocopying, litigation filing fees (if any), travel expenses, delivery charges and telephone and fax charges. It is our policy to charge for individual items such as postage, telephone calls, etc. only to the extent that they exceed $2 per item.

5.    The provisions of the Brown Rudnick Terms of Engagement relating to "Conflict of Interest and Waiver" and "Other Issues" are applicable to the engagement of our Firm as well, except to the extent they relate to functions not being performed by our Firm (*e.g.*, collection and remittance of Catch-Up Payments).

Assuming the above meets with your approval, please have this retention letter singed by Brown Rudnick in its representative capacity under the Brown Rudnick Terms of Engagement and return it to me. Our wire instructions for the payment of the retainer are:

> Manion McDonough & Lucas, P.C.
> ABA # 043000096
> PNC Bank
> US Steel Tower, Pittsburgh, PA 15219
> Account # 2712677
> Att: Diane (412) 232-0200

This agreement shall become effective upon our receipt of a signed copy of the letter and our receipt of the retainer.

Very truly yours,

MANION McDONOUGH & LUCAS, P.C.

By
    James G. McLean

JGM:jp

MANION MCDONOUGH & LUCAS, P.C.
November 22, 2005
Page 3

APPROVED:

cc: Members of Ad Hoc Committee of Le-Nature's, Inc. Secured Lenders

**Exhibit A**
**Members of the Ad Hoc Committee of Le-Nature's, Inc. Secured Lenders**

| | |
|---|---|
| Aurelius Capital Management, LP<br>53 Forest Avenue, Suite 202<br>Old Greenwich, CT 06870 | Luc Dowling<br>Email: mbrodsky@aurelius-capital.com<br><br>Mark Brodsky<br>Email: mbrodsky@aurelius-capital.com |
| Blackrock Advisors<br>40 East 52nd Street, 4th Floor<br>New York, NYU 10022 | Mark Williams<br>Email: mark.williams@blackrock.com<br><br>Phil Brendel<br>Email: philip.brendel@blackrock.com |
| Bond Street Capital, LLC<br>700 Palisade Avenue<br>Englewood Cliffs, NJ 07632 | Nick DeLeonardis<br>Email: nd@bondstreetcap.com |
| The Carlyle Group<br>520 Madison Avenue, 41st Floor<br>New York, NY 10022 | Vivek Bommi<br>Email: vivek.bommi@carlyle.com<br><br>Jeffrey Ferguson<br>Email: jeffrey.ferguson@carlyle.com |
| Deutsche Bank Securities, Inc.<br>60 Wall Street<br>New York, NY 10005 | Mayur Lakhani<br>Email: mayor.lakhani@db.com<br><br>Matt Doheny<br>Email: matthew.doheny@db.com<br><br>C.J. Lankree<br>Email: charles.l.lankree@db.com |
| Goldentree Asset Management LLC<br>300 Park Avenue, 25th<br>New York, NY 10022 | Noah Charney<br>Email: ncharney@goldentree.com |
| Harbinger Capital Partners<br>555 Madison Avenue, 16th Floor<br>New York, NY 10022 | Scott Tillman<br>Email: stillman@harbingercap.net<br><br>Jeff Kirshner<br>Email: jkirshner@harbingercap.net<br><br>Philip Falcone<br>Email: pfalcone@harbingercap.net |

| Latigo Partners, L.P.<br>590 Madison Avenue, 9th Floor<br>New York, NY 10022 | Stephen Blauner<br>Email: stephen.blauner@latigopartners.com<br><br>Paul Malek<br>Email: paul.malek@latigopartners.com |
|---|---|
| One East Capital Advisors, L.P.<br>1 East 57th Street, 10th Floor<br>New York, NY 10022 | Sina Tousei<br>Email: sina@oneeastcap.com |
| Ore Hill Partners LLC<br>650 Fifth Avenue, 9th Floor<br>New York, NY 10019 | Claude A. Baum, Esq.<br>Email: cbaum@orehill.com<br><br>Alok Makhija<br>Email: amakhija@orehill.com<br><br>Mathew Van Alstyne<br>Email: mvalstyne@orehill.com |
| QVT Financial L.P.<br>527 Madison Avenue, 8th Floor<br>New York, NY 10022 | Kevin McGoey<br>Email: Kevin.mcgoey@qvt.com |
| Robeco Investment Management<br>909 3rd Avenue<br>New York, NY 10002 | Kevin Ghomashchi<br>Email: Kevin.ghomashchi@robecoinvest.com |
| Schultze Asset Mgmt., LLC<br>3000 Westchester Avenue<br>Purchase, NY 10577 | George J. Schultze<br>Email: schultze@samco.net<br><br>Mark P. Kronfeld<br>Email: mark@samco.net |
| Scoggin Capital Management LP<br>660 Madison Avenue #20<br>New York, NY 10022 | Dev Chodry<br>Email: dchodry@scogcap.com<br><br>Michael Spector<br>Email: mspector@scogcap.com |
| Taconic Capital Partners<br>450 Park Avenue, 9th Floor<br>New York, NY 10022 | Joshua Miller<br>Email: jmiller@taconiccap.com<br><br>Margaret Jones<br>Email: mjones@taconiccap.com |

| White Horse Capital Partners, L.P.<br>200 Crescent Court, Suite 1414<br>Dallas, Texas 75201 | Amy Kennedy Graham<br>Email: amy@whitehorsecap.com |

# Exhibit 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No.06-25454 (MBM) |
| LE-NATURE'S, INC., et al., ) | (Jointly Administered) |
| ) | |
| ) | Relates to Docket Nos. 1282, 1328 |
| Debtors. ) | |
| ) | Hearing Date & Time: |
| ) | August 21, 2007 at 3:00 p.m. (EST) |

**SUPPLEMENTAL RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, THE *AD HOC* COMMITTEE OF SECURED LENDERS, AND THE
*AD HOC* COMMITTEE OF SENIOR SUBORDINATED NOTEHOLDERS TO
(A) COURT'S ORDER TO SHOW CAUSE WHY CASES SHOULD NOT BE
DISMISSED AND (B) MOTION OF WACHOVIA BANK, NATIONAL
ASSOCIATION TO CONVERT CASES TO CHAPTER 7**

The duly appointed Official Committee of Unsecured Creditors (the "Official

Creditors' Committee") of Le-Natures, Inc. and affiliated Chapter 11 debtors (collectively, the

"Debtors"), the *Ad Hoc* Committee of Secured Lenders (the "Lenders' Committee") and the *Ad*

*Hoc* Committee of Senior Subordinated Noteholders (the "Noteholders' Committee" and,

together with the Official Creditors' Committee and the Lenders' Committee, the "Plan

Proponents"), by and through their respective undersigned counsel, hereby file this Supplemental

Response to (a) the Court's May 31, 2007 Order to Show Cause why the Debtors' cases should

not be dismissed ("Order to Show Cause") and (b) the Motion of Wachovia Bank, National

Association to Convert Cases to Chapter 7 ("Wachovia Motion to Convert").[1]  In support of their

Supplemental Response, the Plan Proponents respectfully state as follows:

---

[1]     The Plan Proponents incorporate by reference all other pleadings filed in response to the Order to Show
Cause and the Wachovia Motion to Convert.  Many of the issues addressed herein were previously addressed in
those pleadings and other pleadings previously filed in these cases.

**PRELIMINARY STATEMENT**

1. The Plan Proponents have filed and are prepared to seek confirmation of an eminently confirmable plan – the *Second Amended Joint Chapter 11 Plan of Liquidation of the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Secured Lenders, and the Ad Hoc Committee of Senior Subordinated Noteholders*, dated June 18, 2007 (the "Plan") [Docket No. 1377]. The Chapter 11 Trustee supports the Plan. It is the product of extensive and complex negotiations, and embodies compromises of a number of inter-creditor disputes that could otherwise take years to resolve. More importantly, however, the Plan provides an opportunity for all creditors – secured and unsecured alike – to recover what was lost in the massive fraud that led to Le-Nature's momentous collapse. Proceeding towards confirmation will finally allow creditors and this Court to turn focused and undivided attention towards those parties that bear responsibility for the great losses suffered by the estates' creditors. If, on the other hand, these cases are dismissed, unsecured creditors will not have a unified means to pursue the necessary litigation, and if these cases are converted to Chapter 7, it is unclear whether the plaintiff (the Chapter 7 Trustee) would be adequately funded.

2. The Plan Proponents file this Supplemental Response primarily to address the concerns of this Court that there is an insufficient record and explanation of the Plan distribution mechanics and, more specifically, how unsecured creditors will receive value from the Plan. Although the issues and negotiations with respect to the Plan were admittedly difficult and complex, the Plan distribution mechanisms are relatively straightforward, as will be demonstrated herein.

3. The Plan Proponents also file this Supplemental Response to affirm that the Plan is ready for voting and confirmation, and therefore neither dismissal nor conversion of these cases is appropriate or necessary. The objections raised by the only known Plan objector –

2

Wachovia Bank, National Association ("Wachovia") – have been reduced down to five remaining confirmation objections, none of which have merit.[2]

**DISCUSSION**

I.    **Plan Distribution Mechanics**[3]

    A.    **Litigation Trust**

        4.    The centerpiece of the Plan is the creation of a Liquidation Trust to be vested with all estate assets, including estate causes of action. See Plan § 7.02. The Liquidation Trust will have the exclusive right to pursue estate causes of action and the non-exclusive right to object to claims, and will be charged with all administrative functions for winding-up the Chapter 11 cases. See id. §§ 7.02, 7.05(a), 10.02(b).

        5.    The Liquidation Trust will be managed by a Liquidation Trustee. See Plan § 7.02. The Plan also provides for the creation of a seven-member Liquidation Trust Oversight Board (the "Oversight Board") comprised of members of each creditor constituency, as follows:    four Lender representatives, two Unsecured Creditor representatives, and one Subordinated Noteholder representative. See id. § 7.02(e)(i). Subject to its fiduciary duties, the Liquidation Trustee will generally follow the direction of the Oversight Board (by majority vote) with regard to any material decisions. See id. § 7.02(e)(ii).

        6.    To the extent that a minority of the Oversight Board (in particular, the unsecured creditor representatives) disagrees with certain important Oversight Board decisions, the dissenting minority is entitled to retain counsel, seek discovery, and request this Court's

---

[2]    Although this Court has stated its preference for resolving all confirmation-related issues prior to approval of the Disclosure Statement, the Plan Proponents emphasize that none of Wachovia's extant objections relate to the adequacy of the Disclosure Statement with respect to the Plan.

[3]    The discussion herein concerning the Plan is, and is intended to, provide only a summary of the pertinent Plan provisions. To the extent that anything stated herein conflicts with the terms of the Plan, the Plan controls.

intervention *at the Trust's expense.* For example, if the Oversight Board determines that the Trust should settle estate litigation at a particular amount or under particular terms, and the unsecured creditor representatives on the Oversight Board do not agree with such settlement, they may retain counsel *at the Trust's expense* to oppose approval of such settlement by this Court. See Plan § 7.05(c).

### B.    Trust Funding

7.      The Plan requires initial trust funding of $15 million or such lesser amount agreed upon by the Plan Proponents. See Plan § 1.01 (definition of "Initial Trust Funding"). The Initial Trust Funding (i.e., the funding on the effective date of the Plan) will be provided by (a) unencumbered estate assets,[4] (b) contribution of the collateral of Lenders (except for those Lenders holding Wachovia Claims[5]), and/or (c) borrowing under the Exit Facility.[6] See id. A significant aspect of the Plan is that Lenders (except for holders of Wachovia Claims) will contribute their collateral on the Effective Date to the Liquidation Trust for Initial Trust Funding and, thereafter, to "refresh" the $7.5 million Trust reserve as determined necessary by the Liquidation Trustee. This contribution effectively provides a covenant free, interest-free loan by the Lenders to the Trust, for the benefit of all unsecured creditors, and will provide funding for the Liquidation Trust to pursue estate causes of action.

---

[4]      At this time, the Plan Proponents do not know whether any unsecured value is available for Initial Trust Funding.

[5]      The Plan defines Wachovia Claims as "all Lenders Claims for which: (i) Wachovia was the record holder (in its individual capacity) on March 8, 2007 or any time thereafter; and (ii) that is not the subject of a Trade Placement occurring before the close of business February 14, 2007." Plan § 10.01.

[6]      The Exit Facility consists of a $15 million term loan, providing to the exit lenders interest at a rate of LIBOR +3 plus an additional 5% of litigation recoveries unencumbered by existing liens. The Exit Credit Agreement contains minimal covenants and there are no foreclosure rights provided to the exit lenders.

4

**C.**    **Creditor Interests**

8.    Under the Plan, creditors will receive uncertificated, non-transferable beneficial interests in the Liquidation Trust on account of their allowed claims. The interests will be assigned as set forth below:

- Tier One Interests: Secured Lenders

- Tier Two Interests: Unsecured Claims -- Lender Deficiency Claims, General Unsecured Claims, Subordinated Noteholder Claims

- Tier Three Interests: 510(b) Subordinated Litigation Claims

- Tier Four Interests: Equity Interests

See Plan Art. V.

**D.**    **Distribution Scheme ("Waterfall")**

9.    The distribution of estate assets under the Plan (after satisfaction of administrative and priority claims) is governed by a priority "waterfall" mechanism, which is described below and illustrated in greater detail on the charts attached hereto as Exhibit A.

**i.**    **Determination of Secured Claims**

10.    The first level of determination for the distribution of estate assets is whether those assets are subject to the liens of the Lenders. If the estate assets are subject to the Lenders' liens, then those assets will be distributed pro rata to the Lenders on account of their Tier One Interests.[7] If, however, the assets are not subject to the Lenders' liens, then those assets will be distributed to unsecured creditors holding Tier Two Interests.

---

[7]    The Lenders Secured Claims, evidenced by the Tier One Interests, encompass the Lenders' claims secured by (a) their pre-petition liens (e.g., the Latrobe assets) and (b) their post-petition replacement liens on account of (i) the use of their cash collateral in these cases and (ii) the diminution of value of their collateral during the cases. See Plan § 1.01 (definition of "Lenders Secured Claims"). For purposes of the distribution illustrations on Exhibit A only, the Plan Proponents have used a hypothetical estimate of Lenders Secured Claims of $32.5 million in the aggregate.

5

11.    Because a substantial amount of the assets expected to be distributed by the Liquidation Trust will be the proceeds of litigation, the Plan Proponents resolved in the Plan the extent to which Lenders could assert a lien on such proceeds.  Specifically, the Plan stipulates, and the Lenders agreed as part of the compromises reached in the Plan, that any estate tort claims and any substantially related claims (and the proceeds thereof) will not be subject to the Lenders' liens.  See Plan § 1.01 (definition of "Lenders Secured Causes of Action"). Therefore, the Liquidation Trust's recoveries on litigation will generally be distributed pro rata to unsecured creditors, with the proviso that Lenders have retained the right to argue that they have a lien on litigation recoveries traceable to their collateral.  See id.  By way of illustration, Lenders do not retain the argument that their liens attach to proceeds from settlements, judgments, or awards of tort or similar damage claims (because awards of damages are not traceable recoveries of the Lenders' collateral), but Lenders do retain the right to argue (and all parties retain the right to challenge the argument) that their liens attach to the traceable recoveries of collateral that were, for example, converted or fraudulently conveyed to third parties.  In short, unsecured creditors will share in the proceeds of the estate assets with perhaps the greatest value – litigation claims against those that are responsible for the collapse of Le-Nature's.[8]

### ii.    Distributions to Unsecured Creditors

12.    Distributions to unsecured creditors – those creditors holding Tier Two Interests – will be made on a pro rata basis according to the respective claim amounts.  See Plan §§ 5.04(c), 5.05(c), 5.06(c).  As noted, this Tier consists of General Unsecured Claims,

---

[8]    In this regard, the Plan Proponents note that their expectation of substantial estate recoveries from tort actions has a strong empirical basis.  Indeed, just in the past several weeks, the Chapter 11 estate of Adelphia Communications Corp. settled a suit against its accountants for over $160 million, and a Florida jury determined that an auditor must pay over $500 million in damages for failing to detect the fraud that led to the collapse of one of its former clients.

Noteholder Claims and Lenders' Unsecured Deficiency Claims.  Thus, the Plan provides for the pro rata sharing of what is likely to be the estates' primary value between secured and unsecured creditors.

13.    One exception to that general principal is that the Plan also provides for the reallocation and distribution to Lenders of certain amounts otherwise owing on account of Noteholder Claims ("Turnover Enforcement"), as part of a compromise regarding the extent to which such claims are contractually subordinated to Lender claims under the terms of the Subordinated Noteholders' Indenture.[9]  See Plan § 5.06(c).  Pursuant to Section 5.06(c) of the Plan, the Turnover Enforcement operates as follows:

- All distributions that are otherwise owing on account of Subordinated Noteholder claims will be distributed to Lenders, until the Lenders receive $110 million in the aggregate on account of their claims.

- After Lenders have received $110 million in distributions, Subordinated Noteholders will receive the next $15 million owing on account of their claims without any Turnover Enforcement.

- Thereafter, distributions on account of Subordinated Noteholder claims will be reallocated and distributed to Lenders at varying percentages corresponding with the aggregate payments made on account of Lender claims, as set forth below:

| Aggregate Payments On Account Of Lender Claims | Percentage Turnover Enforcement To Lenders | Percentage Retained By Noteholders |
|---|---|---|
| Less than $175 million | 50% | 50% |
| $175 million to $200 million | 45% | 55% |
| $200 million to $225 million | 40% | 60% |
| $225 million to $250 million | 35% | 65% |
| $250 million to $280 million | 30% | 70% |
| Greater than $280 million | 25% | 75% |

---

[9]    The sharing formula embedded in the Plan represents the settlement of a dispute regarding the extent to which the contractual subordination provision in the Subordinated Notes' Indenture can be enforced by Lenders, another of the compromises reached as part of the Plan.

7

The pro rata distributions to General Unsecured Creditors are not affected by this sharing formula between the Lenders and the Noteholders.

14.    If the unsecured claims represented by Tier Two Interests are satisfied in full, the Liquidation Trust will thereafter distribute estate assets pro rata on account of claims represented by Tier Three Interests (litigation claims subordinated under Section 510(b)). See Plan § 5.07(b). Then, if the claims represented by Tier Three Interests are satisfied in full, the Liquidation Trust will thereafter distribute estate assets pro rata on account of allowed equity interests, represented by Tier Four Interests. See id. § 5.08(b).

15.    Hypothetical scenarios showing distributions at various recovery levels are attached to the Disclosure Statement at Exhibit M, attached hereto as Exhibit C for ease of reference.

## II.    Wachovia's Remaining Plan Objections

16.    Although Wachovia initially raised a litany of objections to the Plan, through its Objection and Supplemental Objection to the Plan Proponents' Disclosure Statement, the Plan Proponents have removed most of those objections through modifications to the original Plan. Wachovia's only remaining objections are:  (a) the Plan improperly releases Wachovia's contractual rights of subordination against the Subordinated Noteholders; (b) the Plan improperly releases Lenders (excluding Wachovia and those holding Wachovia Claims) from avoidance actions; (c) that not treating Wachovia Claims as allowed constitutes unfair discrimination; (d) the Plan improperly provides for substantive consolidation of the Debtors' estates; and (e) the Plan is not feasible on account of the $21 million claim asserted by the Internal Revenue Service

("IRS"). The Plan Proponents will briefly discuss each objection in turn (but reserve the right to further brief and try these issues as part of the Plan process).[10]

### A.    Subordination Compromise

17.    Wachovia contends that the Plan impermissibly releases Wachovia's subordination rights against the Subordinated Noteholders, and thereby violates Section 524(e) of the Bankruptcy Code.  Even assuming the contractual subordination provisions currently entitle the Lenders to full seniority (a contention disputed by the Noteholders), the applicable provisions of the Lenders' pre-petition secured credit agreement (the "Credit Agreement"), attached hereto as Exhibit B, dispel this argument, as they unequivocally permit the Required Lenders -- those holding a majority of the bank debt -- to compromise the extent to which the Subordinated Noteholders are subordinated in right of payment to the Lenders.  See Credit Agreement § 6.8 (a majority of Lenders may consent to modification of subordination of the Subordinated Notes); § 9.1 (a majority of Lenders may waive defaults under § 7.1(l) arising from the Subordinated Notes' subordination ceasing to be effective; affirmation that Lenders' class vote on a plan supersedes any unanimous consent provisions in the Credit Agreement).  Case law and other persuasive authority confirm this point.  See Bartle v. Markson Bros., 314 F.2d 303, 305 (2d Cir. 1963); 7 Collier on Bankruptcy ¶ 1129.03[7][c][v] (15th ed. rev. 2004) ("Once the relationship is established between the debtor and the subordination agreement, the rights of senior creditors vis-à-vis subordinated creditors might be effected, provided that two-thirds in amount and a majority in number of the senior class, voting for or against the plan, accept the plan."); Ordin on Contested Confirmation § 6.11[B] ("The bulk of the authority suggests that the

---

[10]    The Plan Proponents have already addressed many of these issues in their *Reply to Objections to Approval of Proposed Disclosure Statement* dated April 24, 2007 [Docket No. 1158].

Bankruptcy Court has the power to bind non-consenting senior lenders to a plan that extinguishes their subordination rights.").

18.    Moreover, to the extent that the Plan constitutes a Rule 9019 settlement of difficult and complex issues surrounding contractual subordination, Wachovia's objection point is deemed by the law settled and moot if the settlement is approved.  See In re Best Prods. Corp., 168 B.R. 35, 71-2 (Bankr. S.D.N.Y. 1994) ("Since the LBO Action is being compromised in a settlement which I am approving, the appropriate value to affix to the LBO Action [for Section 1129(a)(7)(A)(ii) purposes] is the amount of the compromise."); see also Martin J. Bienenstock, Bankruptcy Reorganization at 617 (1987) ("Once the court determines to approve the settlement, the claims and the values paid to satisfy them may be deleted from the model and the best interest of creditors test may be applied to the balance of the claims and values available.").

### B.    Lenders Release From Avoidance Action

19.    Wachovia contends that the Plan inappropriately releases avoidance actions against Lenders.  However, Section 1123(b)(3)(A) allows a plan to provide for the settlement or release of estate claims against parties-in-interest.  In this Circuit, the key factor in determining whether such a release is appropriate is whether the released party has made a "substantial contribution" to the plan.  See Gillman v. Continental Airlines ( In re Continental Airlines), 203 F.3d 203, 217 n. 17 (3d Cir. 2000); In re Coram Healthcare Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004).  Here, the Lenders (other than holders of Wachovia Claims) are directly contributing their collateral to fund the Liquidation Trust.  That funding, in turn, will allow the Liquidation Trust to pursue estate causes of action for the benefit of all creditors. Therefore, the Lenders' limited release from avoidance actions pursuant to the Plan is eminently justified and permissible under applicable precedent.

10

### C.    Treatment Of Wachovia Claims

20.    Wachovia contends that, because its claims are not deemed allowed under the Plan, its claims are subject to unfair discrimination under Section 1123(a)(4).  But unfair discrimination is concerned with the differential treatment of <u>allowed</u> claims under a plan, not whether a claim is allowed, disputed or, in this case, treated in a neutral fashion.  <u>See, e.g., Enron Corp. v. New Power Co. (In re New Power Co.)</u>, 438 F.3d 1113, 1122-23 (11th Cir. 2006) ("[D]elayed receipt of distributions to members of a class whose claims remain disputed does not, in and of itself, violate § 1123(a)(4)."); <u>Bustop Shelters v. Classic Homes, Inc.</u>, 914 F.2d 810, 814 n.7 (6th Cir. 1990) ("[T]he requirement of 11 U.S.C. § 1123(a)(4) that all claims or interest of the same class receive the same 'treatment' does not appear to be violated by the escrowing of one class member's payments pending the outcome of disputes over the claim's validity.").  More significantly, however, is that Wachovia's claims, if they are allowed, may actually fare better than the claims of other Lenders.  Whereas Lenders are contributing their collateral to the Liquidation Trust and taking the attendant risks of an uncertain payment of their secured claims, Wachovia's collateral will be placed in a reserve and the payment of its secured claim, if allowed, is not subject to such risks.

### D.    Substantive Consolidation

21.    Wachovia contends that the Plan Proponents have provided an insufficient factual record to justify the substantive consolidation of the estates.  The Plan Proponents have already negated this objection by providing distributions in the Plan that lead to the same economic result as a plan with non-consolidated estates.  Specifically, the Plan provides for the assets of Debtors Tea Systems International, LLC ("TSI") and Le-Nature's Holdings, Inc. ("Holdings") to be distributed to the Lenders and the Subordinated Noteholders on account of the guarantees provided for in the Credit Agreement and Subordinated Noteholder Indenture,

respectively.  See Plan §§ 5.04(c), 5.06(c).  Aside from these guarantee claims, no other claims are presently asserted against TSI or Holdings.[11]

### E.    Feasibility

22.    Wachovia argues that the Plan Proponents have failed to establish that the Plan is feasible, chiefly because they have not explained how the $21 million IRS priority tax claim ("IRS Claim") will be paid.  On June 25, 2007, the Chapter 11 Trustee filed an objection to the IRS Claim, asserting that, based on amended tax returns, the estates have no tax liability to the IRS.  As the Trustee reported to the Court on August 9, 2007, the Trustee is in discussions with the IRS regarding the withdrawal of the IRS Claim, and the estates may in fact be owed money from the IRS by way of a tax refund.  Based on their discussions with the Trustee, the Plan Proponents believe this issue will be obviated shortly.  Accordingly, Wachovia's argument with respect to feasibility is unsustainable.

---

[11]    In fact, as reported by the Chapter 11 Trustee, neither Holdings nor TSI apparently ever conducted any business, and Holdings was only formed a few months prior to the bankruptcy filing.

## CONCLUSION

The Plan Proponents have filed an eminently confirmable Plan that provides unsecured creditors with their best opportunity for a meaningful recovery. The only substantive matter to be resolved prior to confirmation of the Plan is the adjudication of Wachovia's remaining objections, which, as discussed herein, can be readily overruled. Accordingly, the Plan Proponents respectfully submit that these cases should not be dismissed or converted to cases under Chapter 7, and respectfully request that this Court schedule a hearing to consider approval of the Disclosure Statement with respect to the Plan.

Dated: August 16, 2007
      Pittsburgh, Pennsylvania

                                **OFFICIAL COMMITTEE OF**
                                **UNSECURED CREDITORS**

                                ____ s/ David K. Rudov_____
                                **RUDOV & STEIN, P.C.**
                                David K. Rudov
                                100 First Avenue, Suite 500
                                Pittsburgh, PA 15222
                                (412) 281-7300

                                - and -

                                **LOWENSTEIN SANDLER PC**
                                Kenneth A. Rosen
                                John K. Sherwood
                                Sharon L. Levine
                                65 Livingston Avenue
                                Roseland, NJ 07068
                                (973) 597-2500

                                ***AD HOC* COMMITTEE OF SECURED**
                                **LENDERS**

                                ___ s/ James G. McLean_____
                                **MANION  MCDONOUGH  &  LUCAS**
                                **P.C.**
                                James G. McLean

600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

- and -

**BROWN RUDNICK BERLACK
ISRAELS LLP**
Edward S. Weisfelner
Robert J. Stark
Daniel J. Saval
7 Times Square
New York, NY 10036
(212) 209-4800


*AD HOC* **COMMITTEE OF SENIOR
SUBORDINATED NOTEHOLDERS**

**DUANE MORRIS LLP**
William S. Katchen
Joel Walker
Jeffrey Spear
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2811
(412) 497-1000

-and-


   s/ Matthew J. Williams
**KRAMER LEVIN NAFTALIS
 & FRANKEL LLP**
Thomas Moers Mayer
Matthew J. Williams
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

14

# EXHIBIT
# "A'

# LE-NATURE'S : PLAN DISTRIBUTIONS



**LIQUIDATION TRUST**
$15 mm initial funding

**RESERVE**
$7.5 mm

**ADMINISTRATIVE CLAIMS**
Estimated at $2.5 mm
Paid on Effective Date

**PRIORITY CLAIMS**
Estimated at $2 mm
Paid on Effective Date

**TIER 1**

**LENDERS SECURED CLAIMS:** Estimated at $32.5 mm **
- Paid when cash is available
- Cash Collateral Usage: Estimated at $15 mm
- Diminution of Collateral: Stipulated at $7.5 mm
- Proceeds of Collateral as Liquidated (e.g., Latrobe assets): Estimated at $10 mm
- *Liens do not attach to tort claims and similar claims*

**TIER 2**

**LENDERS UNSECURED DEFICIENCY CLAIMS**
- Paid When Cash Available
- Pro Rata Distribution + Allocation from Noteholder Per Sharing Formula

**GENERAL UNSECURED CLAIMS**
- Paid When Cash Available
- Pro Rata Distribution
- Unaffected by sharing formula between Lenders and Noteholders

**NOTEHOLDERS CLAIMS**
- Paid When Cash Available
- Pro Rata Distribution Per Sharing Formula with Lenders

**TIER 3**

**510 SUBORDINATED CLAIMS**
- Paid When Cash Available

**TIER 4**

**ALLOWED EQUITY INTERESTS**
- Paid When Cash Available

** Presumes no additional collateral proceeds for Lenders obtained after the Effective Date. If there are additional proceeds subject to Lenders' liens, those proceeds are paid to Lenders under Tier 1 and the Lenders' unsecured deficiency claim is reduced under Tier 2.

## Hypothetical Distribution Illustration:
## First Recovery of $250 mm (From Tort Actions)



**LIQUIDATION TRUST**
$7.5 mm placed in reserve; $242.5 mm remaining

**ADMINISTRATIVE CLAIMS**
Will have been paid on Effective Date

**PRIORITY CLAIMS**
Will have been paid on Effective Date

**TIER 1**
**$32.5mm**

**LENDERS SECURED CLAIMS**
- Lenders' liens do not attach to recoveries. However, Lenders Secured Claim = $32.5 mm (estimated) = paid on account of (a) deferment on payment of Lenders' replacement lien claims and (b) contribution of Lenders' collateral to initial trust funding
- *$210 mm remaining for distributions to unsecured creditors*

**TIER 2**
**$210mm**

**LENDERS UNSECURED DEFICIENCY CLAIMS**
*$92 mm (approx.) recovery* – assuming $245.5 mm in claims and applying Turnover Enforcement

**GENERAL UNSECURED CLAIMS**
*$90 mm (approx.) recovery* – assuming $300 mm in claims

**NOTEHOLDER CLAIMS**
*$28 mm (approx.) recovery* – assuming $150 mm in claims and applying Turnover Enforcement**

**TIER 3**

**510 SUBORDINATED CLAIMS**

**TIER 4**

**ALLOWED EQUITY INTERESTS**

**Noteholders do not retain distributions until Lenders receive $110 mm (less pro rata portion of any Wachovia Claim disallowed).

# EXHIBIT
# "B'

Section 6.5     Advances, Investments and Loans.

Each of the Credit Parties will not, nor will it permit any Subsidiary to, make any Investment except for Permitted Investments.

Section 6.6     Transactions with Affiliates.

Except as permitted in subsection (iv) of the definition of Permitted Investments, each of the Credit Parties will not, nor will it permit any Subsidiary to, enter into any transaction or series of transactions, whether or not in the ordinary course of business, with any officer, director, shareholder or Affiliate other than on terms and conditions substantially as favorable as would be obtainable in a comparable arm's-length transaction with a Person other than an officer, director, shareholder or Affiliate.

Section 6.7     Ownership of Subsidiaries; Restrictions.

Each of the Credit Parties will not, nor will it permit any Subsidiary to, create, form or acquire any Subsidiaries, except for Domestic Subsidiaries which are joined as Additional Credit Parties in accordance with the terms hereof. The Borrower will not sell, transfer, pledge or otherwise dispose of any Capital Stock or other equity interests in any of its Subsidiaries, nor will it permit any of its Subsidiaries to issue, sell, transfer, pledge or otherwise dispose of any of their Capital Stock or other equity interests, except in a transaction permitted by Section 6.4.

Section 6.8     Fiscal Year; Organizational Documents; Material Contracts.

Each of the Credit Parties will not, nor will it permit any Subsidiary to, change its fiscal year or its accounting policies except to comply with changes in GAAP.  Each of the Credit Parties will not, nor will it permit any Subsidiary to, amend, modify or change its articles of incorporation (or corporate charter or other similar organizational document) or bylaws (or other similar document) without the prior written consent of the Required Lenders.  Each of the Credit Parties will not, nor will it permit any Subsidiary to, without the prior written consent of the Administrative Agent, amend, modify, cancel or terminate or fail to renew or extend or permit the amendment, modification, cancellation, termination of any of the Material Contracts, except in the event that such amendments, modifications, cancellations, terminations or failure to renew could not reasonably be expected to have a Material Adverse Effect.  The Borrower will not, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders, amend, modify, waive or extend or permit the amendment, modification, waiver or extension of any Subordinated Indebtedness or of any documentation governing or evidencing such Subordinated Indebtedness (including, without limitation, the Subordinated Notes or the Subordinated Note Indenture) in a manner that is adverse to the interests of the Lenders.  The Borrower will not, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders, amend, modify, waive or extend or permit the amendment, modification, waiver or extension of any documentation governing or evidencing the Preferred Stock in a manner that is adverse to the interests of the Lenders.

institution that is not a Revolving Lender. Each of the Credit Parties will not, nor will it permit any Subsidiary to, open, maintain or otherwise have any securities accounts or any non-primary checking, savings or other deposit accounts at any bank or other financial institution, or any other non-primary account where money is or may be deposited or maintained with any Person, other than (a) the accounts set forth on Schedule 6.15 and designated as unrestricted accounts; provided that the average daily balance in any such account for any calendar month does not exceed $250,000 and the aggregate average daily balance in all such accounts for any calendar month does not exceed $1,000,000, (b) deposit accounts that are subject to deposit account control agreements in form and substance acceptable to the Administrative Agent, (c) securities accounts that are subject to securities account control agreements in form and substance acceptable to the Administrative Agent, (d) deposit accounts established solely as payroll and other zero balance accounts, (e) deposit accounts and/or securities accounts held with a Lender and (f) deposit accounts, so long as the aggregate average daily balance in any such account does not exceed $250,000 and the aggregate average daily balance in all such accounts does not exceed $1,000,000.

## ARTICLE VII

## EVENTS OF DEFAULT

**Section 7.1    Events of Default.**

An Event of Default shall exist upon the occurrence of any of the following specified events (each an "Event of Default"):

(a)    The Borrower shall fail to pay any principal on any Loan when due in accordance with the terms thereof or hereof; or the Borrower shall fail to reimburse the Issuing Lender for any LOC Obligations when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or any fee or other amount payable hereunder when due in accordance with the terms thereof or hereof and such failure shall continue unremedied for three (3) Business Days (or any Guarantor shall fail to pay on the Guaranty in respect of any of the foregoing or in respect of any other Guaranty Obligations thereunder within the aforesaid period of time); or

(b)    Any representation or warranty made or deemed made herein, in the Security Documents or in any of the other Credit Documents or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement shall prove to have been incorrect, false or misleading in any material respect on or as of the date made or deemed made; or

(c)    (i) Any Credit Party shall fail to perform, comply with or observe any term, covenant or agreement applicable to it contained in Section 5.4, Section 5.7(a), Section 5.9 or Article VI hereof; or (ii) any Credit Party shall fail to comply with any other covenant, contained in this Credit Agreement or the other Credit Documents or any other agreement, document or instrument among any Credit Party, the Administrative

(l)    Any default (which is not waived or cured within the applicable period of grace) or event of default shall occur under any document governing or evidencing any Subordinated Indebtedness or the subordination provisions contained therein shall cease to be in full force and effect or to give the Lenders the rights, powers and privileges purported to be created thereby.

### Section 7.2    Acceleration; Remedies.

Upon the occurrence of an Event of Default, then, and in any such event, (a) if such event is an Event of Default specified in Section 7.1(e) above, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon), and all other amounts under the Credit Documents (including without limitation the maximum amount of all contingent liabilities under Letters of Credit) shall immediately become due and payable, and (b) if such event is any other Event of Default, any or all of the following actions may be taken: (i) with the written consent of the Required Lenders, the Administrative Agent may, or upon the written request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; (ii) the Administrative Agent may, or upon the written request of the Required Lenders, the Administrative Agent shall, by notice of default to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes to be due and payable forthwith and direct the Borrower to pay to the Administrative Agent cash collateral as security for the LOC Obligations for subsequent drawings under then outstanding Letters of Credit in an amount equal to the maximum amount of which may be drawn under Letters of Credit then outstanding, whereupon the same shall immediately become due and payable; (iii) exercise any rights or remedies of the Administrative Agent or the Lenders under this Agreement or any other Credit Document, including, without limitation, any rights or remedies with respect to the Collateral; and (iv) exercise any rights or remedies available to the Administrative Agent or Lenders under applicable law.

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT

### Section 8.1    Appointment.

Each Lender hereby irrevocably designates and appoints Wachovia as the Administrative Agent of such Lender under this Credit Agreement, and each such Lender irrevocably authorizes Wachovia, as the Administrative Agent for such Lender, to take such action on its behalf under the provisions of this Credit Agreement and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Credit Agreement, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Credit Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties,

or further act or deed on the part of such former Administrative Agent or any of the parties to this Credit Agreement or any holders of the Notes. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in Charlotte, North Carolina or New York, New York, or an affiliate of such bank. If no successor Administrative Agent has accepted appointment as Administrative Agent by the date which is 45 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 8.9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Credit Agreement.

### Section 8.10    Other Agents; Arrangers.

Except as otherwise expressly stated herein, any agent (other than the Administrative Agent) or arranger listed from time to time on the cover page of this Credit Agreement shall have no obligations, responsibilities or duties under this Credit Agreement or under any other Credit Document other than obligations, responsibilities and duties applicable to all Lenders in their capacity as Lenders; provided, however, that such agents and arrangers shall be entitled to the same rights, protections, exculpations and indemnifications granted to the Administrative Agent under this Article VIII in their capacity as an agent or arranger.

## ARTICLE IX

## MISCELLANEOUS

### Section 9.1    Amendments, Waivers and Release of Collateral.

Neither this Agreement, nor any of the other Credit Documents, nor any terms hereof or thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this Section. The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent may, from time to time, (a) enter into with the Borrower written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, waiver, supplement, modification or release shall:

(i)    reduce the amount or extend the scheduled date of maturity of any Loan or Note or any installment thereon, or reduce the stated rate of any interest



or fee payable hereunder (except in connection with a waiver of interest at the increased post-default rate) or extend the scheduled date of any payment thereof or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; or

(ii)  amend, modify or waive any provision of this Section 9.1 or reduce the percentage specified in the definition of Required Lenders, without the written consent each Lender directly affected thereby; or

(iii)  amend, modify or waive any provision of Article VIII without the written consent of the then Administrative Agent; or

(iv)  amend, modify or waive any provision of Section 2.12 without the written consent of each Lender directly affected thereby; or

(v)  release the Borrower, in its entirety, from its obligations under the Credit Documents or Holdco from its obligations under the Guaranty or all or substantially all of the Guarantors (other than Holdco), in their entirety, from their obligations under the Guaranty, without the written consent of each Lender directly affected thereby; or

(vi)  release all or substantially all of the Collateral, without the written consent of each Lender directly affected thereby; or

(vii)  amend, modify or waive any provision of the Credit Documents requiring consent, approval or request of the Required Lenders or all Lenders, without the written consent of all of the Required Lenders or Lenders as appropriate; or

(viii)  without the consent of the Lenders holding in the aggregate more than 50% of the Revolving Commitments or, if the Revolving Commitments have been terminated, the outstanding Revolving Loans (in addition to the Lenders required herein to take such action), amend, modify or waive any term specific to the Revolving Loans (including, without limitation, Section 4.2); or

(ix)  without the consent of the Lenders holding in the aggregate more than 50% of the outstanding Tranche B Term Loan (in addition to the Lenders required herein to take such action), amend, modify or waive any term specific to the Tranche B Term Loan.

provided, further, that no amendment, waiver or consent affecting the rights or duties of the Administrative Agent, the Issuing Lender or the Swingline Lender under any Credit Document shall in any event be effective, unless in writing and signed by the Administrative Agent, the Issuing Lender and/or the Swingline Lender, as applicable, in addition to the Lenders required hereinabove to take such action.

Any such waiver, any such amendment, supplement or modification and any such release shall apply equally to each of the Lenders and shall be binding upon the Borrower, the other Credit Parties, the Lenders, the Administrative Agent and all future holders of the Notes. In the case of any waiver, the Borrower, the other Credit Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Loans and Notes and other Credit Documents, and any Default or Event of Default permanently waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding any of the foregoing to the contrary, the consent of the Borrower shall not be required for any amendment, modification or waiver of the provisions of Article VIII (other than the provisions of Section 8.9); provided, however, that the Administrative Agent will provide written notice to the Borrower of any such amendment, modification or waiver. In addition, the Borrower and the Lenders hereby authorize the Administrative Agent to modify this Credit Agreement by unilaterally amending or supplementing Schedule 2.1(a) from time to time in the manner requested by the Borrower, the Administrative Agent or any Lender in order to reflect any assignments or transfers of the Loans as provided for hereunder; provided further, however, that the Administrative Agent shall promptly deliver a copy of any such modification to the Borrower and each Lender.

Notwithstanding the fact that the consent of all the Lenders is required in certain circumstances as set forth above, (x) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein and (y) the Required Lenders may consent to allow a Credit Party to use cash collateral in the context of a bankruptcy or insolvency proceeding.

Notwithstanding anything to the contrary contained herein, to the extent that Wachovia assigns any Loans to any Eligible Assignee during the primary syndication of the Loans, and such Eligible Assignee requires an amendment to this Agreement as a condition to its participation as a Lender, Wachovia shall be entitled and authorized to amend this Agreement to make such necessary changes; provided that such changes shall not include modifications to the pricing, tenor or the aggregate amount of the Loans.

Section 9.2    Notices.

Except as otherwise provided in Article II, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) when delivered by hand, (b) when transmitted via telecopy (or other facsimile device) to the number set out herein, (c) the day following the day on which the same has been delivered prepaid (or pursuant to an invoice arrangement) to a reputable national overnight air courier service, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case addressed as follows in the case of the Borrower, the other Credit Parties and the Administrative Agent, and as set forth in such Lender's

# EXHIBIT "C"

LB-NATURE'S
HYPOTHETICAL RECOVERIES / ASSUMPTIONS

ACTUAL AMOUNTS
AND RECOVERIES
WILL DIFFER

SUBMITTED ONLY TO
DESCRIBE APPLICATION
OF FORMULAS
CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $44.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (face) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Banks | Bonds | GUCs |
| 85,000 | 85,000 | - | - | - | - | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | - | - | - | - | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | - | - | 3,174 | 3,174 | 28,174 | 123,174 | 100% | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 15,000 | 15,000 | 4,293 | 7,467 | 38,103 | 161,277 | 0% | 100% | 46.0% | 10.0% | 16.8% |
| 25,000 | 200,000 | 13,167 | 28,167 | 7,536 | 15,003 | 66,893 | 228,170 | 50% | 50% | 62.5% | 18.8% | 33.7% |
| 25,000 | 225,000 | 8,069 | 36,236 | 4,199 | 19,201 | 37,268 | 265,438 | 45% | 55% | 71.4% | 24.2% | 43.1% |
| 25,000 | 250,000 | 9,069 | 45,305 | 4,325 | 23,527 | 38,394 | 303,832 | 40% | 60% | 80.4% | 30.2% | 52.9% |
| 30,000 | 280,000 | 10,131 | 55,436 | 4,460 | 27,987 | 39,591 | 343,423 | 35% | 65% | 89.3% | 37.0% | 62.5% |
| 18,733 | 298,734 | 13,513 | 68,949 | 5,525 | 33,511 | 49,038 | 392,461 | 30% | 70% | 100.0% | 46.0% | 75.3% |
| 2,904 | 301,638 | 56,200 | 125,149 | 9,514 | 43,025 | 84,447 | 476,908 | 25% | 75% | 106.7% | 83.4% | 96.7% |
|  |  | 8,713 | 133,862 | 1,475 | 44,500 | 13,092 | 490,000 | 25% | 75% | 107.7% | 89.2% | 100.0% |

Assumptions (actual amounts and line items will differ)

| | FACE | 000 USD | PERCENTAGE |
|---|---|---|---|
| Administration expenses, unreleed to bank' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | | 155,500 | |
| GUCs (estimated general unsecured claims including lease rejection claims) | 150,000 | 44,500 | 0.393671 |
| Payments to Banks (estimated) for liens, including administration claims for use and impairment of collateral, collateral proceeds, and diminution claims | | 85,000 | 0.112658 |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.393671 |
| Post-petition interest for banks | | 21,638 | 0.491671 |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claim | | 395,000 | 1,000000 |
| Total estate claims (hypothetical estimate) | | 490,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $44.5MM, $144.5MM, $244.5MM and $344.5MM.

LE-NATURE'S
HYPOTHETICAL RECOVERIES / ASSUMPTIONS

ACTUAL AMOUNTS
AND RECOVERIES
WILL DIFFER

SUBMITTED ONLY TO
DESCRIBE APPLICATION
OF FORMULAS
CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $144.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (Bond) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Bank | Bonds | GUCs |
| 85,000 | 85,000 | - | - | - | - | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | - | - | - | - | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | - | - | - | - | 35,307 | 130,307 | 100% | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 15,000 | 15,000 | 10,307 | 10,307 | 47,249 | 178,056 | 0% | 100% | 46.0% | 10.0% | 16.6% |
| 25,000 | 200,000 | 13,167 | 28,167 | 13,939 | 24,246 | 83,828 | 261,884 | 50% | 50% | 62.5% | 18.8% | 33.7% |
| 25,000 | 225,000 | 8,069 | 36,236 | 24,471 | 48,717 | 46,703 | 308,586 | 45% | 55% | 71.4% | 24.2% | 43.1% |
| 25,000 | 250,000 | 9,069 | 45,305 | 13,633 | 62,350 | 48,114 | 356,701 | 40% | 60% | 80.6% | 30.2% | 52.9% |
| 30,000 | 280,000 | 10,131 | 55,434 | 14,045 | 76,395 | 49,614 | 406,315 | 35% | 65% | 89.3% | 37.0% | 62.9% |
| 18,733 | 298,734 | 13,513 | 68,949 | 14,483 | 90,879 | 61,453 | 467,767 | 30% | 70% | 100.0% | 46.0% | 75.3% |
| 2,904 | 301,638 | 56,200 | 125,149 | 17,939 | 108,818 | 105,826 | 573,593 | 25% | 75% | 106.7% | 83.4% | 96.7% |
|  |  | 8,713 | 133,862 | 30,893 | 139,710 | 16,407 | 590,000 | 25% | 75% | 107.7% | 89.2% | 100.0% |
|  |  |  |  | 4,790 | 144,500 |  |  |  |  |  |  |  |

Assumptions (actual amounts and line items will differ)

| | FACE | 000 USD | PERCENTAGE |
|---|---|---|---|
| Administration expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | 150,000 | 155,550 | 0.314141 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 144,500 | 0.291919 |
| Payments to Banks (estimated) for liens, including administration claims for use and impairment of collateral, collateral proceeds, and diminution claims | | 85,000 | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.393939 |
| Post-petition interest for banks | | 21,638 | |
| Total part passu unsecured claims including bonds, GUCs, bank deficiency claim | | 495,000 | 1.000000 |
| Total estate claims (hypothetical estimate) | | 590,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and any new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $44.5MM, $144.5MM, $244.5MM and $344.5MM.

## LE-NATURE'S
### HYPOTHETICAL RECOVERIES / ASSUMPTIONS

ACTUAL AMOUNTS AND RECOVERIES WILL DIFFER

SUBMITTED ONLY TO AND DESCRIBE APPLICATION OF FORMULAS CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs $344.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (face) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Banks | Bonds | GUCs |
| 85,000 | 85,000 | - | - | - | - | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | - | - | - | - | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | 15,000 | 15,000 | 17,439 | 17,439 | 42,439 | 137,439 | 100% | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 13,167 | 28,167 | 23,583 | 41,025 | 57,395 | 194,835 | 0% | 100% | 46.0% | 10.0% | 16.8% |
| 25,000 | 200,000 | 8,069 | 36,236 | 41,406 | 82,430 | 100,763 | 295,598 | 50% | 50% | 62.5% | 18.8% | 33.7% |
| 25,000 | 225,000 | 9,069 | 45,305 | 23,068 | 105,499 | 56,137 | 351,735 | 45% | 55% | 71.4% | 24.2% | 43.1% |
| 25,000 | 250,000 | 10,131 | 55,436 | 23,766 | 129,264 | 57,834 | 409,569 | 40% | 60% | 80.4% | 30.2% | 52.9% |
| 30,000 | 280,000 | 13,513 | 68,949 | 24,506 | 153,771 | 59,637 | 469,207 | 35% | 65% | 89.3% | 37.0% | 62.9% |
| 18,733 | 298,734 | 56,200 | 125,149 | 30,354 | 184,124 | 73,867 | 543,074 | 30% | 70% | 100.0% | 46.0% | 75.3% |
| 2,904 | 301,638 | 8,713 | 133,862 | 52,272 | 236,396 | 127,205 | 670,278 | 25% | 75% | 106.7% | 83.4% | 96.7% |
| | | | | 8,104 | 244,500 | 19,722 | 690,000 | 25% | 75% | 107.7% | 89.2% | 100.0% |

**Assumptions (actual amounts and line items will differ)**

| | | FACE | PERCENTAGE |
|---|---|---|---|
| | | 000 USD | |
| Administration expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | 150,000 | 155,500 | 0.261345 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 244,500 | 0.410924 |
| Payments to Banks (estimated) for liens, including administration claims for use and impairment of collateral, collateral proceeds, and diminution claims | | 85,000 | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.327731 |
| Post-petition interest for banks | | 21,638 | |
| | | | |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claims | | 595,000 | 1.000000 |
| | | | |
| Total estate claims (hypothetical estimate) | | 690,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and any new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $46.5MM, $144.5MM, $244.5MM and $344.5MM.

**LE-NATURE'S**
**HYPOTHETICAL RECOVERIES / ASSUMPTIONS**

**ACTUAL AMOUNTS AND RECOVERIES WILL DIFFER**

SUBMITTED ONLY TO DESCRIBE APPLICATION OF FORMULAS CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $344.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (fees) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Banks | Bonds | GUCs |
| 85,000 | 85,000 | - | - | - | - | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | - | - | - | - | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | 15,000 | 15,000 | 24,572 | 24,572 | 49,572 | 144,572 | 100% | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 13,167 | 28,167 | 33,232 | 57,804 | 67,042 | 211,614 | 0% | 100% | 46.9% | 0.0% | 16.8% |
| 25,000 | 200,000 | 8,069 | 36,236 | 58,341 | 116,144 | 117,698 | 329,312 | 50% | 50% | 62.5% | 18.8% | 33.7% |
| 25,000 | 225,000 | 9,069 | 45,305 | 32,503 | 148,647 | 65,572 | 394,884 | 43% | 55% | 71.4% | 24.3% | 43.1% |
| 25,000 | 250,000 | 10,131 | 55,436 | 33,486 | 182,133 | 67,354 | 462,438 | 40% | 60% | 80.4% | 30.2% | 52.9% |
| 30,000 | 280,000 | 13,513 | 68,949 | 34,529 | 216,662 | 69,660 | 532,098 | 35% | 65% | 89.3% | 37.0% | 62.9% |
| 18,733 | 298,734 | 56,200 | 125,149 | 42,768 | 259,431 | 86,282 | 618,380 | 30% | 70% | 100.0% | 46.0% | 75.3% |
| 2,904 | 301,638 | 8,713 | 133,862 | 73,650 | 333,081 | 148,584 | 766,964 | 25% | 75% | 106.7% | 83.4% | 96.7% |
| | | | | 11,419 | 344,500 | 23,036 | 790,000 | 25% | 75% | 107.7% | 89.2% | 100.0% |

**Assumptions (actual amounts used line items will differ)**

| | FACE | 000 USD | PERCENTAGE |
|---|---|---|---|
| Administrative expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | 150,000 | 155,500 | 0.223741 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 344,500 | 0.495583 |
| Payments to Banks (estimated) for liens, including administration claims for use and impairment of collateral, collateral proceeds, and diminution claims | | 85,000 | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.280576 |
| Post-petition interest for banks | | 21,638 | |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claim | | 695,000 | 1.000000 |
| Total estate claims (hypothetical estimate) | | 790,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and new calculations will be required, based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $44.5MM, $144.5MM, $244.5MM and $344.5MM.