# Exhibit A, Part I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 07 CIV 8139
## JUDGE CHIN

---

HARBINGER CAPITAL PARTNERS
MASTER FUND I, LTD.; AURELIUS
CAPITAL MASTER, LTD.; AURELIUS
CAPITAL PARTNERS, LP; ARROW
DISTRESSED SECURITIES FUND;
SCHULTZE MASTER FUND, LTD.;
LATIGO MASTER FUND, LTD.; UBS
WILLOW FUND, LLC; MISSOURI STATE
EMPLOYEES' RETIREMENT SYSTEM;
BLACKROCK GLOBAL FLOATING RATE
INCOME TRUST; BLACKROCK LIMITED
DURATION INCOME TRUST;
BLACKROCK SENIOR INCOME SERIES;
BLACKROCK SENIOR INCOME SERIES
II; BLACKROCK SENIOR INCOME
SERIES III PLC; MAGNETITE V CLO,
LIMITED; BLACKROCK SENIOR LOAN
PORTFOLIO; HARCH CLO II, LTD.; and
RZB FINANCE LLC,

Plaintiffs,

-against-

WACHOVIA CAPITAL MARKETS, LLC
d/b/a WACHOVIA SECURITIES, BDO
SEIDMAN, LLP, GREGORY J.
PODLUCKY, and ROBERT LYNN,

Defendants.

SEP 17 2007

U.S.D.C. S.D. N.Y.
CASHIERS

No. 07 Civ.

**COMPLAINT**

**Jury Trial Demanded**

---

Plaintiffs, by their attorneys Quinn Emanuel Urquhart Oliver & Hedges, LLP, for

their Complaint against Defendants Wachovia Capital Markets, LLC d/b/a Wachovia Securities

("Wachovia"), BDO Seidman, LLP ("BDO"), Gregory J. Podlucky, and Robert Lynn

(collectively, the "Defendants"), allege as follows:

### PRELIMINARY STATEMENT

1.      Le Nature's, Inc. ("Le Nature's" or the "Company"), a beverage manufacturer, bottler, and distributor based in Latrobe, Pennsylvania, orchestrated a massive and now widely acknowledged fraud that led to the Company's bankruptcy and ultimate demise.  For the year 2005, Le Nature's reported net sales of over $275 million.  As a court-appointed custodian discovered, however, Le Nature's' actual revenues were as little as *$32 million*.  The massive revenues inflation, which was accompanied by overstated and false profit reports, had gone on for years; Le Nature's had long been reporting sales numbers that had no relation whatsoever to its actual results.

2.      On November 1, 2006, just after the public revelation of Le Nature's fraud, a group of Le Nature's' creditors placed the Company in involuntary bankruptcy.  Not long thereafter, the Company ceased operations altogether.

3.      Just 60 days before the bankruptcy proceedings commenced, on or about September 1, 2006, Le Nature's borrowed $285 million in a loan administered by Wachovia Bank, N.A. ("Wachovia Bank"), an affiliate of defendant Wachovia.  Wachovia arranged the loan, underwrote the loan, and orchestrated the "syndication" of the loan -- that is, sale of the indebtedness to an array of banks and other investors.  Through the syndication process, these other banks and investors became lenders to Le Nature's.  As a result of the syndication, Wachovia Bank ended up owning – and thus, being at risk with respect to – only a small fraction (approximately $7 million) of the overall loan.

4.      Each Plaintiff in this action owns a portion of the $285 million Le Nature's bank debt, having either purchased an interest directly from Wachovia in the syndication process or from a subsequent holder of the debt.  In total, Plaintiffs own more than $165 million of debt issued pursuant to the Credit Facility.  Other third-parties – i.e., *not* Wachovia – own the vast

bulk of the remaining debt. Because of Le Nature's' financial distress, the Company is unable to repay the loan, including interest thereon.

5.     It is now clear that Wachovia, unlike Plaintiffs or their predecessors, knew about Le Nature's' improper practices and struggling finances long before completion of the September 1, 2006 Credit Facility (the "Credit Facility"), yet chose to press forward with the loan and its syndication to advance its own agenda, as well as that of its affiliates. Wachovia had, by its own design, become a trusted advisor and confidant to the Company and its executives, and had secured tens of millions of dollars in fees over several years by structuring, underwriting, syndicating, and managing (both directly and through its affiliates) at least six of Le Nature's' bank facilities and securities issuances. Together with Le Nature's' management, Wachovia also engaged in extensive efforts, over several years, to sell the Company, a process through which Wachovia's investment bankers learned even more details about the Company's fraudulent reporting and management practices. For many years, Wachovia served as Le Nature's' facilitator and arranger for all major financial undertakings.

6.     Among other things, Wachovia knew – but did not disclose to the solicited unsuspecting lenders – that (i) Le Nature's systematically had been unable to make timely interest payments, a fact that Wachovia hid from present and potential lenders by covertly fronting the payments for Le Nature's, (ii) Le Nature's was reporting sales data that could not possibly be accurate based on information readily available to, but purposefully ignored by, Wachovia, (iii) Le Nature's had improperly recorded more than $200 million in capital leases as operating leases, thereby removing these massive liabilities from its balance sheet in order to comply with its debt covenants, (iv) Le Nature's convened a special committee to investigate the sudden resignation of the Company's chief financial officer and other senior financial managers, resulting in a report identifying serious issues with the Company's financial reporting and the

CEO's unchecked control over *all* of the Company's operations, (v) Le Nature's' management was habitually dismissive of requests for information and disregarded specific mandates to improve accounting, inventory, and other financial safeguards, and (vi) Le Nature's' products were being pulled from the shelves at retailers. None of this information, all of which was material and known to Wachovia, was disclosed to lenders. Wachovia knew that Le Nature's was engaging in fraud.

7.    Rather than disclose these important shortcomings, Wachovia published and disseminated to potential lenders, including Plaintiffs or their predecessors, Le Nature's' outrageously inflated revenue and profit numbers in marketing materials and research reports that Wachovia drafted. Wachovia knew that, had the real situation at Le Nature's been revealed, it would have been unable to syndicate the September 2006 loan. But Wachovia's motivation to hide the true facts, and to structure, fund, and syndicate the Credit Facility, was strong. The benefits for Wachovia of completing the new facility included:

- Reducing the credit exposure of its affiliates to Le Nature's by replacing Wachovia Bank's lending commitment to the Company with commitments from unrelated third-parties (such as Plaintiffs or their predecessors);

- Enabling Le Nature's, which could not meet its obligations under the pre-existing credit facility, to perpetuate its operations, and thereby seek a potential acquirer of the Company (a process in which Wachovia as financial advisor would earn many millions of dollars more in fees);

- Generating a substantial banking fee for Wachovia, in excess of $7 million for the September 2006 facility alone; and

- Garnering additional banking work for a mid-market company and improving its high-yield debt resumé, further breaking into a market that Wachovia had been struggling to obtain exposure in.

8.    Remarkably frank internal correspondence within Wachovia reveals Wachovia's true motivations for structuring and marketing the Credit Facility. *On the very day that the Credit Facility was fully funded, Wachovia's bankers boasted that their exposure to Le*

*Nature's was being slashed from $19 million drawn on the pre-existing facility all the way down to $0 drawn on the new facility.* The bankers also celebrated the massive *$7.125 million* fee – what they termed the "skim" – obtained by Wachovia as a result of the new Credit Facility.

9.     Wachovia's improper conduct was not limited to the concealment of information that it knew would be essential to unsuspecting syndicate members. Wachovia also affirmatively conveyed false information about Le Nature's and its operations to the initial lenders under the Credit Facility, including Plaintiffs or their predecessors. Among other things, Wachovia provided documents to the initial lenders that stated false and vastly over-inflated revenues, EBITDA, and growth rates for several years prior to completion of the Credit Facility. Wachovia also presented false asset coverage data to the lenders based on Le Nature's' deflated liabilities resulting from hidden lease obligations. Wachovia's marketing materials falsely described Le Nature's as a strong, competitively positioned company that was capable of taking on even more debt. Moreover, Wachovia's periodic market analyst reports, which were issued many times prior to completion of the Credit Facility and provided by Wachovia to the incoming lenders, gave the Company consistently positive reviews and assigned a strong "outperform" rating to Le Nature's.

10.     Wachovia was not alone in defrauding, and in assisting Le Nature's to defraud, Plaintiffs or their predecessors into extending credit in connection with the new facility. To the contrary, BDO – as the outside, purportedly independent auditor for the Company – played an equally essential role in misrepresenting Le Nature's' financial health. For the year ended 2005, for example, BDO issued a clean audit opinion to accompany Le Nature's' financial statements – the very statements that falsely reflected net sales in excess of $275 million (nearly *ten* times the sales level determined by the court-appointed custodian). BDO also assisted Le Nature's in misclassifying its massive capital lease obligations as operating leases, thereby keeping more

than $200 million of liabilities off the Company's balance sheet, and in hiding rental expenses for production equipment, thereby overstating the Company's net income by more than 37%. BDO's conduct enabled Le Nature's falsely to claim that it had complied with financial ratios mandated in the loan documents. Absent such purported compliance, the Credit Facility never would have closed in the first place. BDO knew, or purposefully refused to determine, that the financial statements were grossly misleading.

      11.    Indeed, from the very outset of its engagement by Le Nature's in 2004, BDO knew that the Company was hampered by severe accounting problems. BDO was initially hired just after (i) Le Nature's' chief financial officer and two other key accounting personnel resigned and submitted letters detailing the Company's serious financial integrity issues – issues that they had previously identified and that the Company refused to remedy, (ii) a law firm issued a report identifying numerous deficiencies in the Company's accounting methods and internal controls, and (iii) the Company's previous auditor, Ernst & Young LLP, was abruptly terminated. Although BDO never disclosed any of these facts in any of its audit reports, BDO knew that the enhanced risk of fraudulent conduct at the Company rendered Le Nature's' audits sensitive. Nevertheless, during three years of audit work, BDO ignored numerous glaring red flags demonstrating the Company's falsification efforts, assisted in the misclassification of liabilities, and issued reports – which it knew that lenders would rely upon – confirming and validating the misstated results. BDO's stamp of approval was a key component of the fraud perpetrated on the lenders.

      12.    Through their conduct described in detail in this Complaint, Wachovia and BDO engaged in fraud and aided and abetted the fraud conducted by Le Nature's and its inside management. Wachovia and BDO also conspired with and assisted the Le Nature's executives in their use of Le Nature's as the vehicle for the commission of numerous federal offenses,

including multiple acts of wire fraud and bank fraud. With the active assistance of Wachovia and BDO, the Le Nature's' executives, through the Le Nature's enterprise, fraudulently misled Plaintiffs or their predecessors, thereby generating hundreds of millions of dollars in fraudulent financing. As a result, Wachovia, BDO and the Le Nature's executives agreed to and did violate the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

13.     Plaintiffs in this action are Allowed Parties in the Le Nature's bankruptcy cases. As a result, they have been permitted access to documents produced by various parties in the bankruptcy discovery process. Those documents provide further details regarding Defendants' fraudulent activities. The allegations in this Complaint, however, are not based on documents produced in the bankruptcy cases that have been designated as "confidential" by the producing parties. When those documents become available for use in this proceeding, Plaintiffs will amend this Complaint to provide further details regarding Defendants' knowledge and conduct.

## PARTIES

### Plaintiffs

14.     Plaintiffs in this action own interests in the Credit Facility, either as the initial purchasers from Wachovia or as the successors-in-interest to such initial lenders. As alleged in more detail below, in accordance with standard practice in the secondary market for loans, such successors-in-interest acquired not only their predecessor lenders' interests in the Credit Facility, but also any and all other rights and claims the predecessor lenders had against all persons and entities related to the same debt. Accordingly, all Plaintiffs in this action have standing to assert the claims set forth in this Complaint.

15.     Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

16.    Aurelius Capital Master, Ltd. ("Aurelius Master"), an exempted company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

17.    Aurelius Capital Partners, LP ("Aurelius Partners"), a Delaware limited partnership, holds interests in the Credit Facility.

18.    Arrow Distressed Securities Fund ("Arrow"), a company organized under the laws of Canada, holds interests in the Credit Facility.

19.    Schultze Master Fund, Ltd. ("Schultze"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

20.    Latigo Master Fund, Ltd. ("Latigo"), an exempted company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

21.    UBS Willow Fund, LLC ("UBS Willow"), a Delaware limited liability company, holds interests in the Credit Facility.

22.    Missouri State Employees' Retirement System ("MOSERS") is a body corporate and an instrumentality of the state of Missouri. MOSERS operates as a trust fund for purposes of providing retirement benefits to its membership and holds interests in the Credit Facility.

23.    BlackRock Global Floating Rate Income Trust ("BlackRock Global"), a Delaware statutory trust, holds interests in the Credit Facility.

24.    BlackRock Limited Duration Income Trust ("BlackRock LDI"), a Delaware statutory trust, holds interests in the Credit Facility.

25.    BlackRock Senior Income Series ("BlackRock Senior"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

26.    BlackRock Senior Income Series II ("BlackRock Senior II"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

27.     BlackRock Senior Income Series III PLC ("BlackRock Senior III"), a company organized under the laws of Ireland, holds interests in the Credit Facility.

28.     Magnetite V CLO, Limited ("Magnetite"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

29.     BlackRock Senior Loan Portfolio ("BlackRock SLP"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

30.     Harch CLO II, Ltd. ("Harch"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

31.     RZB Finance LLC ("RZB"), a Delaware limited liability company, holds interests in the Credit Facility.

**Defendants**

32.     Wachovia is a Delaware limited liability company that conducts substantial business and maintains an office in New York.  According to its website, Wachovia offers "debt and equity underwriting, trading, research and sales, loan syndications agent services, and corporate finance and M&A advisory services."  Wachovia provides these services under the trade name "Wachovia Securities," which is the trade name for all of the corporate and investment banking services of Wachovia Corporation and its subsidiaries (including Wachovia Capital Markets, LLC).  At all times relevant to this Complaint, Wachovia was the principal investment banker and financial advisor to Le Nature's, and it arranged, promoted, and performed other services in connection with multiple credit facilities and securities issuances for Le Nature's, totaling hundreds of millions of dollars.  Wachovia arranged, promoted, and syndicated the $285 million Credit Facility specifically at issue in this action.

33.     BDO is a New York limited liability partnership that conducts substantial business and maintains an office in New York.  BDO was Le Nature's' outside accountant and

auditor for the years 2003 through 2006, and issued audit reports with respect to Le Nature's financial statements for the years ended December 31, 2003, 2004, and 2005.

34.    Gregory J. Podlucky ("Podlucky") is an individual who resides in Pennsylvania. At all times relevant hereto, he was the majority and controlling shareholder of Le Nature's and its Chairman and Chief Executive Officer. Podlucky traveled to New York on several occasions to market Le Nature's bank debt to potential lenders.

35.    Robert Lynn ("Lynn") is an individual who resides in Pennsylvania. At all times relevant hereto, he was an Executive Vice President of Le Nature's and was Podlucky's nominee to, and a member of, Le Nature's' Board of Directors. Lynn traveled to New York on several occasions to market Le Nature's' bank debt to potential lenders. Podlucky and Lynn are referred to collectively as the "Le Nature's Executives."

**Selected Relevant Non-Parties**

36.    Le Nature's is a Delaware corporation with its principal place of business in Latrobe, Pennsylvania. Le Nature's was in the business of manufacturing, bottling, and distributing an array of non-carbonated beverages. Le Nature's was placed in involuntary bankruptcy on November 1, 2006.

37.    Wachovia Bank, a national banking association, conducts business in and maintains a substantial number of offices in New York. At all times relevant hereto, Wachovia Bank administered hundreds of millions of dollars of loans to Le Nature's.

38.    Jonathan Podlucky ("Jonathan Podlucky"), the brother of Gregory Podlucky, is an individual who resides in Pennsylvania. At all times relevant hereto, he was the Chief Operating Officer of Le Nature's and was Podlucky's nominee to, and a member of, Le Nature's' Board of Directors.

39.    Andrew Murin ("Murin") is an individual who resides in Pennsylvania. At all times relevant hereto, he was Podlucky's nominee to, and a member of, Le Nature's' Board of Directors.

## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. §§ 1331, 1334(b), and 1367. The causes of action alleged herein arise under, *inter alia*, sections 1962 and 1964 of the RICO Act.

41.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Among other things, Wachovia met with certain Plaintiffs or their predecessors in New York to induce them to invest in the Credit Facility, and Le Nature's' audited and unaudited financial statements were sent to investors in New York, including certain Plaintiffs or their predecessors. Wachovia and BDO maintain substantial operations and offices in this District.

## BACKGROUND

### History of Le Nature's:  A Rapid Rise and Dramatic Fall

42.    Le Nature's was founded by Podlucky in 1989 and produced its first product – a carbonated flavored water called Le*Nature's Sparkler – in 1992. Within a year, the Company expanded its line of products to include iced teas, lemonades, and a juice-based line of drinks called Dazzlers. By 2005, the Company claimed to be producing nearly 60 different non-carbonated beverage products.

43.    Le Nature's styled itself an innovator in the beverage industry and touted its alleged use of cutting-edge technologies and distribution methods. In the 1990's, Le Nature's purported to be one of the first beverage companies to move its products into environmentally safer PET plastic bottles, to patent a method by which beverages could be pasteurized in the

bottle itself, and to develop new technologies for brewing iced tea. Indeed, Le Nature's

described itself as having "one of America's most advanced beverage manufacturing facilities."

44.    According to its annual financial statements, public pronouncements, and

marketing materials, Le Nature's was a remarkably successful company. The growth in its array

of products was purportedly coupled with even more impressive growth in its gross sales, net

sales, and profits. The year-to-year increases in financial performance were purportedly as

follows:

| Year | Reported Gross Sales | Reported Net Sales | Reported Net Income |
|------|---------------------|--------------------|--------------------|
| 2000* | $40,658,000 | $40,405,000 | $953,000 |
| 2001* | $85,094,000 | $83,961,000 | $1,350,000 |
| 2002 | $143,766,705 | $135,650,095 | $9,458,809 |
| 2003 | $179,905,164 | $155,746,687 | $13,268,578 |
| 2004 | $228,812,363 | $207,069,179 | $22,010,988 |
| 2005 | $287,233,880 | $275,089,169 | $22,916,977 |

*Indicated amounts for 2000 and 2001 are rounded to the nearest thousand.

45.    In August 2005, Le Nature's commenced operations at a new, 500,000 square

foot state-of-the-art facility in Phoenix, Arizona. The new facility substantially expanded Le

Nature's' production capacity, enabling (according to the Company) the production of 32 million

more cases per year. According to the Company, in a presentation made in conjunction with

Wachovia, by December 2005 Le Nature's had "expanded from 1 production facility with a total

of 2 lines in 2003, to currently 2 production facilities with a total of 7 lines in operation."

46.    The reported financial information, as well as the news of expanded production

capacity and plans for additional facilities, falsely painted the picture of a booming company. In

May 2006, however, several minority shareholders in the Company – essentially, early investors

who provided seed capital in exchange for preferred shares of stock and representation on the

board of directors – initiated an action in Delaware Chancery Court against Le Nature's and four

of its inside directors (Podlucky, Jonathan Podlucky, Murin, and Lynn) (the "Delaware Action").

The Delaware Action involved various corporate governance disputes, including claims against the inside directors for failing to actively maximize value and pursue a sale of the company in a manner consistent with their fiduciary duties.

47.     In the Delaware Action, the minority preferred shareholders obtained several orders prohibiting the inside directors from, *inter alia*, incurring non-ordinary capital expenditures and performing certain actions without the board of directors' unanimous consent. In June 2006, the Chancery Court entered a preliminary injunction restraining the Company from taking certain steps, such as making capital expenditures outside the ordinary course of business, without the minority shareholders' approval. On October 20, 2006, the Court issued an order prohibiting the inside directors from accessing, tampering with, or destroying any Company property, books, or records.

48.     Months after filing their initial complaint seeking the restraining order and the appointment of a custodian to preserve Le Nature's' assets, the Company's minority preferred shareholders were advised that, through the use of forged documents, Le Nature's had converted funds placed on deposit by one of its lessors. Specifically, American International Group, Inc. ("AIG") had agreed to provide equipment lease financing for production lines at a planned Florida facility. To that end, in late 2005 and early 2006, AIG deposited approximately $26 million with Krones, Inc., the equipment manufacturer. When AIG sent a representative to the Krones plant to inspect the equipment, it learned that manufacturing had barely begun, and that Krones had forwarded nearly $20 million of AIG's deposit to Le Nature's, supposedly based on written instructions from AIG. Having given no such instruction, AIG asked for copies of the relevant documents. Among other documents, Krones produced a letter, purportedly written on AIG letterhead and purportedly signed by AIG, authorizing release of funds to Le Nature's.

According to AIG, the letter was a forgery, and AIG retained an expert opinion attesting to the letter's falsification.

49.     Following revelation of the forgery, on October 27, 2006, the Delaware Chancery Court approved the minority preferred shareholders' request for the appointment of a custodian and appointed Kroll Zolfo Cooper ("KZC") as custodian for Le Nature's. KZC took possession and control of the company that same day at 5:30 p.m. Over the next few days, several Company employees informed KZC that they had witnessed individuals, including Podlucky, shredding documents. An accounting employee advised KZC that false entries were made in order to meet revenue targets and that the 2005 audited financial statements were based on falsified information. KZC also was advised that over the weekend of October 21 and 22, 2006, a dump truck arrived at the company and unloaded a large volume of documents into the trash compactor, and that several employees witnessed Podlucky's personal bodyguard depositing various bundles of documents into the trash compactor.

50.     On November 1, 2006, Steven G. Panagos, a KZC managing director, filed an affidavit with the Delaware Chancery Court detailing some of KZC's findings in its first few days at Le Nature's. Among other things:

- Information at the Company indicated that actual 2005 revenues were as low as $32 million, as compared to the $275 million reported in Le Nature's' audited financial statements;

- Significant discrepancies existed between customer shipment and accounts receivable information located at the Company and the Company's (a) 2005 audited financial statements, and (b) unaudited financial statements as of June 30, 2006;

- Le Nature's had $1.8 million in available cash reserves, against which it had $2.9 million in outstanding checks; and

- Vendors were making demands on the Company for past due payments in excess of $10 million.

51.    The custodian's findings clearly indicated that the Company had engaged in massive overstatement of its revenues, not only for 2005 but for many years leading up to the Company's bankruptcy.  The meager $32 million in revenues was achieved only *after* the Company brought into operation several of its production lines at the brand new Phoenix facility. Thus, in prior years, the revenues were necessarily lower.  Graphically comparing the Company's purported annual revenues to the $32 million level uncovered by the custodian provides a startling picture of the degree of Le Nature's' fraudulent revenues reports:



52.    On November 1, 2006, several creditors of the Company initiated involuntary bankruptcy liquidation proceedings under Chapter 7 of the Bankruptcy Code.  On November 3, 2006, the Bankruptcy Court for the Western District of Pennsylvania put Le Nature's into Chapter 11 bankruptcy, thereby giving the Company an opportunity to reorganize.

53.    Almost immediately after the initiation of bankruptcy proceedings, Le Nature's ceased operations at its Phoenix facility.  On November 13, 2006, employees who reported to work at the Latrobe plant were sent home and told that the plant would be temporarily closed. Production never resumed thereafter.

54.    Le Nature's' website now states: "Le-Nature's has filed [for] bankruptcy and is no longer producing or selling its products. Unfortunately, the company is also unable to honor any promotions advertised online or elsewhere. We apologize for any inconvenience."

**Wachovia Was Le Nature's' Trusted Advisor and Banker**

55.    For several years leading up to the September 2006 Credit Facility, Wachovia was the exclusive financial advisor to, and investment banker for, Le Nature's. In this role, Wachovia was responsible for arranging, funding, syndicating, and selling an array of credit facilities and a substantial notes offering, all to raise more money to fund Le Nature's' purportedly expanding production and sales. Wachovia was also retained, prior to the Credit Facility, to explore a possible sale of the Company, a process through which it obtained even greater access to, and knowledge of, the Company's operations and finances (as well as bidders' reactions to the information they were provided). As the result of its multiple roles, Wachovia was provided with access to Le Nature's' financial records, personnel, and outside accounting and legal firms.

1)    *April 2003 Credit Facility*

56.    In April 2003, Wachovia was the co-lead arranger for a $150 million credit facility for Le Nature's (the "April 2003 Credit Facility"). Wachovia Bank acted as the administrative agent. As set forth below, the April 2003 Credit Facility was repaid only two months later with funds raised, again by Wachovia, in a bond offering.

2)    *June 2003 Notes Offering – Wachovia's "Reach" to Break Into the High Yield Market*

57.    In or about June 2003, Wachovia arranged the issuance and placement, and acted as the initial purchaser, of $150 million in senior subordinated notes (the "Notes Offering"). Wachovia marketed the Notes Offering to investors through a detailed Offering Memorandum

drafted by Wachovia and bearing the "Wachovia Securities" name on its cover. The proceeds of the offering were used to satisfy Le Nature's' obligations under the April 2003 credit facility.

58.    Even by the time of the June 2003 Notes Offering, Wachovia knew that Le Nature's was a troubled company. Motivated by (i) fees to be generated by the Notes Offering, (ii) the solidification of an on-going investment banking relationship with Le Nature's, and (iii) relief of its affiliate's credit exposure under the April 2003 credit facility, however, Wachovia pressed forward with the Notes Offering. The result was placement of the notes with an array of investors who also would fall victim to Le Nature's' fraud.

59.    One of Wachovia's principal motivations for participating in Le Nature's fraud, and facilitating placement of the June 2003 Notes, was its strong desire to build up its fledgling high-yield bond business, which was dependent on generating financing transactions for mid-market companies such as Le Nature's. In early 2003, Wachovia was still a comparatively new player in the high-yield underwriting business. In 2000, Wachovia underwrote only one issue. In 2001 and 2002, it underwrote only four and 10 issues (respectively), increasing the total issue amount from $200 million in 2000 to $476.6 million in 2001 and $960.3 million in 2002. In 2003, the year of the Le Nature's' Notes Offering, Wachovia underwrote considerably more: 38 issues valued at $2.7 billion, earning fees of $58 million (up from $23 million in 2002, $9.9 million in 2001, and $4 million in 2000). Compared to other investment banks, however, Wachovia remained a minor player in the sector. In 2003 alone, for example, Credit Suisse First Boston ("CSFB") underwrote 127 issues, valued at more than $21.6 billion.

60.    Struggling to compete with more established investment banks, Wachovia could not be as selective in choosing which high-yield issuances to pursue. Large and more established bond issuers were unlikely to choose a fledgling underwriter like Wachovia. As a result, Wachovia sought to expand its high-yield underwriting business through *quantity*, rather than

quality, and was willing to underwrite deals that other banks were not even willing to consider because of their relatively low credit quality. The Le Nature's Notes Offering was just such a deal. In May 2003, Wachovia's High-Yield Capital Markets Division (the "Origination Division"), which acted as an investment bank charged with originating and underwriting investment opportunities, approached its publicly trading counterpart, the High-Yield Sales (Trading and Research) Division (the "Sales Division"), with the Le Nature's transaction. Within Wachovia, the Sales Division expressed misgivings about the Notes Offering, specifically questioning the accuracy of Le Nature's' recent sales trajectory. Moreover, a senior Wachovia executive had warned the Sales Division that the Company "had hair on it" – a colloquial term meaning that Le Nature's had serious financial and management integrity issues. As one former senior member of the Sales Division acknowledged, the Sales Division was very concerned about moving forward with the transaction and hoped that it would simply "go away."

61.    In light of its concerns, the Sales Division tried to push off the transaction by advising the Origination Division that, based on its review of the Notes Offering, it believed additional due diligence was needed. The Origination Division, hungry to complete the transaction and further cement Wachovia's relationship with Le Nature's, denied that request and instead advised the Sales Division simply to "trust" the Origination Division's due diligence and move forward in selling the Notes. Additional due diligence was not completed at that time.

62.    As a result, Wachovia pushed forward with the Notes Offering even though it was well aware that additional due diligence, requested by its own Sales Division, had purposefully not been done. And lack of due diligence was only part of the picture. Even in early 2003, Wachovia had direct information about the troubling state of affairs at Le Nature's. Grant Rice, a senior manager within the Origination Division and Wachovia's principal contact with Le Nature's, worked at Bank of America before joining Wachovia. Like Wachovia, Bank of

America considered the possibility of raising financing for Le Nature's. Unlike Wachovia, however, that bank cut off its efforts based on its uneasiness with the Company and the Company's lack of openness in the due diligence process. Bank of America recognized that Le Nature's' management could not be trusted, and thus that a financing transaction should not be completed. Rice arrived at Wachovia armed with this knowledge about Le Nature's and the unreliability of its managers. But he brought Le Nature's with him as a client, and worked with fellow Wachovia employees to complete the Notes Offering, knowing all along that his former employer was unwilling to complete a transaction with Le Nature's because of the financial integrity issues it had identified.

63.    The same concerns were reiterated by the Sales Division only months later, following the abrupt and unexpected resignation of Le Nature's' chief financial officer, John Higbee, in August 2003. Higbee, who had worked for decades as an auditor at Arthur Andersen LLP, was hired by Le Nature's (along with a colleague from Andersen) in 2002 to lend credibility to the Company's management team. News of his resignation sent shockwaves through Wachovia's Sales Division. As one former senior member of the Division explained, "it is always pretty horrifying" when a chief financial officer leaves for no reason. Higbee's departure was even more disturbing, given his role in providing legitimacy to Le Nature's' financial management team and his expressly articulated concerns with Le Nature's' accounting practices in his resignation letter. *As explained by a Wachovia Sales Division manager, Higbee's departure was a "very scary event."*

64.    The Wachovia Sales Division, which was at that time making a market by actively trading Le Nature's notes, brought its concerns to the Origination Division. The Sales Division knew that noteholders and potential investors would raise questions about Le Nature's, and it knew that it would be making representations to those investors regarding Le Nature's'

financial health and integrity. Because the Origination Division (and, in particular, Grant Rice) had the closest relationship with Le Nature's, the Sales Division sought its assistance to obtain the best information concerning Higbee's resignation. But when the Sales Division questioned the bankers in the Origination Division about the departure, it was, once again, told simply to "trust" Origination's view that the chief financial officer's departure was insignificant. The Sales Division, which was admittedly "scared" about the developments at Le Nature's, had hit a stone wall; Wachovia simply would not provide its own salesmen with further information that was already in Wachovia's possession and easily within its ability to obtain from the Company. Notwithstanding these serious issues, the Sales Division continued to sell Le Nature's' bonds, and Wachovia continued to structure and place a series of further financings for the Company.

### 3)   *June 2003 Credit Facility*

65.    Coupled with the Notes Offering, Wachovia arranged a replacement $100 million credit facility in June 2003. Wachovia was the sole lead arranger and bookrunner. And, once again, its affiliate, Wachovia Bank, served as administrative agent for a fee. Wachovia syndicated the $100 million credit facility – which consisted of a $100 million revolving line of credit senior to the bonds – to multiple lenders. Wachovia Bank, which also participated as a lender, capped its exposure in this senior facility at $25 million.

66.    As demonstrated by the several transactions that Wachovia arranged in early 2003, from the very outset of its relationship with Le Nature's, Wachovia was willing to turn a blind eye to Le Nature's' substantial infirmities in order to obtain massive fees, generate substantial public exposure, and develop its high yield banking business. Indeed, in a widely circulated e-mail of July 1, 2003, Wachovia's bankers congratulated themselves on their close relationship with Le Nature's management, and celebrated the fees and publicity generated by that relationship. The e-mail also made it clear that brushing aside internal struggles, such as

those between Wachovia's Sales Division and Origination Division concerning the integrity of

Le Nature's management and financial controls, helped to achieve such results. As the e-mail

makes clear, Wachovia was willing to sacrifice its own integrity, and adapt to Le Nature's'

"ever-changing" deal, in order to promote its own business and financial success:

> . . . . The recent transaction is receiving a lot of publicity here in
> Charlotte and everyone is aware that the recent bank/bond deal
> would not have happened without our prior support of the
> company via the previous bank deal and the rapport developed
> with management in the process. . . . As a result of your ability to
> adapt to an *ever-changing deal* and willingness to work in concert
> with CIB [a division within Wachovia], we have recognized *total
> fees of nearly $7.5MM* between the two bank deals and the high
> yield issuance. *This deal has become a poster child for what we
> can get done when we don't get hung up on internal issues* and
> do what is best for the client and our firm as a whole.

### 4) *May 2004 "Add-On" Facility*

67.    In May 2004, Wachovia arranged and marketed another $75 million loan facility

to be added to the pre-existing $100 million revolver. In connection with the new loan and its

syndication, Wachovia prepared a Confidential Information Memorandum that it distributed to

potential lenders. The memorandum touted Le Nature's' purported net sales from 1999 through

2003: $28 million in 1999, $40 million in 2000, $84 million in 2001, $135 million in 2002, and

$159 million in 2003.

68.    The net sales figures in the Wachovia materials were materially false. As

uncovered by the court-appointed custodian in October 2006, Le Nature's' net sales were as low

as $32 million *even after the expansion of the Company's production capacity* with the

completion and operation of its Phoenix facility. Clearly, net sales could not have reached

anything even close to the levels reported by Wachovia in earlier years. Sales in excess of $100

million, such as Wachovia reported for 2002 and 2003, were simply fanciful. Wachovia's

memorandum further stated that the Company's 2003 EBITDA was $61.1 million, reflecting a

compound annual growth rate of 55.0% since 1999. These numbers were also without basis in reality.

69.     On April 20, 2004, Wachovia and Le Nature's made a presentation in New York City to potential lenders with respect to the May 2004 Add-On Facility. The cover slide for the presentation proudly showed authorship by "Wachovia Securities." Jerry Hullinger, a Wachovia director, initiated the presentation by providing a "Transaction Overview." He was accompanied by several Le Nature's executives, including Podlucky, David Getzik (then chief financial officer), and Robert Lynn (general manager), who reiterated the financial results set forth in the Wachovia marketing materials. Following this presentation, Ted Swimmer, a Wachovia managing director, provided a "Syndication Overview," in which he discussed the logistics of the loan and its anticipated closing. As part of his presentation, Swimmer reviewed an "asset coverage calculation" detailing the available collateral for the loan, including a description of Le Nature's' purportedly then-existing accounts receivable and inventory. The financial information presented by Wachovia and Le Nature's' managers was materially flawed, including a substantial overstatement of the asset-to-debt ratio.

70.     In May 2004, Wachovia originated and provided the $75 million add-on term loan to Le-Nature's, which was used to pay outstanding debt due to Wachovia Bank under the pre-existing revolver.

### 5)  *December 2005 "Add-On" Facility*

71.     In late 2005, Le Nature's again called upon its investment bankers at Wachovia to raise new capital for the Company; this time, a $100 million add-on term loan facility to supplement the pre-existing loans. Once again, Wachovia prepared a detailed Confidential Information Memorandum, which it distributed to potential lenders in the new facility. Among other things, the offering memorandum made specific representations regarding Le-Nature's net

sales, gross profit, EBITDA, accounts receivable, inventory, debt, and debt service obligations, much of which was false. For example, Wachovia's offering memorandum reported:

- For the 12 months leading up to September 30, 2005, Le Nature's generated net sales of $271.6 million and EBITDA of $112.3 million, "resulting in an EBITDA margin of 41.4%, its highest level since the Company began operations."

- Compound annual net sales growth from 2000 through the last twelve months period ending September 30, 2005, was 49.3%.

- Since 2003, EBITDA has increased by 98%.

- For the 12-month period ending on September 30, 2005, Le Nature's sold 69.2 million cases of its product, reflecting compound annual growth of 70.9% from 2001.

72.    On December 6, 2005, Wachovia and Le Nature's made a presentation to potential lenders, at the New York Palace Hotel, similar to the April 2004 presentation. As with other presentations, the cover slide proudly displayed the "Wachovia Securities" name and logo. Wachovia's Jerry Hullinger again initiated the presentation, which was organized and run by Wachovia, with a "Transaction Overview" that touted the strength of asset coverage for the loan (based, in part, on Le Nature's' then-existing accounts receivable and inventory). Hullinger also emphasized the Company's strong sales growth and continued margin improvement. During the presentation, prospective lenders were provided with information similar to that set forth in Wachovia's offering memorandum, including the exaggerated sales and EBITDA numbers. Podlucky, Lynn, and David Getzik attended the presentation on behalf of Le Nature's and helped Wachovia present extensive and materially false financial information to the lenders.

73.    As a consequence of Wachovia's efforts, Le Nature's was successful in obtaining the $100 million add-on loan in December 2005, and Wachovia earned millions of dollars in fees in connection therewith. From and after December 2005, Wachovia's affiliate, Wachovia Bank,

continued to act as administrative agent for Le Nature's' secured lending facilities, which thereafter totaled $275 million dollars.

74.    The proceeds of the $100 million add-on loan were used to pay and satisfy the then approximately $83 million in outstanding indebtedness due under Le Nature's' $100 million revolver, including debt due to Wachovia Bank.  Thus, Wachovia Bank's previously capped $25 million exposure under the revolver was eliminated by funding of the new term loan.

75.    As the direct result of Wachovia's efforts, Le Nature's' long-term secured debt increased from approximately $40 million in 2003 to $171 million in 2005.  This lending substantially leveraged Le Nature's' assets and balance sheet and permitted it to continue funding its operations and purported expansion, to present the image of a thriving, growing company to the public and the business community, and to fuel its ever-expanding fraud.

**Le Nature's' Key Financial Managers Identify Fraud at the Company**

76.    On August 14, 2003, shortly after Wachovia completed Le Nature's' $150 million Notes Offering and new $100 million credit facility, John Higbee, Le Nature's' chief financial officer, abruptly resigned.  Higbee was a veteran auditor – with more than 20 years of experience as an audit partner at Arthur Andersen – who was hired by Le Nature's in 2002 to provide legitimacy to Le Nature's' financial management team.  Prior to joining Le Nature's, Higbee had been a member of the Arthur Andersen team that audited Le Nature's' financial statements and had done independent consulting work for Le Nature's.

77.    In his detailed resignation letter, Higbee explained that he repeatedly had requested direct access to the Company's general ledger detail.  As set forth in the letter, however, Podlucky refused to grant Higbee access to the general ledger, a remarkable position for any chief executive to take with respect to a company's chief financial officer.  Among other things, Higbee further explained that Podlucky's completion of business transactions "without

any normal review by others, such as the CFO," had made it impossible for Higbee to fulfill his responsibilities to the Company.  Higbee concluded his letter by explaining the complete control – and the impropriety of such complete control – that Podlucky exercised over Le Nature's:

> I consider 1) *the absolute control you maintain over the Company's detail financial records* 2) the *lack of checks and balances* related to deposits on equipment 3) the *lack of checks and balances* related to deposits on tea leaf 4) the *lack of checks and balances* related to the sale of bulk tea concentrate and bulk tea leaf to be *material weaknesses in the Company's internal controls*.

78.    Higbee was not alone in his concerns and his willingness to express them.  The same day, Jennifer Fabry, the Company's chief administrative officer (who had recently been given the title of chief financial officer in Higbee's place), and Stacy Juchno, the vice president of administration, submitted their resignations.  Both Fabry and Juchno wrote, *"I have seen inconsistencies with how business is conducted and do not agree with such behavior."*

79.    Higbee alerted the Company's auditors at Ernst & Young LLP to the resignations.  In a letter dated August 22, 2003, Ernst & Young, which had audited the Company's financials for the previous two years and issued clean audit reports, requested that the Company "engage immediately competent independent legal counsel to conduct a thorough and complete investigation of the allegations made by the former employees."  Ernst & Young further explained that it would be "unable to be associated with any unaudited interim financial statements or historical audited financial statements, including issuing any consents or comfort letters, until the allegations are investigated thoroughly by independent counsel, we complete our review of the report of the investigation, we perform any additional procedures we consider necessary in the circumstances, and we interview the former employees."

80.    In response to Ernst & Young's demands, Le Nature's purported to create a special committee of its board of directors (the "Special Committee") to investigate certain

business transactions identified by Higbee, Fabry, and Juchno.  The committee, in turn, retained the law firm Kirkpatrick & Lockhart LLP ("K&L") to conduct the investigation.  Both the Special Committee and K&L, while purporting to conduct an independent investigation, limited the scope of the investigation to seven specific transactions identified by the resigning managers. With respect to these transactions, the resigning employees had expressed their concerns that:

- Podlucky exercised exclusive control over significant aspects of Le Nature's' business, including equipment deposits and purchases, the purchase of tealeaf, and the sale of Bulk Tea Products;

- Podlucky refused to explain his relationship with Lawrence Wooten, who they suspected controlled both (i) the sole supplier of tealeaf to Le Nature's, and (ii) Le Nature's' principal purchasers of Bulk Tea Products; and

- Podlucky's flamboyant lifestyle was not consistent with his purported annual income of $50,000.

81.    K&L's resulting report (the "Report") demonstrates that the law firm, while purporting to be an "independent" examiner of the resigning managers' allegations, was beholden to the corrupt management that had hired it and thus failed to conduct an adequate investigation.  The Report repeatedly noted the unavailability of supporting information and documentation, the lack of Le Nature's' (and, specifically, Podlucky's) cooperation, and the insufficiency of Le Nature's' almost nonexistent internal financial controls.  Among other things, the Report revealed the following startling facts, all of which provide a glimpse into the perverse way in which Le Nature's was being managed:

- Andrew Murin (formerly president of Le Nature's) and Edward Reeves (the owner of the sole supplier of tealeaf to Le Nature's) were not "forthcoming" in their interviews.  When K&L requested an opportunity to interview each of them again, "Le-Nature's refused to make either individual available."

- "In many instances, Counsel was unable to obtain external supporting documentation relating to the Bulk Tea Products transactions reviewed by it."

- Counsel sought to interview Lawrence Wooten, the owner of Le Nature's' principal Bulk Tea Products customer. In the first half of 2003, Wooten's companies supposedly purchased $34.2 million of such products from Le Nature's and received trade credits of $3.95 million that were approved by Podlucky *without any involvement of any other Le Nature's employee.* Wooten declined to be interviewed.

- Le Nature's did not enable Counsel to interview a representative of Vistar, a substantial Le Nature's customer that received a large refund for tea concentrate in the first half of 2003.

- Le Nature's inexplicably agreed to increase Wachovia's fee in connection with the June 2003 Notes Offering even though the offering was "oversubscribed at the time of Wachovia Securities' proposal to revise the fee."

- Le Nature's was unable to provide reliable documentation "evidencing the shipping or receiving" of bartered items.

- "Counsel was unable to independently verify receipts and shipments related to Le-Nature's reported purchases of tealeaf and sales of Bulk Tea Products because the third party documents reflecting these transactions are illegible, unreliable, or non-existent."

Acting as if it had not read its own report, K&L unbelievably concluded: "Counsel found no evidence of fraud or malfeasance with respect to any of the transactions."

82.    Among the many other deficiencies in the Report, K&L utterly failed to obtain supporting documentation and information concerning bulk tea concentrate and bulk tea leaf sales. Documents were missing, key customers (with connections to Podlucky) refused to be interviewed, and receipts and shipments could not be verified. The insufficiency of the Report in this regard is jarring, given that problems in this specific area were identified by Higbee in his resignation letter. Indeed, even K&L recognized that "there are significant internal control weaknesses relating to the tealeaf inventory, including the lack of valid third party shipping documents and inadequate segregation of duties." But based on its determination that Podlucky's "explanation for Le-Nature's Bulk Tea Product activity" was "plausible," K&L concluded that Le Nature's' bulk tea sales and purchases were sufficiently identified.

83.     Although refusing to acknowledge fraud at Le Nature's, K&L's Report did identify a number of significant shortcomings in Le Nature's' internal procedures, all of which made the Company more susceptible to fraudulent activities. Thus, K&L recommended that remedial action be taken to improve, among other things, (i) the segregation of duties at Le Nature's, so that Podlucky would not continue to exercise virtually exclusive control over multiple aspects of the business, and (ii) documentation practices, so that assertions reflected in the financial statements could be supported by competent evidential matter.

84.     With K&L's Report in hand, Le Nature's' managers and inside directors continued on, largely undisturbed, in their improper practices. Most significantly, Podlucky continued to exercise unfettered control over all key aspects of the Company's operations. And the Company continued to report revenues that had no relation to the Company's actual level of sales.

85.     The Company provided K&L's Report to BDO, which reviewed the report in conjunction with its audit of the Company's 2003 financials. Upon information and belief, the Report also was provided to Wachovia, which, as the result of its multiple transactions on behalf of Le Nature's, was already familiar with many of the shortcomings identified in the report. In contrast, neither the Report, nor the facts, conclusions, and recommendations contained therein, were ever disclosed to the lenders prior to the closing of the $285 million Credit Facility. Indeed, the lenders were never even advised of, and were not aware of, the existence of the Le Nature's Special Committee that investigated the employee resignations.

**Le Nature's Terminates Ernst & Young and Installs a New
"Independent" Auditor, BDO**

86.     On information and belief, in January 2004, following submission of K&L's Report, Ernst & Young requested that Le Nature's provide it with additional documents. Le

Nature's responded, not by providing information, but by terminating Ernst & Young as its auditor. Ernst & Young was abruptly removed, and Le Nature's brought in BDO as its new auditor.

87.      On information and belief, BDO was aware of the reasons for, and the circumstances surrounding, the removal and replacement of Ernst & Young as the Company's auditor. In particular, BDO knew that *Ernst & Young was terminated after it requested – and because it requested – that the Company provide additional information*. On information and belief, Wachovia was also aware of the dispute between Le Nature's and Ernst & Young and advised of the basis for the substitution of auditors. In contrast, neither the reasons for nor the circumstances surrounding the replacement of Ernst & Young and the hiring of BDO Seidman were ever disclosed to the Plaintiffs or their predecessors prior to the initial sale of interests in the $285 million Credit Facility.

### *1)   BDO Failed to Disclose Material Shortcomings in Its 2003 Audit Report*

88.      In March 2004, Le Nature's engaged BDO to audit the Company's year-end 2003 financial statements. BDO purported to conduct the audit in accordance with "auditing standards generally accepted in the United States of America [i.e., "GAAS"]."

89.      Based on the fraud allegations asserted by the former Le Nature's employees and the sudden termination and departure of Ernst & Young, BDO knew that the Le Nature's audit was sensitive, and therefore that BDO was required to undertake appropriate procedures to identify fraud and other possible sources of material misstatements in the Company's financial statements.

90.      Indeed, as part of its audit, BDO would have been required to review the K&L Report, its recommendations, and any resulting action or failure to act at Le Nature's. On

information and belief, BDO would have noted Le Nature's' failure to adopt even the limited

procedures recommended in the Report.

91.     Notwithstanding Le Nature's' obvious failures to comply with the Report's

recommendations, BDO gave Le Nature's a clean report:

> In our opinion, the 2003 financial statements referred to above
> present fairly, in all material respects, the financial position of Le-
> Nature's, Inc. at December 31, 2003, and the results of its opera-
> tions and its cash flows for the year then ended in conformity with
> accounting principles generally accepted in the United States of
> America [i.e., "GAAP"].

### 2)   BDO Knew and Intended that Its Audit Reports Would Be Provided to, and Relied Upon by, Le Nature's' Lenders

92.     BDO conveyed each set of Le Nature's financial statements, together with its

clean audit opinions, to the Company (and, upon information and belief, to Wachovia or

Wachovia Bank, as administrative agent) with the knowledge and intent that the audited financial

statements would be provided directly to existing and potential lenders to Le Nature's.  Indeed,

the Company's financing agreements *required* that audited annual financial statements be

provided to the Company's lenders.  That requirement was first set forth in section 5.1(a) of the

original June 2003 credit agreement (which all later loans to Le Nature's either supplemented,

amended, or restated), which mandated provision of:

> Annual Financial Statements.  As soon as available, but in any
> event within ninety (90) days after the end of each fiscal year of
> the Borrower, a copy of the consolidated balance sheet of the
> Borrower and its consolidated Subsidiaries as at the end of such
> fiscal year . . . including notes thereto and audited . . . by a firm of
> independent certified public accountants of nationally recognized
> standing . . . .

93.     Later versions of the credit agreement include nearly identical language, including

in section 5.1(a) of the May 2004 and December 2005 amendments to the credit agreement, and

in section 5.1(a) of the September 2006 Credit Facility at issue in this action.  As part of its audit

work, BDO must have reviewed and become familiar with the terms of Le Nature's' credit

facilities. Thus, BDO *knew* that the audited financials would be provided – and permitted them

to be provided – to lenders and potential lenders to Le Nature's.

      94.    Moreover, section 3.1 of the Credit Facility expressly states that, *"to induce the*

*Lenders to enter into this Agreement and to make the Extensions of Credit herein provided*

*for,"* the Company had provided its audited financials and management letters prepared by BDO

to the lenders. The section states:

> The Borrower has delivered to the Administrative Agent and the
> Lenders (a) the balance sheets and related statements of income
> and of cash flows of the Borrower and its Subsidiaries for the fiscal
> years ended December 31, 2003, December 31, 2004 and
> December 31, 2005 audited by BDO Seidman, LLP, (b) an
> unaudited balance sheet and related statement of income and of
> cash flows for the six months ending June 30, 2006 reviewed, (c)
> to the extent prepared and received by the Borrower, management
> letters prepared by BDO Seidman, LLP for the fiscal years ended
> December 31, 2003, December 31, 2004 and December 31, 2005,
> and (d) the six year projections of the Borrower which have been
> prepared in good faith based upon reasonable assumptions. The
> financial statements referred to in clause (a) above are complete
> and correct in all material respects and present fairly the financial
> condition of the Borrower and its Subsidiaries as of such dates.
> The financial statements referred to in clause (a) above, including
> the related schedules and notes thereto, have been prepared in
> accordance with GAAP applied consistently throughout the
> periods involved (except as disclosed therein).

      95.    Similar provisions appear in earlier versions of the credit facility and the

amendments thereto as well. Accordingly, BDO knew not only that its audit opinions would be

provided to the lenders, but that lenders would directly and expressly rely on the content of those

reports in determining to provide credit to Le Nature's and participate in the Credit Facility.

      96.    Additionally, BDO knew that the lenders would rely on its work product beyond

the annual audit reports. Section 5.14(h) of the Credit Facility requires the Company to deliver,

within 30 days of the closing of the facility, "an unaudited balance sheet and related statement of

income and of cash flows for the six months ending June 30, 2006 reviewed by BDO Seidman,
LLP in accordance with SAS 100."

### 3) BDO Issued Defective and False Audit Reports for the Years 2003, 2004, and 2005

#### a. The Requirements of GAAS

97.    Each of BDO's audit reports plainly states that the audit at issue was performed in
accordance with GAAS, and sets forth a basic description of GAAS requirements.  Specifically,
each report states:

> We conducted our audit in accordance with auditing standards
> generally accepted in the United States of America.  Those
> standards require that we plan and perform the audit to obtain
> reasonable assurance about whether the financial statements are
> free of material misstatement.  An audit includes examining, on a
> test basis, evidence supporting the amounts and disclosures in the
> financial statements.  An audit also includes assessing the
> accounting principles used and significant estimates made by
> management, as well as evaluating the overall financial statement
> presentation.  We believe that our audit provides a reasonable basis
> for our opinion.

98.    To conduct an audit in compliance with GAAS, an auditor is not permitted to
simply accept financial information provided to it by its client.  Rather, as set forth in the
codification of auditing standards by the American Institute of Certified Public Accountants
("AICPA"), an "auditor has a responsibility to plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of material misstatement, whether
caused by error or fraud."  (AU § 110.02)  (Citations to "AU" refer to the codification assembled
by the AICPA.)  "The independent auditor's objective is to obtain sufficient competent evidential
matter to provide him or her with a reasonable basis for forming an opinion."  (AU § 230.11)

99.    In addition, due professional care requires the auditor to exercise professional
skepticism, defined as "an attitude that includes a questioning mind and a critical assessment of

audit evidence. . . . Gathering and objectively evaluating audit evidence requires the auditor to

consider the competency and sufficiency of the evidence. . . . [T]he auditor should not be

satisfied with less than persuasive evidence because of a belief that management is honest." (AU

§ 230.07-.09)

100.    Auditors are also required to assess the risk of material misstatement of the

financial statements due to fraud.  (AU § 316)  Based upon that assessment:

> The *nature* of auditing procedures performed may need to be
> changed to obtain evidence that is more reliable or to obtain
> additional corroborative information.  For example, more
> evidential matter may be needed from independent sources outside
> the entity, such as public-record information about the existence
> and nature of key customers [and] vendors . . . The *extent* of the
> procedures applied should reflect the assessment of the risks of
> material misstatement due to fraud.  For example, increasing
> sample sizes or performing analytical procedures at a more
> detailed level may be appropriate.  (AU § 316.52)

101.    The requirements for assessing fraud are especially important for a company such

as Le Nature's, where the former chief financial officer had identified the CEO's exclusive

control over the Company's finances and the lack of internal checks and balances.  Inquiries of

management alone are insufficient, under such circumstances, to assess fraud risk.  "Making

inquiries of others within the entity, in addition to management, may be useful in providing the

auditor with a perspective that is different from that of individuals involved in the financial

reporting process.  The responses to these other inquiries . . . might provide information

regarding the possibility of management override of controls."  (AU § 316.26)  Moreover, when

"evaluating management's responses to the inquries," auditors should be aware "that

management is often in the best position to perpetrate fraud."  (AU § 316.27)

### b. *BDO Failed to Comply with GAAS in Performing Its Audits*

102.     The standards cited above make clear an auditor's duty, in the exercise of professional skepticism, to question financial data provided by the company it is auditing, to take steps to verify that data with independent sources outside of the company, and to question the reliability of information received from management where management itself may be involved in misconduct. BDO failed to follow even these basic standards in conducting its audits for each of the years 2003, 2004, and 2005.

i.     <u>Failure to Test Sales</u>

103.     When, as here, a company's sales and revenues may be overstated, GAAS provides additional analytical procedures that should be performed by the auditor:

> In planning the audit, the auditor also should perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that may indicate a material misstatement due to fraudulent financial reporting. An example of such an analytical procedure that addresses this objective is a comparison of sales volume, as determined from recorded revenue amounts, with production capacity. An excess of sales volume over production capacity may be indicative of recording fictitious sales. (AU § 316.29)

104.     On information and belief, BDO did not take such steps. Rather, BDO failed properly to test Le Nature's' sales, thereby failing to disclose the excessively inflated sales figures in 2003, 2004, and 2005, and falsely certifying those sales amounts in each of the annual financial statements that it audited.

ii.     <u>Failure to Assess Fraud Risk With Non-Executive Employees</u>

105.     When the management of a company may itself engage in fraud, and when management is known to override controls (to the extent there are any controls in place), GAAS requires auditors to interview non-management employees regarding the possible existence of fraud. (AU §§ 316.26, 316.27)

106.    Indeed, with respect to Le Nature's, had BDO interviewed several non-management employees – as the custodian did immediately after it was installed at the Company – BDO would have learned specific information regarding the Company's (and Podlucky's) inappropriate conduct.  On information and belief, notwithstanding its knowledge of Podlucky's management style and his disregard for controls, however, BDO chose not to interview non-management employees.

      iii.     Gross Misclassification of Leases, Thereby Vastly Reducing
              the Stated Amount of Liabilities

107.    In 2005, Le Nature's substantially increased the amount of property and equipment that it was leasing, largely in connection with its new Phoenix facility.  According to the 2005 audited financials, Le Nature's' *operating* lease obligations jumped from $37.8 million at the end of 2004 to over $413 million at the end of 2005.  Over the same period of time, Le Nature's' *capital* lease obligations, as reported on the audited financials, fell from $7.4 million to $5.0 million.

108.    The distinction between capital leases and operating leases is important.  In essence, the lessee in a capital lease – much like an owner of property – assumes the risk that the value of the asset will change over time.  Thus, capital lease payments are akin to repayment of debt to acquire property.  Capital lease obligations must be disclosed as liabilities on a company's balance sheets.  In contrast, operating lease expenses are typical expenses incurred during the course of a year that do not impact a company's balance sheet.

109.    BDO's review of Le Nature's' leases – to the extent any such review was actually conducted – was necessarily flawed because its ultimate approval of the Company's classification of hundreds of millions of dollars of leases as operating leases was incorrect.  Statement of Financial Accounting Standards No. 13 ("FAS 13"), titled "Accounting for

Leases," provides that "a lease shall be classified as a capital lease by the lessee" if the present value of the minimum lease payments equals or exceeds 90 percent of the fair value of the leased property (in excess of any related investment tax credit). Applying this test (which constitutes the GAAP standard for reporting by lessees like Le Nature's), the vast majority of the nearly $400 million in new leases obtained by Le Nature's in 2005 were, in fact, capital leases. Specifically, with respect to at least $200 million of the new leases, the lease payments were structured to amount to 90% (and, in many cases, far more) of the fair value of the property.

110.   In determining that the leases were properly classified as *operating* leases, BDO either knowingly bowed to Le Nature's' misclassification of the leases or refused to make a proper determination on its own, thereby willfully blinding itself to the economic substance of the leases in question.

111.   Indeed, *even Wachovia was aware of the lease misclassification issue,* so much so that it retained the independent services of another major auditing firm to review the very same leases. In the fall of 2006, on the heels of its syndication of the new Credit Facility, Wachovia retained the services of PricewaterhouseCoopers LLP ("PwC") to assist Wachovia in its own evaluation of Le Nature's. Among other things, Wachovia specifically instructed PwC to:

> Perform and prepare an analysis of debt and debt-like items, as well as identify other significant commitments and contingencies including developing an understanding of the nature of the expense and related commitments behind the operating lease agreements and deposits.

As part of its analysis, PwC reviewed, among other documents, BDO's audit workpapers in connection with the 2005 audit. PwC also held conversations with the BDO audit team.

112.   Le Nature's and BDO's misclassification of capital leases as operating leases was not limited to the leases for equipment to be installed in the Phoenix facility. Le Nature's also entered into a $65 million lease for the real estate – the plant and property – in Phoenix. As with

the equipment leases, Le Nature's, with BDO's approval, classified the real estate lease as an operating lease, thereby keeping yet another $65 million liability off of the balance sheet. Once again, however, the lease should have been classified as a capital lease, and the full amount of the lease should have been reflected as a liability on Le Nature's' balance sheet.

113.    Among the many reasons that BDO was required to classify the property lease as a capital lease was the requirement that Le Nature's maintain a $3 million letter of credit on behalf of the lessor. FAS 98 limits the recourse a lessor may have to the asset under lease. Any additional guarantee as a form of collateral, such as the letter of credit that Le Nature's was required to (and did in fact) post, prohibits operating lease treatment.

114.    Additionally, the property lease required Le Nature's to pay for the cost of electrical wiring and heating and air conditioning systems in the Phoenix facility. GAAP, specifically EITF 97-10, prohibits a lessee from paying for structural costs, and expressly identifies electrical wiring and air conditioning.

115.    In total, between the equipment leases and the real estate lease, Le Nature's hid more than $200 million in liabilities from its balance sheet, all with BDO's knowledge and approval.

116.    BDO's errors in validating the misclassification of more than $200 in liabilities were patent; indeed, the only explanation is that BDO was complicit in Le Nature's' efforts to misstate its liabilities, thereby enabling the Company to take on additional and excessive loans, such as the September 2006 Credit Facility. By permitting Le Nature's to hide a massive amount of debt, BDO approved fundamentally false – let alone materially misstated – financial statements.

117.    The misclassification of capital leases as operating leases had a direct impact on Le Nature's' ability to obtain, and Wachovia's efforts to syndicate, the very debt at issue in this

action. The Credit Facility includes various financial covenants that Le Nature's was required to satisfy in order to obtain the financing. Had Le Nature's been unable to satisfy these covenants – as would have been the case had the capital leases been included, as required, on the balance sheet – the loan never would have been consummated.

118.    For example, the very first financial covenant, set forth in section 5.9(a) of the Credit Facility, required Le Nature's to maintain a Leverage Ratio – i.e., the ratio between "Funded Debt" (which includes capital leases) and EBITDA – of no more than 4.25 to 1.0. Adding $200 million to the capital leases would render Le Nature's incapable of satisfying this covenant – the Leverage Ratio would have jumped to higher than 5.0. At that level of debt to EBITDA, the Credit Facility never would have been completed.

119.    Moreover, by enabling Le Nature's to borrow ever increasing amounts, the improper classification and off-balance sheet treatment of capital leases enabled Le Nature's to bring in more cash that could be used to fraudulently pay invoices to customers creating the appearance that the customers themselves had made those payments, thereby perpetuating the Company's revenues fraud.

iv.    Failure to Expense Rental Payments

120.    BDO failed to comply with GAAP not only by classifying Le Nature's' equipment leases as operating leases, but also in failing to reflect substantial payments under those leases as expenses chargeable against Le Nature's' income. As a result, the 2005 audited financial statements that BDO confirmed substantially overstated Le Nature's' net income.

121.    Specifically, Le Nature's planned to install four production lines at the Phoenix facility. The equipment for each line was financed through the leases referenced above (which Le Nature's and BDO improperly treated as operating leases). Accounting standards make clear that, when the equipment subject to such a lease comes under the control of the lessee (i.e., Le

Nature's), rental payments under the lease must be accounted for as expenses. Such expenses, in turn, are included in the company's statement of income, and therefore reduce the bottom-line net income reflected in the financial statements.

122.    In its December 2005 presentation to potential lenders, Wachovia reported that the Company had "a total of 7 lines in operation." Because four of those lines were in Latrobe, three of the production lines at the Phoenix plant must have been operational by the end of 2005. Accordingly, rental payments for three of the Phoenix lines should have been recorded as an expense in 2005.

123.    Rent payments for the Phoenix equipment lines totaled approximately $12 million in 2005. Of this, BDO failed properly to expense rent payments for the second and third production lines. Those payments amounted to $8.6 million in 2005, or more than 37% of Le Nature's reported $22.9 million net income. Applying the operating lease treatment that Le Nature's and BDO themselves adopted, the full $8.6 million should have been expensed. Even if Le Nature's had properly classified the leases as capital leases – which it failed to do – its income would have been reduced by a similar amount. Had proper capital lease treatment been used, income would have been reduced by depreciation of the assets subject to the leases and by interest expenses under the leases. Yet no such expenses were recorded on Le Nature's financial statements, and no such depreciation was taken.

124.    This material overstatement of net income, in turn, affected Le Nature's purported compliance with the financial ratios covenanted in the Credit Facility. Moreover, because Le Nature's was already overstating its income – e.g., by reporting inflated revenues – the improperly omitted expenses had an even greater impact, on a percentage basis, on the actual income level. Had Le Nature's' net income properly been reflected on the financial statements audited by BDO, the initial lenders would not have loaned money to the Company.

**Wachovia Was Aware of Le Nature's' Financial Problems Prior to September 2006**

### *1)    Wachovia Was Directly Advised of Le Nature's' Problems in Trying to Sell the Company*

125.    In 2005 and 2006, Podlucky, Le Nature's, and Wachovia initiated efforts to pursue a liquidity event that would result in the sale of Le Nature's, satisfaction of the Company's secured debt, a payout to its shareholders, and even more millions of dollars in fees for Wachovia.

126.    To that end, in April 2005, the Le Nature's board of directors established the Project Palmer Committee and charged it with reviewing and maintaining information regarding proposed sale transactions. Podlucky and the Project Palmer Committee worked closely with Wachovia to solicit potential buyers for Le Nature's. In connection with the effort, Wachovia convened its own team of senior officers to work with Le Nature's on a sale of the Company, hoping to achieve another substantial fee for Wachovia.

127.    Throughout the second half of 2005 and into early 2006, Wachovia solicited potential buyers and conducted presentations to many potential acquirers. Several of the potential buyers undertook due diligence on Le Nature's and directed their questions and concerns to Wachovia. At least one of the potential buyers, GTCR Golder Rauner, LLC ("GTCR"), raised serious concerns about Le Nature's including, on information and belief, issues with its reported wholesale product pricing.

128.    Although, on information and belief, GTCR raised the pricing issue directly with Wachovia, Wachovia knew that Le Nature's would never be able to provide answers to GTCR's issues. Rather, in April 2006, Podlucky reported that GTCR "was not going to provide [the] value we were looking for" and broke off discussions with GTCR. On information and belief, other potential buyers identified similar price discrepancies.

129.   Accordingly, in its attempt to solicit buyers for Le Nature's prior to consummation of the Credit Facility, Wachovia was presented with serious and disturbing questions from potential buyers that directly challenged the Company's financial and managerial integrity. Although Wachovia was aware of these problems, it did not disclose them to Le Nature's' lenders or potential lenders.

### 2)    *Wachovia Encouraged Its Bank Affiliate to Hide Le Nature's' Dire Financial Situation by Fronting Interest Payments to Syndicate Lenders*

130.   Throughout 2006, Wachovia was also acutely aware – and concealed from other existing lenders to Le Nature's – that Le Nature's was suffering serious cash flow problems. As the Administrative Agent for the existing credit facility, Wachovia's banking affiliate, Wachovia Bank, was charged with collecting interest payments from Le Nature's and distributing them to the syndicate lenders. Le Nature's, however, was habitually late with the interest payments – it was unable to timely satisfy obligations on its most senior credit facility. Wachovia knew that disclosure of such payment problems would jeopardize any future financings, issuances, or deals for Le Nature's (and thereby jeopardize the associated fees for Wachovia). To hide the problem from the other lenders, Wachovia actually fronted the interest payments to the syndicate lenders; that is, it paid out interest before collecting the payments from Le Nature's. This procedure was remarkably atypical, and was motivated solely by Wachovia's desire to keep Le Nature's' financial straits hidden from the other lenders.

131.   In March 2006, for example, Wachovia Bank paid out nearly $1.9 million in interest, despite failing to obtain the payment from Le Nature's. Sue Patterson, the Wachovia Bank employee charged with collecting interest from Le Nature's (who apparently was not advised of Wachovia Bank's purpose in fronting the payments), complained that "[a]nytime there is LIBOR interest due or interim interest due the company does not seem to be in a big

hurry to pay me." She noted her frustration with the situation: "It's very frustrating when I have to pay the bank group on the payment due dates and then try to recover funds WBNA is out for the time period in which we are awaiting the funds."

132.    Even Patterson, however, was not fully in the dark. In an e-mail complaint about the interest situation, which was forwarded to bankers in Wachovia's Origination Division, Patterson explained, "I try to jump through hoops for this company to keep Greg [Podlucky] happy so I would appreciate it if they could pay on time."

133.    Le Nature's' failure to make timely interest payments was not an isolated event; it continued throughout 2006. Indeed, on August 29, 2006 – just days before Wachovia put the new Credit Facility into effect – Le Nature's was still behind on its interest payments. Although the problem persisted on the eve of closing the new and even larger facility, Wachovia never advised the other lenders of this serious indication that Le Nature's was struggling to stay afloat.

### 3)    *Wachovia's Own Analysts Were Identifying Disturbing Issues*

134.    In the years leading up to the September 2006 Credit Facility, analysts in Wachovia's Sales Division regularly issued glowing reports about Le Nature's' business, repeatedly assigning an "Outperform" rating to the Company. Wachovia's analysts were aware of Le Nature's' problems, however, long before September 2006. And the analysts' questions to Origination Division bankers *in the days just before completion of the Credit Facility* make clear that the Sales Division was aware of Le Nature's' improper conduct and ailing financial situation before the Credit Facility was completed.

135.    In April 2006, several months before the Credit Facility closed, Bryan Hunt, a Wachovia director and the head of high-yield research for Food & Beverage, Food Retailing, and Restaurants, sent an e-mail to Le Nature's' executive vice president noting that Le Nature's' products were not being stocked in retail stores. Among other things, Hunt noted that (i)

flavored water had been removed from the shelves at southeast Kroger stores, (ii) Dazzlers were

removed at Target stores, (iii) and other stores were showing weak "sales tempo" and "very little

product" for Le Nature's.

136.    On August 29, 2006 – the day before Wachovia actively sought lenders to buy up

the new Credit Facility – Hunt sent an e-mail to several investment bankers in Wachovia's

Origination Division highlighting more (and more severe) problems at Le Nature's.  Titled

"Questions that need to be answered . . . .," Hunt's e-mail stated, among other things:

- "Why is the company's interest exposure roughly $4MM a quarter over the last 10 quarters, while debt has increased every quarter?"

- "How does a company of this scale have zero payables?"

- "Why did the company suddenly re-enter the commercial tea business after exiting the business a year ago?"

137.    Hunt also noted, "*I find it hard to believe* that Le Nature's EBITDA margins are a

full 10% higher than any other company in the space."

138.    The Origination Division did not answer Hunt's questions.  Rather, it obtained

commitments from lenders for the full amount of the new Credit Facility.  Only after those

commitments were obtained, those very questions, and many more, were forwarded on to

Podlucky at Le Nature's.  Simply put, rather than answer the troubling questions raised by its

own analyst, Wachovia purposefully brushed the questions aside long enough to enable funding

of the new Credit Facility it was peddling.

### 4)    *Wachovia's Trading Desk Sold Off Its Le Nature's Bonds by September 2006*

139.    For several years following issuance of Le Nature's bonds in June 2003,

Wachovia maintained an inventory of the bonds both to "make a market" – that is, to provide

liquidity for other parties interested in buying or selling the bonds – and for its own proprietary

trading purposes.  The market-making function was typical for banks underwriting such notes,

and the broader market would expect Wachovia to fulfill that function. This was an important component of Wachovia's attempt to become a meaningful dealer in the high yield bond market.

140.   On information and belief, at some point in 2006, well before completion of the new Credit Facility, Wachovia's trading desk stopped committing *any* capital to investments in Le Nature's. Moreover, the trading desk sold off all of its holdings in Le Nature's bonds, including the market making inventory and the bonds held for proprietary purposes. The trading desk chose to forego the market-making role notwithstanding market expectations of purchasers in private placements like the Notes Offering.

141.   Wachovia's trading desk position was flatly inconsistent with the research reports being published and distributed by Wachovia (assigning ratings such as "outperform" to Le Nature's). While Wachovia was publicly distributing materials touting Le Nature's' financial performance, including the Company's sales and profit growth, the actions of Wachovia's trading desk belied any true belief at Wachovia that Le Nature's was performing well.

**The September 2006 Credit Facility**

### *1)   Wachovia's Strategy for Refinancing the Company, Reducing Its Own Exposure, and Dumping Risk on Other Lenders*

142.   By August 2006, Wachovia was deeply troubled by Le Nature's' financial problems and growing disputes between management and the minority preferred shareholders. Wachovia's efforts to sell the Company had proven unsuccessful with bidders walking away, and the Company desperately needed a cash infusion to meet its obligations and continue as a going concern. Wachovia was aware of these issues, but had to devise a strategy to achieve an array of competing goals: (i) obtain a short-term cash infusion to keep the Company afloat, (ii) enable the Company to continue its marketing and longer term refinancing efforts, both to take out the minority preferred shareholders and to achieve a sale, (iii) substantially reduce Wachovia's credit

exposure to the Company, and (iv) generate additional significant fees for Wachovia. Moreover, Wachovia had to meet these goals without conveying the message to investors that reduction of its own exposure was, from Wachovia's perspective, essential.

143.    Privy to knowledge of Le Nature's' problems, Wachovia, together with Le Nature's, devised a plan to achieve their joint goals. Specifically, Wachovia determined to launch a new larger credit facility that would completely replace the facility that was then in place. The new facility could be funded by the pre-existing lenders to which Wachovia had made complete presentations in December 2005. By following this route, Wachovia could (i) get a quick cash infusion for Le Nature's, (ii) avoid producing a new array of documents and inviting new due diligence by relying principally on the fraudulent materials that were already created and distributed for the pre-existing facility, and (iii) induce the other lenders to increase their commitments and thereby reduce Wachovia's exposure on the loan.

144.    At the very end of August 2006, Wachovia informed the pre-existing lenders that a technical event of default had occurred under the existing Le Nature's credit facility, requiring that a new loan be substituted in its place. Specifically, Wachovia explained that the minority preferred shareholders' lawsuit in Delaware, which requested the appointment of a custodian, gave rise to an event of default because, notwithstanding a settlement between the Company and the minority shareholders, the case had not been formally dismissed. Wachovia explained that the default could be waived with 100% lender approval, but that getting unanimous approval from a large group is always a time consuming, unwieldy process. Wachovia told the lenders that the new facility had to be funded by September 1, only a few days (and, in many cases, one day) after Wachovia informed the lenders of the proposal.

145.    Wachovia pitched the new facility to the lenders by explaining that they would get an enhanced yield – i.e., the interest rate was being increased – even though Le Nature's