# Exhibit A, Part II

remained the same strong, growing company that it was in December 2005. Le Nature's still had a positive credit rating and was reporting increasing revenues and climbing EBITDA. As one Wachovia salesman explained in an e-mail of August 30, 2006, participating in the new facility was a "no brainer."

146.    Wachovia also pitched the new facility by claiming that lenders would be able to get an increased, long-term yield, even though the facility would turn out to be a short-term, and thus less risky, loan. Wachovia salesmen told lenders that Le Nature's would soon be obtaining new financing (from Wachovia) to take out the Company's minority preferred shareholders. As a result, the $285 million Credit Facility, according to Wachovia, would be of limited duration, lasting perhaps only a few months.

### 2)    Wachovia Disseminated False Information to, and Withheld Material Adverse Information from, the Credit Facility Lenders

147.    Wachovia authored and distributed a limited set of new materials to the lenders in connection with the new Credit Facility, relying to a large extent on the fraudulent documents prepared for the December 2005 Add-On Facility, which also had been drafted by Wachovia. To justify the sparse documentation, Wachovia cited the need to complete the refinancing on an expedited basis because of the purported technical event of default. Wachovia turned to many of its frequent customers, repeatedly telling them to "trust us" rather than require a comprehensive set of contemporaneous documents.

148.    Wachovia did, however, provide some documents to the lenders, both newly prepared documents and documents drafted in connection with the prior facility. All of these documents contained material misrepresentations regarding Le Nature's' business. The lenders thus based their decisions to participate in the Credit Facility – generally at *higher* levels than

their participation in the previous facility – on false information provided to them by Wachovia.

Among other documents, the lenders were provided, and reasonably relied upon:

- Audited financials for the years 2004 and 2005, which, among other things, overstated Le Nature's' revenues, understated Le Nature's' liabilities, and included BDO's stamp of approval;

- The December 2005 Confidential Information Memorandum drafted by Wachovia, which, among other issues, overstated the Company's revenues, understated liabilities, and misreported the Company's growth rate; and

- Unaudited financial statements for March 31, 2006 and June 30, 2006, both of which overstated revenues and understated liabilities.

149.    Wachovia also provided to the lenders a series of research reports authored by its Sales Division, touting Le Nature's as a sound investment. The information reported to the lenders (and to other investors) was inconsistent with Wachovia's actual knowledge and internal but undisclosed behavior, and was riddled with materially inaccurate statements. For example, on June 6, 2006, just a few months before completion of the Credit Facility, Wachovia released a report reiterating its "outperform" rating for Le Nature's. Among other false information, the research report stated that (i) EBITDA increased $18.4 million to $39.9 million (surpassing Wachovia's estimate of $25.0 million), (ii) bottled case volume increased 80.3%; and (iii) the Company has generated case volume sales growth of 57% to 90% annually over the last five years.

150.    Similarly, before the December 2005 Add-On Facility, Wachovia published research reports that materially misrepresented the financial health of the Company. On August 30, 2005, for example, Wachovia maintained its "outperform" rating for Le Nature's and reported that

> Q2 [2005] EBITDA was $49.1 million, which compared favorably to $26.3 million in the year-earlier period. EBITDA handily beat our estimate due to the significant increase in sales levels and the

reduction of trade spending expenses. EBITDA margin increased
495 bps from the year earlier period to 50.3% due to greater sales
levels and reduced expenses.

The report further and falsely asserted that Le Nature's' gross sales had increased 44.9% from

the year earlier period to $94.6 million for the second quarter of 2005.

151.    Wachovia created and distributed additional research reports on Le Nature's, each

one including material misstatements regarding Le Nature's' revenues and other financial

information, on or about August 18, 2003, October 3, 2003, November 19, 2003, February 20,

2004, June 15, 2005, and April 13, 2006.

152.    While providing the lenders with documents and information containing false

information, Wachovia failed to disclose its knowledge of Le Nature's' financial problems and

misconduct. Wachovia did not tell any of the lenders (other than its affiliate, Wachovia Bank)

that:

- Wachovia Bank was secretly fronting interest payments for Le Nature's,
  which was incapable of making timely payments;

- Le Nature's was classifying more than $200 million of capital leases as
  operating leases, in order to keep liabilities off its balance sheet and enable
  compliance with mandated financial ratios in the loan documents;

- Following the abrupt resignation of the Company's chief financial officer
  and other most senior financial managers, a law firm had drafted a report
  making it clear that Le Nature's was dominated by a chief executive
  officer who made unilateral decisions without input or oversight from
  other Company employees, the Company failed to maintain
  documentation supporting its reported financial results, the Company was
  unable to produce verification for many of its most significant purported
  transactions, the Company was operated without any meaningful controls,
  and the Company's employees and key vendors were unwilling to
  participate in a meaningful investigation of the Company's operations;

- Le Nature's' management was both uncooperative and failed to provide
  requested financial information; and

- Wachovia's own analysts were uncomfortable with Le Nature's, but Wachovia's investment bankers put off their questions – rather than attempt to obtain answers – until after completion of the Credit Facility.

153.    Wachovia also failed to disclose that a true purpose in arranging the Credit Facility was to reduce Wachovia Bank's financial exposure to Le Nature's. Despite hiding this fact from the lenders, Wachovia's bankers celebrated the reduction in exposure when the Credit Facility was fully funded. *While Wachovia pitched participation in the new loan to the other lenders as a "no brainer," it used the new Credit Facility as an opportunity to dump its own exposure to Le Nature's onto other, unsuspecting lenders, including many of its own best customers.*

154.    Specifically, on September 1, 2006, a Wachovia vice president e-mailed his colleagues that Le Nature's was funded. He added, "At the end of the day, we reduce our exposure from $19MM drawn against our $25MM commitment to $0 drawn against what we expect to be a final commitment of under $10mm (target of $7MM, which is inside of our skim of $7.125MM)." In simple English, Wachovia had (i) reduced its affiliate's existing exposure by $19 million, all the way down to zero; (ii) reduced its affiliate's potential exposure from $25 million to approximately $7 million; and (iii) earned a massive fee of $7.125 million for its few days of work.

155.    There can be no question that Wachovia knew about – or, at the very least, willfully blinded itself to – the massive and ongoing financial fraud being perpetrated by Le Nature's management, including the specific issues that Wachovia failed to disclose to the lenders. First, Wachovia knew that its bank affiliate was fronting interest payments on the existing credit facility to hide from the other lenders the Company's inability to pay.

156.    Second, at the time it arranged the new Credit Facility, Wachovia plainly was aware of Le Nature's' misclassification of more than $200 million of capital leases, and of the

effect that this misclassification had on Le Nature's' purported compliance with financial ratios covenanted in the Credit Facility. Wachovia identified *this very issue* for PwC to review in the days immediately following completion of the Credit Facility. In hiring PwC to perform due diligence – in itself, an unusual action for a bank that had spent years working closely with Le Nature's – Wachovia directed PwC to "develop[] an understanding of the nature of the expense and related commitments behind the operating lease agreements and deposits."

157.    Following disclosure of the fraud, word leaked to some of the lenders that Wachovia had retained PwC, a fact that Wachovia failed to share prior to the Company's bankruptcy. Even then, Wachovia was unwilling to disclose the truth, or to explain the nature of the work that PwC was retained to perform. Instead, Wachovia continued to actively mislead lenders by offering the lame excuse that PwC was hired merely to perform "ticking and tying" work.

158.    Third, potential acquirers had directly advised Wachovia of issues with Le Nature's' sales and revenues reporting. In completing the Credit Facility, and shifting risk from its own affiliate to third-party lenders, Wachovia simply brushed these issues aside.

159.    Fourth, Wachovia knew that its "technical event of default" justification for the new Credit Facility was a sham. To begin with, the original action seeking appointment of the custodian was filed in Delaware on May 16, 2006. Documents prepared by Wachovia asserted that the pendency of such an action for 60 days would constitute an event of default. If accurate, then the default occurred in the middle of July 2006; the rush to close a new facility in the beginning of September made no sense. Yet Wachovia purposefully led the lenders to believe that time was of the essence to resolve the "technical" default. Moreover, Wachovia knew that the debt was trading above par. Under those circumstances, getting approval from the lenders to waive the event of default should have been no problem. In all events, it should not have been

more difficult to obtain approval from all of the lenders than to implement an entirely new credit facility – unless, of course, Wachovia believed that some of the lenders (specifically, the lenders that did *not* participate in the new Credit Facility) were aware of Le Nature's' real state of affairs.

### 3) *Wachovia Moves On to Earn Yet Another Fee from Le Nature's*

160.    Immediately after completing the syndication and funding of the new Credit Facility, Wachovia turned its efforts back to arranging yet another refinancing for Le Nature's and generating another huge fee for Wachovia.  Merely a week before Le Nature's entered bankruptcy, Wachovia was contemplating a new $340 million bridge financing to buy out the minority preferred shareholders, as part of a recapitalization involving a new *$500 million* credit facility and $340 million in notes.  Once again, Wachovia anticipated a huge fee for its assistance to Le Nature's.

### Each Plaintiff Has Standing to Assert Claims Against Defendants

161.    Through the distribution of materially false information and the purposeful omission of other material information, Wachovia, BDO, and the Le Nature's Executives played essential roles in fraudulently inducing the lenders to participate in the September 2006 Credit Facility.  As such, each of the initial lenders – that is, the lenders that purchased their interests in the Credit Facility directly from Wachovia Bank – possessed rights to assert claims against Wachovia, BDO, the Le Nature's Executives, and others based on the lenders' purchase of interests in the Credit Facility.

162.    Ten of the Plaintiffs in this action are initial lenders under the Credit Facility, and thus assert claims they have possessed since the placement and syndication of the Credit Facility. These Plaintiffs are MOSERS, BlackRock Global, BlackRock LDI, BlackRock Senior,

BlackRock Senior II, BlackRock Senior III, Magnetite, BlackRock SLP, Harch, and RZB. These initial lenders may be referred to as the "Initial Lender Plaintiffs."

163.    The remaining seven Plaintiffs – the "Successor Lender Plaintiffs" – purchased interests in the Credit Facility on the secondary market. The transfer of interests in syndicated credit facilities is a standard practice in the United States syndicated loan market. The trading of interests in syndicated credit facilities in the United States is a mature, sophisticated market comprised of the nation's major commercial banks, investment banks, hedge funds, mutual funds, and other major financial organizations.

164.    Here, the credit agreement specifically contemplated that participating lenders might sell their interests in the Credit Facility to other lenders. Indeed, Wachovia was a regular buyer and seller of interests in the Credit Facility (as well as interests in the previous Le Nature's credit facilities).

165.    Many of the participants in the syndicated loan market – including Wachovia Bank – are members of the Loan Syndications and Trading Association (the "LSTA"), a trade association dedicated to the promotion and orderly development of a fair, efficient, liquid, and professional trading market for commercial loans. Barry Bobrow, a managing director at Wachovia, sits on the LSTA's 20-member board of directors.

166.    Among other things, the LSTA has developed – and the market has adopted for use – standard documentation for the sale of interests in various types of syndicated loans including so-called distressed debt, which is debt of a company perceived to be in some degree of financial distress that impairs the prospects of full and timely payment. This standard documentation includes a standard Purchase and Sale Agreement for Distressed Trades ("LSTA Purchase Agreement") and an accompanying set of Standard Terms and Conditions ("LSTA Standard Terms").

167.    The LSTA Standard Terms make it clear that, when interests in a distressed credit

facility are sold, *all* of the seller's interests are conveyed, including any rights to assert tort or

other legal claims against third-parties relating to the debt at issue.  Specifically, the Standard

Terms provide:

> **"Transferred Rights"** means any and all of Seller's right, title,
> and interest in, to and under the Loans and the Commitments (if
> any) and, to the extent related thereto, the following . . . .
>
> (e) all claims (including "claims" as defined in Bankruptcy Code
> §101(5)), suits, causes of action, and any other right of Seller or
> any Prior Seller, whether known or unknown, against Borrower,
> any Obligor, or any of their respective Affiliates, agents,
> representatives, contractors, advisors, or any other Entity that in
> any way is based upon, arises out of or is related to any of the
> foregoing, including, to the extent permitted to be assigned under
> applicable law, all claims (including contract claims, tort claims,
> malpractice claims, and claims under any law governing the
> purchase and sale of, or indentures for, securities), suits, causes of
> action, and any other right of Seller or any Prior Seller against any
> attorney, accountant, financial advisor, or other Entity arising
> under or in connection with the Credit Documents or the
> transactions related thereto or contemplated thereby . . . .

168.    The LSTA Standard Terms provide that New York law governs transfers effected

pursuant to the LSTA Purchase Agreement:

> THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF
> THE PARTIES UNDER THIS AGREEMENT AND ANY
> CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY
> BASED UPON OR ARISING OUT OF THIS AGREEMENT OR
> THE TRANSACTION (WHETHER BASED ON CONTRACT,
> TORT OR ANY OTHER THEORY), INCLUDING ALL
> MATTERS OF CONSTRUCTION, VALIDITY AND
> PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED
> BY AND INTERPRETED, CONSTRUED AND DETERMINED
> IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE
> STATE OF NEW YORK (WITHOUT REGARD TO ANY
> CONFLICTS OF LAW PROVISION THEREOF THAT WOULD
> REQUIRE THE APPLICATION OF THE LAWS OF ANY
> OTHER JURISDICTION).

The LSTA Standard Terms further mandate that the parties submit to the exclusive jurisdiction and venue of courts in New York County for all actions arising out of or relating to transfers effected under the LSTA Purchase Agreement.

169.    Pursuant to a series of purchases executed almost exclusively using the LSTA Purchase Agreement and accompanying LSTA Standard Terms, the Successor Lender Plaintiffs acquired interests in the Credit Facility and all associated and/or related rights of the initial lenders under the Credit Facility that first held those interests. Accordingly, these Plaintiffs are permitted to assert claims against the Defendants (and other parties) as if they were original participants in the loan syndicate.

170.    Harbinger directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Madison Park Funding IV, Ltd., (2) Madison Park Funding V, Ltd., (3) CSAM Funding II, (4) Landmark IX CDO Ltd., (5) LCF2 Funding LLC, (6) 1888 Fund Ltd., (7) Green Lane CLO Ltd., (8) Kennecott Funding Ltd., (9) Sands Point Funding Ltd., (10) Copper River CLO Ltd., (11) Grand Central Asset Trust, BDC Series, (12) Goldentree Loan Opportunities I, (13) Stone Tower CLO V Ltd., (14) Venture VII CDO Limited, (15) Eaton Vance CDO VI Ltd., (16) Eaton Vance CDO VIII, Ltd., (17) Eaton Vance CDO X PLC, (18) Eaton Vance Credit Opportunities Fund, (19) Harbourview CLO IV, Ltd., (20) Oppenheimer Senior Floating Rate Fund, (21) WhiteHorse I, Ltd., (22) WhiteHorse II, Ltd., (23) WhiteHorse III, Ltd.(24) Van Kampen Senior Loan Fund, (25) Van Kampen Senior Income Trust, (26) Carlyle High Yield Partners IV, Ltd., (27) Carlyle High Yield Partners VI, Ltd., (28) Carlyle High Yield Partners VII, Ltd., (29) Carlyle High Yield Partners VIII, Ltd., (30) Carlyle High Yield Partners IX, Ltd., (31) Carlyle Loan Investment Ltd., (32) General Electric Capital Corporation, (33) Grayson CLO, Ltd., (34) Brentwood CLO, Ltd., (35) CSAM Funding I, (36) CSAM Funding III, (37) CSAM Funding IV, (38) Atrium CDO, (39)

Castle Garden Funding, (40) CS Credit Strategies Master Fund, Ltd., (41) Galaxy CLO 2003-1, Ltd., (42) Highland Credit Strategies Fund, (43) Highland Floating Rate Advantage Fund, and (44) Omega Bank, N.A.

171.    Aurelius Master directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Venture V CDO Limited, (2) Venture VI CDO Limited, (3) Vista Leveraged Income Fund, (4) Grand Central Asset Trust, BDC Series, (5) Galaxy V CLO, Ltd., (6) American International Group, Inc., (7) BlackRock Senior Income Series II, (8) BlackRock Senior Income Series III, (9) The Missouri State Employees' Retirement System, (10) Senior Loan Portfolio, (11) Eaton Vance CDO VI, Ltd., (12) Eaton Vance CDO VIII, Ltd., (13) Eaton Vance CDO X PLC, (14) Eaton Vance Credit Opportunities Fund, (15) Eaton Vance Floating-Rate Income Trust, (16) Eaton Vance Institutional Senior Loan Fund, (17) Eaton Vance Limited Duration Income Fund, (18) AgFirst Farm Credit Bank, (19) Carlyle Loan Investment Ltd., and (20) Landmark IX CDO, Ltd.

172.    Aurelius Partners directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Venture CDO 2002, Limited, (2) Venture II CDO 2002, Limited, (3) Venture III CDO Limited, (4) Venture IV CDO Limited, (5) Venture V CDO Limited, (6) Grand Central Asset Trust, BDC Series, (7) Galaxy V CLO, Ltd., (8) BlackRock Senior Income Series, (9) BlackRock Limited Duration Income Trust, (10) BlackRock Global Floating Rate Income Trust, (11) Senior Loan Portfolio, (12) Eaton Vance Senior Floating-Rate Trust, (13) Eaton Vance Senior Income Trust, (14) Eaton Vance Variable Leverage Fund Ltd., (15) Eaton Vance VT Floating-Rate Income Fund, (16) Eaton Vance Limited Duration Income Fund, (17) ORIX Finance Corporation, (18) Waterville Funding LLC, (19) AgFirst Farm Credit Bank, (20) Landmark IX CDO, Ltd., (21) Grayson CLO, Ltd., and (22) Brentwood CLO, Ltd.

173.    Arrow directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Eaton Vance Senior Floating-Rate Trust and (2) Carlyle High Yield Partners IX, Ltd.

174.    Schultze directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Eaton Vance Credit Opportunities Fund, (2) Eaton Vance Floating-Rate Income Trust, (3) Eaton Vance Institutional Senior Loan Fund, (4) Eaton Vance Limited Duration Income Fund, (5) Eaton Vance Senior Floating-Rate Trust, (6) Carlyle High Yield Partners IV, Ltd., (7) Carlyle High Yield Partners VI, Ltd., (8) Carlyle High Yield Partners VII, Ltd., (9) Carlyle High Yield Partners VIII, Ltd., and (10) Carlyle High Yield Partners IX, Ltd.

175.    Latigo directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) AgStar Financial Services, PCA/FLCA, (2) Grand Central Asset Trust, BDC Series, (3) CSAM Funding I, (4) CSAM Funding II, (5) CSAM Funding III, (6) CSAM Funding IV, (7) Atrium CDO, (8) Atrium II, (9) Castle Garden Funding, (10) CS Credit Strategies Master Fund, Ltd., (11) NYLIM High Yield CDO 2001, Ltd., (12) US Bank National Association, (13) Stone Tower CLO III, Ltd., (14) Stone Tower CLO VI Ltd., (15) Carlyle Loan Investment Ltd., (16) Grayson CLO Ltd., (17) Landmark IX CDO Ltd., (18) LFC2 Loan Funding LLC, (19) Vista Leveraged Income Fund, (20) Venture CDO 2002, Limited, (21) Venture II CDO 2002, Limited, (22) Venture III CDO Limited, (23) Venture IV CDO Limited, (24) Venture V CDO Limited, and (25) Venture VI CDO Limited.

176.    UBS Willow directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Harbourview

CLO 2006-1, Ltd., (2) Granite Ventures I Ltd., (3) Stone Tower CLO II, Ltd., (4) Stone Tower CLO III, Ltd., and (5) Stone Tower CLO VI, Ltd.

177.    Each transfer of interests in the Credit Facility once the debt became distressed (which constitutes nearly all of the transfers of Credit Facility interests) was accomplished using the LSTA Purchase Agreement and LSTA Standard Terms. The parties to each such transfer also executed a ministerial two-page Commitment Transfer Supplement, which was appended to the Credit Agreement and required by Wachovia Bank in order to register new holders of record for interests in the Credit Facility. The transferors (i.e., not the Plaintiffs in this action) were required to submit the Commitment Transfer Supplements to Wachovia for its records. For the short period when the debt was trading at par, transfers were generally accomplished using the Commitment Transfer Supplements.

178.    Wachovia and its banking affiliate are aware that the LSTA Purchase Agreements, and not the Commitment Transfer Supplements, effected the transfer of the claims at issue in this action. Wachovia Bank receives copies of each completed and executed Commitment Transfer Supplement (from the transferors) so that it can update its records of Credit Facility lenders. In a recent filing in the Le Nature's bankruptcy proceedings, Wachovia Bank explained that, as a result, it has the names of the holders and the amount of claims held by each holder. It further explained that it does *not* have "the precise acquisition date for such claims." Wachovia Bank does not have the acquisition dates for such claims because those dates are on the LSTA Purchase Agreements, which are not provided to Wachovia Bank.

**Wachovia's Preemptive Action in North Carolina**

179.    On March 14, 2007, Wachovia (together with its affiliate, Wachovia Bank) filed a strategic, defensive action in North Carolina state court attempting to prevent many of the Plaintiffs from asserting their rights against Wachovia. In a transparent forum-shopping effort,

Wachovia's action asserts that the Successor Lender Plaintiffs engaged in champerty by buying interests in the Credit Facility because, Wachovia asserts, personal tort claims cannot be assigned *under North Carolina law*. At the time Wachovia asserted champerty, Plaintiffs had not yet filed any claims against Wachovia. Thus, Wachovia contended that Plaintiffs *intended* to file claims against Wachovia.

180.    Wachovia asserted its claim in North Carolina state court, even though none of the Successor Lender Plaintiffs has any presence in North Carolina. Wachovia claims that the action is properly venued there because the Credit Facility "originated" out of North Carolina and because the two-page ministerial supplements executed after the transfer documents were completed provide for the application of North Carolina law. (The Successor Lender Plaintiffs are challenging the North Carolina court's ability to exercise personal jurisdiction over them.) Wachovia has attempted to secure a North Carolina forum based on its beliefs that North Carolina champerty law is more favorable to its position and, more important, that Wachovia will receive a warmer reception in its home state and city.

181.    Even the ministerial Commitment Transfer Supplement – a form drafted by Wachovia and its affiliates – contemplates that claims such as those asserted in this action could be assigned by the initial lenders to subsequent purchasers of their interests. The document states that, among other things, the seller assigns:

> to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, *including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity* related to the rights and obligations sold and assigned . . . . (emphasis added)

182.    Wachovia initiated the North Carolina action by obtaining an *ex parte* temporary restraining order prohibiting the Successor Lender Plaintiffs (who are defendants in that action) from asserting claims against Wachovia. On April 12, 2007, without deciding whether it had personal jurisdiction over all of the parties, the North Carolina court entered a preliminary injunction, specifically superseding the factual findings set forth in the temporary restraining order, barring the same parties from asserting state law tort claims against Wachovia in any court. The North Carolina court did not take any position with respect to Wachovia's substantive champerty claims; rather, it sought to prevent a multiplicity of lawsuits by holders of Le Nature's bank debt by requiring all such holders to assert any state law claims against Wachovia (but not against any other defendants) as counterclaims in the North Carolina action that Wachovia initiated.

183.    In other words, the North Carolina court purported to require non-North Carolina residents to bring state law claims (regardless of which state's law applies), if they had any, only in North Carolina state court. Under well-established United States Supreme Court precedent, such an injunction cannot permissibly prohibit Plaintiffs from filing and pursuing claims in federal court.

## FIRST CLAIM FOR RELIEF

### (All Plaintiffs Against the Le Nature's Executives for Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

184.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

185.    The Le Nature's Executives were and are "persons" within the meaning of 18 U.S.C. 1961(3).

186.    During the period from 2002 through 2006 (the "Scheme Period"), Le Nature's

was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which was

engaged in, or the activities of which affected, interstate or foreign commerce.

187.    During the "Scheme Period," the Le Nature's Executives were high-ranking

officers and employees of Le Natures who conducted the affairs of that enterprise through a

pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).

188.    The Le Nature's Executives' conduct and acts in furtherance of the scheme

described above (the "Scheme") included, but were not limited to, (i) misrepresenting the nature

and extent of Le Nature's' revenues, operations, profits, liabilities, and prospects to investors and

prospective investors by the creation and dissemination of false and fraudulent financial

statements; (ii) arranging for and entering into transactions with investors, including the various

credit transactions sponsored, originated, and syndicated by Wachovia, under false pretenses;

(iii) engaging in fraudulent transactions with purported suppliers, customers and other complicit

third parties, and employing other means to wrongfully divert to their own use funds received

from investors for use in Le Nature's' business and operations; and (iv) concealing from

investors and others the misappropriation of funds obtained from investors and the true financial

condition of Le Nature's, its assets, business, and operations.

189.    The racketeering activity of the Le Nature's Executives included, but was not

limited to, the use of interstate wires for the purpose of executing a scheme to obtain money or

property by means of false pretenses, representations or promises.  Accordingly, the racketeering

activity consisted of multiple, related acts perpetrated during the Scheme Period that are

indictable under 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank

fraud) that are within the scope of 18 U.S.C. § 1961(1)(B) and (5).

190.    Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Le Nature's Executives, for the purpose of executing the Scheme and with the intent to defraud the Plaintiffs or their predecessors:

(a)    BDO's delivery of materially false and misleading audit reports and accompanying financial statements for each of the years 2003, 2004, and 2005, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(b)    Wachovia's distribution of materially false and misleading offering memoranda in connection with the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(c)    Wachovia's distribution of materially false and misleading written "slide" presentations and term sheets for the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(d)    Wachovia's distribution of materially false and misleading high-yield research bulletins and reports on or about August 18, 2003, October 3, 2003, November 9, 2003, February 20, 2004, June 15, 2005, August 30, 2005, April 13, 2006, and June 6, 2006, which were either (i) sent via interstate e-mail to Wachovia customers, such as the initial lenders (including Plaintiffs or their predecessors), or (ii) transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to the initial lenders, including Plaintiffs or their predecessors;

(e)    Le Nature's' delivery of materially false and misleading unaudited quarterly financial statements, which were transmitted over interstate wires by Wachovia on SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006;

(f)    Le Nature's' delivery of materially false and misleading quarterly Management's Discussions and Analyses of Financial Condition and Results of Operation, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006; and

(g)    Le Nature's' delivery of materially false and misleading quarterly Compliance Certificates required by the credit facilities to confirm compliance with ratios included in the financial covenants in those facilities, which were transmitted by interstate wire by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006.

191.    Plaintiffs or their predecessors justifiably, reasonably, and foreseeably relied on the false statements and misrepresentations contained in these materials.

192.    The pattern of racketeering activity also involved a course of conduct that was intended to, and did in fact, deceive federally chartered and/or federally insured financial institutions into releasing property with the intent to victimize those institutions. Accordingly, the racketeering activity included acts constituting bank fraud under 18 U.S.C. § 1344. Federally chartered and/or federally insured lenders that were fraudulently induced to participate in the

Credit Facility, and thereby to extend credit to Le Nature's, included without limitation (i) US Bank, which is a member of the Federal Deposit Insurance Corporation, (ii) AgFirst Farm Credit Bank, which is subject to the protections of the Farm Credit Act of 1971, and (iii) AgStar Financial Services, which is subject to the protections of the Farm Credit Act of 1971.

193.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Scheme and the Le Nature's Executives engaged in such acts with the specific intent of furthering the Scheme.

194.    The pattern of racketeering consisted of multiple acts of racketeering by each member of the Le Nature's enterprise. The activity was interrelated, not isolated, and was perpetrated for the same or similar purposes by the same people. The activity extended for a period of several years, up to the commencement of the Le Nature's involuntary bankruptcy proceedings in November 2006.

195.    The conduct of the Scheme was continuous and of substantial duration. The activity occurred after the effective date of 18 U.S.C. § 1961 *et seq.*, and the last act occurred within 10 years after the commission of a prior act of racketeering activity. During the Scheme Period, the Le Nature's Executives engaged in numerous acts of wire and bank fraud that were directed at numerous lenders and investors, including Plaintiffs or their predecessors, and that caused numerous separate and distinct injuries. But for the exposure of the Scheme following appointment of a custodian for the Company as the result of the Delaware Action, the Scheme would have continued indefinitely.

196.    Plaintiffs have been injured in their business or property as a direct and proximate result of the Le Nature's Executives' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.

197.    As a result of the violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interests, costs, and attorney's fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## SECOND CLAIM FOR RELIEF

### (All Plaintiffs Against All Defendants for Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))

198.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

199.    Beginning in or about 2002 and through and until the commencement of Le Nature's' involuntary bankruptcy proceedings, Defendants willfully, knowingly, and unlawfully did conspire, combine, confederate, and agree together to violate 18 U.S.C. § 1962(c) by enabling the Le Nature's Executives to conduct the affairs of the Le Nature's enterprise through a pattern of racketeering activity.

200.    It was specifically agreed by the Defendants that the pattern of racketeering activity would include acts in violation of 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank fraud).  Specifically, in furtherance of the conspiracy and to effect its objectives, each of the defendants agreed that the following predicate acts, among others, would be committed by one or more of the members of the conspiracy:

(a)    BDO's delivery of materially false and misleading audit reports and accompanying financial statements for each of the years 2003, 2004, and 2005, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(b)     Wachovia's distribution of materially false and misleading offering memoranda in connection with the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(c)     Wachovia's distribution of materially false and misleading written "slide" presentations and term sheets for the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(d)     Wachovia's distribution of materially false and misleading high-yield research bulletins and reports on or about August 18, 2003, October 3, 2003, November 9, 2003, February 20, 2004, June 15, 2005, August 30, 2005, April 13, 2006, and June 6, 2006, which were either (i) sent via interstate e-mail to Wachovia customers, such as the initial lenders (including Plaintiffs or their predecessors), or (ii) transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to the initial lenders, including Plaintiffs or their predecessors;

(e)     Le Nature's' delivery of materially false and misleading unaudited quarterly financial statements, which were transmitted over interstate wires by Wachovia on SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006;

(f)     Le Nature's' delivery of materially false and misleading quarterly Management's Discussions and Analyses of Financial Condition and Results of Operation,

which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made

accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among

other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March

31, 2006, and June 30, 2006; and

      (g)    Le Nature's' delivery of materially false and misleading quarterly

Compliance Certificates required by the credit facilities to confirm compliance with ratios

included in the financial covenants in those facilities, which were transmitted by interstate wire

by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders,

including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30,

2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006.

      201.    Plaintiffs or their predecessors justifiably, reasonably and foreseeably relied on

the false statements and misrepresentations contained in these materials.

      202.    Each of the Defendants also agreed that the pattern of racketeering activity would

involve a course of conduct that was intended to, and did in fact, deceive federally chartered

and/or federally insured financial institutions into releasing property with the intent to victimize

those institutions. Accordingly, the Defendants agreed that the racketeering activity would

include acts constituting bank fraud under 18 U.S.C. § 1344. Federally chartered and/or

federally insured lenders that were fraudulently induced to participate in the Credit Facility, and

thereby to extend credit to Le Nature's, included without limitation (i) US Bank, which is a

member of the Federal Deposit Insurance Corporation, (ii) AgFirst Farm Credit Bank, which is

subject to the protections of the Farm Credit Act of 1971, and (iii) AgStar Financial Services,

which is subject to the protections of the Farm Credit Act of 1971.

      203.    It was specifically intended and foreseen by the Defendants that the Le Nature's

enterprise would engage in, and conduct activities which affected, interstate commerce.

204.    Plaintiffs have been injured in their business or property as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

205.    As a result of the conspiracy between and among Defendants to violate 18 U.S.C. § 1962(c), Plaintiffs have suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs, and attorneys fees, incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

### THIRD CLAIM FOR RELIEF

### (Initial Lender Plaintiffs Against Wachovia for Fraud)

206.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

207.    As set forth more fully above, Wachovia knowingly or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

208.    Wachovia materially misrepresented, among other things, the amount of Le Nature's' revenues, profits, liabilities, sales volume, and annual growth rates. Wachovia made these misrepresentations in, among other places and documents, offering memoranda, research reports, written and oral presentations, and e-mails to the lenders as alleged in detail above.

209.    Wachovia failed to disclose material information known only to Wachovia, and specifically not known to the other lenders to Le Nature's, which, under the circumstances, Wachovia was under a duty to disclose. Wachovia failed to disclose, among other things, Wachovia Bank's fronting of interest payments to lenders to hide Le Nature's' inability to make the payments, the existence of a Special Committee convened after the resignation of Le

Nature's' CFO and the results of the Committee's report, the misclassification of massive
amounts of leases to keep them off of Le Nature's' balance sheets, and Wachovia's own
identification of serious issues involving Le Nature's' organizational structure, sales, and
financial reporting.

210.    Wachovia was required to disclose these facts to the lenders because, *inter alia*,
(i) the absence of such disclosure rendered prior statements false and misleading or half-truths,
(ii) Wachovia had special knowledge regarding Le Nature's that was not available to the other
lenders, (iii) Wachovia had access to Le Nature's' management by virtue of its multi-year
investment banking and advisory relationship with Le Nature's, (iv) Wachovia's affiliate
(Wachovia Bank) was designated as the administrative agent charged with acting in the interests
of the lender group (including Plaintiffs or their predecessors), and (v) Wachovia had arranged
for a portion of the $285 million Credit Facility to be used to satisfy and discharge Le Nature's'
obligations to Wachovia Bank under the pre-existing credit facility.

211.    Wachovia knew, or was reckless in not knowing, that its conduct constituted a
fraud on the Plaintiffs or their predecessors and would result in, and did result in, the purchase of
interests in the Credit Facility by the Plaintiffs or their predecessors and the subsequent loss of a
substantial portion of the value of these interests.

212.    Wachovia made the material misrepresentations, and omitted to disclose the
material facts, herein alleged with the intention of inducing the Plaintiffs or their predecessors to
purchase interests in the Credit Facility in reliance thereon, and the Plaintiffs or their
predecessors did reasonably and justifiably rely on the misrepresentations and omissions in
purchasing and retaining said interests.

213.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by Wachovia's wrongful conduct, which caused each of them to purchase interests in the Credit Facility.

214.    Wachovia's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. Wachovia's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

215.    By reason of the foregoing, the Initial Lender Plaintiffs are entitled to a judgment against Wachovia awarding the Initial Lender Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FOURTH CLAIM FOR RELIEF

### (Initial Lender Plaintiffs Against Wachovia for Aiding and Abetting Fraud)

216.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

217.    As alleged in detail above, Le Nature's engaged in a what is now a widely acknowledged fraud with respect to, among other things, the operation of its business and the reporting of its financial results. Le Nature's then fraudulently induced banks and other investors (including Plaintiffs or their predecessors) to invest in the Company, through the purchase of notes and interests in the various credit facilities extended to Le Nature's, based on information that Le Nature's knowingly created and falsified.

218.    Le Nature's fraud included, but was not limited to, its massive overstatement of revenues, reporting more than $275 million in net sales for 2005, when its actual revenues were as low as $32 million. Le Nature's also overstated its profits, its sales volume, and its growth rate.

219.    Le Nature's acted knowingly or recklessly in creating and disseminating its falsified financial results. Le Nature's' principal executives, including Podlucky, orchestrated the misstatements. Le Nature's prepared these false records, including its financial statements, for the very purpose of inducing banks and other investors to participate in Le Nature's' financing activities.

220.    Le Nature's also concealed from Plaintiffs or their predecessors material information concerning the true nature of Le Nature's, its business, assets, and operations, including, but not limited to, the determinations of the Special Committee that was convened after the resignation of the Company's key financial managers and the extent of the Company's liabilities that were kept off the books through the massive misclassification of capital leases.

221.    By the foregoing conduct and by its other conduct and omissions, Le Nature's willfully and intentionally misrepresented to and concealed from Plaintiffs or their predecessors the true financial condition, business, operations and assets of Le Nature's for the purpose of inducing the Plaintiffs or their predecessors to purchase interests in the Credit Facility.

222.    As set forth in detail above, Wachovia was aware or consciously disregarded the fact that Le Nature's was conducting a fraud on investors, including specifically lenders that participated in the Credit Facility. Wachovia knew, among other things, that (i) its bank affiliate was fronting interests payments to lenders on behalf of Le Nature's, (ii) Le Nature's had misclassified more than $200 million in capital leases, (iii) Le Nature's was basing its revenues on improper sales prices, and (iv) Le Nature's had convened a Special Committee that drafted a report highlighting operating deficiencies that the Company did not subsequently address. Wachovia also knew that disclosing any of these facts to Plaintiffs or their predecessors would disrupt funding of the Credit Facility, thereby depriving Wachovia of a transaction fee of more than $7 million and preventing Wachovia from reducing its credit risk.

223.    Wachovia substantially assisted the fraud committed by Le Nature's by providing financing to Le Nature's, lending its name and credibility to Le Nature's, disseminating false information to induce Plaintiffs or their predecessors to participate in the Credit Facility, and withholding material and damaging information from Plaintiffs or their predecessors. Wachovia's assistance included, among other things, (i) directly disseminating materials to lenders and potential lenders, (ii) posting materials (including the audited financial statements and other documents) on a website for access by lenders and potential lenders, (iii) orchestrating and participating in in-person presentations directly to lenders and potential lenders, (iv) compiling, drafting, and producing written presentation materials for lenders and potential lenders, and (v) actively marketing, by telephone, e-mail, and otherwise, interests in the Credit Facility to the lenders.

224.    Absent Wachovia's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated. As a direct and proximate result of Wachovia's actions, Plaintiffs or their predecessors suffered damages.

225.    Wachovia's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. Wachovia's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

226.    By reason of the foregoing, the Initial Lender Plaintiffs are entitled to a judgment against Wachovia awarding the Initial Lender Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FIFTH CLAIM FOR RELIEF

### (Initial Lender Plaintiffs Against Wachovia for Negligent Misrepresentation)

227.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

228.    In connection with the decisions by Plaintiffs or their predecessors to acquire interests in the Credit Facility, Wachovia made numerous representations to the lenders about Le Nature's depicting Le Nature's as a strong company, with a history of substantial revenues and profits growth. In the materials that it distributed and the presentations that it made, Wachovia misrepresented, among other things, the amount of Le Nature's' revenue, profits, and liabilities.

229.    Wachovia should have known, and negligently disregarded, the falsity of these material misrepresentations, concealing from the lenders, including Plaintiffs and their predecessors, among other things, that (i) its bank affiliate was fronting interests payments to lenders on behalf of Le Nature's, (ii) Le Nature's had misclassified more than $200 million in capital leases, (iii) Le Nature's was basing its revenues on improper wholesale prices, and (iv) Le Nature's had convened a Special Committee that drafted a report highlighting operating deficiencies that the Company did not subsequently address.

230.    Wachovia negligently made these materials misrepresentations and/or omissions, which induced Plaintiffs or their predecessors to extend credit to Le Nature's by participating in the syndication of the Credit Facility.

231.    The lenders who were members of the Credit Facility syndicate, including Plaintiffs or their predecessors, enjoyed a special relationship of trust with Wachovia. Wachovia actively solicited the lenders to purchase their interests in the Credit Facility. Wachovia knew that the lenders were dependent on it and relied on it to disclose material facts, such as those concerning Wachovia's negligent misrepresentations and omissions. At various points,

Wachovia specifically told the lenders to "trust us" in connection with the lenders' agreements to purchase interests in the Credit Facility. Wachovia knew that the lenders received most of their information about Le Nature's from Wachovia's postings to a website accessible by the lenders. Wachovia also knew that this information, including Wachovia's misrepresentations and omissions, was material, and that the lenders were relying on such representations and omissions in choosing to participate in the Credit Facility.

232.    Wachovia was in a position of unique and superior knowledge to the lenders regarding information about the operations and financial condition of Le Nature's. As the long-time advisor and investment banker to Le Nature's, Wachovia had substantial access to Le Nature's' management and financial records. The lenders, including Plaintiffs and their predecessors, did not have access to similar information.

233.    In September 2006, when Plaintiffs or their predecessors purchased interests in the Credit Facility from Wachovia, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions.

234.    In purchasing interests in the Credit Facility, Plaintiffs or their predecessors reasonably relied upon and were induced to proceed by the foregoing negligent misrepresentations and/or omissions. The lenders justifiably relied on Wachovia's representations regarding the financial health and strength of Le Nature's.

235.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by Wachovia's misrepresentations and omissions, which caused each of them to purchase interests in the Credit Facility.

236.    By reason of the foregoing, the Initial Lender Plaintiffs are entitled to a judgment against Wachovia awarding the Initial Lender Plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SIXTH CLAIM FOR RELIEF

### (All Plaintiffs Against BDO for Fraud)

237.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

238.    Le Nature's engaged BDO to perform an audit of its balance sheet and related financial statements as of December 31, 2003. BDO was similarly engaged to perform audits for the years ended December 31, 2004 and December 31, 2005. As part of its audits, BDO was required to undertake extensive auditing and accounting work sufficient to comply with its GAAS duties and to ensure that the financial statements were presented in compliance with GAAP. BDO was engaged by the Company to do additional work, including review of its unaudited quarterly financial reports.

239.    BDO was aware of the history leading to its engagement, including the resignation of Le Nature's' most senior financial managers and Le Nature's' termination of its relationship with Ernst & Young. As such, BDO was required to undertake steps to determine whether fraud had occurred at Le Nature's, including specific review procedures for the financial statements and conducting interviews with non-management employees of Le Nature's.

240.    Rather than undertake the mandated steps, including compliance with the GAAS provisions set forth in detail above, BDO failed to conduct complete and independent audits and instead issued and executed clean audit reports accompanying materially false financial statements. As a result, as set forth more fully above, BDO knowingly or recklessly made false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

241.    The financial statements certified by BDO and accompanied by BDO's audit reports grossly overstated Le Nature's' revenues and profits. BDO knowingly or recklessly

certified these erroneous financials rather than complete appropriate verifications of sales levels and revenues.

242.    The balance sheets included within the financial statements certified by BDO and accompanied by BDO's audit reports materially understated Le Nature's' liabilities. For the year ended December 31, 2005, in particular, the balance sheet failed to include more than $200 million in capital leases. BDO was responsible for determining, in conjunction with Le Nature's, the classification of these leases and knowingly or recklessly classified the lease obligations as operating leases so that they would not be included on the balance sheet and in calculating the financial ratios mandated by the Credit Facility.

243.    In addition to overstating revenues, the income statement for the year ended December 31, 2005, which was also included within the financial statements certified by BDO and accompanied by BDO's audit report for that year, substantially understated Le Nature's' expenses due to the improper characterization of rental expenses under equipment leases for the Phoenix facility. As a result, net income was further exaggerated.

244.    BDO also knowingly or recklessly failed to disclose the Company's inadequate internal controls and the CEO's domination of the Company's finances in its audit reports. BDO was required to disclose such material facts because it had special knowledge regarding Le Nature's that was not available to the lenders. In its capacity as auditor and advisor to the Company, BDO had access to Le Nature's' management and was privy to Le Nature's' financial information, controls, and internal accounting books, records, and methods.

245.    Notwithstanding its awareness of material discrepancies in Le Nature's' financial records and the absence of adequate internal financial controls at the Company, BDO falsely certified that Le Nature's' financial statements for each of the fiscal years ended December 31,

2003 through December 31, 2005 were in compliance with GAAP and that its audits of the financial statements complied with GAAS.

246.    BDO knew, by virtue of express provisions in the Credit Facility and otherwise, that its audit reports and the accompanying financial statements, and the unaudited quarterly financial statements that it reviewed, would be distributed to and relied upon by the lenders, including Plaintiffs or their predecessors.

247.    BDO knew, or was reckless in not knowing, that its conduct constituted a fraud on the Plaintiffs or their predecessors and would result in, and did result in, the purchase of interests in the Credit Facility by the Plaintiffs or their predecessors and the subsequent loss of a substantial portion of the value of these interests.

248.    BDO made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing the Plaintiffs or their predecessors to purchase interests in the Credit Facility in reliance thereon, and the Plaintiffs or their predecessors did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said interests.

249.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by BDO's wrongful conduct, which caused each of them to purchase interests in the Credit Facility.

250.    BDO's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. BDO's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

251.    By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### SEVENTH CLAIM FOR RELIEF

**(All Plaintiffs Against BDO for Aiding and Abetting Fraud)**

252.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

253.    As set forth in detail above, and as specifically reiterated in paragraphs 217 through 221, Le Nature's engaged in a massive fraud that included, among other things, the gross overstatement of revenues and profits in order to induce lenders, including Plaintiffs or their predecessors, to extend credit to Le Nature's.

254.    BDO was aware or consciously disregarded the fact that Le Nature's was conducting a fraud on investors, including specifically lenders that participated in the Credit Facility. BDO knew, among other things, that (i) Le Nature's had misclassified more than $200 million of capital leases as operating leases, thereby keeping that amount off of the Company's balance sheet as liabilities and enabling the Company falsely to report compliance with ratios set forth in the Credit Facility's financial covenants, (ii) Le Nature's had mischaracterized more than $8.5 million in expenses in 2005, thereby falsely inflating net income by more than 37%, and (iii) Le Nature's' chief executive completely dominated the Company and ignored and overrode the limited set of controls that were in place. BDO also knew that disclosing these facts, in the audit reports it drafted or otherwise, would disrupt funding of the Credit Facility, thereby preventing consummation of the facility and jeopardizing BDO's relationship with Le Nature's management.

255.    BDO substantially assisted the fraud committed by Le Nature's by certifying patently false financial statements and permitting those statements, with its signature and approval, to be distributed to lenders and potential lenders.  By issuing such clean audit reports attesting to the fair presentation of Le Nature's' financial statements in conformity with GAAP, BDO enabled Le Nature's to perpetuate its fraud.  BDO's assistance included, among other things, (i) issuing clean audit reports to accompany Le Nature's annual financial statements for 2003, 2004, and 2005 even though BDO did not undertake the steps required to determine the veracity of those statements, (ii) determining on behalf of Le Nature's that the Company's lease obligations with respect to property and equipment for the Phoenix facility were operating leases, rather than capital leases, notwithstanding the applicable GAAP standards mandating their designation as capital leases, and (iii) determining on behalf of Le Nature's that rental payments under operating leases should not be reflected as expenses.

256.    Absent BDO's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated.  As a direct and proximate result of BDO's actions, Plaintiffs or their predecessors suffered damages.

257.    BDO's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors.  BDO's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

258.    By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## EIGHTH CLAIM FOR RELIEF

### (All Plaintiffs Against BDO for Negligent Misrepresentation)

259.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

260.    BDO held and continues to hold itself out as a professional accounting firm qualified to perform public accounting services, including independent audits.  BDO has a duty to maintain, and should be held to, the generally accepted auditing and accounting standards by which an auditor is obligated to conduct an audit.

261.    BDO executed engagement letters with Le Nature's with respect to its audits of Le Nature's' financial statements for each of the years 2003, 2004, and 2005.  In each such letter, BDO stated that it would conduct its audit in accordance with GAAS, and that the objective was to express an opinion on Le Nature's' financial statements in conformity with GAAP.

262.    BDO owed the duty to perform its audit work in accordance with GAAS not only to Le Nature's, but also to Le Nature's lenders, including those that participated in the Le Nature's Credit Facility.  BDO knew that its audit reports were being provided directly to these lenders in connection with their extensions of credit to Le Nature's.  BDO knew that section 5.1 the Credit Facility itself (like earlier credit facilities that it replaced) required the Company to provide BDO's audit reports to the lenders.  BDO further knew that section 3.1 of the Credit facility (like earlier credit facilties that it replaced) expressly stated that, to induce the lenders to extend credit to Le Nature's, the Company was providing the lenders with its audited financial statements, and the accompanying BDO audit reports, for each of the years 2003, 2004, and 2005.  Thus, BDO knew and expected that its audit reports were being provided to a select group – i.e., the lenders and potential lenders to Le Nature's – specifically for those lenders to use and rely upon in determining whether to participate in Le Nature's' financing transactions.

263.    Additionally, in the course of their work for Le Nature's, Wachovia and BDO had extensive contacts with each other to discuss various issues relating to Le Nature's' financial condition, financial statements, and even the drafting of confidential information memoranda in connection with the various Le Nature's financing transactions. As BDO was aware, Wachovia Bank was the administrative agent for all of the lenders under each of the credit facilities, and thus BDO was further linked to the lenders by providing and sharing information with Wachovia Bank.

264.    BDO knew that its audit reports and the accompanying financial statements were being provided to the lenders, knew that the lenders would rely on those audit reports and the accompanying financial statements, and was further linked to the lenders through direct contact with their agent and otherwise.

265.    Additionally, BDO was in a position of unique and superior knowledge to the lenders regarding information about the operations and financial condition of Le Nature's. As the auditor and advisor to Le Nature's, BDO had substantial access to Le Nature's' management and financial records. The lenders, including Plaintiffs and their predecessors, did not have access to similar information.

266.    Notwithstanding its professional obligation to audit Le Nature's in accordance with GAAS, BDO failed to do so. BDO did not exercise the professional skepticism that is a central element of a proper GAAS audit. Instead, BDO accepted, without adequate questioning or corroboration, information provided to it by Podlucky and other senior executives at Le Nature's. BDO knew that these few individuals, more than anyone else, would be motivated to, and in a position to, misrepresent Le Nature's' finances, sales, and profits. Nonetheless, BDO failed adequately to question the information provided by these few executives, as is required of an auditor acting in accordance with GAAS.

267.    BDO's negligent conduct is demonstrated by the firm's many failings in connection with its audits of Le Nature's, including:

- BDO assisted Le Nature's in misclassifying more than $200 million in capital leases as operating leases, enabling the Company to keep the leases off of its balance sheet and thereby to represent that it was in compliance with mandated financial ratios;

- BDO assisted Le Nature's in misclassifying more than $8.5 million in rental expenses for fiscal year 2005, preventing the inclusion of those expenses on the income statement and falsely inflating the Company's net income;

- BDO failed to report any findings with respect to the Report of the Special Committee that was convened following the resignation of the Company's CFO;

- BDO failed, on information and belief, to obtain sufficient corroborating evidence from external sources; and

- BDO failed, on information and belief, to make adequate fraud inquiries to non-executive employees.

268.    As a result of its negligent conduct of the audit, BDO, contrary to its professional obligations, certified financial statements that were grossly incorrect, issued an improper clean audit report, and failed to advise the lenders of the massive fraud that was being committed at Le Nature's.

269.    In September 2006, when Plaintiffs or their predecessors purchased interests in the Credit Facility, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions.

270.    In purchasing interests in the Credit Facility, Plaintiffs or their predecessors reasonably relied upon and were induced to proceed by the foregoing negligent misrepresentations and/or omissions. The lenders justifiably relied on BDO's representations regarding the financial health and strength of Le Nature's and BDO's certification of Le Nature's financial statements as being in compliance with GAAP.

271.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by BDO's negligent conduct, misrepresentations, and omissions, which caused each of them to purchase interests in the Credit Facility.

272.    By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## NINTH CLAIM FOR RELIEF

### (All Plaintiffs[1] Against All Defendants for Civil Conspiracy)

273.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

274.    Defendants and Le Nature's conspired to accomplish an unlawful objective; i.e., to defraud Le Nature's' lenders, creditors, and investors regarding Le Nature's business, assets, liabilities, operations, and true financial condition.  The conspiracy was aimed at defrauding, among others, lenders participating in the Credit Facility, including Plaintiffs or their predecessors.

275.    The conspirators agreed to conceal from the lenders the full extent of Le Nature's' liabilities, to inflate its revenues, and to disguise the diversion and dissipation of misappropriated corporate funds.

276.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it.

277.    Wachovia furthered the conspiracy by, among other things, the following overt acts: (i) acting as Le Nature's principal advisor and investment banker over a period of more than

---

[1]  The Successor Lender Plaintiffs assert this claim against only BDO and the Le Nature's Executives.

three years, during which time it assisted Wachovia in raising several hundred million dollars through the use of materially false offering materials, (ii) directly disseminating materials to lenders and potential lenders that misrepresented Le Nature's' revenues, assets, liabilities, and financial stability, (iii) orchestrating and participating in in-person presentations directly to lenders and potential lenders, (iv) compiling, drafting, and producing written presentation materials for lenders and potential lenders, and (v) actively marketing, by telephone, e-mail, and otherwise, interests in the Credit Facility to the lenders. Wachovia also furthered the conspiracy by concealing material facts, such as the Company's inability to make timely interest payments, its calculation of revenues based on improper product prices, and its lack of internal controls capable of controlling its own management.

278.   BDO furthered the conspiracy by, among other things, certifying materially false financials and issuing clean audit reports in connection with those financials and assisting Le Nature's hide a massive amount of debt by classifying capital lease obligations as operating leases. BDO was aware and intended that the lenders would rely on these audit reports and financial statements in deciding to extend credit to Le Nature's. BDO also concealed material information regarding Le Nature's, including the existence and results of the Special Committee Report.

279.   The Le Nature's Executives furthered the conspiracy by, among other things, publishing false financial results, including inflated revenues and income, and concealing material information regarding the operations and financial integrity of Le Nature's for the purpose of inducing Plaintiffs and their predecessors to acquire interests in the Credit Facility.

280.   As a direct and proximate result of the foregoing conduct, each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged.

281.    Defendants' conspiracy was intended to, and in fact did, (i) deceive the public about Le Nature's' financial condition, including its revenues and liabilities, and (ii) induce agencies to issue incorrect credit ratings for the Company.  As a result, thousands of investors, vendors, lenders, and the Company's employees collectively have lost hundreds of millions of dollars.

282.    Defendants' conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. Defendants' conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

283.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.  Only the Initial Lender Plaintiffs assert this claim against Wachovia.

WHEREFORE, Plaintiffs demand judgment as follows:

A.  On the First and Second Claims for Relief, directing Defendants to pay all Plaintiffs treble damages, pursuant to 18 U.S.C. § 1964(c), for losses caused by defendants' violations of the Racketeer Influenced and Corrupt Organization Act;

B.  On the Third, Fourth, Fifth, and Ninth Claims for Relief, directing Wachovia to pay the Initial Lender Plaintiffs compensatory damages in an amount not less than the principal and accrued interest of their respective loan positions to be determined at trial;

C.  On the Third, Fourth, and Ninth Claims for Relief, directing Wachovia to pay the Initial Lender Plaintiffs punitive damages in an amount to be determined at trial;

D.  On the Sixth, Seventh, and Eighth Claims for Relief, directing BDO to pay all Plaintiffs compensatory damages in an amount not less than the principal and accrued interest of their respective loan positions to be determined at trial;

E.  On the Sixth and Seventh Claims for Relief, directing BDO to pay all Plaintiffs punitive damages in an amount to be determined at trial;

F.  On the Ninth Claim for Relief, directing BDO and the Le Nature's Executives to pay all Plaintiffs compensatory damages in an amount not less than the principal and accrued interest of their respective loan positions to be determined at trial, as well as punitive damages in an amount to be determined at trial;

G.  Awarding Plaintiffs pre- and post-judgment interest at the rate allowed by law; and

H.  Granting Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims so triable.

DATED:    New York, New York
              September 17, 2007

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

By: _____
      Michael B. Carlinsky (MC-6594)
      Richard I. Werder (RW-5601)
      Robert S. Loigman (RL-0675)
      Susheel Kirpalani (SK-8926)

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

Attorneys for Plaintiffs