# Exhibit D, Part I

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

In re:

Le-Nature's, Inc., *et al.*,

Chapter 11
Case No. 06-25454 (MBM)

Jointly Administered

Debtors.

SECOND AMENDED DISCLOSURE STATEMENT
WITH RESPECT TO SECOND AMENDED JOINT CHAPTER 11 PLAN OF
LIQUIDATION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
THE *AD HOC* COMMITTEE OF SECURED LENDERS, AND
THE *AD HOC* COMMITTEE OF SENIOR SUBORDINATED NOTEHOLDERS

Dated June 18, 2007

THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR
REJECTION OF THE PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY
THE BANKRUPTCY COURT

THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT BEEN APPROVED BY THE COURT

ALL CAPITALIZED TERMS USED IN THIS SECOND AMENDED DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") THAT ARE NOT DEFINED HEREIN BUT THAT ARE DEFINED IN ARTICLE I OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION (ATTACHED HERETO AS EXHIBIT A) (THE "PLAN") SHALL HAVE THE MEANINGS ASCRIBED TO SUCH TERMS BY THE PLAN AND SUCH DEFINITIONS ARE INCORPORATED HEREIN BY REFERENCE.

<u>****NOTICE****</u>

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. CREDITORS AND INTEREST HOLDERS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR INTERESTS. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ALTHOUGH GREAT EFFORT WAS TAKEN TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE PROPONENTS NOR THEIR RESPECTIVE PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS. INDEED, MUCH OF THE INFORMATION CONTAINED HEREIN WAS PROVIDED TO THE PROPONENTS BY THE CHAPTER 11 TRUSTEE AND BY OTHER PARTIES-IN-INTEREST.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS CONTAINING INFORMATION THAT HAVE BEEN AUTHORIZED TO BE DISTRIBUTED TO CREDITORS AND INTEREST HOLDERS. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THE DISCLOSURE STATEMENT OR THE PLAN IN CONSIDERING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE PROPONENTS STRONGLY URGE YOU TO READ THIS DISCLOSURE STATEMENT BECAUSE IT CONTAINS A SUMMARY OF THE PLAN AND IMPORTANT INFORMATION CONCERNING THE DEBTORS' HISTORY AND OPERATIONS. THE DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN. A COPY OF THE PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT. THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES ONLY CERTAIN PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN. COPIES OF THIS DISCLOSURE STATEMENT AND THE PLAN ARE BEING PROVIDED TO ALL KNOWN CREDITORS AND INTEREST HOLDERS. THE PLAN SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT. YOU SHOULD CONSULT YOUR OWN COUNSEL AND/OR FINANCIAL ADVISOR IN CONNECTION WITH YOUR CLAIM AGAINST OR

INTEREST IN THE DEBTORS AND THE TREATMENT ACCORDED YOUR CLAIM(S) OR INTEREST(S) UNDER THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS' ESTATES, THE LIQUIDATION TRUST OR ANY OTHER PARTY. NO REPRESENTATIONS BY ANY PERSON CONCERNING THE DEBTORS (PARTICULARLY AS TO ITS BUSINESS OPERATIONS, OR THE VALUE OF THEIR PROPERTIES) ARE AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION.

# TABLE OF CONTENTS

Page

ARTICLE I  Introduction ................................................................................. 1
    Section 1.01    Disclosure Statement Enclosures. ......................................... 1
    Section 1.02    Summary of Treatment of Claims and Interests Under the Plan. ......... 2
ARTICLE II  Historical Information.................................................................. 7
    Section 2.01    Description of the Debtors' Business. ..................................... 7
    Section 2.02    Prepetition Ownership and Capital Structure of the Debtors Prior
                to the Chapter 11 Case. ......................................................... 8
                a. Secured Credit Facility.......................................................... 8
                b. Senior Subordinated Notes .................................................... 8
                c. Equity .................................................................................. 9
    Section 2.03    Events Leading to the Chapter 11 Filing. ............................... 9
ARTICLE III  The Debtors' Chapter 11 Bankruptcy Cases................................ 10
    Section 3.01    Brief Explanation of Chapter 11. ......................................... 10
    Section 3.02    Commencement of the Chapter 11 Cases. ............................. 10
    Section 3.03    Transition Motions.............................................................. 11
    Section 3.04    Cash Collateral Stipulations................................................. 11
    Section 3.05    Retention Applications......................................................... 12
    Section 3.06    Appointment of a Creditors' Committee. .............................. 12
    Section 3.07    Formation of the Ad Hoc Lenders' Committee. ..................... 12
    Section 3.08    Formation of the Ad Hoc Noteholders' Committee. .............. 12
    Section 3.09    Appointment of a Chapter 11 Trustee................................... 13
    Section 3.10    Other Significant Events During the Chapter 11 Cases.......... 13
                a. Discontinuing of Business. .................................................. 13
                b. Pursuit of a Sale of the Latrobe Bottling Facility ................ 13
                c. Rule 2004 Investigations...................................................... 14
                d. Litigation Against Federal Insurance Company .................... 15
                e. The Delaware Action ........................................................... 16
                f. Merrill Lynch Motion to Convert Cases to Chapter 7.......... 17
                g. Order To Show Cause ..........................................................17
                h. Wachovia Motion to Convert to Chapter 7...........................17
    Section 3.11    Schedules and Statement of Financial Affairs/Asserted Claims........ 17
    Section 3.12    Monthly Financial Reports. ................................................. 21
    Section 3.13    Lenders Collateral Stipulation. ............................................ 21
ARTICLE IV  General Information on Confirmation Procedure and Voting ....... 21
    Section 4.01    Purpose of Disclosure Statement. ........................................ 21
    Section 4.02    Voting On the Plan.............................................................. 21
                a. Who May Vote. .................................................................... 22
                b. Eligibility. ........................................................................... 22
                c. Binding Effect. .................................................................... 22
                d. Procedure/Voting Deadlines. ............................................... 22
    Section 4.03    Plan Confirmation Process................................................... 23
                a. Requirements. ...................................................................... 23
                      (i) Acceptance by Impaired Classes............................... 23

i

(ii) Feasibility.................................................................... 23
(iii) "Best Interests" Test. ................................................ 23
(iv) "Cramdown" Provisions............................................ 24
b. Confirmation Hearing. .................................................... 24
c. Objections to Confirmation............................................. 24
d. Effect of Confirmation. ................................................... 25
ARTICLE V The Plan of Liquidation .............................................. 26
Section 5.01    Plan Objectives. ...................................................... 26
Section 5.02    Overview of the Plan. ............................................ 26
Section 5.03    Administrative Claims, Priority Tax Claims, and Fee Claims............ 28
Section 5.04    Classification and Treatment of Claims and Interests. ...................... 29
a. Class 1: Lenders Secured Claims. .................................. 29
b. Class 2: Other Secured Claims. .................................... 31
c. Class 3: Priority Non-Tax Claims. ................................ 31
d. Class 4A: Lenders Unsecured Claims. ........................... 31
e. Class 4B: General Unsecured Claims. ........................... 32
f. Class 4C: Unsecured Subordinated Note Claims. ........... 32
g. Class 5: Subordinated Litigation Claims. ...................... 34
h. Class 6: Interests. ........................................................ 35
ARTICLE VI Implementation of the Plan........................................ 35
Section 6.01    Implementation on the Effective Date. ................................. 35
Section 6.02    Substantive Consolidation. .................................... 35
Section 6.03    Creation of Liquidation Trust. ................................ 38
Section 6.04    Liquidation Trust – Vesting. ................................... 40
Section 6.05    Appointment of the Liquidation Trustee............................... 40
Section 6.06    Liquidation Trust – Governance ............................ 41
Section 6.07    Liquidation Trust – Trust Fees and Expenses............................ 41
Section 6.08    Investigations Aiding Administration of the Estates. ...................... 41
a. Continuation of Rights Under Federal Rule of Bankruptcy
Procedure 2004. .............................................................. 41
b. Approval of "Joint Interest" Agreement. ...................... 41
Section 6.09    Prosecution and Resolution of Estate Causes of Action................... 42
a. The Liquidation Trust's Exclusive Authority to Pursue,
Settle, or Abandon Estate Causes of Action. ..................... 42
b. Settlement of Estate Causes of Action........................... 42
c. Authority of Members of the Liquidation Trust Oversight
Board to Retain Attorneys to Oppose Settlements. ........... 42
Section 6.10    Approval of Exit Financing. ................................... 43
Section 6.11    Delivery of the Lenders Distribution Agreement. ...................... 44
Section 6.12    Release of Liens and Perfection of Liens. ............................. 44
Section 6.13    Cancellation of Documents...................................... 45
Section 6.14    Termination of Official Creditors' Committee and Chapter
11 Trustee........................................................................ 45
Section 6.15    Preservation of Estate Causes of Action............................... 45
Section 6.16    Preservation of Causes of Action Not Expressly Settled and
Released. ........................................................................ 47

ARTICLE VII Provisions Governing Distributions ............................................................... 48
    Section 7.01   Distributions to Holders of Lenders Claims and Subordinated Notes.48
                    a. Distributions Through the Lenders Distribution Agent and
                    the Senior Subordinated Notes Indenture Trustee. ........................... 49
                    b. Satisfaction of Charging Liens............................................................ 49
                    c. Distributions of the Proceeds of TSI/Holdings Property.............50
    Section 7.02   Provisions Concerning Distributions to Holders of Allowed
                    Class 1 and Class 4A Claims. ................................................................. 50
    Section 7.03   Disputed Claim Reserves. ........................................................................ 50
                    a. Establishment of Disputed Claim Reserves. ................................... 50
                    b. Amounts to Be Reserved. .................................................................... 50
                    c. Distributions. ......................................................................................... 51
                    d. Termination of Disputed Claim Reserve. ....................................... 51
                    e. Limitation of Liability for Funding the Disputed Claim Reserve... 51
    Section 7.04   Setoffs. ........................................................................................................ 52
    Section 7.05   Withholding Taxes and Expenses of Distribution. ............................. 52
    Section 7.06   Allocation of Plan Distributions Between Principal and Interest. ...... 52
    Section 7.07   Disputed Identity of Holder. .................................................................. 52
    Section 7.08   Transfers of Claims. .................................................................................. 52
    Section 7.09   Method of Cash Distributions. ................................................................ 53
    Section 7.10   De Minimis Distributions. ....................................................................... 53
    Section 7.11   No Distribution in Excess of Allowed Amount of Claim.................... 53
    Section 7.12   Exemption from Certain Transfer Taxes. ............................................ 53
ARTICLE VIII Conditions to Effectiveness of Plan ......................................................... 53
    Section 8.01   Conditions to Confirmation. .................................................................. 53
    Section 8.02   Conditions to the Effective Date............................................................. 56
ARTICLE IX Effects of Confirmation of the Plan. ........................................................... 57
                    (i) Binding Effect. ................................................................................... 57
                    (ii) Retention of Estate Causes of Action/Reservation of Rights. 57
                    (iii) Direct Causes of Action. ................................................................ 57
                    (iv) Compromise of Controversies........................................................ 57
                    (v) Preservation of Insurance. .............................................................. 58
                    (vi) Term of Injunctions or Stays........................................................... 58
                    (vii) EXCULPATION.............................................................................. 59
                    (viii) INJUNCTION............................................................................... 59
                    (ix) No Releases for Specified Parties. ................................................. 59
                    (x) Subrogation. ...................................................................................... 60
ARTICLE X Executory Contracts and Leases ................................................................... 60
    Section 10.1   Rejection of Contracts and Leases.......................................................... 60
    Section 10.2   Bar Date for Rejection Damages. ........................................................... 60
ARTICLE XI Disputed, Contingent and Unliquidated Claims and Interests .................. 60
    Section 11.1   Certain Disputed Claims and Interests................................................... 60
    Section 11.2   Objections to Other Claims and Interests .............................................. 62
    Section 11.3   Estimation of Claims or Interests............................................................ 63
    Section 11.4   Alleged Equipment Leases. ..................................................................... 63
    Section 11.5   Amendments to Claims or Interests........................................................ 64

Section 11.6    Authority to Settle Disputed Claims or Interests. ............................... 64
ARTICLE XII Retention of Jurisdiction.................................................................................... 64
Section 12.1    Retention of Exclusive Jurisdiction by the Bankruptcy Court........... 64
Section 12.2    Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court. .. 66
ARTICLE XIII Best Interests Test ............................................................................................ 66
ARTICLE XIV Feasibility of the Plan ...................................................................................... 69
ARTICLE XV Risk Factors........................................................................................................ 70
ARTICLE XVI Certain Federal Income Tax Consequences.................................................. 72
ARTICLE XVII Alternatives to the Plan................................................................................... 73
a. Alternative Plan........................................................................... 73
b. Chapter 7 Liquidation. ............................................................... 74
c. Dismissal. .................................................................................... 74
ARTICLE XVIII Recommendations ......................................................................................... 74
ARTICLE XIX Conclusion ........................................................................................................ 74

EXHIBITS


A       The Plan


B       Notice Fixing Time For Casting Ballots, Deadline for Objections and Hearing on Confirmation


C       Order Approving the Disclosure Statement


D       Ballot


E       Order with attendant Lessor Term Sheet


F       Liquidation Trust Agreement


G       Identification and Curriculum Vitae of the Liquidation Trustee


H       Initial Members of the Liquidation Trust Oversight Board


I       Joint Interest Agreement


J       Exit Facility Agreement


K       Lenders Distribution Agreement


L       Cash Flow Projections


M       Hypothetical Recoveries/Assumptions – Submitted Only to Describe Applications of Formulas Contained In The Plan.


N       Liquidation Trust Reserve

# ARTICLE I
## Introduction

**General.** The Official Creditors' Committee, the Ad Hoc Lenders' Committee and the Ad Hoc Noteholders' Committee propose the Plan, as it may be modified or amended from time to time, for the liquidation of Estate Assets, the resolution of Estate Causes of Action, the distribution of value to holders of Claims and Interests, and the efficient and cost effective resolution of all administrative matters relating to these Chapter 11 cases. This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan. Simultaneously with the filing of this Disclosure Statement, the Proponents are filing the Plan that is discussed and described in this Disclosure Statement.

On November 1, 2006, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against Le-Nature's. On November 3, 2006, the Le-Nature's case was converted to a case under Chapter 11 of the Bankruptcy Code. On November 5, 2006, Le-Nature's Holdings and TSI each filed a voluntary petition under Chapter 11 of the Bankruptcy Code. By order dated November 7, 2006, the Debtors' Chapter 11 cases were procedurally consolidated, and are being jointly administered. This solicitation is being conducted to obtain sufficient acceptances of the Plan and contains information relevant to a decision to accept or reject the Plan. This Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of Section 1125(a) of the Bankruptcy Code.

**Section 1.01 Disclosure Statement Enclosures**. Accompanying this Disclosure Statement are copies of:

1.    the Plan, which is attached hereto as Exhibit "A";

2.    a notice (the "Notice"): (a) fixing the time for casting ballots either accepting or rejecting the Plan; (b) fixing the deadline for filing objections to Confirmation of the Plan; and (c) scheduling a hearing on Confirmation of the Plan, which is attached hereto as Exhibit "B";

3.    the Order approving this Disclosure Statement, which is attached hereto as Exhibit "C";

4.    for holders of Impaired Claims and Interests, a ballot for acceptance or rejection of the Plan (the "Ballot"), which is attached hereto as Exhibit "D";

5.    the Lessor Term Sheet (as such term is defined in Section 11.4 of the Disclosure Statement), which is attached hereto as Exhibit "E";

6.    the Liquidation Trust Agreement, which is attached hereto as Exhibit "F";

7.    Identification and Curriculum Vitae of the Liquidation Trustee, which is attached hereto as Exhibit "G";

8.     Initial Members of the Liquidation Trust Oversight Board, which is attached hereto as Exhibit "H";

9.     The form of the Joint Interest Agreement, which is attached hereto as Exhibit "I";

10.     The form of the Exit Facility Agreement, which is attached hereto as Exhibit "J";

11.     The form of the Lenders Distribution Agreement, which is attached hereto as Exhibit "K";

12.     Cash Flow Projections, which are attached hereto as Exhibit "L";

13.     Hypothetical Recoveries/Assumptions – Submitted Only to Describe Applications of Formulas Contained In The Plan, which are attached hereto as Exhibit "M"; and

14.     The Budget for the Liquidation Trust Reserve, which is attached hereto as Exhibit N.


**Section 1.02 Summary of Treatment of Claims and Interests Under the Plan**.  Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan.

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN |
| --- | --- |
| Unclassified: Administrative Claims | Allowed Administrative Claims shall be paid in full, in Cash on the later of the Effective Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as reasonably practicable. |
| Unclassified: Priority Tax Claims. | Allowed Priority Tax Claims shall be paid either in full, in Cash on the Effective of the Plan or shall receive deferred Cash payments in equal annual installments through the date that is the fifth anniversary of the Petition Date (or the date on which holders of Class 4A claims are paid in full, whichever earlier), plus interest at the rate of 6% per annum. |

2

| | |
|---|---|
| Unclassified: Fee Claims | Holders of Allowed Fee Claims shall be paid in full, in Cash on the date that the claim is Allowed by Final Order (or by an Order that is appealed but not stayed) or becomes Allowed after the Effective Date, or as soon thereafter as reasonably practicable. |
| Class 1: Lenders Secured Claims. | Holders of Allowed Claims in this Class (subject to the provisions of the Plan on Allowance of Class 1 Claims) shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims: (a) Tier One Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 1; (b) additional Tier One Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 1, as a result of the Disallowance of any Disputed Claim in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement |
| Class 2: Other Secured Claims | Holders of Allowed Claims in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the option of the Liquidation Trust, one or a combination of the following (net of any applicable rights to surcharge, including rights arising under Bankruptcy Code Section 506(c)): (i) payment in Cash from proceeds from the sale or disposition of the collateral securing the Allowed Other Secured Claims to the extent of the value of any holder's Lien on such property; (ii) surrender of the collateral securing the Allowed Other Secured Claims; or (iii) such other distributions as shall satisfy the requirements of Bankruptcy Code Section 1129. |

Class 3: Priority Non-Tax Claims

Holders of Allowed Priority Non-Tax Claims shall be paid in full, in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

Class 4A: Lenders Unsecured Claims

Holders of Allowed Lenders Unsecured Claims (subject to the provisions of the Plan on Allowance of Class 4A Claims) shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C; (c) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 4A, as a result of Turnover Enforcement of Class 4C distributions; (d) all proceeds of the foregoing distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement and (e) a percentage of the proceeds of the TSI/Holdings Property to other holders of Allowed Claims in Class 4A and Class 4C, subject to the (i) use of such proceeds to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) reallocation of such proceeds to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan.

Class 4B: General Unsecured Claims

Holders of Allowed General Unsecured Claims shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and

4

Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C; (c) distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement and (d) a percentage of the proceeds of the TSI/Holdings Property Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, but only to the extent (i) such proceeds are not used to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) such proceeds are reallocated to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan.

| | |
|---|---|
| Class 4C: Unsecured Senior Subordinated Notes Claims | Holders of Allowed Unsecured Subordinated Note Claims (subject to the provisions of the Plan on Allowance of Class 4C Claims) shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C; (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement; and (d) a percentage of the proceeds of the TSI/Holdings Property Ratable to other holders of Allowed Claims in Class 4A and Class 4C, subject to the (i) use of such proceeds to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) reallocation of such proceeds to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan; *provided, however*, that certain such distributions shall be deemed reallocated and distributed on account of Claims in Class 4A, as a settlement of potential claims by Lenders for enforcement of contractual subordination provisions in the Senior Subordinated Notes Indenture, in accordance with "Turnover Enforcement" (as defined in the Plan and summarized further in this Disclosure Statement). |

Class 5: -Subordinated Litigation Claims

Holders of Allowed Litigation Claims shall be entitled to receive: (a) Tier Three Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 5; (b) additional Tier Three Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class5, as a result of the Disallowance of any Disputed Claim in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement;

Class 6: Interests

Holders of Allowed Interests shall be entitled to receive: (a) Tier Four Trust Beneficial Interests in a percentage Ratable to other Allowed Interests in Class 6; (b) additional Tier Four Trust Beneficial Interests in a percentage Ratable to other Allowed Interests in Class 6, as a result of the Disallowance of any Disputed Interest in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement

## ARTICLE II
## Historical Information[1]

**Section 2.01   Description of the Debtors' Business**. The Debtors' business began in 1992 and consisted of the production and marketing of all-natural, non-carbonated beverage products that were sold under the Le-Nature's brand name. The products sold by the Debtors included bottled water, flavored water, and tea drinks. The company initially operated its business at a facility located at Latrobe, Pennsylvania and sold its products primarily in the northeast and mid-atlantic regions of the United States. Its corporate headquarters were also located in Latrobe. In 2004, the Debtors expanded their operations by leasing a facility in Phoenix, Arizona, which enabled the Debtors to market their products in the southwest United States. Le-Nature's is a private company incorporated in Delaware and is the direct parent of each of the other Debtors. The Debtors employed approximately 200 employees as of the Petition Date.

---

[1] As indicated in Section 2.03 of this Disclosure Statement, substantial questions exist about the veracity of all information concerning the Debtors' pre-petition conduct and business activities. The information contained herein is based on representations made by the Chapter 11 Trustee and other sources of information deemed by the Proponents more trustworthy than the Debtors' pre-petition disclosures.

The audited financial statements of Le-Nature's prepared by BDO Seidman represented that the Debtors' gross revenue for 2005 was $287,233,880. However, in October 2006, evidence surfaced that Gregory Podlucky, the company's chairman and CEO ("Podlucky"), with the likely assistance of other Insiders, had engaged in massive corporate wrongdoing. In October 2006, pursuant to an order of the Delaware Chancery Court, existing management was replaced by Kroll Zolfo Cooper LLC ("Kroll"), as Custodian. Kroll found evidence of widespread fraudulent activity, and that the company's 2005 revenues were more likely close to $30 million. Shortly after these discoveries, Kroll made the decision to discontinue the Debtors' business operations.

## Section 2.02    Prepetition Ownership and Capital Structure of the Debtors Prior to the Chapter 11 Case.

### a.    Secured Credit Facility

On September 1, 2006, the Debtors entered into the Pre-Petition Secured Credit Agreement, dated as of September 1, 2006, with Wachovia Bank, as administrative agent, and the Lenders party thereto.

The Pre-Petition Secured Credit Agreement provided for a revolving loan in an amount of $20 million and a Tranche B term loan facility in the amount of $265 million. As of the Petition Date, there was approximately $278 million, plus interest, outstanding under the Pre-Petition Secured Credit Agreement.

To secure their obligations under the Pre-Petition Secured Credit Agreement, the Debtors also entered into that certain Amended and Restated Security Agreement, dated as of September 1, 2006, with Wachovia (the "Security Agreement"), and certain other collateral documents (the "Collateral Documents"). Under the Security Agreement and the Collateral Documents, the Debtors purported to grant Wachovia, for the benefit of the Lenders, a security interest in substantially all of their assets.

Borrowings under the Pre-Petition Secured Credit Agreement bore interest at either an alternative base rate or rates calculated by reference to LIBOR. The Pre-Petition Secured Credit Agreement also contains restrictive covenants that, among other things, limited indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

### b.    Senior Subordinated Notes

On or about June 23, 2003, the Debtors issued or guaranteed $150 million in aggregate principal amount of 9% Senior Subordinated Notes due June 15, 2013 pursuant to the Senior Subordinated Notes Indenture among the Debtors, Manufacturers and Traders Trust Company, as indenture trustee, dated as of June 23, 2003.

The Senior Subordinated Notes are unsecured, and arguably subordinated in right of payment to all existing and future "Senior Indebtedness" (as such term is defined in the

Indenture). As of the Petition Date, there was approximately $150 million plus interest, outstanding on the Senior Subordinated Notes.

    **c.**    **Equity**

The approximately 19 million outstanding voting shares of Le-Nature's stock are privately held. Approximately 54% of the outstanding shares are owned by Podlucky, and 45% are collectively owned by three financial institutions.

**Section 2.03   Events Leading to the Chapter 11 Filing**.

Prior to the commencement of these bankruptcy cases, evidence surfaced that a massive corporate fraud had occurred. In or about June 2006, certain minority shareholders of Le-Nature's commenced an action in the Delaware Court of Chancery styled as *George K. Baum Capital Partners, et al. v. Le-Nature's, Inc., f/k/a Global Beverage Systems, Inc. et al.*, Civil Action No. 2158-N (the "Delaware Action"). In the Delaware Action, the minority shareholders sought to enforce their rights against Podlucky and other Board members designated by Podlucky. In their Second Amended Verified Complaint, the minority shareholder-plaintiffs allege that the defendants, among other things, sabotaged a process to sell the company.

After the commencement of the Delaware Action, the minority shareholders discovered the first traces of corporate wrongdoing. Specifically, the minority shareholders purportedly learned from one of Le-Nature's equipment financiers, AIG Commercial Equipment Finance, Inc. ("AIG"), that the company allegedly (a) fraudulently induced AIG to deposit more than $25 million with an equipment manufacturer ("Krones") to purchase certain equipment that was to be leased by the company, and (b) thereafter, through the use of one or more forged documents, caused Krones to remit more than $20 million of those funds to the company without AIG's knowledge. The whereabouts of those funds, along with more than $100 million of similar deposits, remains unknown.

In light of this discovery and its potential effect on the day-to-day operations of the company, the plaintiffs in the Delaware Action petitioned for the appointment of a receiver *pendente lite* to manage Le-Nature's ordinary course operations pending a final ruling in the Delaware Action. On or about October 27, 2006, the Delaware Court of Chancery entered an order appointing Kroll, as custodian, charged with administering Le-Nature's affairs and overseeing its day-to-day business activities.

Upon its arrival at Le-Nature's headquarters, Kroll found evidence that the company was in serious financial distress and uncovered additional evidence of massive corporate wrongdoing. Specifically, Kroll discovered evidence of (a) rampant document destruction, (b) significant accounting discrepancies, and (c) falsification of the company's books and records. This evidence is disclosed in the *Affidavit of Steven G. Panagos*, dated November 1, 2006 (the "Panagos Affidavit"), submitted in support of a motion filed by Kroll in the Delaware Action to expand Kroll's authority as custodian. The Panagos Affidavit disclosed, among other things, the following:

- Kroll discovered evidence of rampant document destruction. Specifically, Le-Nature's employees witnessed (a) Podlucky and other company employees shredding corporate documents and (b) Podlucky's bodyguard loading a large number of boxes of corporate documents into a dump truck for disposal.

- Kroll's investigation uncovered significant discrepancies between (a) customer shipments and accounts receivable information it found at the company and (b) the company's 2005 audited financial statements and unaudited financial statements as of June 30, 2006. Although Le-Nature's 2005 audited financial statements show annual revenues of $275 million, Kroll found information suggesting that the actual 2005 revenues may be as low as $32 million.

- An accounting department employee admitted to Mr. Panagos that the books and records of the company had been falsified at the direction of Podlucky. That employee explained that the false entries were made in order to meet certain revenue targets, and that the company's 2005 audited financial statements were based on such falsified information.

Shortly thereafter, the involuntary bankruptcy petition was filed by four trade creditors against Le-Nature's, as described above.

## ARTICLE III
## The Debtors' Chapter 11 Bankruptcy Cases

**Section 3.01 Brief Explanation of Chapter 11.** The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.

The confirmation of a plan of reorganization or liquidation is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

**Section 3.02 Commencement of the Chapter 11 Cases.** On the Petition Date, an involuntary petition for relief under Section 303 of the Bankruptcy Code was filed against Le-Nature's by four of its unsecured trade creditors. On November 3, 2006, the Bankruptcy Court appointed Salvatore LoBiondo, Jr. as Le-Nature's Responsible Officer. On that same

date, Le-Nature's consented to the filing and elected to have the case administered under chapter 11 of the Bankruptcy Code. On November 6, 2006, Le-Nature's caused its wholly-owned subsidiaries, Le-Nature's Holdings and TSI, to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 7, 2006, the Bankruptcy Court ordered that the Debtors' three Chapter 11 Cases are jointly administered.

**Section 3.03 Transition Motions**. Shortly after the Petition Date, the Debtors filed a number of motions with the Bankruptcy Court, seeking various forms of relief that the Debtors deemed essential to facilitating its transition to chapter 11. Among the orders sought by the Debtors were, without limitation, the following: Emergency Motion of Custodian for Order Authorizing It to Continue in Possession, Custody and Control of Property of the Estate and Granting It Relief From the Automatic Stay; Motion for an Order Authorizing the Debtors to Pay Prepetition Premiums Necessary to Maintain Insurance Coverage Currently in Effect and Certain Expenses Related Thereto; Motion for an Order Authorizing Continued Use of Existing Cash Management System, Bank Accounts and Business Forms and Motion to Pay (A) Certain Prepetition Claims for (I) Wages, Salaries and Other Compensation, (II) Withholdings and Deductions and (III) Reimbursable Employee Expenses; Motion to Continue Employee Benefits in the Ordinary Course, (C) Related Costs and Expenses; and (D) Motion Authorizing and Directing Banks and Other Financial Institutions, to Pay All Checks and Electronic Payment Requests Made by Debtors Relating to the Foregoing.

**Section 3.04 Cash Collateral Stipulations**. Cash Collateral has been used to fund postpetition activities, including efforts to sell the Latrobe facility and other hard assets, creating an understanding of the Debtors' books and records, pursuing discovery of Estate Causes of Action, and performing administrative tasks in connection with the Plan. The Bankruptcy Court has approved six stipulations and/or orders authorizing the use the Lenders' Cash Collateral. The first three Cash Collateral stipulations, entered into between the Custodian and Wachovia, as administrative agent, provided for the Custodian's use of Cash Collateral in the aggregate amount of $1,050,000. The fourth Cash Collateral stipulation, approved by the Bankruptcy Court on December 7, 2006, authorized the Custodian to utilize Cash Collateral pursuant to a budget consented to by the Ad Hoc Lenders' Committee. On February 14, 2007, the Chapter 11 Trustee filed an emergency motion for use of Cash Collateral, including a request for an interim order for authority to use $220,000 through March 15,-2007, and a final order to utilize Cash Collateral through June 30, 2007, in accordance with a proposed budget. The fifth Cash Collateral order, approved by the Bankruptcy Court on March 5, 2007, authorized the Chapter 11 Trustee to use Cash Collateral of up to $220,000 through March 15, 2007. The Sixth Order Regarding Use of Collateral by Trustee and Granting Adequate Protection (the "Sixth Order") was entered by the Bankruptcy Court on March 21, 2007, and authorizes the Chapter 11 Trustee to continue to use Cash Collateral in accordance with a budget attached to the order until June 30, 2007, or the earlier occurrence of certain specified events, including a dismissal of the cases or conversion to chapter 7.

As adequate protection for the aggregate diminution in the value of collateral and as security for the use of the collateral, the Sixth Order authorized the grant to Wachovia, as administrative agent, and to the Lenders of a security interest and lien upon all of the Debtors' assets, subject only to certain pre-petition liens and payments specified in the Sixth

Order and subject to the rights of the Trustee and the Official Creditors Committee under that Stipulation and Order dated March 13, 2007. The Sixth Order also authorized and the Trustee granted to the Lenders, pursuant to Section 507(b) of the Code, administrative claims with priority over any and all administrative claims, diminution claims and all other claims against the Debtors. On May 25, 2007, the Chapter 11 Trustee, with the consent of the Lenders, submitted the Seventh Order Regarding Use of Collateral by Trustee and Granting Adequate Protection (the "Seventh Order") which extends authorization for the use of cash collateral through August 2007. The Seventh Order is pending approval by the Court and a hearing has been scheduled for June 26, 2007.

**Section 3.05 Retention Applications**. The Custodian requested authorization to retain various professionals to provide services in these Chapter 11 cases. These professionals included Kirkland & Ellis LLP and Campbell & Levine LLC, which acted as counsel, and Kroll, which provided management and forensic accounting services. After the appointment of the Chapter 11 Trustee in these cases, the Chapter 11 Trustee employed his own professionals, as discussed in Section 3.08.

**Section 3.06 Appointment of a Creditors' Committee**. On November 15, 2006, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Creditors' Committee to represent the interests of the unsecured creditors. The Official Creditors' Committee's members are as follows: (1) Manufacturers and Traders Trust Company, as Trustee, Corporate Trust Services, 25 S. Charles Street, 16th Floor, Baltimore, MD 21201; (2) Canusa Hershman Recycling, LLC, 9 Business Park Drive, Branford, CT 06405; (3) Bishof+Klein GmbH & Co. KG, Rabestrabe 47, Lengerich/Germany D-49525; (4) Starpet, Inc., 801 Pineview Road, Asheboro, NC 27203; (5) Owens Illinois Closure Inc., One Michael Owens Way, Perrysburg, OH 43551; (6) CIT Group/Equipment Financing, Inc., 1540 Fountainhead Parkway, Tempe, AZ 85282; (7) Davis Gardner Gannon Pope Architecture, LLC, 2325 East Carson Street, Suite 100, Pittsburgh, PA 15203; (8) General Press Corporation, 110 Allegheny Drive, P.O. Box 316, Natrona Heights, PA 15065; and (9) AIG Commercial Equipment Finance Inc. (AIGCEF), 5700 Granite Parkway, Suite 850, Plano, TX 75025.

Shortly after its formation, the Official Creditors' Committee applied for Bankruptcy Court authorization to retain Lowenstein Sandler PC and Rudov & Stein PC as its co-counsel. The retention applications of Lowenstein Sandler and Rudov & Stein, PC were granted by the Bankruptcy Court with an effective date of November 15, 2006.

**Section 3.07 Formation of the Ad Hoc Lenders' Committee**. Shortly after the Petition Date, the Ad Hoc Lenders' Committee was formed. The members of the Ad Hoc Lenders' Committee collectively hold approximately 62% of the outstanding indebtedness under the Pre-Petition Secured Credit Agreement and approximately 48% of the Senior Subordinated Notes. The Ad Hoc Lenders' Committee has appeared in these cases through its co-counsel, Manion McDonough & Lucas, P.C. and Brown Rudnick Berlack Israels LLP.

**Section 3.08   Formation of the Ad Hoc Noteholders' Committee**. Shortly after the Petition Date, the Ad Hoc Noteholders' Committee was formed. The members of the Ad Hoc Noteholders' Committee  hold approximately $4,000,000 or about 1.5% of the outstanding indebtedness under the Pre-Petition Secured Credit Agreement and hold

12

approximately 26% of the Senior Subordinated Notes. The Ad Hoc Noteholders' Committee has appeared in these cases through its co-counsel, Duane Morris LLP and Kramer Levin Naftalis & Frankel LLP.

**Section 3.09 Appointment of a Chapter 11 Trustee.** On January 9, 2007, the U.S. Trustee appointed E. Todd Neilson (the "Chapter 11 Trustee") to act as the fiduciary for the Estates. Shortly after his appointment, the Chapter 11 Trustee filed applications seeking Bankruptcy Court authorization to retain Pachulski Stang Ziehl Young Jones & Weintraub PC as his general counsel and LECG, LLC as his accountants and financial advisor. By orders dated March 2, 2007, the Bankruptcy Court approved the retentions. The Chapter 11 Trustee filed an application to retain Spilman, Thomas & Battle, PLLC as co-counsel, which application was granted by order dated June 5, 2007.

**Section 3.10    Other Significant Events During the Chapter 11 Cases.**

    **a.**    **Discontinuing of Business**

Following the appointment of Kroll, as Custodian, the Debtors' business operations were terminated except for such operations necessary for an orderly wind-down of the Debtors' affairs and liquidation of assets.

    **b.**    **Pursuit of a Sale of the Latrobe Bottling Facility.**

In December 2006, the Custodian began exploring the retention of a broker to sell the Latrobe plant in a turnkey sale. Due to the projected depletion of Cash in January 2007, Kroll's discussions with potential brokers also involved the provision of a Cash advance to be repaid upon the sale. In mid-January, the Chapter 11 Trustee took over efforts to retain a broker to sell the Latrobe plant, including owned and leased equipment and the warehouse facility. These efforts included extensive negotiations with potential brokers regarding the sale and a cash advance and negotiations with Wachovia, the Ad Hoc Lenders' Committee, the Official Creditors' Committee, and equipment lessors relating to the sale of the plant and equipment in either a turnkey or auction sale, equipment ownership disputes, allocation of sale expenses, and repayment of the cash advance from the sale proceeds. On February 12, 2007, the Chapter 11 Trustee filed a motion to sell the Latrobe facility free and clear of liens and interests and to authorize entry into an agreement with Gordon Brothers Industrial LLC and Harry Davis & Company ("Gordon Brothers/Harry Davis" or the "Broker") to act as the exclusive selling agent and to advance $8 million to fund the sale and liquidation activities. Under the agreement, Gordon Brothers/Harry Davis would market and conduct a sale of the Latrobe facility, including both owned and leased equipment at the Latrobe plant and the real estate and warehouse facilities used in the operations in a turnkey sale. If a turnkey sale cannot be accomplished, the agreement provides for an orderly sale in an auction, which will realize greater value for the equipment than a piecemeal or firesale liquidation. It is believed that the highest value of the assets will be obtained if they are sold together.

Following the filing of the motion to employ the Broker and sell the Latrobe plant, the Chapter 11 Trustee, Wachovia, the Ad Hoc Lenders' Committee, and equipment lessors

continued with extensive negotiations regarding the sale and related issues and disputes. A hearing on the motion to employ the Broker and sell the Latrobe plant was held on March 13, 2007. The Bankruptcy Court considered a competing broker proposal at the March 13 hearing and Gordon Brothers/Harry Davis proposed to reduce their commissions and compensation to match the competing offer. Following further bidding resulting in further reductions in the proposed commissions and compensation, Gordon Brothers/Harry Davis was approved as the broker and sale of the Latrobe plant was authorized subject to finalizing an agreement with equipment lessors under a "Lessor Term Sheet" that provided for consents of alleged equipment lessors to selling equipment that they claimed was leased. The Lessor Term Sheet, which also provided for procedures to address allocation and ownership dispute issues, was finalized and submitted to the Bankruptcy Court on March 27, 2007. A copy of the Order, with attendant Lessor Term Sheet, is attached hereto as Exhibit "E". By an order filed April 12, 2007, the Bankruptcy Court authorized the retention of Gordon Brothers/Harry Davis as broker and authorized the sale of the Latrobe plant on the terms set forth in the Order and the Lessor Term Sheet.

      **c.**    **Rule 2004 Investigations.** Shortly after its formation, the Ad Hoc Lenders' Committee initiated an investigation into Estate Causes of Action arising out of the pre-petition activity that occurred at Le-Nature's. The Ad Hoc Lenders' Committee furthered this investigation by serving subpoenas pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004 Subpoenas") on the following parties: Wachovia Bank, N.A., Wachovia Capital Markets, LLC, Wachovia Securities, Ernst & Young, BDO Seidman LLP, Andrew Murin, Robert B. Lynn, Jonathan E. Podlucky, Gregory J. Podlucky, and David E. Getzik. The Ad Hoc Lenders' Committee's investigation has been supported by the Official Creditors' Committee. In addition, the Ad Hoc Lenders' Committee, consistent with the local rules of the Bankruptcy Court, conferred with other parties with potentially relevant information, including minority shareholders of Le-Nature's and a former consultant to Le-Nature's, Executive Sounding Board Associates, and negotiated voluntary production of documents relating to Le-Nature's.

      On December 26, 2006, Wachovia filed a motion to quash the Rule 2004 Subpoenas ("Motion") on grounds that the subpoenas were premature and improperly related to private claims against Wachovia. The Debtors, Official Creditors' Committee, Ad Hoc Lenders' Committee, and the Jointly Represented Initial/Par Purchasers objected to the Motion. The Motion was continued until the Chapter 11 Trustee had an opportunity to present his position. On January 18, 2007, the Chapter 11 Trustee filed his statement requesting that the Bankruptcy Court deny the Motion and order that all of the document discovery requested in the subpoenas be delivered to him, and stated that he would subsequently make such discovery available to the parties in interest. Subsequently, Wachovia withdrew its Motion. The Chapter 11 Trustee has been coordinating discovery responses, document production, and document management. In that regard, the Chapter 11 Trustee negotiated a form of confidentiality agreement to govern the production and sharing of documents and discovery materials. The Ad Hoc Lenders' Committee, Official Creditors' Committee and Ad Hoc Noteholders' Committee provided comments to the confidentiality agreement and the confidentiality agreement was ultimately approved by the Bankruptcy Court on March 28,

2007. Over the past few months, the Chapter 11 Trustee has been working with the Ad Hoc
Lenders' Committee, Official Creditors' Committee and Ad Hoc Notcholders' Committee to
preserve and protect the Debtors' books and records, including electronic documents and
information. In addition, the Chapter 11 Trustee has also begun a forensic analysis of the
Debtors' books and records.

### d.    Litigation Against Federal Insurance Company

On or about December 28, 2006, Federal Insurance Company ("Federal Insurance")
filed the Motion of Federal Insurance Company to Lift the Automatic Stay, to the Extent
Applicable, to Permit Advancement of Defense Costs Under the Debtor's Directors and
Officers Liability Insurance Policy (the "D&O Policy Lift Stay Motion"). Prior to the
Petition Date, Federal Insurance issued Forefront Portfolio Insurance Policy No. 8181-1088
to Le-Nature's (the "Federal D&O Policy"). Through the D&O Policy Lift Stay Motion,
Federal Insurance sought authorization to advance defense costs to certain of the Debtors'
former officers and directors for costs incurred in defending the Delaware Action. The
Official Creditors' Committee filed an objection to the D&O Policy Lift Stay Motion, and
the Ad Hoc Lenders' Committee and the Chapter 11 Trustee joined in the Official Creditors'
Committee's objection. In addition, the Debtors, Podlucky, Jonathan Podlucky and Andrew
Murin filed a joint objection to the Motion. The parties settled the matter and agreed to entry
of an order authorizing Federal Insurance to advance up to $759,039.51 in defense costs,
subject to certain reporting provisions described in the Order (A) Authorizing Federal
Insurance Company to Advance Defense Costs Up To $759,039.51, and (B) Requiring
Federal Insurance Company to File Monthly Reports of Defense Costs Advanced entered on
March 21, 2007 (Docket No. 1021).

Also on December 28, 2006, Federal Insurance filed its Motion to Lift the Automatic
Stay to Permit Determination of Validity of Insurance Policy (the "Rescission Lift Stay
Motion"). The Official Creditors' Committee objected to the Rescission Lift Stay Motion,
and the Chapter 11 Trustee and the Ad Hoc Lenders Committee joined in the objection. On
February 20, 2007, the Bankruptcy Court held a hearing on the Rescission Lift Stay Motion.
On February 1, 2007, the Bankruptcy Court entered an order denying the Rescission Lift Stay
Motion (Docket No. 842).

On March 30, 2007, Federal Insurance commenced the adversary proceeding
encaptioned *Federal Insurance Company v. Le-Nature's, Inc., R. Todd Neilson, as Chapter
11 Trustee of Le-Nature's, Inc., and Gregory J. Podlucky*, Adv. Pro. No. 07-02138-MBM
(the "Federal Insurance Proceeding"). Through the Federal Insurance Proceeding, Federal
Insurance seeks an order of the Court, *inter alia*, rescinding the Federal D&O Policy.
Concurrently with commencing the Federal Insurance Proceeding, Federal Insurance moved
to withdraw the reference for the proceeding to the United States District Court for the
Western District of Pennsylvania ("District Court.") On April 20, 2007, the District Court
entered an Order requiring that responsive briefs shall be filed on April 30, 2007. The
Chapter 11 Trustee, the Official Creditors Committee, the Ad Hoc Lenders and Podlucky
filed responses objecting to the motion for withdrawal of the reference. A status conference
was held before the District Court on May 15, 2007. By Order entered June 1, 2007, the

District Court denied the motion to withdraw the reference and reinstated the reference of jurisdiction in the case to the Bankruptcy Court.

### e.    The Delaware Action

As is discussed previously at Section 2.03, approximately six months prior to the Petition Date, certain of Le-Nature's minority shareholders commenced an action in Court of Chancery of the State of Delaware encaptioned *George K. Delaware Capital Partners, et al. v. Le-Nature's, Inc., et al.*, Civil Action No. 2158-N (the "Delaware Action"). On November 3, 2006, Le-Nature's removed the Delaware Action to the Bankruptcy Court, where it is currently pending as Adversary Proceeding No. 06-02756–MBM. On December 1, 2006, the Plaintiffs in the Delaware Action moved to remand the action back to the Delaware Chancery Court. The Official Creditors Committee objected to the motion to remand the Delaware Action, and the Chapter 11 Trustee and the Ad Hoc Lenders' Committee joined in the objection. In addition, certain of the nondebtor defendants in the Delaware Action objected to the motion for remand. At a hearing held on March 27, 2007, the Bankruptcy Court directed that the parties submit post-hearing briefs on whether the Bankruptcy Court should stay the Delaware Action. On April 9, 2007, the Delaware Plaintiffs filed their Supplemental Brief/Memorandum in Support of Plaintiffs' Motion to Remand. On April 23, 2007, the Official creditors Committee and the Chapter 11 Trustee filed pleadings requesting that the Bankruptcy Court deny the motion or stay the Delaware Action. The matter is currently under submission. On May 16, 2007, the Bankruptcy Court entered an order directing the Chapter 11 Trustee to file by May 25, 2007 an adversary proceeding seeking the entry of an injunction as to the plaintiff's removed action. The Chapter 11 Trustee commenced an adversary proceeding at Adversary Proceeding # 07-02241-MBM and filed a complaint as directed on May 25, 2007. The Bankruptcy Court has set a status conference in the <u>Baum</u> Adversary Proceeding for June 26, 2007.

**f.    Merrill Lynch Motion to Convert Cases to Chapter 7**

On February 15, 2007, Merrill Lynch filed a motion to convert the Debtors' cases to proceedings under Chapter 7. While supporting efforts to pursue a sale process in which the Latrobe facility is sold in a turnkey operation or in an orderly liquidation, Merrill Lynch expressed concerns with the costs of the Chapter 11 cases and sale expenses allocated to equipment lessors. Based on the resolution of issues relating to the sale of the Latrobe plant and equipment under the Lessor Term Sheet, Merrill Lynch withdrew its motion to convert on April 2, 2007.

**g.    Order To Show Cause.**

On May 31, 2007, the Bankruptcy Court signed an Order directing that the Debtor and/or Debtors' Counsel; Chapter 11 Trustee and any other party that wishes to appear to show cause why the Cases should not be dismissed since the case is serving a purpose to secured creditors and has and will never serve any benefit to unsecured creditors. The hearing on the Rule to Show Cause is scheduled for June 26, 2007.

**h.    Wachovia Motion to Convert to Chapter 7.**

On June 12, 2007, Wachovia filed a Motion to Convert Case from Chapter 11 to Chapter 7. The motion is scheduled to be heard by the Court on July 10, 2007.

**Section 3.11    Schedules and Statement of Financial Affairs/Asserted Claims.**  On January 8, 2007, the Debtors filed their Schedules of assets and statement of financial affairs.

As discussed above in Section 2.03, upon its appointment as custodian, Kroll found that records of the Debtors had been destroyed or removed and that available information was in many instances unreliable. Kroll was able through its work over the ensuing months to reconstruct certain financial information for the Debtors and did file Schedules for the Debtors on January 8, 2007. The Schedules and Statement of Financial Affairs for each Debtor were filed with the following Addendum:

> "Please be advised that, as it may pertain to each of Le-Nature's, Inc. Le-Nature's Holdings, Inc. and Tea Systems International, LLC (collectively the "Debtors" and each, a "Debtor"), (i) the information contained in the schedules, statement of financial affairs, and any related documents (the "schedules"), was obtained from the affected Debtor's available records (the "Records"); (ii) as a result of what is believed to be massive fraud, including but not limited to, one or more of the Debtors maintaining at least two sets of books, one containing fraudulent information, and the other containing information that may or may not be reliable or verifiable, the information contained in the Schedules, as reflected from the Records, may not be accurate"

17

Neither the Proponents nor the Chapter 11 Trustee have verified the accuracy of the Schedules and given the serious discrepancies with the Debtors' record keeping, they cannot be relied upon. As filed, the Schedules showed assets of $40,149,242.19 for Debtor Le-Nature's and liabilities of $453,314,099.49. The Schedules for Debtor TSI showed assets of $2,768,146.46 and liabilities of $278,000,000. Debtor Le-Nature Holdings was scheduled with no assets and no liabilities. Due to the state of the Debtors' records, serious questions remain regarding the completeness and accuracy of the Schedules as to the type, nature and value of the Debtors' assets. As explained further below, the $40 million in assets for Debtor Le-Nature's does not include any value for the owned real estate and equipment (since the Schedules listed value of these items as "unknown") and does not include any estimate of the value of Causes of Action of the Debtors' Estates.

The filed Schedules indicate that the assets of Debtor Le-Nature's, as of the Petition Date, consisted of owned real estate in Latrobe, Pennsylvania, and Ligonier, Pennsylvania, equipment used in the bottling operations at the Latrobe facility, cash on hand of approximately $2,000,000, accounts receivable estimated at $5,289,354.00, finished goods valued at approximately $1,200,000, and new material inventory of approximately $20,500,000. In addition, following its appointment, Kroll discovered at the Debtors' facility in Latrobe large quantities of jewelry and precious stones and an inventory of collectible trains, all of an undetermined value. The jewelry and precious stones were seized initially by the U.S. Postal Inspection Service pending investigation and determination of ownership. The Assistant United States Attorney has advised the Chapter 11 Trustee that he or the United States Postal Inspector have seized over 2,000 pieces or jewelry or stones, including pieces that were on consignment with various jewelry stores and pieces that were in Podlucky's possession. The jewelry, stones and collectible trains may belong to the Debtors and may be subject to the liens and security interests of the Lenders. The Assistant United States Attorney has indicated a willingness to turn the Debtors' seized assets over to the Chapter 11 Trustee for valuation and sale once he has completed the necessary tasks to establish an evidentiary record.

According to the Schedules, Debtor Le-Nature's has ownership of various parcels of real estate located in Latrobe, Westmoreland County, Pennsylvania. The Schedules list the real property to be of unknown value, and subject to the liens of the Debtors' Lenders. The parcels comprise the land on which Debtor Le-Nature's bottling and beverage production in Latrobe is located and associated warehouse facilities. Shortly after the Chapter 11 Cases were commenced, the operations at the Latrobe facility were idled and basic maintenance, security, and insurance of the facility has been continued during the bankruptcy proceedings. As discussed above, on or about April 12, 2007, the Bankruptcy Court, on motion of the Chapter 11 Trustee, and with the consent of the Lenders, equipment lessors and Official Creditors' Committee, approved the retention of Gordon Brothers/Harry Davis, as broker, to market for sale the Latrobe facility including all real estate and personal property relating to the Latrobe facility bottling operations and warehouse facilities. The valuation of the assets subject to the sale and the payment of expenses of the sale and distribution of the proceeds are subject to determination and resolution in accordance with procedures agreed to by the Lenders, equipment lessors, and the Chapter 11 Trustee as part of the Order approving the retention of the broker and sale of the Latrobe facility assets.

The Schedules filed for Debtor TSI list ownership of unimproved real estate located in Ligonier, Pennsylvania, of an undetermined value. The real property had been acquired in 2006 for a purchase price of $2,750,000. The Schedules also identify a bank account for TSI with a balance of approximately $18,000.00. No other assets were identified for Debtor TSI. The Schedules filed for Debtor Le-Nature's Holdings did not list it as owning any assets.

During the Bankruptcy Cases, Kroll, as the Custodian, and thereafter, following its appointment, the Chapter 11 Trustee, has collected the accounts receivable, and made sales of the Debtors' inventory and raw materials. As of the date of this Disclosure Statement, a total of approximately $3,290,000 in accounts receivable have been collected and approximately $970,000 in accounts receivable remain outstanding, the collectibility of which is largely questionable. Finished goods inventory has been sold for an aggregate sale price of approximately $2,400,000.

In addition to the assets discussed above, the Debtors' Estates hold various Causes of Action and claims, the successful pursuit of which will provide recoveries for distribution to creditors as outlined in the Plan. The nature of these Causes of Action and potential defendants are discussed further in this Disclosure Statement below in Sections 6.16 and 6.17. None of these Causes of Action had been filed by the Debtors prior to the filing of the petition in bankruptcy. The Causes of Action are the subject of on-going and continuing investigation and it is not possible at this time to specify which specific Causes of Action or defendants will be pursued, to predict the outcome of the actions that will be pursued or to estimate the amount of the recoveries. (*See* Article XV below discussing *Risk Factors*)

As to liabilities, the Schedules filed on behalf of the Debtors listed total liabilities for Debtor Le-Nature's of $453,314,099.49, total liabilities for TSI of $278,000,000, and no liabilities for Le-Nature's Holdings. Given the circumstances of the books and records of the Debtors, it cannot be known whether the information in the Schedules contain all of the liabilities of the Debtors or whether that information is fully accurate and it may be changed as additional information is found and/or records reconstructed. The liabilities of Debtor Le-Nature's shown on the Schedules include indebtedness to lenders in an aggregate estimated amount of $278,000,000 plus interest, fees, costs, expenses, and claims under the Pre-Petition Secured Credit Agreement, indebtedness to Notcholders of $150,000,000, indebtedness owed to equipment lessors in an undetermined amount due to issues as to ownership and validity of leases, but believed to be as much as $300,000,000 and indebtedness to unsecured trade creditors estimated to be approximately $30 million.

The "bar date" for filing of proofs of claim in the bankruptcy cases was March 21, 2007 for nongovernmental creditors and was May 7, 2007 for governmental unit claims. The aggregate amount for filed proofs of claim by nongovernmental creditors in each case is as follows:

| | |
|---|---|
| Le-Nature's | $1,043,490,402.99 |
| TSI | $  437,123,852.09 |
| Le-Nature's Holdings | $  411,322,334.69 |

Proofs of claims filed by governmental units are as follows:

19

| | | |
|---|---|---:|
| Administrative | $ | 1,000.00 |
| Secured | $ | 7,170.00 |
| Unsecured Priority | $ | 20,907,820.11 |
| General Unsecured | $ | 11,689,124.71 |

The proofs of claim filed by governmental units include a claim filed by the Internal Revenue Service ("IRS") on April 17, 2007. The IRS has filed a claim for $32,502,935.87, broken down as follows:

| | PRIORITY UNSECURED | GENERAL UNSECURED |
|---|---:|---:|
| Income Tax – 2001 (including interest) | $ 399.00 | |
| Income Tax – 2002 (including interest) | 3,678,162.00 | |
| Income Tax – 2004 (including interest) | 11,840,913.00 | |
| Income Tax – 2005 (including interest) | 5,284,149.00 | |
| FICA Tax – 2004 (including interest) | 43,089.17 | |
| Penalties (including interest) | | $11,656,223.70 |
| TOTAL | $20,846,712.17 | $11,656,223.70 |

The IRS' claim is based on income tax returns filed by Le-Nature's, as adjusted pursuant to IRS examination. The Chapter 11 Trustee has reviewed the claim and it is the Trustee's belief that the income tax returns filed by Le-Nature's were prepared from falsified financial information which grossly overstated revenues and other financial activity. The Chapter 11 Trustee will be amending the income tax returns for the years in question in order to properly quantify the IRS' claim, if any.

After a preliminary reconciliation by the Chapter 11 Trustee to account for superseded and duplicate Claims (including claims filed against multiple entities), the adjusted amount of Claims filed against the Estates is:

| | Le-Nature's | Tea System | Le Nature's Holdings | Total |
|---|---:|---:|---:|---:|
| Administrative | 2,487,881.97 | 00 | 1,000.00 | 2,488,881.97 |
| Secured | 286,176,924.92 | 7,170.00 | 152,706.99 | 286,336,801.91 |
| Priority | 23,167,481.77 | 170.00 | 3,861.70 | 23,171,513.47 |
| General Unsecured | 506,790,795.67 | 502,574.76 | 1,486,413.36 | 508,779,783.79 |

Under the Plan, certain Claims are unclassified:    1) Administrative Claims; 2) Priority Tax Claims, and 3) Fee Claims.  The Administrative Claims are estimated by the Chapter 11 Trustee to be $2,500,000, and Priority Tax Claims (other than the IRS claim discussed above) are estimated by the Chapter 11 Trustee to be $70,000.  Fee Claims are subject to submissions of applications and fee petitions, to objection by parties in interest and to approval by the Bankruptcy Court; based on current information and subject to the approval process, Fee Claims are estimated by the Chapter 11 Trustee to be approximately $14,737,000 in the aggregate.

**Section 3.12   Monthly Financial Reports.**  A monthly financial report was filed by the Debtors on December 20, 2007, for the period ending November 30, 2006.  The Chapter 11 Trustee filed a monthly financial report on January 23, 2007 for the period from December 1, through December 31, 2006,  filed a monthly financial report on February 21, 2007, for the period of January 2007, and filed a monthly financial report on March 23, 2007, for the period  from February 1 through February 28, 2007 ( Docket # 1035), filed a monthly financial report on April 25, 2007 for the period from March 1 through March 31, 2007 (Docket # 1170) and filed a monthly financial report on May 23, 2007 for the period April 1 through April 30, 2007 (Docket # 1262).

**Section 3.13   Lenders Collateral Stipulation.**    The Proponents and the Trustee entered into a *Stipulation and Order (I) Extending the Time to Challenge the Validity, Extent, Enforceability and Perfection of Certain Liens, Security Interests and Pledges Granted to and Held by the Agent for the Benefit of the Pre-Petition Secured Lenders and (II) Memorializing Stipulation as to Perfection of Liens and Security Interests as to Certain Assets*, which was entered by the Bankruptcy Court on or about March 13, 2007 (Docket Number 993).

# ARTICLE IV
## General Information on Confirmation Procedure and Voting

**Section 4.01  Purpose of Disclosure Statement**.    The Bankruptcy Code requires the provisions of this Disclosure Statement to all holders of Claims and Interests in the Debtor entitled to vote upon the Plan pursuant to Section 1125 of the Bankruptcy Code to enable such holders of Claims and Interests to make an informed judgment concerning the Debtor's solicitation of acceptances of the Plan.    After notice and a hearing conducted on _____, the Bankruptcy Court by Final Order dated _____, approved this Disclosure Statement as containing "adequate information" (as defined in §Section 1125(a) of the Bankruptcy Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the holders of Claims against and Interests in the Debtor to make an informed judgment in voting to accept or reject the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation to accept or reject the Plan.

**-Section 4.02 Voting On the Plan**

21

      **a.**    **Who May Vote.** Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims or Interests in Classes that are Impaired by the Plan may vote on the Plan. Holders of Claims or Interests *not* Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. Administrative Claims and Priority Tax Claims are not generally classified for purposes of voting or receiving Distributions under the Plan. In this case, holders of Claims in the following Classes are entitled to vote to accept or reject the Plan: Class 1, Class 2, Class 4A, Class 4B, Class 4C, Class 5 and Class 6. This Disclosure Statement is being distributed for informational purposes to all Creditors, the Interest holders and parties-in-interest without regard to their right to vote. If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting.

      **b.**    **Eligibility.** In order to vote on the Plan, a Creditor must have timely filed or been assigned a timely filed proof of claim, unless its Claim is listed on the Debtors' Schedules and is not identified as disputed, unliquidated, or contingent or has been objected to prior to the Confirmation Hearing. Creditors having an Allowed Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class. The General Claims Bar Date set by the Bankruptcy Court for filing proofs of claim for general claims was March 21, 2007, and the Governmental Unit Claims Bar Date was May 5, 2007.

      **c.**    **Binding Effect.** Whether a Creditor votes on the Plan or not, such person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Unless a Ballot is completed and returned in accordance with approved Bankruptcy Court procedures, a Creditor will not be included in the vote for purposes of accepting or rejecting the Plan or for purposes of determining the number of Persons voting on the Plan.

      **d.**    **Procedure/Voting Deadlines.** In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to the following:

[ATTORNEY NAME]
[ADDRESS]

      Pursuant to Federal Rule of Bankruptcy Procedure 3017, the Bankruptcy Court ordered that **original** Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery to the address set forth above on or before _____**p.m., (Prevailing Eastern Time) on** _____ **(the "Voting Deadline"). Facsimile or electronically submitted Ballots will not be counted.** Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

      Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

      (i)    Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim shall be completed or corrected, as the case may be, based upon the following hierarchy: (i) the claim amount temporarily Allowed by Court

22

order for voting purposes pursuant to Bankruptcy Rule 3018; (ii) the amounts of any timely filed proofs of Claim which have not been objected to prior to the Voting Deadline; and (iii) the claim amount listed on the Schedules if no proof of Claim has been filed by such Creditor, and counted as a vote to accept or reject the Plan;

(ii)    Ballots received that do not identify the Creditor, whether or not signed by the Creditor, shall not be counted as a vote to accept or reject the Plan;

(iii)    Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim and that are otherwise properly completed shall be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan; and

(iv)    Ballots that are completed, except that such Creditor failed to vote to accept or reject the Plan, shall be completed and counted as a vote to accept the Plan.

You are urged to timely complete, date, sign and promptly mail the enclosed Ballot. **BALLOTS TRANSMITTED BY FACSIMILE, TELEX, ELECTRONICALLY (E-MAIL) OR TELECOPIER WILL NOT BE ACCEPTED.** Please be sure to complete the Ballot properly and legibly identifying the exact amount of your Claim, the Class(es) in which the Claims(s) is/are classified under the Plan and the name of the Creditor.

**Section 4.03 Plan Confirmation Process.**

a.    **Requirements**. The requirements for confirmation of the Plan are set forth in detail in Section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

(i)    **Acceptance by Impaired Classes**. Except as noted below, each Impaired Class of Claims and the Class of Interests must either vote to accept the Plan or be deemed to accept the Plan. "Impaired" is defined in Section 1124 of the Bankruptcy Code. A Claim or Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the holder. Under the Plan, Class 1, Class 2, Class 4A, Class 4B, Class 4C, Class 5 and Class 6 are Impaired. The holders of Claims in Class 1, Class 2, Class 4A, Class 4B, Class 4C, Class 5 and Class 6 are entitled to vote, separately, to accept or reject the Plan. As a voting Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number holding two-thirds in dollar amount of the Claims voting (of such Impaired class of Claims) must vote to accept the Plan. At least one Impaired Class of Claims must accept the Plan for it to be confirmed by the Court.

(ii)    **Feasibility**. The Bankruptcy Court is required to find that the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan will be able to do so.

(iii)    **"Best Interests" Test**. The Bankruptcy Court must find that the Plan is in the "best interests" of Creditors and Interest Holders. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the

23

Debtors: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property that, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code on that date.

      **(iv)** **"Cramdown" Provisions.**   Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though a Class of Claims or Interests has not voted to accept the Plan, so long as one Impaired class of Claims has accepted the Plan (excluding the votes of Insiders) and the Plan is fair and equitable and does not discriminate unfairly against the non-accepting Classes.   The Proponents may invoke the "cramdown" provisions of §Section 1129(b) of the Bankruptcy Code should any voting class fail to accept the Plan.

      **b.** **Confirmation Hearing.**  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Section 1129 of the Bankruptcy Code (the "Confirmation Hearing").    The Bankruptcy Court has set _____ **(Prevailing Eastern Time)** for the Confirmation Hearing. The Confirmation hearing will be conducted in the courtroom of the Honorable M. Bruce McCullough, United States Bankruptcy Court for the Western District of Pennsylvania, 54th Floor, US Steel Tower, Pittsburgh, Pennsylvania 15219.

      **c.** **Objections to Confirmation.**  Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set _____ as the deadline for filing and serving Objection upon Proponents' attorneys.   Objections to confirmation must also be filed electronically with the Bankruptcy Court located at the following address:

United States Bankruptcy Court Clerk
Western District of Pennsylvania
54th Floor, US Steel Tower
Pittsburgh, Pennsylvania 15219

with a copy served upon attorneys for the following at the addresses below:

      To the Chapter 11 Trustee:

      Richard M. Pachulski, Esq.
      Pachulski Stang Ziehl Young Jones & Weintraub LLP
      10100 Santa Monica Boulevard
      11th Floor
      Los Angeles, California  90067

      Debra Grassgreen, Esq.
      Pachulski Stang Ziehl Young Jones & Weintraub LLP
      150 California Street
      15th Floor
      San Francisco, California  94111

To the Ad Hoc Lenders' Committee:

    Edward S. Weisfelner, Esq.
    Robert J. Stark, Esq.
    Daniel J. Saval, Esq.
    Brown Rudnick Berlack Israels LLP
    7 Times Square
    New York, NY 10036

        and –

    James G. McLean, Esq.
    Manion McDonough & Lucas P.C.
    600 Grant Street
    Suite 1414
    Pittsburgh, Pennsylvania  15219

To the Official Creditors' Committee:

    John K. Sherwood, Esq.
    Sharon L. Levine, Esq.
    Kenneth A. Rosen, Esq.
    Lowenstein Sandler PC
    65 Livingston Avenue
    Roseland, New Jersey  07068

        and –

    David K. Rudov, Esq.
    Rudov & Stein, P.C.
    100 First Avenue
    Suite 500
    Pittsburgh, Pennsylvania  15222

To the Ad Hoc Noteholders' Committee

    **DUANE MORRIS LLP**
    Joel Walker
    Jeffrey Spear
    600 Grant Street, Suite 5010
    Pittsburgh, PA 15219-2811
    (412) 497-1000

        -and-

Thomas Moers Mayer, Esq.
Matthew J. Williams, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

To Office of the United States Trustee:

Liberty Center
1001 Liberty Avenue, Suite 970
Pittsburgh, PA 15222

     **d.**    **Effect of Confirmation**.  The effects of a confirmation of the Plan are summarized in Article VIII below and in the Plan.

## ARTICLE V
## The Plan of Liquidation

**Section 5.01 Plan Objectives**.  The primary objectives of the Plan are to:  (i) liquidate the Assets of the Estates and prosecute Estate Causes of Action, (ii) maximize the value of the ultimate recovery to all Creditors and Interest holders on a fair and equitable basis, compared to the value they would receive if the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code; and (iii) settle, compromise, or otherwise dispose of certain disputes.

**Section 5.02 Overview of the Plan**.  The Proponents believe that the Plan provides the best and most prompt recovery to holders of Claims and Interests and is supported by the Official Creditors' Committee, the Ad Hoc Lenders' Committee, and the Ad Hoc Noteholders Committee.  Under the Plan, Claims against and Interests in the Debtors are divided into different classes.  Under the Bankruptcy Code, "claims" and "interests" are classified rather than "creditors" and "shareholders" because such entities may hold Claims or Interests in more than one Class.  If the Plan is confirmed by the Bankruptcy Court and consummated, then on the Effective Date or as soon as practicable thereafter, the Liquidation Trust shall be formed and shall make distributions in respect of certain Classes of Claims and Interests as provided for in the Plan.  In addition, distributions will be funded from the proceeds of any Causes of Action.  The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and distributions to be made under the Plan are described below.

     The Plan provides for the liquidation of Assets of the Estates, including the investigation and prosecution of Estate Causes of Action, by a Liquidation Trust to be formed pursuant to the Plan, and a Liquidation Trust Agreement.  The Liquidation Trust is to be managed by a Liquidation Trustee, as well as by a Liquidation Trust Oversight Board selected by the Official Creditors' Committee, the Ad Hoc Lenders' Committee, and the Ad Hoc Noteholders' Committee.  The Liquidation Trust shall be responsible for making distributions to holders of Claims and Interests, as well as all other administrative tasks necessary for ultimate resolution of the Chapter 11 Cases, per the terms of the Plan and the Liquidation Trust Agreement.  Distributions otherwise allocable on account of Disputed

Claims shall be placed in Disputed Claims Reserves pending adjudication of the Claim.

At the heart of the Plan are compromises regarding, among other things: (a) the Allowed amount and priority of the Lenders Secured Claims; (b) the extent to which holders of Lenders Secured Claims may successfully assert that they hold Liens on Assets of the Estates or the proceeds thereof, including Estate Causes of Action; and (c) the extent to which Claims held by holders of Senior Subordinated Notes are structurally and/or contractually subordinated the Claims held by Lenders. As part of this compromise, the Allowed amount, as well as seniority (both structural and contractual), of Lenders Claims is fixed by the Plan and, after the Effective Date, shall be not be subject to objection, defense, avoidance, offset, subordination, or reduction of any kind (subject to Wachovia Claims being deemed Disputed Claims as provided in the Plan). The Plan also contemplates a sharing of distributions allocable to holders of Senior Subordinated Notes with the Lenders, on account of their unsecured deficiency Claims, if any.

The issues involved in the settlements and compromises contained in the Plan relate to a number of substantive issues between several creditor constituencies. The Ad Hoc Lenders' Committee, the Ad Hoc Noteholders Committee and the Official Creditors' Committee addressed the Allowed amount of the Lenders' Claims and the extent to which the Lenders' Liens and security interests extended to assets of the Debtors and the Estate Causes of Action. Based upon information provided with respect to the amount of the Lenders Secured Claims, the Plan provides for Allowed Lenders' Claims in the aggregate amount of $278,000,000 in principal, plus interest and costs. The Plan also resolves a number of discrete issues as to the applicability of the Lenders' Liens and security interests to assets of the Debtors. Specifically, the Official Creditors' Committee and the Ad Hoc Noteholders Committee questioned whether the Lenders' security interest in "commercial tort actions" extended to the tort Causes of Action held by the Debtors against third parties, including professionals. The Ad Hoc Lenders' Committee contends that the Lien did extend to these types of Causes of Action either directly or to the proceeds thereof and also contends that the tort actions are subject to the Liens in favor of the Lenders for general intangibles. Each creditor constituency provided legal argument and support for their respective positions. To avoid the substantial cost and expense that would be required to adjudicate these issues, and remove for each creditor group the uncertainty of outcome, the Plan reflects a compromise under which based upon and subject to the terms and provisions of the Plan, and the Confirmation of the Plan, and subject to certain reservations specified in the Plan (*see specifically*, definition of "Lenders Secured Causes of Action"), the Lenders agreed that the Lenders would retain the argument that the Lenders' Liens attached to certain Estate Causes of Action but not to other Estate Causes of Action.

The Plan also resolves disputed issues between the Ad Hoc Lenders' Committee and the Ad Hoc Noteholders' Committee. The Ad Hoc Lenders' Committee contended, based on legal and contractual subordination, that the Claims of the Senior Subordinated Noteholders were subordinated to all Claims of the Lenders and the Lenders were entitled to a priority of recovery and payment with respect to their Claims and to payment in full before any payments to the Senior Subordinated Noteholders. The Ad Hoc Noteholders' Committee disputed the Lenders' entitlement to any subordination. This dispute is compromised in the Plan by provisions providing for an agreed-upon scale for turnover by the Senior

Subordinated Noteholders of recoveries to the Lenders. The Plan provides for the Lenders to receive repayment of $110 million before any payments to the Senior Subordinated Noteholders, and as to amounts above $110 million provides for a partial turnover of proceeds by the Senior Subordinated Noteholders but less than the 100%. Thus, the rate of turnover based on subordination under the Plan is less than the full subordination the Lenders contended was required by its interpretation of the applicable law and documents but more than the Senior Subordinated Noteholders argued they were obligated to provide.

**Section 5.03  Administrative  Claims,  Priority  Tax  Claims,  and  Fee  Claims**. Administrative Claims, Priority Tax Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article IV of the Plan in accordance with Bankruptcy Code Section 1123(a)(1).

Each holder of an Allowed Administrative Claim shall be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claims become Allowed Claims or otherwise become payable under the Plan, and (iii) as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Claims of the United States Trustee for fees pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid on the Effective Date (and, thereafter, as such fees may thereafter accrue and be due and payable) in accordance with the applicable schedule for payment of such fees.    The Liquidation Trust may satisfy, in the ordinary course of business, any Administrative Claim incurred in the ordinary course of business by the Chapter 11 Trustee or any other Debtor representative after the Petition Date and before the Effective Date.

Subject to the terms herein, and unless the holder of an Allowed Priority Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Tax Claim shall be entitled to receive, at the option of the Liquidation Trust: (1) 100% of the unpaid amount of such Claim in Cash on the date that is the latest of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable; or (ii) deferred Cash payments in an aggregate principal amount equal to the amount of the Allowed Claim plus interest on the unpaid portion thereof at the rate of 6% per annum from the Effective Date through the date of payment thereof, which payments (i) shall be made in equal annual installments through the date that is the fifth anniversary of the Petition Date, but (ii) shall become accelerated and immediately due and payable on the date all Allowed Claims in Class 4A are fully satisfied. Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Bankruptcy Code Section 507(a)(8)(G)) shall be Disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Estates, the Liquidation Trust, or any of their respecting Assets or property.

Each holder of an Allowed Fee Claim shall be paid 100% of the unpaid amount of such Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that such Claim (i) is Allowed by Final Order (or an order that is appealed but not stayed) or (ii) becomes Allowed after the Effective Date.

**Section 5.04    Classification and Treatment of Claims and Interests.** The categories of Claims and Interests and their treatment listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Status | Voting Rights |
|-------|--------|---------------|
| Class 1 (Lenders Secured Claims) | Impaired | Entitled to Vote |
| Class 2 (Other Secured Claims) | Impaired | Entitled to Vote |
| Class 3 (Priority Non-Tax Claims) | Unimpaired | Not Entitled to Vote |
| Class 4A (Lenders Unsecured Claims) | Impaired | Entitled to Vote |
| Class 4B (General Unsecured Claims) | Impaired | Entitled to Vote |
| Class 4C (Unsecured Senior Subordinated Notes Claims) | Impaired | Entitled to Vote |
| Class 5 (Subordinated Litigation Claims) | Impaired | Entitled to Vote |
| Class 6 (Interests) | Impaired | Entitled to Vote |

    a.    **Class 1: Lenders Secured Claims.** Class 1 shall consist of all Lenders Secured Claims. Class 1 is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Claims in this Class is required. The Lenders Pre-Petition Secured Claims shall be deemed Allowed Claims (except as otherwise provided in Section 10.1 of the Plan) in an aggregate amount equal to the ultimately liquidated value of the Lenders Collateral (excluding Used Cash Collateral) up to $278 million plus accrued interest to the extent provided for in the definition of Tier One Trust Beneficial Interests) and costs (to the

extent provided for in Section 8.01(b) of the Plan).[3]  The Lenders Replacement Lien Claims shall be deemed Allowed Claims in an aggregate amount equal to the sum of: (a) $7,500,000, representing a stipulated value for the diminution in value of Lenders Collateral during the Chapter 11 Cases; and (b) Used Cash Collateral.[4]  Notwithstanding anything else in Section 5.01(b) of the Plan, upon receipt of payment in full of the Lenders Claims (including interest accruing after the Petition Date, to the extent provided for by the Plan) from any source, including but not limited to payments arising from the Causes of Action belonging to the Lenders against third- parties or Turnover Enforcement, the Lenders shall not receive any further distributions under the Plan; provided, however, that nothing in the Plan shall be deemed to impair or limit rights of Senior Subordinated Noteholders to subrogation as set forth in Section 13.02 of the Plan.

Subject to the terms of the Plan and unless a holder of an Allowed Lenders Secured Claim agrees to receive other less favorable treatment, such holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim: (a) Tier One Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 1; (b) additional Tier One Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 1, as a result of the Disallowance of any Disputed Claim in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement.

Tier One Trust Beneficial Interests are defined in the Plan as beneficial interests in the Liquidation Trust with a priority senior to Tier Two Trust Beneficial Interests, Tier Three Trust Beneficial Interests, and Tier Four Trust Beneficial Interests, entitling holders to distributions of Available Cash held by the Liquidation Trust: (a) after full satisfaction of Allowed Administrative Claims, Allowed Fee Claims, and Allowed Priority Claims, and after funding of the Liquidation Trust Reserve; (b) equal to the amount of Cash proceeds of the Lenders Collateral, to the extent that such proceeds exceed the amount vested in the Liquidation Trust as Initial Trust Funding; (c) equal to the Allowed Lenders Replacement Lien Claims before any distributions may be made by the Liquidation Trust to holders of Tier Two Trust Beneficial Interests (except as otherwise provided in Plan Section 8.02), Tier Three Trust Beneficial Interests, or Tier Four Trust Beneficial Interests; and (d) for payment of interest accrued on Lenders Secured Claims after the Petition Date, at the contract rate, (x) to the extent Allowable under Bankruptcy Code Section 506(b) or (y) before any distributions may be made by the Liquidation Trust to holders of Tier Four Trust Beneficial Interests.

---

[3] As such amount shall be Ratably reduced to the extent Disputed Claims referenced in Section 10.01 of the Plan are equitably subordinated, reduced, Disallowed, invalidated or expunged by Final Order.

[4] As such amount shall be Ratably reduced to the extent Disputed Claims referenced in Section 10.01 of the Plan are equitably subordinated, reduced, Disallowed, invalidated or expunged by Final Order.

**b.    Class 2: Other Secured Claims.**   Class 2 shall consist of all Other Secured Claims.   Class 2 is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Claims in this Class is required.   Subject to the terms of the Plan and unless a holder of an Allowed Other Secured Claim agrees to receive other less favorable treatment, such holder of Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the option of the Liquidation Trust, one or a combination of the following (net of any applicable rights to surcharge, including rights arising under Bankruptcy Code Section 506(c)): (i) payment in Cash from proceeds from the sale or disposition of the collateral securing the Allowed Other Secured Claims, to the extent of the value of any holder's Lien on such property; (ii) surrender of the collateral securing the Allowed Secured Other Claims; or (iii) such other distributions as shall satisfy the requirements of Bankruptcy Code Section 1129.

**c.    Class 3: Priority Non-Tax Claims.**   Class 3 shall consist of Allowed Claims entitled to priority under Bankruptcy Code Section 507(a)(3), (4), (5), (6) or (7).   Class 4 Claims are Unimpaired by the Plan and the Holders of Allowed Class 4 Claims are deemed to accept the Plan and therefore are not entitled to vote.   Subject to the terms of the Plan, and unless the holder of an Allowed Priority Non-Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

**d.    Class 4A: Lenders Unsecured Claims.**   Class 4A shall consist of all Lenders Unsecured Claims.   Class 4A is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Claims in this Class is required.   The Lenders Unsecured Claims shall be deemed Allowed Claims in an aggregate amount equal to $278 million less Class 1 distributions.[5]   Notwithstanding anything else in Section 5.01(b) of the Plan, upon receipt of payment in full of the Lenders Claims (including interest accruing after the Petition Date, to the extent provided for by the Plan) from any source, including but not limited to payments arising from the Causes of Action belonging to the Lenders against third- parties, the Lenders shall not receive any further distributions under the Plan.

Subject to the terms of the Plan and unless the holder of an Allowed Lenders Unsecured Claim agrees to receive other less favorable treatment, each holder of an Allowed Lenders Unsecured Claim shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C); (c) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 4A, as a result of Turnover Enforcement of Class 4C distributions;   (d) all proceeds of the foregoing distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement; and (e) a percentage of the proceeds of the TSI/Holdings Property to other holders of

---

[5] As such amount shall be Ratably reduced to the extent Disputed Claims referenced in Section 10.01 of the Plan are equitably subordinated, reduced, Disallowed, invalidated or expunged by Final Order.

Allowed Claims in Class 4A and Class 4C, subject to the (i) use of such proceeds to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) reallocation of such proceeds to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan.

Tier Two Trust Beneficial Interests are defined in the Plan as beneficial interests in the Liquidation Trust with a priority subordinate to Tier One Trust Beneficial Interests but senior to Tier Three Trust Beneficial Interests and Tier Four Trust Beneficial Interests, entitling holders to distributions of Available Cash held by the Liquidation Trust: (a) after full satisfaction of Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Claims, Allowed Lenders Secured Claims (except as otherwise provided in Plan Section 8.02) (including interest after the Petition Date, at the contract rate, to the extent Allowable under Bankruptcy Code Section 506(b)), and after funding of the Liquidation Trust Reserve; (b) equal to the Allowed Claims in Class 4A, Class 4B and Class 4C before any distributions may be made by the Liquidation Trust to holders of Tier Three Trust Beneficial Interests or Tier Four Trust Beneficial Interests; and (c) for payment of interest accrued on Allowed Claims in Class 4A, Class 4B, and Class 4C after the Petition Date, at the contract rate, before any distributions may be made by the Liquidation Trust to holders of Tier Four Trust Beneficial Interests.

    **e.**    Class 4B: General Unsecured Claims.   Class 4B shall consist of all General Unsecured Claims.   Class 4B is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Claims in this Class is required.   Subject to the terms herein, and unless the holder of an Allowed General Unsecured Claim agrees to receive other less favorable treatment, each holder of an Allowed General Unsecured Claims shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C;); (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement; and (d) a percentage of the proceeds of the TSI/Holdings Property Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, but only to the extent (i) such proceeds are not used to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) such proceeds are reallocated to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan.

    **f Class 4C: Unsecured Subordinated Note Claims**.   Class 4C shall consist of all Unsecured Senior Subordinated Note Claims.   Class 4C is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Claims in this Class is required. The Unsecured Senior Subordinated Notes Claims shall be deemed Allowed Claims in an aggregate amount equal to $150 million plus accrued and unpaid interest as of the Petition Date.

Subject to the terms of the Plan, each holder of an Allowed Unsecured Subordinated Notes Claim shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C); (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement; and (d) a percentage of the proceeds of the TSI/Holdings Property Ratable to other holders of Allowed Claims in Class 4A and Class 4C, subject to the (i) use of such proceeds to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) reallocation of such proceeds to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan *provided, however*, that such distributions shall be deemed reallocated and distributed on account of Claims in Class 4A, as a settlement of potential claims by Lenders for enforcement of contractual subordination provisions in Senior Subordinated Notes Indenture, in accordance with the following:

(i)    Until such time as distributions totaling $110 million (or, to the extent applicable, $110 million less any Ratable portion of the Lenders Claims that are Disputed Claims and that are equitably subordinated, reduced, disallowed, invalidated or expunged by Final Order) has been distributed on account of Lenders Claims (whether to Lenders on account of Allowed Lenders Claims (including but not limited to distributions on account of Allowed Lenders Pre-Petition Secured Claims, Allowed Lenders Replacement Lien Claims, distributions to Lenders of proceeds of Lenders Collateral on account of Turnover Enforcement, or Allowed Lenders Unsecured Claims) or into Disputed Claims Reserves, 100% of all distributions on account of Class 4C Claims shall be reallocated and distributed as Turnover Enforcement to holders of Claims in Class 4A.

(ii)    After distributions totaling $110 million (or, to the extent applicable, $110 million less any Ratable portion of the Lenders Claims that are Disputed Claims and that are equitably subordinated, reduced, disallowed, invalidated or expunged by Final Order) have been distributed from the Estate or the Liquidation Trust on account of Lenders Claims (whether to Lenders on account of Allowed Lenders Claims (including but not limited to distributions on account of Allowed Lenders Pre-Petition Secured Claims, Allowed Lenders Replacement Lien Claims, distributions to Lenders of proceeds of Lenders Collateral, or Allowed Lenders Unsecured Claims) or into Disputed Claims Reserves), the next $15 million in Cash distributions on account of Class 4C Claims shall be distributed to holders of Allowed Claims in Class 4C, and shall not be subject to Turnover Enforcement.

(iii)    Thereafter, distributions on account of Class 4C Claims shall be reallocated and distributed as Turnover Enforcement to holders of Claims in Class 4A as follows (until all Lenders Claims are paid in full, plus postpetition interest thereon):

| Aggregate Payments On Account Of Lenders Claims[5] | Percentage Turnover Enforcement To Class 4A | Percentage Retained By Class 4C |
|---|---|---|
| Less than $175 million | 50% | 50% |
| $175 million to $200 million | 45% | 55% |
| $200 million to $225 million | 40% | 60% |
| $225 million to $250 million | 35% | 65% |
| $250 million to $280 million | 30% | 70% |
| Greater than $280 million[6] | 25% | 75% |

(iv)    To the extent that (a) holders of Claims in Class 4A have received Cash distributions as a result of Turnover Enforcement, (b) thereafter, the Liquidation Trust has received proceeds in respect of Lenders Collateral, and (c) had such proceeds been distributed to holders of Allowed Claims in Class 1 on a prior Distribution Date, the Lenders would not have received certain Cash distributions as a result of Turnover Enforcement, then the Liquidation Trust shall distribute the proceeds referenced in (b) and (c) of this sentence to the extent necessary to reimburse holders of Senior Subordinated Notes for Turnover Enforcement that would not have occurred if such proceeds were available for distribution to the Lenders at an earlier time.

The Allowed Claim of the Unsecured Subordinated Notes Claims in an aggregate amount equal to $150 million plus accrued and unpaid interest as of the Petition Date is acknowledged by the Proponents as part of and subject to the provisions of the Plan. The $150 million is the aggregate principal amount of the bond indebtedness and does include a premium.

g.    **Class 5: Subordinated Litigation Claims.**  Class 5 shall consist of all Subordinated Litigation Claims.   Class 5 is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Claims in this Class is required.   Each holder of an Allowed Subordinated Litigation Claim shall be entitled to receive: (a) Tier

---

5. As such amounts may be Ratably reduced to the extent the aggregate amount of Lenders Claims are Disputed Claims that are equitably subordinated, reduced, disallowed, invalidated or expunged by Final Order.

[6] As provided for in Section 13.02 of the Plan, after Lenders have received full payment, Senior Subordinated Noteholders shall subrogate to Lenders Claims to the extent of Turnover Enforcement, and Turnover Enforcement shall thereafter continue (based upon the full Allowed amount of the Class 4C Claims plus the subrogated amount of Lenders Claims) until the Lenders have been fully paid post-petition interest, at the contract rate.

Three Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 5; (b) additional Tier Three Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 5, as a result of the Disallowance of any Disputed Claim in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement.

Tier Three Trust Beneficial Interests are defined in the Plan as beneficial interests in the Liquidation Trust with a priority subordinate to Tier One Trust Beneficial Interests and Tier Two Trust Beneficial Interests but senior to Tier Four Trust Beneficial Interests, entitling holders to distributions of Available Cash held by the Liquidation Trust: (a) after full satisfaction of Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Claims, Allowed Lenders Secured Claims (including interest after the Petition Date, at the contract rate, to the extent Allowable under Bankruptcy Code Section 506(b)), Allowed Claims in Class 4A, Class 4B and Class 4C, and after funding of the Liquidation Trust Reserve; and (b) equal to (x) Allowed Claims in Class 5 and (y) interest accrued on such Claims after the Petition Date, at the contract rate, in either case, before any distributions may be made by the Liquidation Trust to holders of Tier Four Trust Beneficial Interests.

**h.    Class 6: Interests.** Class 6 shall consist of all Interests in Le-Nature's. Class 6 is impaired by the Plan and solicitation of acceptances of the Plan with respect to holders of Interests and Claims in this Class is required. Each holder of an Allowed Interest and Allowed Class 6 Claim shall be entitled to receive: (a) Tier Four Trust Beneficial Interests in a percentage Ratable to other Allowed Interests in Class 6; (b) additional Tier Four Trust Beneficial Interests in a percentage Ratable to other Allowed Interests and Claims in Class 6, as a result of the Disallowance of any Disputed Interest in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement. To the extent Class 6 includes Claims subordinated pursuant to Bankruptcy Code Section 510(b), the Bankruptcy Court shall, upon motion by the Liquidation Trust or any holder of Class 6 Claims or Interests, determine an appropriate Ratable allocation of distributions to holders of Interests and holders of such Claims.


**ARTICLE VI**
**Implementation of the Plan**


**Section 6.01    Implementation on the Effective Date.** The Plan shall be implemented on the Effective Date.

**Section 6.02    Substantive Consolidation.**

**a.** **Effect of Consolidation.** The Plan provides for substantive consolidation of the Estates. The substantive consolidation of the Estates has the following effects: (i) all assets and liabilities of the Estates shall be treated as though they were merged for purposes of distribution; (ii) all prepetition and postpetition cross-corporate guaranties of the Debtors shall be eliminated; (iii) all Claims based upon guaranties of collection, payment, or performance made by one or more Debtors as to the obligations of another Debtor or of any other Entity or Person shall be discharged, released, and of no further force or effect; (iv) any obligation of any Debtor and all guaranties thereof executed by one or more of the Debtors shall be deemed to be one obligation of the Estate; (v) any Claims filed or to be filed in connection with any such obligation and such guaranties shall be deemed one Claim against the Estate; and (vi) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Estate in the consolidated Chapter 11 Case and shall be deemed a single obligation of the consolidated Estate under the Plan on and after the Effective Date.

**b.** **Assets and Liabilities of TSI and Le-Nature's Holdings:** The Trustee has informed the Proponents that he believes that the only tangible assets of TSI are a certain parcel of real property that was purchased in 2006 for $2,750,000 and a bank account with approximately $18,000. The TSI Real Property may have been purchased entirely with Le-Nature's cash (to the extent such real estate constitutes proceeds of Lenders' collateral, such value is distributable to Lenders as Class 1 distributions). The Trustee has also advised the Proponents he believes that, although substantial claims have been filed against TSI, the only claims that are properly asserted against TSI are (i) claims by the Lenders and certain noteholders (both based on guaranties of Le-Nature's debt) and (ii) an unliquidated tax claim in the claimed amount of $7,340.00. The Trustee does not believe that any of the other claims filed against TSI are valid claims against that entity and intends to file claim objections for the TSI case prior to Confirmation.

Le-Nature's Holdings was formed in August 2006 and the Trustee has not identified any assets or any legitimate liabilities of Le-Nature's Holdings. As with TSI, there were substantial claims filed against Le-Nature's Holdings. The Trustee advises that these claims are duplicative of claims filed against Le-Natures and the Trustee intends to file claim objections in the Le-Nature's Holdings case prior to Confirmation.

**c.** **Plan Treatment for TSI/Holdings Property.** In order to assure that the proposed substantive consolidation of the Debtors is not inequitable to the few legitimate creditors of TSI, the Plan provides that, notwithstanding the substantive consolidation of the Estates, the value of the TSI/Holdings Property will be allocated only to holders of Allowed Claims at TSI. In addition, the Plan preserves the rights of Le-Nature's creditors to claim that because the TSI/Holdings Property was purchased using Le-Nature's funds, all or any portion of the TSI/Holdings Property is property of Le-Nature's estate, and the Plan provides that any Entity or Person may seek a determination from the Bankruptcy Court that all or any portion of the TSI/Holdings Property should be reallocated to the Le-Nature's Estate up to the time that the Liquidation Trust makes a distribution to holders of Allowed Claims in Class 4. This reservation is set forth in Section 8.01(c) of the Plan.

36

    **d.**    **Legal and Factual Justification for Consolidation**. Substantive consolidation as described in the Plan is warranted and unavoidable under the circumstances of these Cases. Under the law applicable in this Circuit, *see* In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005), at Confirmation, the Bankruptcy Court can only approve the proposed substantive consolidation if the Proponents demonstrate that (i) prepetition the Debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition the Debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

At the Confirmation Hearing (or such earlier time as the Court deems appropriate), the Plan Proponents will put on evidence that the Debtors' assets and liabilities are "so scrambled that separating them is prohibitive and hurts all creditors." That evidence will demonstrate, among other things, that:

- On the whole, the Debtors' books and records are inherently unreliable. Important documents relating to Debtors' financial affairs appear to have been intentionally destroyed or removed from the Debtors' facilities by Podlucky and/or individuals under his control prior to commencement of the Cases.

- In addition, the Debtors maintained multiple sets of books and records, certain key accounting records and bank statements and bank records were fabricated, and the accounting records that are available are incomplete.

- Le-Nature's Holdings was created in August of 2006. No books and records, corporate documents, or bank accounts have been located for Le-Nature's Holdings.

- The Trustee was informed that TSI was established to handle the Debtors' tea concentrate business but the Trustee has not been able to verify that fact or whether TSI conducted any other business. In fact, the Trustee has been unable to locate any accounting information for TSI's tea concentrate business. The Trustee has located one bank account in the name of TSI and is requesting supporting documentation directly from the bank. That documentation may include transactions for the tea concentrate business. In addition, the Trustee located a separate set of books on one of the Debtors' accounting servers which books appear to be unreliable and incomplete as discussed above. There is no information available about what sales occurred at TSI or what expenses were properly chargeable to TSI. Based on the Trustee's preliminary review of the records that are available, the Trustee suspects that most of the transactions that would have related to TSI were actually transacted by Le-Nature's. For example, although there was an addition constructed to the Debtors' bottling plant and that section of the bottling plant was commonly referred to as the "TSI Area," most of the equipment in that area was actually leased by Le-Nature's. The Trustee believes that his forensic investigation will show that the costs of the addition were paid for or funded by Le-Nature's just as the TSI Real Property was purchased with funds from Le-Nature's.

- The Trustee has not located any records that track any intercompany activity to date.

- Given the lack of accurate records, even after the forensic accounting analysis is complete, the Trustee may not be able to determine which transactions were appropriately allocable to Le-Nature's or TSI.

**Section 6.03   Creation of Liquidation Trust**. The Plan provides for the creation of the Liquidation Trust that will liquidate the assets of the Debtors' estates, including Estate Causes of Action, and make distributions therefrom. The Liquidation Trust Agreement is attached hereto as Exhibit "F". On the Effective Date, the Liquidation Trustee shall sign the Liquidation Trust Agreement and accept all Assets of the Estates on behalf of the beneficiaries thereof, and be authorized to obtain, liquidate, and collect all of the Assets of the Estates not in its possession and pursue all of the Estate Causes of Action.   The Liquidation Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any party. The Liquidation Trust shall be established for the sole purpose of liquidating its assets, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust Agreement provides that the Liquidation Trust has a fiduciary duty to maximize the value of the Assets of the Liquidation Trust in the most expeditious manner possible for the benefit of the beneficiaries of the Liquidation Trust. The beneficiaries of the Liquidation Trust shall be bound by the Liquidation Trust Agreement. The Liquidation Trust Agreement shall provide for the establishment of four classes of beneficial interests and shall make distributions to holders thereof in accordance with the Plan and the Liquidation Trust Agreement: Tier One Trust Beneficial Interests; Tier Two Trust Beneficial Interests; Tier Three Trust Beneficial Interests; and Tier Four Trust Beneficial Interests. Interests in the Liquidation Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law.   The Liquidation Trust will have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidation Trustee to extend such terms as applicable law shall allow.

The Liquidation Trustee shall be the exclusive trustee of the assets of the Liquidation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidation Trustee are specified in the Liquidation Trust Agreement attached hereto as Exhibit "F" and include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust assets; (b) pay taxes or other obligations incurred by the Liquidation Trust; (c) retain and compensate, without further order of the Bankruptcy court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and distribution of trust assets; (d) calculate and implement distributions of trust assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of that agreement, all Claims and Causes of Action vested in the Liquidation Trust; and (f) resolve issues involving Claims and Interests pursuant to Article X of the Plan; and (g) undertake all administrative functions of the Chapter 11 cases, including the ultimate closing of the chapter 11 cases. The Liquidation Trustee is subject to the supervision and direction of the Liquidation Trust Oversight Board although nothing in the Liquidation Trust Agreement shall be deemed to prevent the Liquidation Trustee from taking

38