# Exhibit D, Part II

or failing to take any action that the Trustee is obligated to take or fail to take in the performance of any fiduciary or other duty to the beneficiaries or any other Person.

All costs and expenses associated with the administration of the Liquidation Trust, including professional costs related to the prosecution of Estate Causes of Action, objecting to Disputed Claims or Interests, and reasonable compensation for the Liquidation Trustee and, as set forth in the Liquidation Trust Agreement, the Liquidation Trust Oversight Board, shall be the responsibility of and paid by the Liquidation Trust from the Initial Trust Funding and/or the Liquidation Trust Reserve in accordance with the Liquidation Trust Agreement. The Liquidation Trust is to be the successor to the Debtors and the Chapter 11 Trustee's rights to books and records. The compensation to be paid to the Liquidation Trustee is set forth in Exhibit "A" to the Liquidation Trust Agreement attached hereto.

The Liquidation Trust shall be responsible for filing all federal, state, and local tax returns for the Liquidation Trust. The Liquidation Trust shall provide reports to holders of beneficial interests in the Liquidation Trust, as the Liquidation Trust Oversight Board deems appropriate.

The Plan sets forth a description of the federal income tax treatment of the Liquidation Trust and Assets. For federal income tax purposes, it is intended that the Liquidation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries (i.e., holders of Allowed Claims in Class 4A, Class 4B, Class 4C, Class 5, and Class 6). Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in each of the assets of the Liquidation Trust and then contributed such interests to the Liquidation Trust. For all federal income tax purposes, all parties shall treat the transfer of Assets to the Liquidation Trust for the benefit of the holders of Allowed Claims in Class 1, Class 4A, Class 4B, Class 4C, Class 5, and Class 6, as (a) a transfer of the assets of the Liquidation Trust directly to the holders of Allowed Claims in Class 1, Class 4A, Class 4B, Class 4C, Class 5, and Class 6, followed by (b) the transfer by such holders to the Liquidation Trust of the Assets of the Liquidation Trust in exchange for the beneficial interests in the Liquidation Trust. Accordingly, the holders of such Allowed Claims in Class 1, Class 4A, Class 4B, Class 4C, Class 5, and Class 6 shall be treated for federal income tax purposes as the grantors and owners of their respective share of the Assets of the Liquidation Trust.

The Liquidation Trust shall file returns for the Liquidation Trust as a grantor trust pursuant to Treasury regulation Section 1.671-4(a). The Liquidation Trust also shall annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns. The Liquidation Trust's taxable income, gain, loss, deduction or credit will be allocated to holders of Allowed Claims in Class 1, Class 4A, Class 4B, Class 4C, Class 5, and Class 6 in accordance with their relative beneficial interests in the Liquidation Trust.

Notwithstanding the Effective Date, and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Liquidation Trust after the

Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection therewith, including under the Liquidation Trust Agreement.

**Section 6.04    Liquidation Trust – Vesting.**  The Plan provides that pursuant to Bankruptcy Code Section 1141(b), the Assets of the Estates shall vest in the Liquidation Trust, although it also provides that the Liquidation Trust may abandon or otherwise not accept any Assets that the Liquidation Trust believes, in good faith, have no value to the Liquidation Trust. Any Assets the Liquidation Trust so abandons or otherwise does not accept shall not vest in the Liquidation Trust and shall revest in the Debtors. On the Effective Date, the Liquidation Trust shall: (i) take possession of all books, records, and files of the Debtors and their Estates; (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trust determines, in accordance with the Liquidation Trust Agreement, that retention of same is no longer necessary or required; and (iii) file a notice with the Bankruptcy Court identifying the location at which such books, records, and files are stored.

As of the Effective Date, all Assets vested in the Liquidation Trust and all Assets dealt with the Plan, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan or in the Confirmation Order.  The Liquidation Trust may make distributions in accordance with the Plan and the Liquidation Trust Agreement.

Notwithstanding anything else in the Plan, only Estate Causes of Action shall be vested in the Trust.  Causes of Action belonging to any other Entity or Person shall not vest in the Trust, and shall not be affected by the Plan.

**Section 6.05    Appointment of the Liquidation Trustee.**  The Liquidation Trustee for the Liquidation Trust shall be an independent and disinterested Person.  The Liquidation Trustee is identified in Exhibit "G" hereto, which includes a curriculum vitae of the Liquidation Trustee.  The Liquidation Trustee shall be the successor to all of the privileges of the Estates, the Debtors and the Chapter 11 Trustee.  The Liquidation Trust Agreement attached hereto as Exhibit "F" provides that in the event of the resignation or removal of the Liquidation Trustee, a replacement shall be designated by the Liquidation Trust Oversight Board; provided that the majority vote includes at least one vote from a Board member designated by each of the Ad Hoc Lenders Committee, the Ad Hoc Noteholders Committee and the Official Committee of Unsecured Creditors.

**Section 6.06    Liquidation Trust – Governance.**  On the Effective Date, the Liquidation Trust Oversight Board shall be formed pursuant to the Liquidation Trust Agreement.  The Liquidation Trust Oversight Board shall be comprised of seven (7) members, four (4) of whom shall be selected by the Ad Hoc Lenders' Committee, two (2) of whom shall be selected by the Official Creditors' Committee, and one (1) of whom shall be selected by the Ad Hoc Noteholders' Committee  The initial members of the Liquidation Trust Oversight Board are identified in the Liquidation Trust Agreement and in Exhibit "H" hereto.  The

terms of the four members selected by the Ad Hoc Lenders' Committee shall expire, and the three remaining members shall continue as a reconstituted Liquidation Trust Oversight Board, when the Lenders Claims have been paid in full, with interest. The Liquidation Trustee shall report all material matters to and seek approval for all material decisions from the Liquidation Trust Oversight Board. Certain specific matters requiring the approval of the Liquidation Trust Oversight Board are set forth in Section 3.3 of the Liquidation Trust Agreement attached hereto as Exhibit "F". The Liquidation Trust Agreement provides that the Liquidation Trustee must provide advance written notice to the Liquidation Trust Oversight Board prior to making any distribution to any Class of Allowed Claims.

**Section 6.07    Liquidation Trust - Trust Fees and Expenses.** The Liquidation Trust shall satisfy the reasonable fees and expenses incurred by the Liquidation Trust in carrying out its duties under the Plan and the Liquidation Trust Agreement, including, without limitation, pursuing any Causes of Action, undertaking objections to Claims, making Distributions pursuant to the Plan and the Liquidation Trust Agreement and filing, if necessary, any and all tax information and returns required with respect to the Liquidation Trust, and making tax elections by and on behalf of the Liquidation Trust and paying taxes, if any, owed by the Liquidation Trust.

**Section 6.08    Investigations Aiding Administration of the Estates.**

  **a.    Continuation of Rights Under Federal Rule of Bankruptcy Procedure 2004.** The Plan is predicated on the understanding, and constitutes an acknowledgment by all Entities and Persons, that it is being proposed well in advance of a full and complete investigation of all of the facts and circumstances surrounding the Debtors' activities and the activities of Insiders and other Entities and Persons (including Wachovia, BDO Seidman, E&Y, and the Other Debtor Pre-Petition Professionals) prior to the Petition Date. Following the Petition Date, requests for information and for examination were initiated against various parties including Wachovia, BDO Seidman, E&Y, and the Other Debtor Pre-Petition Professionals, as well as former officers and directors of the Debtors, pursuant to Bankruptcy Rule 2004, and such examinations are continuing and contemplated to continue until completed. As the full pursuit of all information to be obtained pursuant to Rule 2004 will require that the process be continued following confirmation of the Plan, the Plan is predicated on the understanding, and constitutes an acknowledgment by all Entities and Persons, that the preservation for the Liquidation Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the Chapter 11 Cases. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors and/or the Chapter 11 Trustee prior to the Effective Date shall vest with the Liquidation Trust and shall continue until dissolution of the Liquidation Trust as of the Effective Date had not occurred.

  **b.    Approval of "Joint Interest" Agreement.** On the Effective Date, the Liquidation Trust, the Liquidating Trust Oversight Board, and to the extent each in its sole discretion elects, the Ad Hoc Lenders' Committee, the Ad Hoc Noteholders' Committee, and/or the Jointly Represented Initial/Par Purchasers' Committee shall enter into the Joint Interest Agreement. The form of the Joint Interest Agreement is attached hereto as Exhibit "I".

**Section 6.09    Prosecution and Resolution of Estate Causes of Action.**

      **a.**    **The Liquidation Trust's Exclusive Authority to Pursue, Settle, or Abandon Estate Causes of Action**.  Prosecution and settlement of all Estate Causes of Action, including Avoidance Actions, shall be the sole responsibility of the Liquidation Trust, pursuant to the Plan and the Confirmation Order.  The Liquidation Trust shall have exclusive rights, powers, and interests of the Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Estates pursuant to Bankruptcy Code Section 1123(b)(3).  All Causes of Action, including Avoidance Actions, are reserved and preserved to the extent set forth in the Plan and shall not be impacted or affected in any way by the substantive consolidation of the Estates.  The Plan provides for the avoidance of doubt that any and all rights vested in any Entity or Person under the Lenders Collateral Stipulation to pursue or prosecute any Estate Cause of Action against Wachovia (in its individual capacity) shall be vested exclusively in the Liquidation Trust, and to the extent Paragraph 6 of the Lenders Collateral Stipulation established a deadline for bringing such action against Wachovia, the deadline shall be extended through the date established in the first proviso of Section 10.02 of the Plan,

      **b.**    **Settlement of Estate Causes of Action**.  Settlement by the Liquidation Trust of any Estate Cause of Action shall require: (i) approval only of the Liquidation Trustee, if the amount claimed by the Liquidation Trust against a defendant is less than $1 million; (ii) approval only of the Liquidation Trustee and the Liquidation Trust Oversight Board, if the amount claimed by the Liquidation Trust against a defendant is more than $1 million but less than $5 million; and (iii) approval of the Liquidation Trustee, the Liquidation Trust Oversight Board, and the Bankruptcy Court, if the amount claimed by the Liquidation Trust against a defendant is unliquidated or equals to or exceeds $5 million.

      **c.**    **Authority of Members of the Liquidation Trust Oversight Board to Retain Attorneys in Certain Circumstances**.  If (i) any three (3) members of the Liquidation Trust Oversight Board have a reasonable good-faith basis to disagree with the terms of any settlement requiring Bankruptcy Court approval pursuant to Section 7.05(b) of the Plan (including without limitation disagreement over a proposed allocation of settlement proceeds among the Liquidation Trust, on the one hand, and private litigants, on the other hand), or (ii) any two (2) members have a reasonable good-faith basis to (w) object to the entry by the Liquidation Trust into any agreement pursuant to Section 7.05(d) of the Plan, (x) disagree with a proposed allocation of litigation or settlement proceeds between Secured Claims, on the one hand, and Unsecured Claims, on the other hand, or (y) disagree with a proposed allocation of litigation or settlement proceeds to Lenders because they have fully recovered on Lender Claims from another source, or (z) argue that, pursuant to Section 8.01(c) of the Plan, any of the TSI/Holdings Property should be reallocated to the Le-Nature's Estate and, as a result, shared among holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, then such members may together retain one law firm to oppose approval of such settlement, oppose such proposed allocation, or seek an order reallocating the TSI/Holdings Property,, and the Liquidation Trust shall satisfy such professional costs (provided they are reasonable) on the same basis and priority as provided in Section 7.02 of the Plan.  In connection with any such action, the members may seek reasonable discovery.  For the avoidance of doubt, any party may challenge any proposed settlement at its own

expense. If a contested matter arises in connection with any such action, the Liquidation Trust shall not consummate such settlement, distribute such settlement proceeds or distribute proceeds of the sale of the TSI/Holdings Property, as applicable, pending Bankruptcy Court resolution of such contested matter.

**Section 6.10    Approval of Exit Financing.** Entry of the Confirmation Order shall, to the extent necessary (because sufficient Cash is not otherwise available consistent with the terms of the Plan), authorize and approve, without further action by the Chapter 11 Trustee or the Proponents, the Exit Facility Agreement and the transactions to be entered into, and actions to be taken thereunder, pursuant to the Bankruptcy Code. All obligations of the Liquidation Trust under the Exit Facility Agreement shall be payable as a cost of administering the Liquidation Trust, payable in advance of distributions on account of Claims or Interests, in accordance with the terms of the Exit Facility Agreement. The terms of the Exit Facility Agreement, if required, are set forth in the Exit Facility Agreement attached hereto as Exhibit "J", and parties- in- interest will be provided the opportunity to object to such terms at or prior to the Confirmation Hearing.

The Plan provides that notwithstanding the provisions for Exit Financing set forth in the Plan and documents attached hereto, the Liquidation Trustee may, in its good faith business judgment, determine not to enter into the Exit Facility Agreement on the Effective Date, provided: (a) sufficient Cash is available to the Liquidation Trust to make initial distributions as required by the Plan; (b) thereafter, the Liquidation Trust Reserve shall equal at least $2.5 million; and (c) the Liquidation Trust then has reason to believe, in its good faith business judgment, it will have sufficient Cash to satisfy its future administrative obligations under the Plan and Liquidation Trust Agreement.

Certain members of Class 4A and certain members of Class 4C (with commitments to provide such financing from certain members thereof, identified in the Exit Facility Agreement as the "Backstop Parties") have offered to provide up to $15 million in exit financing for the Liquidation Trust. The parties agreeing to provide the financing are identified in Exhibit "C" to the Exit Facility documents attached hereto as Exhibit "J". Twelve million dollars of the Exit Facility will be provided by members of Class 4A and three million dollars will be provided by members of Class 4C. As set forth in the Exit Facility documents attached hereto as Exhibit "J", the Exit Facility: (a) would be a term loan; (b) would be secured by a first priority lien and security interest on all assets of the Liquidation Trust that are not encumbered by Existing Liens (as defined in the Exit Financing Agreement); (c) would bear interest at LIBOR + 3% (additional 2% interest after an event of default); and (d) would bear a commitment fee of $200,000 and additional consideration equal to 5% of the net proceeds from Estate Causes of Action. The loans made under the Exit Financing Agreement would have a maturity date at the earlier of the termination of the Liquidation Trust, the occurrence of an Event of Default under the Exit Financing Agreement (as defined therein) or five (5) years from the Effective Date of the Plan. The loans would be repaid from "Available Funds" which is defined as Cash held by the Liquidation Trust that (i) is not encumbered by valid, duly perfected and enforceable Liens as of the Petition Date; (ii) is in excess of the amount required to fund the Liquidation Trust Reserve; and (iii) not necessary to satisfy outstanding approved obligations of the Liquidation Trust.

The Proponents have agreed to consider other, less expensive exit financing proposals (from parties other than primary targets of Estate Causes of Action), should exit financing become necessary to render the Plan feasible.

**Section 6.11    Delivery of the Lenders Distribution Agreement**.  On the Effective Date, the Liquidation Trustee shall execute and deliver to the Lenders Distribution Agent the Lenders Distribution Agreement, and all documents and instruments attendant thereto.  The form of the Lenders Distribution Agreement is attached hereto as Exhibit "K".  The Lenders Distribution Agent shall maintain the register of holders of Lenders Claims and collect and distribute to the Lenders all distributions deliverable to the Lenders in accordance with the Plan.

**Section 6.12    Release of Liens and Perfection of Liens**.  The Plan provides that, except as otherwise specifically provided in the Plan or in any agreement, instrument or document created in connection with the Plan: (a) each holder of (i) a Secured Claim, (ii) a Claim that is purportedly secured and/or (iii) a judgment, personal property or *ad valorem* tax, mechanics' or similar Secured Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, on or immediately before the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been filed: (1) turn over and release to the Estates and the Liquidation Trust any and all property of the Estates that secures or purportedly secures such Claim, or such Lien and/or Claim which shall automatically, and without further action by the Estates or the Liquidation Trust, be deemed released; and (2) execute such documents and instruments as the Liquidation Trust require(s) to evidence such Claim holder's release of such property or Lien, and if such holder violates the Confirmation Order and the Plan by refusing to execute appropriate documents or instruments, the Liquidation Trust may, in its discretion, file a copy of the Confirmation Order which shall serve to release any Claim holder's rights in such property; and (b) on the Effective Date, all right, title and interest in such property shall revert, vest or revest in accordance with the Plan, free and clear of all Claims and Interests, including, without limitation, Liens, escrows, charges, pledges, encumbrances and/or security interests of any kind; *provided, however*, that the physical turnover of property described (1), above, is necessary and required only to the extent the holder is in possession or control of the property that secures or purportedly secures such Claim.

Without limiting the automatic release provisions of the immediately preceding paragraph: (a) no distribution under shall be made to or on behalf of any Claim holder unless and until such holder executes and delivers to the Estates or the Liquidation Trust such release of Liens or otherwise turns over and releases such Cash, pledge or other possessory Liens; (b) such holder that fails to execute and deliver such release of Liens within ninety (90) days after the Effective Date (or such later date as may be determined by the Liquidation Trust and a holder of an Other Secured Claim) shall be subject to whatever sanction deemed appropriate by the Bankruptcy Court; and (c) the Liquidation Trust, which shall be deemed to be appointed as attorney-in-fact for all such holders of Secured Claims for the purpose of releasing such Liens, shall be authorized to use, and all authorities shall be required to accept, the Confirmation Order and the notice of Effective Date as satisfaction of all Liens.

The Plan also provides that, notwithstanding the foregoing two Paragraphs, any Lien

securing a Claim of a holder, to the extent that it is valid, perfected and unavoidable, or otherwise Allowed under the Plan, attaches to the proceeds of such Asset; *provided, however,* that such Liens are immediately released in accordance with the foregoing two Paragraphs when the Claim of such a holder becomes (y) a Disallowed Claim or (z) an Allowed Claim and payment on the Allowed Claim is made.

**Section 6.13   Cancellation of Documents**.  On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in a Debtor or the Debtors shall, with respect to the Debtors, be canceled and deemed rejected and terminated.  Notwithstanding anything to the contrary in the Plan, the Pre-Petition Secured Credit Agreement and the Senior Subordinated Notes Indenture shall, respecting parties other than the Debtors and the Liquidation Trust (and their successors and assigns), continue in full force and effect (to the extent of and consistent with their terms) notwithstanding the occurrence of the Effective Date, and any and all rights, obligations, claims and defenses arising thereunder and related thereto, respecting parties other than the Debtors and the Liquidation Trust (and their successors and assigns), shall remain in full force and effect without waiver; provided, however, that liability of any of the Estates thereunder and the Turnover Enforcement provisions of the Senior Subordinated Notes Indenture shall be treated in accordance with the terms of the Plan.

**Section 6.14   Termination of Official Creditors' Committee and Chapter 11 Trustee**.
The appointments of the Official Creditors' Committee and the Chapter 11 Trustee shall terminate on the Effective Date, and the members of the Official Creditors' Committee and the Chapter 11 Trustee thereafter shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases. On the Effective Date, the rights of any Entity or person under the Lenders Collateral Stipulation to object to Lender Claims (excluding Wachovia Claims) and/or challenge the validity, extent, enforceability, or perfection of Liens securing Lender Secured Claims shall expire.

**Section 6.15 Preservation of Estate Causes of Action**.  Except as otherwise provided in the Plan, the Liquidation Trust shall retain all rights to commence and pursue, as appropriate, any and all objections to Claims under the Plan and any and all Estate Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding or contested matter  including, without limitation, the following actions and  any other litigation or Causes of Action, whether legal, equitable, or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets, or operations or otherwise affecting the Debtors, including, without limitation, possible claims against the following types of parties, both domestic and foreign, for the following types of claims: (a) Causes of Action against vendors, and/or suppliers of goods and/or services, and/or other Parties for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, and/or setoff; (b) Causes of Action against utilities, vendors, and/or suppliers of services and/or goods, and/or other Parties for wrongful or improper termination or suspension of services and/or supply of goods and/or services to meet other contractual or regulatory obligations; (c) Causes of Action against vendors and/or suppliers of goods and/or services, and/or other Parties for failure to fully perform or to condition performance on additional requirements under contracts with

45

any one or more of the Debtors before the assumption or rejection of the subject contracts; (d) Causes of Action for any Liens, including, without limitation, mechanic's, artisan's, materialmen's, possessory, and/or statutory liens held by any one or more of the Debtors; (e) Causes of Action for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, lessor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, and/or other Party; (f) Causes of Action against any current or former director, officer, employee, and/or agent of the Debtors arising out of their employment with the Debtors, including, without limitation, Causes of Action regarding employment contracts, wage overpayments, and/or director, officer, employee, or agent fraud or wrongdoing; (g) Causes of Action against any professional services provider, including, without limitation, financial advisors and accountants, and/or any other Party arising out of financial reporting, accounting, lending relationships or other services; (h) Causes of Action arising out of environmental and/or contaminant exposure matters against, landlords, lessors, environmental consultants, environmental agencies, and/or suppliers of environmental services and/or goods; (i) Causes of Action against insurance carriers, reinsurance carriers, underwriters, and/or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, and/or other matters; (j) counterclaims and defenses relating to notes, bonds, and/or other contract obligations; (k) Causes of Action against local, state, federal, and foreign taxing authorities for refunds of overpayments and/or other payments; (l) Causes of Action against attorneys, accountants, consultants, financial advisors, or other professional service providers relating to services rendered; (m) contract, tort, or equitable Causes of Action that may exist or subsequently arise; (n) any intracompany or intercompany Causes of Action; (o) Causes of Action of the Debtors arising under Section 362 (the automatic stay) of the Bankruptcy Code; (p) equitable subordination Causes of Action arising under Section 510 of the Bankruptcy Code or other applicable law; (q) turnover Causes of Action arising under Sections 542 or 543 of the Bankruptcy Code; (r) Causes of Action arising under Chapter 5 of the Bankruptcy Code, including, without limitation, preferences under Section 547 of the Bankruptcy Code; (s) Causes of Action against any union arising from, among other things, state and/or federal law or under a collective bargaining agreement, including, without limitation, any wrongful or illegal acts, any wrongful termination, suspension of performance, defamation, and/or failure to meet other contract or regulatory obligations; and/or (t) Causes of Action for unfair competition, interference with contract or potential business advantage, conversion, infringement of intellectual property, or other business tort claims. The Liquidation Trust reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Debtors' Chapter 11 Cases. In accordance with Section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Debtors may hold against any Entity or Person shall vest in the Liquidation Trust. The Liquidation Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action, and all other similar claims arising pursuant to applicable state laws, including, without limitation, fraud, aiding and abetting fraud, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, civil conspiracy, civil RICO, breach of covenant of good faith and fair dealing, unjust enrichment, deepening insolvency, and/or fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession pursuant to the Bankruptcy Code. The Liquidation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon,

46

settle, compromise, release, or withdraw, or litigate to judgment any and all such claims, rights, and Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party and without any further notice to or action, order, or approval of the Bankruptcy Court.

**SINCE THE PLAN PRESERVES ALL ESTATE CAUSES OF ACTION TO THE FULLEST EXTENT POSSIBLE (UNLESS EXPRESSLY STATED OTHERWISE IN THE PLAN), EACH AND EVERY PERSON OR ENTITY VOTING ON THE PLAN SHOULD TAKE INTO CONSIDERATION, BEFORE VOTING ON THE PLAN, THAT YOU MAY BE NAMED AS A DEFENDANT IN AN ACTION COMMENCED BY THE LIQUIDATION TRUST.**

**Section 6.16    Preservation of Causes of Action Not Expressly Settled and Released.**
Unless a claim or Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Plan expressly reserves such claim or Cause of Action for later adjudication by the Liquidation Trust and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such claims or Causes of Action have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order. Without limiting the above, the Liquidation Trust expressly reserves such claims or Causes of Action against prepetition professionals, including by not limited to, attorneys, accountants, financial advisors and others related to financial advising, financial reporting, accounting, lending arrangements and other services, for fraud, aiding and abetting fraud, aiding and abetting breach of fiduciary duties, civil conspiracy, civil RICO, breach of covenant of good faith and fair dealing, unjust enrichment, deepening insolvency and other Cause of Action unless such claim or Cause of Action has been expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order. Further, the Liquidation Trust retains, without limiting the above, claims or Causes of Action against any current or former director, officer, employee and/or agent of the Debtors whether related to their employment with the Debtors or otherwise, including but not limited to, fraud, misrepresentation, breach of fiduciary duties, civil conspiracy, civil RICO, breach of covenant of good faith and fair dealing, unjust enrichment, deepening insolvency and other Cause of Action. In addition, the Liquidation Trust pursuant to the Plan expressly reserves the right to pursue or adopt any claims not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase, lease, or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors subsequent to the Effective Date and may, to the extent not theretofore expressly waived, relinquished, released, compromised, or settled, be the subject of an action after the Effective Date, whether or not: (a) such Person has Filed a proof of claim against the Debtors in the

Chapter 11 Cases; (b) such Person's proof of claim has been objected to; (c) such Person's Claim was included in the Debtors' Schedules; or (d) such Person's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

Without limiting the generality of the foregoing, and without limiting (except as set forth in the Plan) the right and ability of the Liquidation Trust to pursue other claims or Causes of Action against other Person or Entities based upon its investigation, the Proponents anticipate that the Liquidation Trust, after the completion of an appropriate analysis and investigation, may assert one or more of the claims listed below against one or more of Gregory J. Podlucky, Jonathan E. Podlucky, Robert B. Lynn, Andrew Murin, Ruth Huet, Venita Fields, William Thomas, BDO Seidman, Ernst & Young, Wachovia Securities, Wachovia Capital Markets, LLC, Wachovia Bank, N.A., George K. Baum Capital Partners, L.P., George K. Baum Employee Equity Fund, L.P., SW Pelham Fund, L.P. and Other Debtor Pre-Petition Professionals:

Breach of contract
Fraud
Intentional misrepresentation
Negligent or affirmative misrepresentation
Aiding and abetting fraud
Civil RICO
Fraudulent inducement
Fraudulent concealment
Negligent omission
Breach of fiduciary duty
Aiding and abetting breach of fiduciary duty
Civil conspiracy
Unjust enrichment
Deepening insolvency
Preference recovery
Fraudulent conveyance recovery
Equitable subordination
Professional malpractice
Any other applicable theory of recovery

## ARTICLE VII
**Provisions Governing Distributions**

**Section 7.01    Distributions to Holders of Lenders Claims and Subordinated Notes.**

48

      **a.**    **Distributions Through the Lenders Distribution Agent and the Senior Subordinated Notes Indenture Trustee**. Under the provisions of the Plan governing distributions, distributions for the benefit of beneficial holders of Lender Claims shall be made to the Lenders Distribution Agent. Distributions for the benefit of beneficial holders of Senior Subordinated Notes shall be made to the Senior Subordinated Notes Indenture Trustee. The Lenders Distribution Agent and the Subordinated Notes Indenture Trustee shall, in turn, promptly administer the distributions to the beneficial holders of Allowed Claims in Classes 1, 4A, and 4C, as applicable, in accordance with the Plan and applicable transaction documents. Neither the Lenders Distribution Agent nor the Senior Subordinated Notes Indenture Trustee shall be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court; and in the event that such parties are so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be paid from the distributions to the beneficial holders of Lenders Claims and Senior Subordinated Notes, as applicable.

      **b.**    **Satisfaction of Charging Liens**. On the Effective Date, the Liquidation Trust shall distribute Cash to Wachovia in an amount sufficient to satisfy all obligations under Section 2.12(b) "FIRST" and "SECOND" of the Pre-Petition Secured Credit Agreement (but only to the extent Wachovia is entitled to be paid under those provisions of the Pre-Petition secured credit agreement, which distribution shall be an advance on future distributions to Wachovia (presuming its Claims are ultimately deemed Allowed Claims) and stand in place of a commensurate distribution into the Disputed Claims Reserve for Wachovia Claims; provided, however, that such distribution to Wachovia shall not be deemed to render any Claim held by Wachovia an Allowed Claim, shall not be deemed a waiver or admission of any fact or law, and shall be subject to disgorgement should any Wachovia Claim ultimately be Disallowed; provided, further, however, that any Person or Entity shall, on the Effective Date, fully subrogate to Wachovia's right to receive the distribution provided for in this sentence to the extent that such Person or Entity satisfied such payment obligation to Wachovia prior to the Effective Date (which subrogation right shall not be subject to disgorgement, regardless of whether all Wachovia Claims are ultimately Disallowed) (for the avoidance of doubt, the Liquidation Trust shall be entitled to seek disgorgement of such payments from Wachovia, but not the Person or Entity subrogating to Wachovia's payment right under this proviso). On the Effective Date or as soon thereafter as is reasonably practicable, to the extent payment of the Lenders Contribution Claim has not occurred pursuant to Bankruptcy Code Section 503(b)(3)(D) and to the extent there are sufficient Cash proceeds of Lenders Collateral, the Liquidation Trust shall distribute Cash to the members of the Ad Hoc Lenders' Committee in an amount sufficient to satisfy all obligations owed to them under Section 2.12(b) "THIRD" of the Pre-Petition Secured Credit Agreement (but only to the extent such Lenders are so entitled to be paid under that provision of the Pre-Petition Secured Credit Agreement). To the extent necessary to satisfy the reasonable fees and expenses and to satisfy the charging lien of the Senior Subordinated Notes Indenture Trustee, up to $75,000.00 in Cash will be paid on the Effective Date or as soon thereafter as practicable to the holders of Senior Subordinated Notes, in order to pay the fees and expenses of the Senior Subordinated Notes Indenture Trustee, which shall be an advance against future distributions payable under the Plan to holders of Senior Subordinated Notes (but not distributions subject to Turnover Enforcement).

c.    **Distribution of the Proceeds of TSI/Holdings Property**.  Notwithstanding anything contrary contained in Section 7.02 of the Plan, the rights of all Entities and Persons to seek a determination from the Bankruptcy Court that all or any portion of the TSI/Holdings Property should be reallocated to the Le-Nature's Estate is preserved under the Plan, in Section 8.01(c), through the first date upon which the Liquidation Trust makes a distribution to holders of Allowed Claims in Class 4.  Under the Plan, if the Bankruptcy Court orders the reallocation of any TSI/Holdings Property to the Le-Nature's Estate, the proceeds thereof shall be distributed to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C in accordance with Section 5.04(c), Section 5.05(b), and Section 5.06(c) of the Plan.

**Section 7.02    Provisions Concerning Distributions to Holders of Allowed Class 1 and Class 4A Claims**.  If, at any time prior to a determination that all Lenders Secured Claims have been paid in full (because, for example, a dispute exists over whether an Estate Asset does or does not constitute Lenders Collateral) and the Liquidation Trust then holds Available Cash for distribution to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, the aggregate amount of Allowed Claims in Class 4A shall be deemed to equal the difference between (a) $278 million plus accrued interest (to the extent provided for in the definition of Tier One Trust Beneficial Interests) and costs (to the extent provided for in Section 8.01(b) of the Plan) [8] and (b) the aggregate amount of Cash distributed as of that date to holders of Tier One Trust Beneficial Interests and into Disputed Claims Reserves for Disputed Claims in Class 1.  If, thereafter, it is determined that additional Cash distributions are due to holders of Tier One Trust Beneficial Interests (because, for example, an Estate Asset is thereafter determined to constitute Lenders Collateral), the Liquidation Trust shall apportion such Cash to holders of Allowed Claims in Class 1, Class 4A, Class 4B, and Class 4C, as necessary to ensure that Lenders did not receive an excessive distribution on account of the pre-determined amount of their Class 4A Claims.

**Section 7.03    Disputed Claim Reserves**.

a.    **Establishment of Disputed Claim Reserves**.  On the Initial Distribution Date (or on any other date on which distributions for any particular Class of Claims are made pursuant to the Plan by the Liquidation Trust), and in connection with making all distributions required to be made on any such date under the Plan, the Liquidation Trust shall establish, a separate Disputed Claim Reserve for Cash distributions pertaining to each Disputed Claim in each relevant Class, as necessary pursuant to the Plan.

b.    **Amounts to Be Reserved**.  The Plan provides that the Liquidation Trust shall reserve a Ratable proportion of all Cash allocated for distribution on account of each Disputed Claim based upon the Face Amount of each such Disputed Claim, or such lesser amount as may be agreed to by the holder of the Claim on one hand and the Liquidation Trust on the other hand.  Respecting any Disputed Claim in Class 1, the

---

[8] As such amounts shall be Ratably reduced to the extent Disputed Claims referenced in Section 10.01 of the Plan are equitably subordinated, reduced, Disallowed, invalidated or expunged by Final Order

Liquidation Trust shall reserve a Ratable proportion of the proceeds of Lenders Collateral based on the Face Amount of Disputed Claims in such Class, or such lesser amount as may be agreed to by the holder of the Claim on one hand and the Liquidation Trust on the other hand. Respecting any Disputed Claim in Class 4A or Class 4C, the Liquidation Trust shall reserve a Ratable proportion of the proceeds of the TSI/Holdings Property based on the Face Amount of Disputed Claims in such Class, or such lesser amount as may be agreed to by the holder of the Claim on one hand and the Liquidation Trust on the other hand; provided, however, that, if the TSI/Holdings Property is reallocated to the Le-Nature's Estate pursuant to Section 8.01(c) of the Plan, the Liquidation Trust shall only reserve a proportion of the proceeds of the TSI/Holdings Property Ratable to holders of Claims in Class 4A, Class 4B, and Class 4C. All Cash or other property allocable to the relevant Class hereunder shall be distributed by the Liquidation Trust to the relevant Disputed Claim Reserve on the Initial Distribution Date (or such other date on which distributions for any particular Class of Claims are made pursuant to the Plan).] All Cash distributed into a Disputed Claim Reserve shall be deposited in an interest-bearing account at a qualified institution, consistent with the Liquidation Trust Agreement.

      **c.**    **Distributions.**    Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed on the first Quarterly Distribution Date after the Claim is Allowed. Distributions shall be made only to the extent of the aggregate distributions that the holder of any such Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to amounts held in the Disputed Claims Reserves). Interest earned on such Disputed Claims Reserve shall be paid in to the claim holder with other cash from such Disputed Claims Reserve. Distributions to each holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified; provided, however, that, to the extent a Disputed Claim in Class 1 ultimately becomes an Allowed Claim in such Class, the holder of such Claim shall only be entitled to receive distributions only in an amount equal to the Allowed Amount of its Lenders Secured Claim, plus interest earned on the Disputed Claims Reserve established on account of such claim.

      **d.**    **Termination of Disputed Claim Reserve.**    Each Disputed Claim Reserve shall be closed and extinguished by the Liquidation Trust when all distributions and other dispositions of Cash or other property required to be made therefrom under the Plan and the Liquidation Trust Agreement have been made. Upon closure of a Disputed Claim Reserve, all Cash and other property held in that Disputed Claim Reserve shall revest in the Liquidation Trust and such Cash and property shall be Ratably distributed to the other holders of Allowed Claims in the Class in respect of which such Disputed Claims Reserve was created, except as otherwise provided in Article V of the Plan.

      **e.**    **Limitation of Liability for Funding the Disputed Claim Reserve.** Except as expressly set forth in the Plan, the Liquidation Trust shall have no duty to fund the Disputed Reserves.

**Section 7.04  Setoffs**.  The Liquidation Trust may, but shall not be required to, offset against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Estates or the Liquidation Trust may have against the Claim holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Liquidation Trust of any such claim it may have against such Claim holder.  Holders of Allowed Claims retain whatever rights to setoff they are otherwise entitled to assert under Bankruptcy Code Section 553.

**Section 7.05  Withholding Taxes and Expenses of Distribution**.  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All holders of Claims or Interests shall be required to provide any information necessary to effect the withholding of such taxes.  In addition, all distributions under the Plan shall be net of the actual and reasonable costs of making such distributions.

**Section 7.06  Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**Section 7.07  Disputed Identity of Holder**.  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Liquidation Trust may, in lieu of making such distribution to such Entity or Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute; *provided, however*, that if the dispute remains unresolved by Final Order for an unreasonable period of time, the Liquidation Trust may request that the Bankruptcy Court order that the property that is the subject of the dispute shall irrevocably become Unclaimed Property

**Section 7.08  Transfers of Claims**.  As of the Effective Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, the Chapter 11 Trustee, or their respective agents, shall be deemed closed, and there shall be no further changes in the holders of record of any of the Claims or Interests.  No party, including but not limited to the Liquidation Trust, shall have any obligation to recognize any transfer of the Claims or Interests occurring after the Effective Date unless notice of the transfer of such Claim or Interest, in form and substance satisfactory to the Liquidation Trust shall have been received by the Liquidation Trustee, as appropriate, prior to the Record Date.  Subject to the immediately preceding sentence, only those holders of record stated on the transfer ledgers as of the close of business on the Effective Date, to the extent applicable, shall be entitled to be recognized for all purposes hereunder.  Nothing herein is intended and shall not be interpreted to mean that the Lenders Distribution Agent is any way restricted from recording on the register and, thereby, recognizing transfers of Lenders Claims after the Effective Date.

**Section 7.09  Method of Cash Distributions**.  Any Cash payment to be made by the Liquidation Trust pursuant to the Plan may be made, at the sole discretion of the Liquidation Trust, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**Section 7.10  *De Minimis* Distributions**.  The Plan provides that no Cash payment in an amount less than fifty dollars ($50.00) shall be made by the Liquidation Trust to any holder of a Claim or Interest unless a request therefor is made in writing to the Liquidation Trust prior to one (1) year after the Effective Date.  Cash that otherwise would be payable under the Plan but for this provision shall be reserved and distributed with future distributions, if any, that, collectively, exceed fifty dollars ($50.00).  Distributions of Cash that otherwise would be payable under the Plan to a holder but for this Section 8.11 that never, collectively, exceed fifty dollars ($50.00) as described in the foregoing sentence and for which a request is not made within the one (1) year deadline shall become Unclaimed Property, which shall vest in the Liquidation Trust for use and/or distributions in accordance with the Plan.  The Liquidation Trust may, at the conclusion of the Chapter 11 Cases, distribute to a charitable organization of its choice any *de minimis* amount of residual Unclaimed Property.

**Section 7.11  No Distribution in Excess of Allowed Amount of Claim**.  Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim plus postpetition interest thereon to the extent Allowed by the Bankruptcy Code and the Plan.  Upon a holder of an Allowed Claim recovering the full amount of its Allowed Claim from another source, it thereafter shall no longer have any entitlement to receive distributions under the Plan.

**Section 7.12  Exemption from Certain Transfer Taxes**.  The Plan provides that pursuant to section 1146(c) of the Bankruptcy Code: (a) the issuance, transfer or exchange of any securities, instruments or documents; (b) the creation or release of any other Lien, mortgage, deed of trust or other security interest; or (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale of any Assets of the Estates, any deeds, releases, bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under Section 1146(a) of the Bankruptcy Code.

### ARTICLE VIII
### Conditions to Confirmation And Effectiveness of Plan

**Section 8.01  Conditions to Confirmation**.  The Plan includes a number of conditions that must occur or be waived in order for the Plan to be confirmed.  Specifically, the Plan provides that, unless waived in accordance with the Plan, (i) the Initial Trust Funding shall be sufficient to render the Plan feasible; and (ii) the Confirmation Order must be in a form and substance reasonably acceptable to each of the Proponents.  The Plan provides that the Confirmation Order must contain the following:

(a)    order, find, and decree that the Confirmation Order shall supersede any orders of the Court issued prior to the Confirmation Date to the extent that those prior orders may be inconsistent with the Confirmation Order;

(b)    order and decree that the Estates shall be substantively consolidated but only to the extent set forth in the Plan;

(c)    authorize implementation of the Plan in accordance with its terms;

(d)    authorize the appointment of all parties appointed under the Plan and the documents substantially in the form attached heretot, including without limitation the Liquidation Trustee, the members of the Liquidation Trust Oversight Board, and the Lenders Distribution Agent, and direct such parties to perform their obligations under such documents;

(e)    provide that any transfers effected or mortgages or other security documents entered into or to be effected or entered into under the Plan shall be and are exempt from any state, city, or other municipality transfer taxes, mortgage recording taxes, and any other stamp or similar taxes pursuant to Bankruptcy Code Section 1146(c);

(f)    order, find, and decree that the Plan contains settlements of complex matters, which settlements meet the applicable standards for approval under Bankruptcy Code Section 1123 and Federal Rule of Bankruptcy Procedure 9019, and are approved in their entirety;

(g)    approve in all respects the other transactions, agreements, and documents to be effected pursuant to the Plan, including the Liquidation Trust Agreement, the Exit Facility Agreement, and the other documents substantially in the form attached hereto;

(h)    authorize the establishment of the Liquidation Trust consistent with the terms of the Plan and the Liquidation Trust Agreement, and authorize the Liquidation Trustee and the Liquidation Trust Oversight Board to assume the rights and responsibilities provided thereto in the Plan and the Liquidation Trust Agreement;

(i)    order, find, and decree that the transfer of Assets to the Liquidation Trust: (a) are or shall be legal, valid, and effective transfers of property; (b) vest or shall vest the transferee with good title to such property free and clear of all Liens, Claims, encumbrances, and Interests of any Entity or Person, except as expressly provided in the Plan or the Confirmation Order; (c) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or nonbankruptcy law; and (d) do not and shall not subject the Liquidation Trust or any holder of a Claim or Interest to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law, including any laws affecting successor or transferee liability or fraudulent conveyance or transfer laws;

(j)    order, find, and decree that the Liquidation Trust shall have been automatically substituted for the Chapter 11 Trustee, the Official Creditors' Committee or

any other Estate representative as a party to all pending contested matters, adversary proceedings, claims, administrative proceedings and lawsuits, both within and outside of the Bankruptcy Court, involving the Assets, Claims against the Estate or matters relating to the Liquidation Trust, including the Causes of Action and the resolution of Disputed Claims;

(k)    order, find, and decree that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(l)    order, find, and decree that the provisions of Bankruptcy Code Sections 1145 and 1146(c) apply to the transactions contemplated hereunder, if applicable;

(m)    order, find, and decree that nothing herein or in any stipulation filed in the Bankruptcy Court or any order of the Bankruptcy Court (including paragraph 6 of the Lenders Collateral Stipulation) operates as a discharge, release, exculpation, or waiver of, or establishes any defense or limitation of damages to: (a) any objection to Wachovia Claims belonging to the Estates or to any other Entity or Person; or (b) any Claim or Cause of Action belonging to the Estates or to any other Entity or Person against any Insider, Wachovia (in its individual capacity), BDO Seidman, E&Y, or any Other Debtor Pre-Petition Professional;

(n)    order, find, and decree that all rights to examination under Federal Rule of Bankruptcy Procedure 2004 or otherwise to conduct examinations of any Person or Entities including, without limitation, the rights to subpoena production of documents and to compel attendance at depositions, that exist prior to the Confirmation Date shall continue to the fullest extent after the Confirmation Date and after the Effective Date, as if neither had occurred; and

(o)    order, find, and decree that privileged communications may be shared among the Liquidation Trust, the Ad Hoc Lenders' Committee, the Ad Hoc Notcholders' Committee, and the Jointly Represented Initial/Par Purchasers without compromising the privileged nature of such communications, in accordance with the "joint interest" or "common interest" doctrine.

**(p)**    order, find, and decree that all privileges with respect to any Assets of the Estates, including the attorney/client privilege, to which the Debtors and/or the Chapter 11 Trustee is entitled shall have been automatically vested in, and available for assertion by or waived on behalf of the Liquidation Trust;

**(q)**    order, find and decree that, except as otherwise provided for in Section 10.01 the Lenders Secured Claims  shall be Allowed Secured Claims, and the Lenders Unsecured Claims and the Claims of holders of the Senior Subordinated Notes shall be Allowed Claims, all as set forth in the Plan; and

**(r)**    if necessary, order, find, and decree that the Exit Facility shall be approved, and Liquidation Trust is authorized to enter into same.

**Section 8.02  Conditions to the Effective Date**.    The Plan also lists the following conditions precedent to the Effective Date and the implementation of the Plan:

The Proponents reserve the right to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Federal Rule of Bankruptcy Procedure 3020(e), the Confirmation Order shall take effect immediately upon its entry and shall be a Final Order.    Notwithstanding that intention, the Plan provides that it may not be consummated, and the Effective Date shall not occur, unless and until each of the conditions set forth below is satisfied or waived (if and to the extent permitted by the Plan) by the Proponents, such waivers not to be withheld unreasonably:

(a)    the Confirmation Date shall have occurred and the Confirmation Order, in a form consistent with Section 6.01 of the Plan, shall have been signed by the judge presiding over the Chapter 11 Cases and shall have become a Final Order;

(b)    after the entry of the Confirmation Order, not modifications shall have been made to the Plan except in accordance with its provisions with respect to modification;

(c)    the conditions precedent to the confirmation of the Plan in Section 6.01 of the Plan shall have been satisfied and shall continue to be satisfied;

(d)    the Liquidation Trust shall have been established and all Assets of the Estates, including but not limited to all Lenders Collateral and Estate Causes of Action, shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Interests, except as specifically provided in the Plan and the Liquidation Trust Agreement;

(e)    the Liquidation Trustee, the Liquidation Trust Oversight Board, and the Lenders Distribution Agent shall have been appointed and assumed their rights and responsibilities under the Plan and the documents substantially in the form attached hereto;

(f)    all actions, documents, and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date shall be reasonably satisfactory to the Proponents, and such actions, documents, and agreements shall have been effected or executed and delivered.    All such documents, including those attached hereto, shall be completed and in final form and, as applicable, executed by the parties thereto and all conditions precedent contained in any of the foregoing shall have been satisfied or waived;

(g)    the Liquidation Trust shall have sufficient Cash on hand to make distributions of Cash and to establish the Liquidation Trust Reserve as required by the Plan and the Liquidation Trust Agreement, whether such funding derives from the liquidation of Assets unencumbered by Liens (excluding Ratable proportions of the TSI/Holdings Property based on the Face Amount of Disputed Claims in Class 4A or Class 4C, which shall be entirely vested in Disputed Claims Reserves pursuant to Section 8.03(b) of the Plan) or the Lenders Collateral (excluding Ratable proportions of Lenders Collateral based on the Face Amount of Disputed Claims in Class 1, which shall be entirely vested in Disputed Claims

Reserves pursuant to Section 8.03(b) of the Plan), settlement of Estate Causes of Action, advances under the Exit Facility, or otherwise.

The waiver of any condition set forth in Article VI of the Plan may be made by the Proponents in accordance with the Plan without further notice or order of the Bankruptcy Court. The failure to satisfy or waive a condition to the Effective Date may be asserted by any Proponent regardless of the circumstances giving rise to the failure of such condition to be satisfied (except for and expressly excluding any action or inaction by any Proponent). The failure of the Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE IX
### Effects of Confirmation of the Plan.

The confirmation of the Plan will have certain effects as described in the Plan and summarized below.

(i)    **Binding Effect.** Upon the entry of the Confirmation Order, the Plan shall be binding upon the Chapter 11 Trustee, the Debtors, all Creditors, Interest holders and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan. The rights, benefits and obligations conferred on any Person by the Plan will be binding upon, and inure to the benefit of, the executors, successors, heirs and assigns of and any Persons claiming an interest in any and all property in which the Estates have an interest within the meaning of Bankruptcy Code Section 541 through such Person.

(ii)    **Retention of Estate Causes of Action/Reservation of Rights**. Except as expressly provided for in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to (i) be *res judicata* or the basis for estoppel of, (ii) create any other defense to the prosecution to judgment on the merits of, (iii) be a waiver of or (iv) be a relinquishment of any Estate Causes of Action, including Avoidance Actions, left unaltered or unimpaired by the Plan. On and after the Effective Date, the Liquidation Trust shall have, retain, reserve and be entitled to assert, prosecute, settle or abandon all such Estate Causes of Action.

(iii)    **Direct Causes of Action**. Nothing in the Plan is intended to, nor shall be interpreted as, impairing, waiving or otherwise affecting in any way Causes of Action that do not belong to the Estates, including assessments of damages. Proceeds recovered through settlement or prosecution of Unsecured Senior Subordinated Notes Direct Causes of Action shall not be subject to Turnover Enforcement. Moreover, it is intended that any and all such rights, claims and defenses with respect to any Causes of Action that do not belong to the Estates are reserved expressly, and nothing in the Plan shall constitute a waiver or release with respect to same.

(iv)    **Compromise of Controversies**. Pursuant to Federal Rule of Bankruptcy Procedure 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good -

faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtor, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtor. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including, without limitation, its injunction, exculpation and compromise provisions, are mutually dependent and nonseverable.

       **(v)**     **Preservation of Insurance**. Except as necessary to be consistent with the Plan, the Plan shall not diminish or impair the enforceability of insurance policies that may cover Claims against the Debtors, the Estate, or Assets or any other Person or Entity.

       **(vi)**     **Term of Injunctions or Stays**. Until the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect. After the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect to the extent provided for herein and in the Confirmation Order.

       **(vii)**    **EXCULPATION**. NONE OF THE PLAN PROPONENTS, THE CHAPTER 11 TRUSTEE NOR ANY MEMBER, DIRECTOR, OFFICER, PARTNER, EMPLOYEE, AGENT, PROFESSIONAL, OR REPRESENTATIVE THEREOF (BUT SOLELY IN THEIR CAPACITY AS SUCH), SHALL HAVE OR INCUR ANY LIABILITY, IN ANY FORM, TO THE ESTATES, OR THE LIQUIDATION TRUST OR, TO THE EXTENT SET FORTH IN BANKRUPTCY CODE SECTION 1125(e), ANY OTHER ENTITY OR PERSON, FOR ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF THEIR INVOLVEMENT IN THE PREPARATION OR FILING OF THE DISCLOSURE STATEMENT, THE PLAN, THE DOCUMENTS ATTACHED HERETO OR THE CONDUCT OF THE CHAPTER 11 CASES, INCLUDING THE TYPE OR VALUE OF DISTRIBUTIONS, IF ANY, RESERVED UNDER THE PLAN FOR HOLDERS OF CLAIMS OR INTERESTS, THE SOLICITATION OF VOTES FOR ACCEPTANCE OR REJECTION OF THE PLAN, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, AND, WITH RESPECT TO GROSS NEGLIGENCE, SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN AND APPLICABLE LAW.

(viii)  **INJUNCTION**.  The Plan provides that Confirmation of the Plan shall have the effect of, among other things, permanently enjoining (x) all Entities or Persons that have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in the Estates, with respect to any such Claim or Interest and (y) respecting (f)(i) and (f)(ii) of Section 11.07 of the Plan, the Estates and the Liquidation Trust, from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan):  (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estates or the Liquidation Trust or any of their property; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estates or the Liquidation Trust or any of their property; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estates or the Liquidation Trust or any of their property; (d) asserting any right of setoff, directly or indirectly, against any obligation due the Estates or the Liquidation Trust or any of their property, except as contemplated or Allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (f) prosecuting or otherwise asserting (i) any form of objection to any Claim that is Allowed by the Plan or (ii) asserting Avoidance Actions against any holder of a Lender Claim that is Allowed by the Plan. Additionally, unless otherwise explicitly stated in the Plan, the injunction contemplated by this Section of the Plan shall prohibit the assertion against the Liquidation Trust of all Claims or Interests, if any, related to the Debtors. The Plan provides that the foregoing is not intended to enjoin Entities or Persons from pursuing direct Causes of Action against any Entity or Person, other than contesting Claims Allowed by the Plan and from the assertion of Avoidance Actions against holders of Allowed Lender Claims on account of such Claims.

**Without limiting the applicability of the foregoing, as set forth in the Plan, the injunction provision of the Plan enjoins any Person or Entity from filing or pursuing any objection, on any basis, to a Claim that is deemed to be Allowed by the Plan, including the Lenders Pre-Petition Secured Claims and the Lenders Replacement Lien Claims deemed Allowed under Class 1, the Lenders Unsecured Claims deemed Allowed under Class 4A and the Unsecured Subordinated Notes Claims deemed Allowed under Class 4C.**

(ix)  **No Releases for Specified Parties**.  None of the waiver, claims Allowance, exculpation, or injunction provisions in the Plan shall benefit or otherwise protect (without limitation) the following: (a) Wachovia Claims; (b) any Claims or Interests asserted by any Insider, BDO Seidman, E&Y, or any Other Debtor Pre-Petition Professional; or (c) any Insider, Wachovia, BDO Seidman, E&Y, or any Other Debtor Pre-Petition Professional from any liability they may have to the Debtors, the Estates, the Liquidation Trust or to any other Entity or Person. None of the waiver, exculpation, or injunction provisions in the Plan shall be deemed to be valid or enforceable to the extent that they benefit or otherwise protect (without limitation) the following: (a) Wachovia Claims;  (b) any Claims or Interests asserted

by any Insider, BDO Seidman, E&Y, or any Other Debtor Pre-Petition Professional; or (c) any Insider, Wachovia, BDO Seidman, E&Y, or any Other Debtor Pre-Petition Professional from any liability they may have to the Estates, the Liquidation Trust or to any other Entity or Person.

      **(x)    Subrogation**. Notwithstanding anything set forth in the Senior Subordinated Notes Indenture, after aggregate distributions on account of Lenders Claims exceed $278 million plus accrued interest (to the extent provided for in the definition of Tier Two Trust Beneficial Interests) and costs (to the extent provided for in Section 8.01(b) of the Plan),[7] until holders of Class 4C Claims are paid in full, Senior Subordinated Noteholders shall subrogate to all Lenders Claims, but only to the extent Turnover Enforcement has paid a portion of distributions on Lenders Claims. No other rights of subrogation respecting Lenders Claims are provided herein. Nothing herein shall otherwise affect any rights that parties- in- interest may have to the subrogation of Claims from any source.

## ARTICLE X
### Executory Contracts and Leases

**Section 10.1    Rejection of Contracts and Leases**. The Plan provides that each executory contract or unexpired lease of the Debtors that has not expired by its own terms prior to the Effective Date, and that has not been assumed or rejected during the Chapter 11 Cases prior to the Effective Date shall be deemed rejected pursuant to Bankruptcy Code Section 365 as of the Effective Date; provided, however, that, prior to the Confirmation Date, the Plan Proponents may agree with the non-Debtor party to an executory contract or unexpired lease to the assumption and/or assumption and assignment of that particular contract and lease on the Effective Date; provided further, however, that each of such agreed upon assumptions or assumptions and assignments shall be approved in the Confirmation Order..

**Section 10.2    Bar Date for Rejection Damages**. Under the Plan, if the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim by the ~~non~~-nondebtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 4B; *provided, however*, that the Unsecured Claim, if any, arising from such rejection shall be forever barred and shall not be enforceable against the Estates, the Liquidation Trust, their successors or properties, unless a proof of such Claim is filed and served on the Liquidation Trust within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease which may include, if applicable, the Confirmation Order.

## ARTICLE XI
### Disputed, Contingent and Unliquidated Claims and Interests

**Section 11.1    Allowance of Certain Lenders Claims**. As set forth in Section 10.01 of the Plan, a Lenders Claim is deemed by the Plan to be an Allowed Claim (and the holder thereof not subject to any Avoidance Actions), but only if: (a) Wachovia was not the record

---

[7]    As such amounts shall be Ratably reduced to the extent Disputed Claims referenced in Section 10.01 of the Plan are equitably subordinated, reduced, Disallowed, invalidated or expunged by Final Order.

beneficial holder of such Claim on March 8, 2007 or any time thereafter; or (b) such Claim was the subject of a Trade Placement effective on or before February 14, 2007 pursuant to which Wachovia agreed to sell such Lenders Claim to an unaffiliated Entity or Person. The Plan provides for the avoidance of doubt that any and all rights vested in any Entity or Person under the Lenders Collateral Stipulation to interpose objections to Wachovia Claims shall be vested (on a non-exclusive basis) in the Liquidation Trust, and to the extent Paragraph 6 of the Lenders Collateral Stipulation established a deadline for interposing such objections to Wachovia Claims, the deadline shall be extended through the Claims/Interest Objection Deadline.  This provision of the Plan, including the dates used and the corresponding treatment of  Claims in accordance with this provision of the Plan, was required to accomplish two objectives. First, March 8, 2007, is the date that the Plan and proposed Disclosure Statement were originally filed with the Bankruptcy Court and therefore the date by which the proposed treatment of the Claims, including the Lenders' Claims, was known. It was necessary to establish a fixed date for the application of the Plan to claims on which Wachovia is the record holder to prevent the claims of Wachovia, which could become Disputed Claims, from being subjected to different treatment by being transferred to another holder after the fixed date, and to fairly advise any party becoming a holder or considering becoming a holder of Claim held by Wachovia after such date of the treatment of the claims under the Plan. Second, it was necessary in the development of the negotiations between the creditor constituencies as to the terms of the Plan to fix the amount of the indebtedness held by the Lenders so that final Plan provisions could be determined and agreed to with the respective amounts of indebtedness in the classes being known and not subject to variation or fluctuation thereafter.  The date of February 14, 2007, was selected as the date for determination of whether a claim was subject to a Trade Placement because that is the date by which the discussions and negotiations between the creditor groups had progressed to the point that it appeared likely that an agreement on the terms of a Plan would be consummated and was the date that fixing the amount of debt being included in the Lenders Claim was required to enable the parties to proceed with and conclude their discussions.

Wachovia Claims are not deemed by the Plan to be Allowed Claims.  The Official Creditors Committee and the Ad Hoc Lenders Committee believe that such treatment is appropriate in light of the facts and circumstances currently known.

In the years leading up to the filing of the Chapter 11 Cases, Wachovia was engaged by the Debtors in at least the following capacities: (a) as exclusive Investment Banker and Financial Advisor, orchestrating M&A processes for a contemplated sale of the company, (b) as Lending and Syndication Arranger, facilitating the Debtors' borrowing of $100 million dollars in "Tranche B" bank debt, (c) as Underwriter for $150 million in Senior Subordinated Notes, and (d) as Lead Arranger, Sole Bookrunner, and Administrative Agent under the $278 million Pre-Petition Secured Credit Agreement that was closed and funded in September 2006.  The Official Creditors Committee and the Ad Hoc Lenders Committee believe that the information made available to Wachovia in the foregoing capacities, at a minimum, placed Wachovia on inquiry notice of the fraudulent and other wrongful activities being perpetrated within Le-Nature's by, among others, Gregory Podlucky.

Documentary evidence adduced to date by the Plan Proponents reveals that Wachovia, among other things, (a) was a key and trusted advisor for the company and its

61

Board, (b) received substantial amounts in fees for providing the above-described services to the Debtors, (c) had ready access to material nonpublic information concerning the company's financial condition, and (d) had knowledge of material inconsistencies in the company's accounting records. Based on this information, the Official Creditors Committee and the Ad Hoc Lenders Committee believe that there is an evidentiary and legal basis to (i) disallow the Wachovia Claims, (ii) equitably subordinate the Wachovia Claims pursuant to Bankruptcy Code Section 510(c), and (iii) assert estate causes of action against Wachovia sounding in, among others, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and unjust enrichment. The Official Creditors Committee and the Ad Hoc Lenders Committee also believe that additional discovery, including but not limited to deposition testimony, will yield further evidence to support these and other claims and causes of action against Wachovia and other parties.

In addition, Wachovia is subject to avoidance actions under Chapter 5 of the Bankruptcy Code in connection with the refinancing of the Debtors' bank debt with the loans made pursuant to the Pre-Petition Secured Credit Agreement, which occurred within weeks of the disclosure of the fraud and the commencement of the Chapter 11 Cases. In connection with this transaction, hundreds of millions of dollars were transferred to, and partly for the benefit of, Wachovia, as Administrative Agent and Lender under both the Pre-Petition Secured Credit Agreement and its predecessor agreement. The Official Creditors Committee and the Ad Hoc Lenders Committee believe that the facts and circumstances with respect to these transfers give rise to, among others, claims of preference pursuant to Section 547 of the Bankruptcy Code and/or fraudulent transfer pursuant to Sections 544 and 548 of the Bankruptcy Code. Because Section 502(d) precludes the allowance of a claim of an entity from which property is recoverable under a Chapter 5 avoidance action, the Plan does not deem the Wachovia Claims to be Allowed Claims.

**Section 11.2   Objections to Other Claims and Interests.**  The Claims/Interest Objection Deadline shall be one (1) year after the Effective Date; *provided, however*, that the last date for filing Avoidance Actions against a holder of a Claim or Interest shall be the date established by Bankruptcy Code Section 546(a) and the last day for asserting any other Estate Cause of Action shall be the last day of the applicable statute of limitations therefor provided under applicable non-bankruptcy law as such period may have been extended by Bankruptcy Code Section 108 or any other section of the Bankruptcy Code or other applicable law *provided further, however*, that no Entity or Person (including the Liquidation Trust, any holder of Claims, or any holder of Interests) may file an objection to any Claim deemed Allowed by the Plan and any such objection shall be deemed null and void. Notwithstanding any of the foregoing, the Liquidation Trust may request from the Bankruptcy Court one or more extensions of the Claims/Interest Objection Deadline, which such extended date shall become the new Claims/Interest Objection Deadline.

The Liquidation Trust shall have the primary but not exclusive responsibility for reviewing and objecting to the Allowance of any Claim or Interest filed in the Chapter 11 Cases. All objections shall be litigated to a Final Order; *provided, however,* that the Liquidation Trust may compromise and settle any objections to Claims or Interests, subject to

the provisions of the Plan without further order of the Bankruptcy Court; *provided further, however*, that distributions may be made to a holder of a Claim or Interest prior to the expiration of the Claims/Interests Objection Deadline if the Liquidation Trust reasonably believes that no basis exists for objection to such holder's Claim or Interest. Notwithstanding the foregoing, nothing in the Plan shall be interpreted to operate as a waiver or release of (x) any right that any Entity or Person may have to object to (a) any Claim or Interest through the Effective Date or (b) any Fee Claim after the Effective Date; or (y) any objection to Claims or Interests pending as of the Effective Date, regardless of whether such objection was brought by the Chapter 11 Trustee or any other Entity or Person.

Objections to Claims or Interests not otherwise deemed Allowed by the Plan shall not be subject to any defense, including, without limitation, *res judicata*, estoppel or any other defense because of the confirmation of the Plan. Additionally, the rights of the Liquidation Trust to amend, modify or supplement any objection to a particular Claim or Interest to include relief pursuant to Bankruptcy Code Section 502(d) are hereby preserved until sixty (60) days after the entry of a Final Order against a holder of such Claim or interest.

**Section 11.3  Estimation of Claims or Interests**.  The Plan provides that, through the Claims/Interests Objection Deadline, the Liquidation Trust may request that the Bankruptcy Court enter an Estimation Order fixing the value of, pursuant to Bankruptcy Code Section 502(c), any Disputed Claim or Interest, regardless of whether a Debtor or the Chapter 11 Trustee has previously objected to such Claim or Interest, provided that a Final Order or unstayed order has not previously been entered by the Bankruptcy Court with respect to such Claim or Interest or any such objection.  Under the Plan, the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim or Interest at any time during litigation concerning any objection to any Disputed Claim or Interest, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court enters an Estimation Order estimating any Disputed Claim or Interest, the amount of such estimation will constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest, as determined by the Bankruptcy Court in the absence of a stay of such order pending appeal.  If a Claim has been estimated for an amount less than the Claim amount asserted and the Claim holder has obtained a stay pending appeal, an amount equal to the difference between the estimated Claim and the Disputed Claim shall constitute the remaining Disputed Claim for which the Disputed Claims Reserve shall be maintained in accordance with Section 8.03 of the Plan.  If the estimated amount constitutes a maximum limitation on such Claim or Interest, the Liquidation Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim or Interest.  All of the aforementioned Claims and Interests objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims or Interests may be estimated and thereafter resolved by any mechanism permitted under the Bankruptcy Code or the Plan.

**Section 11.4  Alleged Equipment Leases.**  The Plan incorporates by reference, as if set forth fully therein, the terms and procedures for resolving disputes with Entities or Persons that allegedly leased equipment to the Debtors for use at their facility in Latrobe, Pennsylvania, set forth in "Exhibit A" to the *Order Under Bankruptcy Code Sections 327, 328(a), 363(b) and (f) and 364(b) and (e) Re Trustee's Motion for Order: (A) Authorizing*

*Employment of Gordon Brothers Industrial LLC and Harry Davis & Company, as Trustee's Exclusive Sales Agent and Approving Form of Agreement; (B) Authorizing the Sale of the Latrobe Plant and Other Property in a Turnkey or Auction Sale Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (C) Authorizing Cash Advance and Repayment from Sale Proceeds Pursuant to Agreement,* entered by the Bankruptcy Court on or about April 12, 2007 (the "Lessor Term Sheet") (Docket Number 1123). A copy of the Order, attendant with the Lessor Term Sheet is attached hereto as Exhibit "E."

**Section 11.5  Amendments to Claims or Interests**. The Plan provides that after the Confirmation Date, a Claim or Interest may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim or Interest solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number, or priority.

**Section 11.6  Authority to Settle Disputed Claims or Interests**. From and after the Effective Date, the Liquidation Trust shall be authorized with respect to those Claims or Interests that are not Allowed by Final Order, pursuant to Federal Rule of Bankruptcy Procedure 9019 and Bankruptcy Code Section 105(a), to compromise and settle Disputed Claims with a Disputed Amount in excess of $25,000.00, upon Bankruptcy Court approval of such settlement. The Plan provides that notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, the Liquidation Trust may settle or compromise any Disputed Claim with a Disputed Amount of $25,000.00 or less without approval of the Bankruptcy Court.

**Section 11.7  No Recourse**. Notwithstanding that the Allowed amount of any particular Disputed Claim or number of Disputed Interests is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount or number for which there is insufficient value in the relevant fund or reserve to provide a recovery equal to that received by other holders of Allowed Claims or Interests in the relevant Class, with respect to such Claim or Interest, no Claim or Interest holder shall have recourse to the Liquidation Trust, the Estates, the Proponents, any member thereof, any of their professionals, the holder of any other Claim or Interest, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim or Interest under section 502(j) of the Bankruptcy Code. **THUS, THE BANKRUPTCY COURT'S ENTRY OF AN ESTIMATION ORDER MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS OR INTERESTS, REGARDLESS OF THE AMOUNT OR NUMBER FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS OR INTERESTS.**

## ARTICLE XII
### Retention of Jurisdiction

**Section 12.1  Retention of Exclusive Jurisdiction by the Bankruptcy Court**. The Plan provides for the Bankruptcy Court to retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, the following purposes:

(i)    to the extent not otherwise determined by the Plan, to (i) determine the Allowance, classification, or priority of Claims upon objection by any Entity or Person entitled to file an objection, or (ii) the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens and other encumbrances against Assets, Estate Causes of Action, or property of the Estates or the Liquidation Trust;

(ii)    to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Entity or Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Entity or Person;

(iii)    to protect the Assets or property of the Estates and/or the Liquidation Trust, including Estate Causes of Action, from claims against, or interference with, such Assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens, security interests or encumbrances on any Assets of the Estates;

(iv)    to determine any and all applications for Allowance of Fee Claims;

(v)    to determine any Priority Tax Claims, Priority Non-Tax Claims, Administrative Claims or any other request for payment of Claims, including both fees and expenses, entitled to priority under Bankruptcy Code Section 507(a) of the Bankruptcy Code;

(vi)    to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of distributions hereunder including any matters arising in connection with Section 7.05 of the Plan;

(vii)    to determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, or to determine any motion to reject an executory contract or unexpired lease pursuant to Article IX of the Plan;

(viii)    except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(ix)    to enter a Final Order closing the Chapter 11 Cases;

(x)    to modify the Plan under Bankruptcy Code Section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(xi)    to issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity or Person, to the full extent authorized by the Bankruptcy Code;

(xii)    to determine any tax liability pursuant to Bankruptcy Code Section 505;

(xiii)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(xiv)    to resolve any disputes concerning whether an Entity or Person had sufficient notice of the Chapter 11 Cases, the applicable Claims bar date, the hearing to consider approval of the Disclosure Statement, or the Confirmation Hearing or for any other purpose;

(xv)    to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(xvi)    to authorize, as may be necessary or appropriate, sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(xvii)    to resolve any disputes concerning any ~~release, discharge,~~ injunction, exculpation or other waiver or protection provided in the Plan;

(xviii)    to approve, if necessary, any distributions, or objections thereto, under the Plan;

(xix)    to approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidation Trust;

(xx)    to resolve any dispute or matter arising under or in connection with the Liquidation Trust;

(xxi)    to order the production of documents, disclosures, or information, or to appear for deposition demanded pursuant to Federal Rule of Bankruptcy Procedure 2004; and

(xxii)    to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code; and

(xxiii)    to adjudicate matters arising under Section 10.04 of the Plan.

**Section 12.2 Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court.** Notwithstanding anything else in the Plan, the Bankruptcy Court shall retain non-exclusive jurisdiction over all Estate Causes of Action prosecuted by the Liquidation Trust

## ARTICLE XIII
### Best Interests Test

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (sometimes called the "Best Interests Test"), the Bankruptcy Code requires that each holder of an Impaired Claim or

Impaired Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine what would be generated from the hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash and cash equivalents available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of Debtors' businesses and the use of chapter 7 for the purposes of a hypothetical liquidation. Any remaining net cash would be allocated to creditors and stockholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

In a chapter 7 liquidation, a trustee in bankruptcy would be appointed and the net amount generated from the liquidation of the Debtors' assets would be reduced by the administrative expenses of both the chapter 7 case and the Chapter 11 Case. The cost of a chapter 7 liquidation would include the fees and commissions of a trustee in bankruptcy, as well as those of counsel and other professionals that might be retained by the trustee in addition to unpaid expenses incurred by the Debtors during the Chapter 11 Case. These expenses and costs would reduce the net proceeds available to holders of Allowed Claims in Chapter 7 liquidation. The hypothetical outcome of the chapter 7 liquidation is then compared with the provisions of the Plan and treatment of each of the Classes of Claims and Interests under the Plan to determine if the Plan is in the best interests of each Creditor or Holder of an Equity Interest.

In these Chapter 11 Cases, there will be liquidation pursuant to the Plan. The Proponents believe that a chapter 11 liquidation will yield a recovery equal to or greater than a chapter 7 liquidation for a number of reasons. The trustee in chapter 7 would liquidate the assets of the Debtors' estates but it is not likely that the Debtors' bottling facility in Latrobe, the principal physical asset, would be liquidated on terms that are better than those under the Plan. Presumably, the trustee in chapter 7 would proceed to offer for sale the Latrobe facility on the same terms as those under which the chapter 11 Trustee has been authorized to retain a broker and sell the facility. Assuming no loss of time is occasioned by a conversion to chapter 7 (which could occur and could reduce the proceeds received from the sale process) the proceeds from the sale of the Latrobe facility would be the same under the Plan and in chapter 7. Those proceeds would, in chapter 7, be distributed to the parties either owning the equipment included in the sale such as the equipment lessors or to the creditors holding a lien and security interest in the assets that are part of the sale. All real property and equipment included in the proposed sale of the Latrobe facility that is not owned by an equipment lessor is subject to liens and security interests in favor of the Lenders. Accordingly, absent a successful challenge to these security interests, or equitable subordination of the Lenders' Claims, all proceeds from the sale of the Latrobe facility would be distributed to either equipment lessors or the Lenders.

Other recoveries in chapter 7 are more speculative. The trustee in chapter 7 could pursue the same Estate Causes of Action as contemplated under the Plan but would require a source of funding in order for the prosecution of those Causes of Action to be undertaken and to be successful. Under the Plan, a source of funding for the pursuit of the Causes of Action has been agreed to as part of the consensual agreements reached by and among the Proponents. Specifically, the Plan provides for proceeds from the disposition of Estate assets to be made available to the Liquidation Trust with the consent of the Lenders holding liens in such proceeds. Alternatively, if such proceeds are not available or not available in sufficient amounts to provide the anticipated funding required by the Liquidation Trust, the Plan provides for an Exit Facility on the terms set forth in the Exit Facility Agreement attached hereto as Exhibit "J" and would be subject to objection and approval in connection with the confirmation of the Plan. The availability of this funding, either through proceeds of assets sales or the Exit Facility, is part of the compromise reflected in the provisions of the Plan. Such funding would not necessarily be available to the trustee in a chapter 7 or may not be available to the chapter 7 trustee on the same terms. Thus, it is not certain whether the trustee in a chapter 7 could obtain the necessary funding to properly investigate, pursue, litigate and successfully conclude the Causes of Action, and any such funding might only be available at significantly higher cost to the chapter 7 estate. Therefore, it is likely that any recoveries from the Estates' Causes of Action that would be received in a chapter 7 would result in distributions to creditors that are materially less than those under the Plan.

In addition, as discussed above, one of the principal features and benefits of the Plan is the compromise and resolution of several complex issues including  (a) the Allowed amount and priority of Secured Claims; (b) the extent to which holders of Secured Claims may successfully assert that they hold Liens on Estate Assets or the proceeds thereof, including Estate Causes of Action; and (c) the extent to which Claims held by holders of Senior Subordinated Notes are structurally and/or contractually subordinated the Claims held by Lenders. In the absence of a Plan and in a chapter 7 liquidation, these issues would not be resolved and would require extensive time-consuming and costly proceedings to litigate. As discussed in greater detail in Section 5.02 above, the issues resolved by these compromises involved complicated legal positions as to which there are genuine, good-faith disputes. The resolution of these matters by means other than compromise and settlement would require extensive discovery and potentially protracted litigation procedures.  The issues include matters requiring factual development and discovery, and full adjudication would require evidentiary hearings, legal briefing, and rulings by the Bankruptcy Court.  Given the substantial amounts involved, the complexity of the legal issues and the consequences of any ruling, it is likely that the parties not prevailing in such adjudications would be economically motivated to file and pursue appeals. The costs and expenses to fully resolve these issues in the absence of a compromise would be astronomical.

For the foregoing reasons, the Proponents believe that the level of recovery by a trustee in chapter 7 would be equal to or substantially less than that under the Plan, and the costs and expenses of pursuing the recoveries and resolving the other issues would be equal to or substantially greater. Therefore, the Proponents believe that the Plan will produce a recovery equal to or greater than what holders of Claims would achieve in a chapter 7 liquidation.

**ARTICLE XIV**
**Feasibility of the Plan**

Bankruptcy law provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. The feasibility standard requires that there is a reasonable probability that the Confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtor or any successor of the Debtor under the Plan, unless liquidation is contemplated under the Plan.

The Plan contemplates and provides for the orderly liquidation of the Estates. The Plan provides for resolution and compromise of issues that otherwise would require litigation and expenditure of available resources and also provides for funding of the Liquidation Trust to allow the pursuit of the Causes of Action described in the Plan. Accordingly, the Proponents believe that the Plan is feasible.

The Plan provides for initial funding of the Liquidation Trust in an amount sufficient to (a) make initial distributions as required by the Plan and (b) establish the Liquidation Trust Reserve in accordance with Section 6.02(g) of the Plan and the Liquidation Trust Agreement. The Liquidation Trust Reserve will be an amount sufficient to satisfy the Liquidation Trust's anticipated future administrative expenses and to permit it to pursue the Estate Causes of Action. The amount of the reserve will be established in accordance with and may be modified from time-to-time by the Liquidation Trust in accordance with the Liquidation Trust Agreement.

Attached hereto as Exhibit "L" are cash flow projections that include the payments that will be made on the Effective Date of the Plan. The Plan provides for the funding of the Liquidation Trust to allow it to make the payments of approved administrative and priority tax claims in accordance with the treatment of those claims under the Plan. The amount of the Initial Trust Funding will be $15,000,000 or such other amount that is necessary to fund required payments under the Plan and to establish the reserves as agreed to by the Plan Proponents and approved by the Bankruptcy Court in the Confirmation Order. The amount of the Initial Funding will include a reasonable estimate of the funds that will be initially required by the Liquidation Trust to undertake the investigation and pursuit of Estate Causes of Action. The Plan includes several alternative sources of funding to pay Administrative and Priority Claims and to fund the Liquidation Trust Reserve in the event the proceeds from sales of assets are not available or inadequate. Specifically, the Plan provides for Cash to be vested in the Liquidation Trust on the Effective Date from any available Cash, the liquidation of Lenders Collateral, and/or advances under the Exit Facility to the extent necessary to establish the amount of the Liquidation Trust Reserve. The terms of the Exit Financing Agreement attached hereto as Exhibit "J" require the advances under the Exit Facility, if necessary, to include the funding of the Liquidation Trust Reserve in the amount of $7,500,000 to satisfy anticipated future administrative expenses, including as modified thereafter in accordance with the Liquidation Trust Agreement (but not in excess of $7,500,000), By these provisions, the Plan provides for funding of the Liquidation Trust in amounts needed to permit it to make the payments required to be made under the Plan with respect to administrative and priority claims and to satisfy anticipated future administrative expenses, funds the anticipated costs of pursuing the Estate Causes of Action, and provides

for primary and alternative sources of funding sufficient to make the required funds available to the Liquidation Trust. Accordingly, the Proponents believe the Plan is feasible.

Attached hereto as Exhibit "M" are certain spreadsheets entitled "Hypothetical Recoveries/Assumptions – Submitted Only to Describe Applications of Formulas Contained In The Plan." The spreadsheets are intended by the Proponents to provide examples of distributable value to various Classes of Claims, based upon hypothetical aggregate recoveries on Estate Causes of Action and other Assets. The spreadsheets are provided only to illustrate the Plan's distribution scheme, and are not intended by the Proponents as predictions of any particular level of recovery on Estate Causes of Action or other Assets.

**ARTICLE XV**
**Risk Factors**

**ALL IMPAIRED HOLDERS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

Parties in interest may object to the classification of Claims. Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor Claim or Interest holder of the Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, and the value of distributions to non-accepting Holders of Claims and Interests within a particular Class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Proponents believe that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.

The confirmation and consummation of the Plan are also subject to certain conditions as described in Article VI of the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests. If an alternative plan could not be agreed to, it is possible that the Debtors would have to liquidate its assets in chapter 7, in which case it is quite possible that holders of Claims and Interests would receive less favorable treatment than they would receive under the Plan.

The Effective Date of the Plan is also subject to certain conditions and even if the Plan is confirmed, the Plan may not become effective if the conditions to the Effective Date do not occur or are not waived.

A party may object to the amount or classification of a Claim. Any estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest whose Claim or Interest is subject to an objection. Any such Claim or Equity Interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

There can be no assurance that the prosecution of the Causes of Action will be successful, or what amounts will be recoverable from the pursuit of the Causes of Action.

There are tax and security risks associated with the use of a Liquidation Trust. Although the Liquidation Trust is being organized and structured in a manner believed to compliant with applicable tax laws and regulations and to minimize taxes where lawfully permissible, there is no assurance that the taxing authorities will agree with the assumptions being made in this regard as to the structure, organization and status of the Liquidation Trust.

In addition, although the Liquidation Trust is intended to be established in a manner that does not constitute the interests in the Liquidation Trust as securities or require registration under or compliance with security laws and regulations, regulators could disagree with or dispute the applicability of security laws. The potential consequences could include challenges to the validity of the Liquidation Trust or, at a minimum, increased compliance cost and greater expense to the operation of the Liquidation Trust.

There is a risk that the assignment or transfer of the Causes of Action, claims and privileges to the Liquidation Trust as contemplated by the Plan could be subject to challenge that, if successful, could nullify the transfer of the Causes of Action, in whole or in part, and result in the Liquidation Trust being unable to pursue those Causes of Action or assert claims or privileges in connection therewith.

The Plan includes provisions that nothing in its provisions or the establishment of the Liquidation Trust and the transfer of Causes of Action to the Liquidation Trust in intended to create or give rise to any claim or preclusion or estoppel in defense of any Causes of Action. Nevertheless, there is a risk that despite such intention and such provisions, there could be a determination that some act or event occurring in connection with the Plan, its implementation and the establishment and operation of the Liquidation Trust will be deemed to create such defenses.

71

There is a risk that the term of the Liquidation Trust will be in adequate to complete the full pursuit and resolution of the Causes of Action.

The Plan and provisions regarding the establishment and operation of the Liquidation Trust require the selection of Liquidation Trustee that is an independent and disinterested Person unanimously designated by the Proponents. There is a risk, despite every effort to select a Person who is qualified to perform the tasks of the Liquidation Trustee, that the Person selected will be less effective than what might have been achieved by continued proceeding in the Chapter 11 Cases.

## ARTICLE XVI
## Certain Federal Income Tax Consequences

Creditors and Interest holders concerned with how the Plan may affect their tax liability should consult with their own accountant, attorney and/or advisor. The following disclosure of possible of tax consequences is intended solely for the purpose of alerting readers to possible tax issues the Plan may present to the Debtors, Creditors and Interest Holders. The Proponents cannot and do not represent that the tax consequences identified below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules that make it difficult to state completely and accurately all of the tax implications. Pursuant to Section 1125(a) of the Bankruptcy Code, a disclosure statement is to include a discussion of the potential material federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims and interest in the case.

The Plan does not contemplate or provide for any continuing operations or income-producing activity by the Debtors. The Debtors may not recognize income as a result of a discharge of debt pursuant to the Plan because Section 108 of the Internal Revenue Code provides that the taxpayers in bankruptcy proceedings do not recognize income from the discharge of debt. However, a taxpayer in a bankruptcy is required to reduce its "tax attributes" by the amount of debt discharged. Tax attributes are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryforwards; (iv) basis in assets; and (v) foreign tax credits.

Under the provisions of the Plan, the Liquidation Trust will be responsible for filing all federal, state, and local tax returns for the Liquidation Trust. The Liquidation Trust will provide reports to holders of beneficial interests in the Liquidation Trust, as the Liquidation Trust Oversight Board deems appropriate.

The Plan sets forth a description of the federal income tax treatment of the Liquidation Trust and Assets that should be reviewed by all creditors and parties voting on the Plan. For federal income tax purposes, it is intended that the Liquidation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries (i.e., holders of Allowed Claims in Class 4A, Class 4B, Class 4C, Class 5, and Class 6). Accordingly, for federal income tax purposes, it is

72

intended that the beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in each of the assets of the Liquidation Trust and then contributed such interests to the Liquidation Trust. For all federal income tax purposes, all parties shall treat the transfer of Assets to the Liquidation Trust for the benefit of the holders of Allowed Claims in Class 4A, Class 4B, Class 4C, Class 5, and Class 6, as (a) a transfer of the assets of the Liquidation Trust directly to the holders of Allowed Claims in Class 4A, Class 4B, Class 4C, Class 5, and Class 6, followed by (b) the transfer by such holders to the Liquidation Trust of the Assets of the Liquidation Trust in exchange for the beneficial interests in the Liquidation Trust. Accordingly, the holders of such Allowed Claims in Class 4A, Class 4B, Class 4C, Class 5, and Class 6 shall be treated for federal income tax purposes as the grantors and owners of their respective share of the Assets of the Liquidation Trust.

The Liquidation Trust will file returns for the Liquidation Trust as a grantor trust pursuant to Treasury regulation Section 1.671-4(a). The Liquidation Trust will annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns. The Liquidation Trust's taxable income, gain, loss, deduction, or credit will be allocated to holders of Allowed Claims in Class 4A, Class 4B, Class 4C, Class 5, and Class 6 in accordance with their relative beneficial interests in the Liquidation Trust. Creditors should be aware that the Plan provides that to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. The Plan provides that any federal, state or local withholding taxes or other amounts required to be withheld under applicable law will be deducted from distributions hereunder.

## ARTICLE XVII
### Alternatives to the Plan

The Proponents believe that the Plan provides Creditors and Holders of Interests with the greatest possible value and earliest possible returns that can be realized on their respective Claims and Interests. The Debtor also believes that the Plan is fair and reasonable in its treatment of all constituencies. The alternatives to Confirmation of the Plan are (i) confirmation of an alternative Plan submitted by a party in interest in the Chapter 11 Cases; (ii) liquidation of the Assets, if necessary, and distribution under chapter 7 of the Bankruptcy Code; and (iii) dismissal of the Chapter 11 Cases. As discussed below, the Proponents believe that the alternatives will be less beneficial to Creditors and Holders of Interests than if the Plan is consummated.

a.    **Alternative Plan**. If the Plan is not confirmed, a party in interest in the Chapter 11 Cases will have an opportunity to file another Plan, but it does not appear that alternative plans are likely to succeed. The Proponents believe that no other Plan would provide Creditors and Holders of Interests with a greater value or earlier recovery than they would be entitled to receive under the Plan. The Proponents have been engaged in extensive negotiations with numerous parties having an interest in the Chapter 11 Cases, and the Plan is

predicated on the resolution of several complex issues that might not be resolved or might be resolved differently under an alternative plan. The Proponents have no reason to believe that any further negotiations regarding a plan of reorganization with any of these parties would lead to any alternative plan of reorganization that would provide greater recoveries that could be confirmed within a reasonable period of time and without protracted litigation and additional administrative expense.

      **b.**      **Chapter 7 Liquidation**. A chapter 7 liquidation of the Debtors' Assets and liabilities could be carried out with the anticipated results described above. For the reasons set forth above, the Proponents believe that the Distributions to Creditors under the Plan will be greater and earlier than the distributions that might result after conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

      **c.**      **Dismissal**. Upon dismissal of the Chapter 11 Cases, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Creditors. Therefore, the Proponents believe that dismissal of the Chapter 11 Cases is not a viable alternative to confirmation of the Plan.

### ARTICLE XVIII
### Recommendations

It is the position of the Proponents that the Plan is substantially preferable to any other plan, to liquidation under chapter 7 of the Bankruptcy Code or to a dismissal of these Chapter 11 Cases. Conversion of this Chapter 11 Cases to a chapter 7 proceeding would result in substantial delays in the distribution of proceeds available under such an alternative, and significantly increase administrative costs, including trustee's fees, expenses and commissions, and, therefore, would materially reduce Creditor recovery.

The Proponents recommend that you vote in favor of the Plan

### ARTICLE XIX
### Conclusion

It is important that you exercise your right to vote on the Plan. It is the Proponents' belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Interests in the Debtors.

### [REMAINDER OF PAGE INTENTIONALLY BLANK]

Dated: June 18, 2007

**OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**


s/ David K. Rudov_____
**RUDOV & STEIN, P.C.**
David K. Rudov
100 First Avenue, Suite 500
Pittsburgh, PA 15222
(412) 281-7300


-and-


**LOWENSTEIN SANDLER PC**
Kenneth A, Rosen
John K. Sherwood
Sharon L. Levine
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500



**AD HOC COMMITTEE OF
SECURED LENDERS**


__s/ James G. McLean_____
**MANION MCDONOUGH & LUCAS P.C.**


James G. McLean
600 Grand Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200


-and-


**BROWN RUDNICK BERLACK
ISRAELS LLP**
Edward S. Weisfelner
Robert J. Stark
7 Times Square
New York, NY 10036
(212) 209-4800


75

AD HOC  NOTEHOLDERS' COMMITTEE


  s/ Joel Walker _____
**DUANE MORRIS LLP**
Joel Walker
Jeffrey Spear
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2811
(412) 497-1000


-and-


  s/ Matthew Williams _____
**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
Thomas Moers Mayer
Matthew J. Williams
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100