# Exhibit E

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No.06-25454 (MBM) |
| LE-NATURE'S, INC., et al., | ) | (Jointly Administered) |
| | ) | |
| | ) | Relates to Docket Nos. 1282, 1328 |
| Debtors. | ) | |
| | ) | Hearing Date & Time: |
| | ) | August 21, 2007 at 3:00 p.m. (EST) |

**SUPPLEMENTAL RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, THE *AD HOC* COMMITTEE OF SECURED LENDERS, AND THE
*AD HOC* COMMITTEE OF SENIOR SUBORDINATED NOTEHOLDERS TO
(A) COURT'S ORDER TO SHOW CAUSE WHY CASES SHOULD NOT BE
DISMISSED AND (B) MOTION OF WACHOVIA BANK, NATIONAL
ASSOCIATION TO CONVERT CASES TO CHAPTER 7**

The duly appointed Official Committee of Unsecured Creditors (the "Official Creditors' Committee") of Le-Natures, Inc. and affiliated Chapter 11 debtors (collectively, the "Debtors"), the *Ad Hoc* Committee of Secured Lenders (the "Lenders' Committee") and the *Ad Hoc* Committee of Senior Subordinated Noteholders (the "Noteholders' Committee" and, together with the Official Creditors' Committee and the Lenders' Committee, the "Plan Proponents"), by and through their respective undersigned counsel, hereby file this Supplemental Response to (a) the Court's May 31, 2007 Order to Show Cause why the Debtors' cases should not be dismissed ("Order to Show Cause") and (b) the Motion of Wachovia Bank, National Association to Convert Cases to Chapter 7 ("Wachovia Motion to Convert").[1]  In support of their Supplemental Response, the Plan Proponents respectfully state as follows:

---

[1]    The Plan Proponents incorporate by reference all other pleadings filed in response to the Order to Show Cause and the Wachovia Motion to Convert. Many of the issues addressed herein were previously addressed in those pleadings and other pleadings previously filed in these cases.

## PRELIMINARY STATEMENT

1.    The Plan Proponents have filed and are prepared to seek confirmation of an eminently confirmable plan – the *Second Amended Joint Chapter 11 Plan of Liquidation of the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Secured Lenders, and the Ad Hoc Committee of Senior Subordinated Noteholders*, dated June 18, 2007 (the "Plan") [Docket No. 1377]. The Chapter 11 Trustee supports the Plan. It is the product of extensive and complex negotiations, and embodies compromises of a number of inter-creditor disputes that could otherwise take years to resolve. More importantly, however, the Plan provides an opportunity for all creditors – secured and unsecured alike – to recover what was lost in the massive fraud that led to Le-Nature's momentous collapse. Proceeding towards confirmation will finally allow creditors and this Court to turn focused and undivided attention towards those parties that bear responsibility for the great losses suffered by the estates' creditors. If, on the other hand, these cases are dismissed, unsecured creditors will not have a unified means to pursue the necessary litigation, and if these cases are converted to Chapter 7, it is unclear whether the plaintiff (the Chapter 7 Trustee) would be adequately funded.

2.    The Plan Proponents file this Supplemental Response primarily to address the concerns of this Court that there is an insufficient record and explanation of the Plan distribution mechanics and, more specifically, how unsecured creditors will receive value from the Plan. Although the issues and negotiations with respect to the Plan were admittedly difficult and complex, the Plan distribution mechanisms are relatively straightforward, as will be demonstrated herein.

3.    The Plan Proponents also file this Supplemental Response to affirm that the Plan is ready for voting and confirmation, and therefore neither dismissal nor conversion of these cases is appropriate or necessary. The objections raised by the only known Plan objector –

2

Wachovia Bank, National Association ("Wachovia") – have been reduced down to five remaining confirmation objections, none of which have merit.[2]

## DISCUSSION

**I.    Plan Distribution Mechanics[3]**

### A.    Litigation Trust

4.    The centerpiece of the Plan is the creation of a Liquidation Trust to be vested with all estate assets, including estate causes of action. See Plan § 7.02. The Liquidation Trust will have the exclusive right to pursue estate causes of action and the non-exclusive right to object to claims, and will be charged with all administrative functions for winding-up the Chapter 11 cases. See id. §§ 7.02, 7.05(a), 10.02(b).

5.    The Liquidation Trust will be managed by a Liquidation Trustee. See Plan § 7.02. The Plan also provides for the creation of a seven-member Liquidation Trust Oversight Board (the "Oversight Board") comprised of members of each creditor constituency, as follows:  four Lender representatives, two Unsecured Creditor representatives, and one Subordinated Noteholder representative. See id. § 7.02(e)(i). Subject to its fiduciary duties, the Liquidation Trustee will generally follow the direction of the Oversight Board (by majority vote) with regard to any material decisions. See id. § 7.02(e)(ii).

6.    To the extent that a minority of the Oversight Board (in particular, the unsecured creditor representatives) disagrees with certain important Oversight Board decisions, the dissenting minority is entitled to retain counsel, seek discovery, and request this Court's

---

[2]    Although this Court has stated its preference for resolving all confirmation-related issues prior to approval of the Disclosure Statement, the Plan Proponents emphasize that none of Wachovia's extant objections relate to the adequacy of the Disclosure Statement with respect to the Plan.

[3]    The discussion herein concerning the Plan is, and is intended to, provide only a summary of the pertinent Plan provisions. To the extent that anything stated herein conflicts with the terms of the Plan, the Plan controls.

3

intervention *at the Trust's expense*. For example, if the Oversight Board determines that the Trust should settle estate litigation at a particular amount or under particular terms, and the unsecured creditor representatives on the Oversight Board do not agree with such settlement, they may retain counsel *at the Trust's expense* to oppose approval of such settlement by this Court. See Plan § 7.05(c).

**B.    Trust Funding**

7.    The Plan requires initial trust funding of $15 million or such lesser amount agreed upon by the Plan Proponents. See Plan § 1.01 (definition of "Initial Trust Funding"). The Initial Trust Funding (i.e., the funding on the effective date of the Plan) will be provided by (a) unencumbered estate assets,[4] (b) contribution of the collateral of Lenders (except for those Lenders holding Wachovia Claims[5]), and/or (c) borrowing under the Exit Facility.[6] See id. A significant aspect of the Plan is that Lenders (except for holders of Wachovia Claims) will contribute their collateral on the Effective Date to the Liquidation Trust for Initial Trust Funding and, thereafter, to "refresh" the $7.5 million Trust reserve as determined necessary by the Liquidation Trustee. This contribution effectively provides a covenant free, interest-free loan by the Lenders to the Trust, for the benefit of all unsecured creditors, and will provide funding for the Liquidation Trust to pursue estate causes of action.

---

[4]    At this time, the Plan Proponents do not know whether any unsecured value is available for Initial Trust Funding.

[5]    The Plan defines Wachovia Claims as "all Lenders Claims for which: (i) Wachovia was the record holder (in its individual capacity) on March 8, 2007 or any time thereafter; and (ii) that is not the subject of a Trade Placement occurring before the close of business February 14, 2007." Plan § 10.01.

[6]    The Exit Facility consists of a $15 million term loan, providing to the exit lenders interest at a rate of LIBOR +3 plus an additional 5% of litigation recoveries unencumbered by existing liens. The Exit Credit Agreement contains minimal covenants and there are no foreclosure rights provided to the exit lenders.

4

C.    **Creditor Interests**

8.    Under the Plan, creditors will receive uncertificated, non-transferable beneficial interests in the Liquidation Trust on account of their allowed claims. The interests will be assigned as set forth below:

- Tier One Interests:  Secured Lenders

- Tier Two Interests: Unsecured Claims -- Lender Deficiency Claims, General Unsecured Claims, Subordinated Noteholder Claims

- Tier Three Interests:  510(b) Subordinated Litigation Claims

- Tier Four Interests:  Equity Interests

See Plan Art. V.

D.    **Distribution Scheme ("Waterfall")**

9.    The distribution of estate assets under the Plan (after satisfaction of administrative and priority claims) is governed by a priority "waterfall" mechanism, which is described below and illustrated in greater detail on the charts attached hereto as Exhibit A.

i.    **Determination of Secured Claims**

10.    The first level of determination for the distribution of estate assets is whether those assets are subject to the liens of the Lenders. If the estate assets are subject to the Lenders' liens, then those assets will be distributed pro rata to the Lenders on account of their Tier One Interests.[7] If, however, the assets are not subject to the Lenders' liens, then those assets will be distributed to unsecured creditors holding Tier Two Interests.

---

[7]    The Lenders Secured Claims, evidenced by the Tier One Interests, encompass the Lenders' claims secured by (a) their pre-petition liens (e.g., the Latrobe assets) and (b) their post-petition replacement liens on account of (i) the use of their cash collateral in these cases and (ii) the diminution of value of their collateral during the cases. See Plan § 1.01 (definition of "Lenders Secured Claims"). For purposes of the distribution illustrations on Exhibit A only, the Plan Proponents have used a hypothetical estimate of Lenders Secured Claims of $32.5 million in the aggregate.

5

11.     Because a substantial amount of the assets expected to be distributed by the Liquidation Trust will be the proceeds of litigation, the Plan Proponents resolved in the Plan the extent to which Lenders could assert a lien on such proceeds.    Specifically, the Plan stipulates, and the Lenders agreed as part of the compromises reached in the Plan, that any estate tort claims and any substantially related claims (and the proceeds thereof) will <u>not</u> be subject to the Lenders' liens.    <u>See</u> Plan § 1.01 (definition of "Lenders Secured Causes of Action"). Therefore, the Liquidation Trust's recoveries on litigation will generally be distributed pro rata to unsecured creditors, with the proviso that Lenders have retained the right to argue that they have a lien on litigation recoveries traceable to their collateral.    <u>See id.</u>    By way of illustration, Lenders do not retain the argument that their liens attach to proceeds from settlements, judgments, or awards of tort or similar damage claims (because awards of damages are not traceable recoveries of the Lenders' collateral), but Lenders do retain the right to argue (and all parties retain the right to challenge the argument) that their liens attach to the traceable recoveries of collateral that were, for example, converted or fraudulently conveyed to third parties.    In short, unsecured creditors will share in the proceeds of the estate assets with perhaps the greatest value – litigation claims against those that are responsible for the collapse of Le-Nature's.[8]

### ii.    Distributions to Unsecured Creditors

12.     Distributions to unsecured creditors – those creditors holding Tier Two Interests – will be made on a pro rata basis according to the respective claim amounts.    <u>See</u> Plan §§ 5.04(c), 5.05(c), 5.06(c).    As noted, this Tier consists of General Unsecured Claims,

---

[8]     In this regard, the Plan Proponents note that their expectation of substantial estate recoveries from tort actions has a strong empirical basis.    Indeed, just in the past several weeks, the Chapter 11 estate of Adelphia Communications Corp. settled a suit against its accountants for over $160 million, and a Florida jury determined that an auditor must pay over $500 million in damages for failing to detect the fraud that led to the collapse of one of its former clients.

Noteholder Claims and Lenders' Unsecured Deficiency Claims. Thus, the Plan provides for the pro rata sharing of what is likely to be the estates' primary value between secured and unsecured creditors.

13.    One exception to that general principal is that the Plan also provides for the reallocation and distribution to Lenders of certain amounts otherwise owing on account of Noteholder Claims ("Turnover Enforcement"), as part of a compromise regarding the extent to which such claims are contractually subordinated to Lender claims under the terms of the Subordinated Noteholders' Indenture.[9]  See Plan § 5.06(c).  Pursuant to Section 5.06(c) of the Plan, the Turnover Enforcement operates as follows:

- All distributions that are otherwise owing on account of Subordinated Noteholder claims will be distributed to Lenders, until the Lenders receive $110 million in the aggregate on account of their claims.

- After Lenders have received $110 million in distributions, Subordinated Noteholders will receive the next $15 million owing on account of their claims without any Turnover Enforcement.

- Thereafter, distributions on account of Subordinated Noteholder claims will be reallocated and distributed to Lenders at varying percentages corresponding with the aggregate payments made on account of Lender claims, as set forth below:

| Aggregate Payments On Account Of Lender Claims | Percentage Turnover Enforcement To Lenders | Percentage Retained By Noteholders |
|---|---|---|
| Less than $175 million | 50% | 50% |
| $175 million to $200 million | 45% | 55% |
| $200 million to $225 million | 40% | 60% |
| $225 million to $250 million | 35% | 65% |
| $250 million to $280 million | 30% | 70% |
| Greater than $280 million | 25% | 75% |

---

[9]    The sharing formula embedded in the Plan represents the settlement of a dispute regarding the extent to which the contractual subordination provision in the Subordinated Notes' Indenture can be enforced by Lenders, another of the compromises reached as part of the Plan.

7

The pro rata distributions to General Unsecured Creditors are not affected by this sharing formula between the Lenders and the Noteholders.

14.    If the unsecured claims represented by Tier Two Interests are satisfied in full, the Liquidation Trust will thereafter distribute estate assets pro rata on account of claims represented by Tier Three Interests (litigation claims subordinated under Section 510(b)). See Plan § 5.07(b). Then, if the claims represented by Tier Three Interests are satisfied in full, the Liquidation Trust will thereafter distribute estate assets pro rata on account of allowed equity interests, represented by Tier Four Interests. See id. § 5.08(b).

15.    Hypothetical scenarios showing distributions at various recovery levels are attached to the Disclosure Statement at Exhibit M, attached hereto as Exhibit C for ease of reference.

## II.    Wachovia's Remaining Plan Objections

16.    Although Wachovia initially raised a litany of objections to the Plan, through its Objection and Supplemental Objection to the Plan Proponents' Disclosure Statement, the Plan Proponents have removed most of those objections through modifications to the original Plan. Wachovia's only remaining objections are: (a) the Plan improperly releases Wachovia's contractual rights of subordination against the Subordinated Noteholders; (b) the Plan improperly releases Lenders (excluding Wachovia and those holding Wachovia Claims) from avoidance actions; (c) that not treating Wachovia Claims as allowed constitutes unfair discrimination; (d) the Plan improperly provides for substantive consolidation of the Debtors' estates; and (e) the Plan is not feasible on account of the $21 million claim asserted by the Internal Revenue Service

("IRS"). The Plan Proponents will briefly discuss each objection in turn (but reserve the right to further brief and try these issues as part of the Plan process).[10]

### A.    Subordination Compromise

17.    Wachovia contends that the Plan impermissibly releases Wachovia's subordination rights against the Subordinated Noteholders, and thereby violates Section 524(e) of the Bankruptcy Code. Even assuming the contractual subordination provisions currently entitle the Lenders to full seniority (a contention disputed by the Noteholders), the applicable provisions of the Lenders' pre-petition secured credit agreement (the "Credit Agreement"), attached hereto as Exhibit B, dispel this argument, as they unequivocally permit the Required Lenders -- those holding a majority of the bank debt -- to compromise the extent to which the Subordinated Noteholders are subordinated in right of payment to the Lenders. See Credit Agreement § 6.8 (a majority of Lenders may consent to modification of subordination of the Subordinated Notes); § 9.1 (a majority of Lenders may waive defaults under § 7.1(l) arising from the Subordinated Notes' subordination ceasing to be effective; affirmation that Lenders' class vote on a plan supersedes any unanimous consent provisions in the Credit Agreement). Case law and other persuasive authority confirm this point. See Bartle v. Markson Bros., 314 F.2d 303, 305 (2d Cir. 1963); 7 Collier on Bankruptcy ¶ 1129.03[7][c][v] (15th ed. rev. 2004) ("Once the relationship is established between the debtor and the subordination agreement, the rights of senior creditors vis-à-vis subordinated creditors might be effected, provided that two-thirds in amount and a majority in number of the senior class, voting for or against the plan, accept the plan."); Ordin on Contested Confirmation § 6.11[B] ("The bulk of the authority suggests that the

---

[10]    The Plan Proponents have already addressed many of these issues in their *Reply to Objections to Approval of Proposed Disclosure Statement* dated April 24, 2007 [Docket No. 1158].

Bankruptcy Court has the power to bind non-consenting senior lenders to a plan that extinguishes their subordination rights.").

18.    Moreover, to the extent that the Plan constitutes a Rule 9019 settlement of difficult and complex issues surrounding contractual subordination, Wachovia's objection point is deemed by the law settled and moot if the settlement is approved. See In re Best Prods. Corp., 168 B.R. 35, 71-2 (Bankr. S.D.N.Y. 1994) ("Since the LBO Action is being compromised in a settlement which I am approving, the appropriate value to affix to the LBO Action [for Section 1129(a)(7)(A)(ii) purposes] is the amount of the compromise."); see also Martin J. Bienenstock, Bankruptcy Reorganization at 617 (1987) ("Once the court determines to approve the settlement, the claims and the values paid to satisfy them may be deleted from the model and the best interest of creditors test may be applied to the balance of the claims and values available.").

### B.    Lenders Release From Avoidance Action

19.    Wachovia contends that the Plan inappropriately releases avoidance actions against Lenders.  However, Section 1123(b)(3)(A) allows a plan to provide for the settlement or release of estate claims against parties-in-interest.  In this Circuit, the key factor in determining whether such a release is appropriate is whether the released party has made a "substantial contribution" to the plan.  See Gillman v. Continental Airlines ( In re Continental Airlines), 203 F.3d 203, 217 n. 17 (3d Cir. 2000); In re Coram Healthcare Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004).  Here, the Lenders (other than holders of Wachovia Claims) are directly contributing their collateral to fund the Liquidation Trust.  That funding, in turn, will allow the Liquidation Trust to pursue estate causes of action for the benefit of all creditors.  Therefore, the Lenders' limited release from avoidance actions pursuant to the Plan is eminently justified and permissible under applicable precedent.

C.    **Treatment Of Wachovia Claims**

20.    Wachovia contends that, because its claims are not deemed allowed under the Plan, its claims are subject to unfair discrimination under Section 1123(a)(4). But unfair discrimination is concerned with the differential treatment of <u>allowed</u> claims under a plan, not whether a claim is allowed, disputed or, in this case, treated in a neutral fashion. <u>See, e.g., Enron Corp. v. New Power Co. (In re New Power Co.)</u>, 438 F.3d 1113, 1122-23 (11th Cir. 2006) ("[D]elayed receipt of distributions to members of a class whose claims remain disputed does not, in and of itself, violate § 1123(a)(4)."); <u>Bustop Shelters v. Classic Homes, Inc.</u>, 914 F.2d 810, 814 n.7 (6th Cir. 1990) ("[T]he requirement of 11 U.S.C. § 1123(a)(4) that all claims or interest of the same class receive the same 'treatment' does not appear to be violated by the escrowing of one class member's payments pending the outcome of disputes over the claim's validity."). More significantly, however, is that Wachovia's claims, if they are allowed, may actually fare better than the claims of other Lenders. Whereas Lenders are contributing their collateral to the Liquidation Trust and taking the attendant risks of an uncertain payment of their secured claims, Wachovia's collateral will be placed in a reserve and the payment of its secured claim, if allowed, is not subject to such risks.

D.    **Substantive Consolidation**

21.    Wachovia contends that the Plan Proponents have provided an insufficient factual record to justify the substantive consolidation of the estates. The Plan Proponents have already negated this objection by providing distributions in the Plan that lead to the same economic result as a plan with non-consolidated estates. Specifically, the Plan provides for the assets of Debtors Tea Systems International, LLC ("TSI") and Le-Nature's Holdings, Inc. ("Holdings") to be distributed to the Lenders and the Subordinated Noteholders on account of the guarantees provided for in the Credit Agreement and Subordinated Noteholder Indenture,

respectively.  See Plan §§ 5.04(c), 5.06(c).  Aside from these guarantee claims, no other claims are presently asserted against TSI or Holdings.[11]

E.      **Feasibility**

22.     Wachovia argues that the Plan Proponents have failed to establish that the Plan is feasible, chiefly because they have not explained how the $21 million IRS priority tax claim ("IRS Claim") will be paid.  On June 25, 2007, the Chapter 11 Trustee filed an objection to the IRS Claim, asserting that, based on amended tax returns, the estates have no tax liability to the IRS.  As the Trustee reported to the Court on August 9, 2007, the Trustee is in discussions with the IRS regarding the withdrawal of the IRS Claim, and the estates may in fact be owed money from the IRS by way of a tax refund.  Based on their discussions with the Trustee, the Plan Proponents believe this issue will be obviated shortly.  Accordingly, Wachovia's argument with respect to feasibility is unsustainable.

---

[11]      In fact, as reported by the Chapter 11 Trustee, neither Holdings nor TSI apparently ever conducted any business, and Holdings was only formed a few months prior to the bankruptcy filing.

## CONCLUSION

The Plan Proponents have filed an eminently confirmable Plan that provides unsecured creditors with their best opportunity for a meaningful recovery.  The only substantive matter to be resolved prior to confirmation of the Plan is the adjudication of Wachovia's remaining objections, which, as discussed herein, can be readily overruled.  Accordingly, the Plan Proponents respectfully submit that these cases should not be dismissed or converted to cases under Chapter 7, and respectfully request that this Court schedule a hearing to consider approval of the Disclosure Statement with respect to the Plan.

Dated: August 16, 2007
      Pittsburgh, Pennsylvania

                                               **OFFICIAL COMMITTEE OF**
                                               **UNSECURED CREDITORS**

                                               ____ s/ David K. Rudov_____
                                               **RUDOV & STEIN, P.C.**
                                               David K. Rudov
                                               100 First Avenue, Suite 500
                                             Pittsburgh, PA 15222
                                           (412) 281-7300

                                           - and -

                                           **LOWENSTEIN SANDLER PC**
                                           Kenneth A. Rosen
                                           John K. Sherwood
                                           Sharon L. Levine
                                           65 Livingston Avenue
                                           Roseland, NJ 07068
                                           (973) 597-2500

                                           ***AD HOC* COMMITTEE OF SECURED**
                                           **LENDERS**

                                           ___ s/ James G. McLean_____
                                           **MANION  MCDONOUGH  &  LUCAS**
                                         **P.C.**
                                           James G. McLean

13

600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

- and -

**BROWN RUDNICK BERLACK
ISRAELS LLP**
Edward S. Weisfelner
Robert J. Stark
Daniel J. Saval
7 Times Square
New York, NY 10036
(212) 209-4800


*AD HOC* **COMMITTEE OF SENIOR
SUBORDINATED NOTEHOLDERS**

**DUANE MORRIS LLP**
William S. Katchen
Joel Walker
Jeffrey Spear
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2811
(412) 497-1000

-and-


_____s/ Matthew J. Williams_____
**KRAMER LEVIN NAFTALIS
& FRANKEL LLP**
Thomas Moers Mayer
Matthew J. Williams
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

14

# EXHIBIT
## "A'

# LE-NATURE'S : PLAN DISTRIBUTIONS



**LIQUIDATION TRUST**
$15 mm initial funding

**RESERVE**
$7.5 mm

**ADMINISTRATIVE CLAIMS**
Estimated at $2.5 mm
Paid on Effective Date

**PRIORITY CLAIMS**
Estimated at $2 mm
Paid on Effective Date

**TIER 1**

**LENDERS SECURED CLAIMS:** Estimated at $32.5 mm **
- Paid when cash is available
- Cash Collateral Usage: Estimated at $15 mm
- Diminution of Collateral: Stipulated at $7.5 mm
- Proceeds of Collateral as Liquidated (e.g., Latrobe assets): Estimated at $10 mm
- *Liens do not attach to tort claims and similar claims*

**TIER 2**

**LENDERS UNSECURED DEFICIENCY CLAIMS**
- Paid When Cash Available
- Pro Rata Distribution + Allocation from Noteholder Per Sharing Formula

**GENERAL UNSECURED CLAIMS**
- Paid When Cash Available
- Pro Rata Distribution
- Unaffected by sharing formula between Lenders and Noteholders

**NOTEHOLDERS CLAIMS**
- Paid When Cash Available
- Pro Rata Distribution Per Sharing Formula with Lenders

**TIER 3**

**510 SUBORDINATED CLAIMS**
- Paid When Cash Available

**TIER 4**

**ALLOWED EQUITY INTERESTS**
- Paid When Cash Available

** Presumes no additional collateral proceeds for Lenders obtained after the Effective Date. If there are additional proceeds subject to Lenders' liens, those proceeds are paid to Lenders under Tier 1 and the Lenders' unsecured deficiency claim is reduced under Tier 2.

## Hypothetical Distribution Illustration:
## First Recovery of $250 mm (From Tort Actions)



**LIQUIDATION TRUST**
$7.5 mm placed in reserve; $242.5 mm remaining

**ADMINISTRATIVE CLAIMS**
Will have been paid on Effective Date

**PRIORITY CLAIMS**
Will have been paid on Effective Date

**TIER 1**
**$32.5mm**

**LENDERS SECURED CLAIMS**
- Lenders' liens do not attach to recoveries
- However, Lenders Secured Claim – $32.5 mm (estimated) – paid on account of (a) deferment on payment of Lenders' replacement lien claims and (b) contribution of Lenders' collateral to initial trust funding
- *$210 mm remaining for distributions to unsecured creditors*

**TIER 2**
**$210mm**

**LENDERS UNSECURED DEFICIENCY CLAIMS**
*$92 mm (approx.) recovery* – assuming $245.5 mm in claims and applying Turnover Enforcement

**GENERAL UNSECURED CLAIMS**
*$90 mm (approx.) recovery* – assuming $300 mm in claims

**NOTEHOLDER CLAIMS**
*$28 mm (approx.) recovery* – assuming $150 mm in claims and applying Turnover Enforcement**

**TIER 3**

**510 SUBORDINATED CLAIMS**

**TIER 4**

**ALLOWED EQUITY INTERESTS**

**Noteholders do not retain distributions until Lenders receive $110 mm (less pro rata portion of any Wachovia Claim disallowed).

# EXHIBIT

# "B'

Section 6.5    Advances, Investments and Loans.

Each of the Credit Parties will not, nor will it permit any Subsidiary to, make any Investment except for Permitted Investments.

Section 6.6    Transactions with Affiliates.

Except as permitted in subsection (iv) of the definition of Permitted Investments, each of the Credit Parties will not, nor will it permit any Subsidiary to, enter into any transaction or series of transactions, whether or not in the ordinary course of business, with any officer, director, shareholder or Affiliate other than on terms and conditions substantially as favorable as would be obtainable in a comparable arm's-length transaction with a Person other than an officer, director, shareholder or Affiliate.

Section 6.7    Ownership of Subsidiaries; Restrictions.

Each of the Credit Parties will not, nor will it permit any Subsidiary to, create, form or acquire any Subsidiaries, except for Domestic Subsidiaries which are joined as Additional Credit Parties in accordance with the terms hereof. The Borrower will not sell, transfer, pledge or otherwise dispose of any Capital Stock or other equity interests in any of its Subsidiaries, nor will it permit any of its Subsidiaries to issue, sell, transfer, pledge or otherwise dispose of any of their Capital Stock or other equity interests, except in a transaction permitted by Section 6.4.

Section 6.8    Fiscal Year; Organizational Documents; Material Contracts.

Each of the Credit Parties will not, nor will it permit any Subsidiary to, change its fiscal year or its accounting policies except to comply with changes in GAAP. Each of the Credit Parties will not, nor will it permit any Subsidiary to, amend, modify or change its articles of incorporation (or corporate charter or other similar organizational document) or bylaws (or other similar document) without the prior written consent of the Required Lenders. Each of the Credit Parties will not, nor will it permit any Subsidiary to, without the prior written consent of the Administrative Agent, amend, modify, cancel or terminate or fail to renew or extend or permit the amendment, modification, cancellation, termination of any of the Material Contracts, except in the event that such amendments, modifications, cancellations, terminations or failure to renew could not reasonably be expected to have a Material Adverse Effect. The Borrower will not, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders, amend, modify, waive or extend or permit the amendment, modification, waiver or extension of any Subordinated Indebtedness or of any documentation governing or evidencing such Subordinated Indebtedness (including, without limitation, the Subordinated Notes or the Subordinated Note Indenture) in a manner that is adverse to the interests of the Lenders. The Borrower will not, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders, amend, modify, waive or extend or permit the amendment, modification, waiver or extension of any documentation governing or evidencing the Preferred Stock in a manner that is adverse to the interests of the Lenders.

CHARI904670v16

86

institution that is not a Revolving Lender. Each of the Credit Parties will not, nor will it permit any Subsidiary to, open, maintain or otherwise have any securities accounts or any non-primary checking, savings or other deposit accounts at any bank or other financial institution, or any other non-primary account where money is or may be deposited or maintained with any Person, other than (a) the accounts set forth on Schedule 6.15 and designated as unrestricted accounts; provided that the average daily balance in any such account for any calendar month does not exceed $250,000 and the aggregate average daily balance in all such accounts for any calendar month does not exceed $1,000,000, (b) deposit accounts that are subject to deposit account control agreements in form and substance acceptable to the Administrative Agent, (c) securities accounts that are subject to securities account control agreements in form and substance acceptable to the Administrative Agent, (d) deposit accounts established solely as payroll and other zero balance accounts, (e) deposit accounts and/or securities accounts held with a Lender and (f) deposit accounts, so long as the aggregate average daily balance in any such account does not exceed $250,000 and the aggregate average daily balance in all such accounts does not exceed $1,000,000.

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.1    Events of Default.

An Event of Default shall exist upon the occurrence of any of the following specified events (each an "Event of Default"):

(a)    The Borrower shall fail to pay any principal on any Loan when due in accordance with the terms thereof or hereof; or the Borrower shall fail to reimburse the Issuing Lender for any LOC Obligations when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or any fee or other amount payable hereunder when due in accordance with the terms thereof or hereof and such failure shall continue unremedied for three (3) Business Days (or any Guarantor shall fail to pay on the Guaranty in respect of any of the foregoing or in respect of any other Guaranty Obligations thereunder within the aforesaid period of time); or

(b)    Any representation or warranty made or deemed made herein, in the Security Documents or in any of the other Credit Documents or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement shall prove to have been incorrect, false or misleading in any material respect on or as of the date made or deemed made; or

(c)    (i) Any Credit Party shall fail to perform, comply with or observe any term, covenant or agreement applicable to it contained in Section 5.4, Section 5.7(a), Section 5.9 or Article VI hereof; or (ii) any Credit Party shall fail to comply with any other covenant, contained in this Credit Agreement or the other Credit Documents or any other agreement, document or instrument among any Credit Party, the Administrative

(l)    Any default (which is not waived or cured within the applicable period of grace) or event of default shall occur under any document governing or evidencing any Subordinated Indebtedness or the subordination provisions contained therein shall cease to be in full force and effect or to give the Lenders the rights, powers and privileges purported to be created thereby.

## Section 7.2    Acceleration; Remedies.

Upon the occurrence of an Event of Default, then, and in any such event, (a) if such event is an Event of Default specified in Section 7.1(e) above, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon), and all other amounts under the Credit Documents (including without limitation the maximum amount of all contingent liabilities under Letters of Credit) shall immediately become due and payable, and (b) if such event is any other Event of Default, any or all of the following actions may be taken: (i) with the written consent of the Required Lenders, the Administrative Agent may, or upon the written request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; (ii) the Administrative Agent may, or upon the written request of the Required Lenders, the Administrative Agent shall, by notice of default to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes to be due and payable forthwith and direct the Borrower to pay to the Administrative Agent cash collateral as security for the LOC Obligations for subsequent drawings under then outstanding Letters of Credit in an amount equal to the maximum amount of which may be drawn under Letters of Credit then outstanding, whereupon the same shall immediately become due and payable; (iii) exercise any rights or remedies of the Administrative Agent or the Lenders under this Agreement or any other Credit Document, including, without limitation, any rights or remedies with respect to the Collateral; and (iv) exercise any rights or remedies available to the Administrative Agent or Lenders under applicable law.

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT

### Section 8.1    Appointment.

Each Lender hereby irrevocably designates and appoints Wachovia as the Administrative Agent of such Lender under this Credit Agreement, and each such Lender irrevocably authorizes Wachovia, as the Administrative Agent for such Lender, to take such action on its behalf under the provisions of this Credit Agreement and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Credit Agreement, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Credit Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties,

or further act or deed on the part of such former Administrative Agent or any of the parties to this Credit Agreement or any holders of the Notes. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in Charlotte, North Carolina or New York, New York, or an affiliate of such bank. If no successor Administrative Agent has accepted appointment as Administrative Agent by the date which is 45 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 8.9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Credit Agreement.

**Section 8.10   Other Agents; Arrangers.**

Except as otherwise expressly stated herein, any agent (other than the Administrative Agent) or arranger listed from time to time on the cover page of this Credit Agreement shall have no obligations, responsibilities or duties under this Credit Agreement or under any other Credit Document other than obligations, responsibilities and duties applicable to all Lenders in their capacity as Lenders; provided, however, that such agents and arrangers shall be entitled to the same rights, protections, exculpations and indemnifications granted to the Administrative Agent under this Article VIII in their capacity as an agent or arranger.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.1   Amendments, Waivers and Release of Collateral.**

Neither this Agreement, nor any of the other Credit Documents, nor any terms hereof or thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this Section. The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent may, from time to time, (a) enter into with the Borrower written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, waiver, supplement, modification or release shall:

(i)    reduce the amount or extend the scheduled date of maturity of any Loan or Note or any installment thereon, or reduce the stated rate of any interest

or fee payable hereunder (except in connection with a waiver of interest at the increased post-default rate) or extend the scheduled date of any payment thereof or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; or

(ii)     amend, modify or waive any provision of this Section 9.1 or reduce the percentage specified in the definition of Required Lenders, without the written consent each Lender directly affected thereby; or

(iii)     amend, modify or waive any provision of Article VIII without the written consent of the then Administrative Agent; or

(iv)     amend, modify or waive any provision of Section 2.12 without the written consent of each Lender directly affected thereby; or

(v)     release the Borrower, in its entirety, from its obligations under the Credit Documents or Holdco from its obligations under the Guaranty or all or substantially all of the Guarantors (other than Holdco), in their entirety, from their obligations under the Guaranty, without the written consent of each Lender directly affected thereby; or

(vi)     release all or substantially all of the Collateral, without the written consent of each Lender directly affected thereby; or

(vii)     amend, modify or waive any provision of the Credit Documents requiring consent, approval or request of the Required Lenders or all Lenders, without the written consent of all of the Required Lenders or Lenders as appropriate; or

(viii)     without the consent of the Lenders holding in the aggregate more than 50% of the Revolving Commitments or, if the Revolving Commitments have been terminated, the outstanding Revolving Loans (in addition to the Lenders required herein to take such action), amend, modify or waive any term specific to the Revolving Loans (including, without limitation, Section 4.2); or

(ix)     without the consent of the Lenders holding in the aggregate more than 50% of the outstanding Tranche B Term Loan (in addition to the Lenders required herein to take such action), amend, modify or waive any term specific to the Tranche B Term Loan.

provided, further, that no amendment, waiver or consent affecting the rights or duties of the Administrative Agent, the Issuing Lender or the Swingline Lender under any Credit Document shall in any event be effective, unless in writing and signed by the Administrative Agent, the Issuing Lender and/or the Swingline Lender, as applicable, in addition to the Lenders required hereinabove to take such action.

CHAR1\904670v16

Any such waiver, any such amendment, supplement or modification and any such release shall apply equally to each of the Lenders and shall be binding upon the Borrower, the other Credit Parties, the Lenders, the Administrative Agent and all future holders of the Notes. In the case of any waiver, the Borrower, the other Credit Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Loans and Notes and other Credit Documents, and any Default or Event of Default permanently waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding any of the foregoing to the contrary, the consent of the Borrower shall not be required for any amendment, modification or waiver of the provisions of Article VIII (other than the provisions of Section 8.9); provided, however, that the Administrative Agent will provide written notice to the Borrower of any such amendment, modification or waiver. In addition, the Borrower and the Lenders hereby authorize the Administrative Agent to modify this Credit Agreement by unilaterally amending or supplementing Schedule 2.1(a) from time to time in the manner requested by the Borrower, the Administrative Agent or any Lender in order to reflect any assignments or transfers of the Loans as provided for hereunder; provided further, however, that the Administrative Agent shall promptly deliver a copy of any such modification to the Borrower and each Lender.

Notwithstanding the fact that the consent of all the Lenders is required in certain circumstances as set forth above, (x) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein and (y) the Required Lenders may consent to allow a Credit Party to use cash collateral in the context of a bankruptcy or insolvency proceeding.

Notwithstanding anything to the contrary contained herein, to the extent that Wachovia assigns any Loans to any Eligible Assignee during the primary syndication of the Loans, and such Eligible Assignee requires an amendment to this Agreement as a condition to its participation as a Lender, Wachovia shall be entitled and authorized to amend this Agreement to make such necessary changes; provided that such changes shall not include modifications to the pricing, tenor or the aggregate amount of the Loans.

Section 9.2    Notices.

Except as otherwise provided in Article II, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) when delivered by hand, (b) when transmitted via telecopy (or other facsimile device) to the number set out herein, (c) the day following the day on which the same has been delivered prepaid (or pursuant to an invoice arrangement) to a reputable national overnight air courier service, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case addressed as follows in the case of the Borrower, the other Credit Parties and the Administrative Agent, and as set forth in such Lender's

# EXHIBIT
# "C"

**LE-NATURE'S HYPOTHETICAL RECOVERIES / ASSUMPTIONS**

ACTUAL AMOUNTS AND RECOVERIES WILL DIFFER

SUBITTED ONLY TO DESCRIBE APPLICATION OF FORMULAS CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $44.5MM | | Total Estate Recoveries | |
|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative |
| 85,000 | 85,000 | | | 3,174 | 3,174 | 10,000 | 10,000 |
| 25,000 | 110,000 | | | 4,293 | 7,467 | 85,000 | 95,000 |
| 18,810 | 128,810 | 15,000 | 15,000 | 7,536 | 15,003 | 28,174 | 123,174 |
| 46,190 | 175,000 | 13,167 | 28,167 | 4,199 | 19,201 | 38,103 | 161,277 |
| 25,000 | 200,000 | 8,069 | 36,236 | 4,333 | 23,527 | 66,893 | 228,170 |
| 25,000 | 225,000 | 9,069 | 45,305 | 4,460 | 27,987 | 37,268 | 265,438 |
| 25,000 | 250,000 | 10,131 | 55,436 | 5,525 | 33,511 | 38,394 | 303,832 |
| 30,000 | 280,000 | 13,513 | 68,949 | 9,514 | 43,025 | 39,591 | 343,423 |
| 18,733 | 298,734 | 56,200 | 125,149 | 1,475 | 44,500 | 49,038 | 392,461 |
| 2,904 | 301,638 | 8,713 | 133,862 | | | 84,447 | 476,908 |
| | | | | | | 13,092 | 490,000 |

| Subordination | | Cumulative Recoveries (face) | | |
|---|---|---|---|---|
| Bank | Bond | Banks | Bonds | GUCs |
| NA | NA | 0.0% | 0.0% | 0.0% |
| NA | NA | 30.4% | 0.0% | 0.0% |
| 100% | 0% | 39.3% | 0.0% | 7.1% |
| 50% | 100% | 46.0% | 0.0% | 16.8% |
| 40% | 50% | 62.5% | 18.8% | 33.7% |
| 35% | 55% | 71.4% | 24.2% | 43.1% |
| 30% | 60% | 80.4% | 30.2% | 52.0% |
| 25% | 65% | 89.3% | 37.0% | 62.0% |
| 25% | 70% | 100.0% | 46.0% | 75.3% |
| 25% | 75% | 106.7% | 83.4% | 96.7% |
| | | 107.7% | 89.2% | 100.0% |

Assumptions (actual amounts and line items will differ)

| | FACE | 000 USD | PERCENTAGE |
|---|---|---|---|
| Administration expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recovery calculated as percentage of 150MM) | 150,000 | 156,500 | 0.393671 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 44,500 | 0.112658 |
| Payments to Banks (estimated) for liens, including administration claims for use and impairment of collateral, collateral proceeds, and elimination claims | | 85,000 | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.493671 |
| Post-petition interest for banks | | 21,638 | |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claim | | 395,000 | 1.000000 |
| Total estate claims (hypothetical estimate) | | 490,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $44.5MM, $144.5MM, $244.5MM and $344.5MM.

LE-NATURE'S
HYPOTHETICAL RECOVERIES / ASSUMPTIONS

ACTUAL AMOUNTS AND RECOVERIES WILL DIFFER

SUBMITTED ONLY TO DESCRIBE APPLICATION OF FORMULAS CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $144.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (face) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Banks | Bonds | GUCs |
| 85,000 | 85,000 | - | - | - | - | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | - | - | - | - | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | 15,000 | 15,000 | 10,307 | 10,307 | 35,307 | 130,307 | | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 13,167 | 28,167 | 13,939 | 24,246 | 47,749 | 178,056 | 0% | 100% | 46.0% | 10.0% | 16.8% |
| 25,000 | 200,000 | 8,069 | 36,236 | 24,471 | 48,717 | 83,828 | 261,884 | 50% | 50% | 62.5% | 18.8% | 33.7% |
| 25,000 | 225,000 | 9,069 | 45,305 | 13,633 | 62,350 | 46,703 | 308,586 | 45% | 55% | 71.4% | 24.2% | 43.1% |
| 25,000 | 250,000 | 10,131 | 55,436 | 14,045 | 76,395 | 48,114 | 356,701 | 40% | 60% | 80.4% | 30.2% | 52.9% |
| 30,000 | 280,000 | 13,513 | 68,949 | 14,483 | 90,879 | 49,614 | 406,315 | 35% | 65% | 89.3% | 37.0% | 62.9% |
| 18,733 | 298,734 | 56,200 | 125,149 | 17,939 | 108,818 | 61,453 | 467,767 | 30% | 70% | 100.0% | 46.0% | 75.3% |
| 2,904 | 301,638 | 8,713 | 133,862 | 30,893 | 139,710 | 105,826 | 573,593 | 25% | 75% | 106.7% | 83.4% | 96.7% |
| | | | | 4,790 | 144,500 | 16,407 | 590,000 | 25% | 75% | 107.7% | 89.2% | 100.0% |

Assumptions (actual amounts and line items will differ)

| | FACE | 000 USD | PERCENTAGE: |
|---|---|---|---|
| Administration expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | 150,000 | 155,500 | 0.314141 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 144,500 | 0.291919 |
| Payments to Banks (estimated) for liens, including administration claims (for use and impairment of collateral, collateral proceeds, and diminution claims | | 85,000 | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.393939 |
| Post-petition interest for banks | | 21,638 | |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claim | | 495,000 | 1.000000 |
| Total estate claims (hypothetical estimate) | | 590,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts.  Parties acknowledge that actual amounts will vary and new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $46.5MM, $144.5MM, $244.5MM and $344.5MM.

## LE-NATURE'S
### HYPOTHETICAL RECOVERIES / ASSUMPTIONS

**ACTUAL AMOUNTS AND RECOVERIES WILL DIFFER**

**SUBMITTED ONLY TO DESCRIBE APPLICATION OF FORMULAS CONTAINED IN THE PLAN**

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $244.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (face) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Banks | Bonds | GUCs |
| 85,000 | 85,000 | - | - | - | - | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | - | - | - | - | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | 15,000 | 15,000 | 17,439 | 17,439 | 42,439 | 137,439 | 100% | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 13,167 | 28,167 | 23,583 | 41,025 | 57,395 | 194,835 | 0% | 100% | 46.0% | 0.0% | 16.8% |
| 25,000 | 200,000 | 8,069 | 36,236 | 41,406 | 82,430 | 100,763 | 295,598 | 50% | 50% | 62.5% | 18.8% | 33.7% |
| 25,000 | 225,000 | 9,069 | 45,305 | 23,068 | 105,499 | 56,137 | 351,735 | 45% | 55% | 71.4% | 24.2% | 43.1% |
| 25,000 | 250,000 | 10,131 | 55,436 | 23,766 | 129,264 | 57,834 | 409,569 | 40% | 60% | 80.4% | 30.2% | 52.9% |
| 30,000 | 280,000 | 13,513 | 68,949 | 24,506 | 153,771 | 59,637 | 469,207 | 35% | 65% | 89.3% | 37.0% | 62.9% |
| 18,733 | 298,734 | 56,200 | 125,149 | 30,334 | 184,124 | 73,867 | 543,074 | 30% | 70% | 100.0% | 46.0% | 75.3% |
| 2,904 | 301,638 | 8,713 | 133,862 | 52,272 | 236,396 | 127,205 | 670,278 | 25% | 75% | 106.7% | 83.4% | 96.7% |
|  |  |  |  | 8,104 | 244,500 | 19,722 | 690,000 | 25% | 75% | 107.7% | 89.2% | 100.0% |

**Assumptions (actual amounts and line items will differ)**

| | FACE | $000 USD | PERCENTAGE |
|---|---|---|---|
| Administration expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | 150,000 | 155,500 | 0.261145 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 244,500 | 0.410924 |
| Payments to Banks (estimated) for liens | | 85,000 | |
| including administration claims for use and impairment of collateral, collateral proceeds, and diminution claims | | | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.327731 |
| Post-petition interest for banks | | 21,638 | |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claim | | 595,000 | 1.000000 |
| Total estate claims (hypothetical estimate) | | 690,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $44.5MM, $144.5MM, $244.5MM and $344.5MM.

LE-NATURE'S
HYPOTHETICAL RECOVERIES / ASSUMPTIONS

ACTUAL AMOUNTS
AND RECOVERIES
WILL DIFFER

SUBMITTED ONLY TO
DESCRIBE APPLICATION
OF FORMULAS
CONTAINED IN THE PLAN

| Total Bank Recoveries | | Total Bond Recoveries | | GUCs: $344.5MM | | Total Estate Recoveries | | Subordination | | Cumulative Recoveries (face) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Incremental | Cumulative | Bank | Bond | Banks | Bonds | GUCs |
| 85,000 | 85,000 | | | | | 10,000 | 10,000 | NA | NA | 0.0% | 0.0% | 0.0% |
| 25,000 | 110,000 | 15,000 | 15,000 | 24,572 | 24,572 | 85,000 | 95,000 | NA | NA | 30.4% | 0.0% | 0.0% |
| 18,810 | 128,810 | 13,167 | 28,167 | 33,232 | 57,804 | 49,572 | 144,572 | 100% | 0% | 39.3% | 0.0% | 7.1% |
| 46,190 | 175,000 | 8,069 | 36,236 | 58,341 | 116,144 | 67,042 | 211,614 | 0% | 100% | 46.0% | 0.0% | 16.8% |
| 25,000 | 200,000 | 9,069 | 45,305 | 32,503 | 148,647 | 117,698 | 329,312 | 50% | 50% | 62.5% | 10.0% | 13.7% |
| 25,000 | 225,000 | 10,131 | 55,436 | 33,486 | 182,133 | 65,572 | 394,884 | 45% | 55% | 71.4% | 18.8% | 24.2% |
| 25,000 | 250,000 | 13,513 | 68,949 | 34,529 | 216,662 | 67,554 | 462,438 | 40% | 60% | 80.4% | 30.2% | 43.1% |
| 30,000 | 280,000 | 13,513 | 68,949 | 42,768 | 259,431 | 69,660 | 532,098 | 35% | 65% | 89.3% | 37.0% | 52.9% |
| 18,733 | 298,734 | 56,200 | 125,149 | 73,650 | 333,081 | 86,282 | 618,380 | 30% | 70% | 100.0% | 46.0% | 62.9% |
| 2,904 | 301,638 | 8,713 | 133,862 | 11,419 | 344,500 | 148,584 | 766,964 | 25% | 75% | 106.7% | 83.4% | 75.3% |
| | | | | | | 23,036 | 790,000 | 25% | 75% | 107.7% | 89.2% | 96.7% |
| | | | | | | | | | | | | 100.0% |

Assumptions (actual amounts and line items will differ)

| | FACE | 000 USD | PERCENTAGE |
|---|---|---|---|
| Administration expenses, unrelated to banks' cash collateral, claims and expenses, including section 503(b) awards and priority claims (estimate only) | | 10,000 | |
| Bank debt (estimate) | | 280,000 | |
| Bonds (cumulative recoveries calculated as percentage of 150MM) | 150,000 | 155,500 | 0.223741 |
| GUCs (estimated general unsecured claims including lease rejection claims) | | 344,500 | 0.495683 |
| Payments to Banks (estimated) for liens, including administration claims for use and impairment of collateral, collateral proceeds, and diminution claims | | 85,000 | |
| Bank deficiency claim (assumed bank debt less assumed payments for lien proceeds) | | 195,000 | 0.280576 |
| Post-petition interest for banks | | 21,638 | |
| | | | |
| Total pari passu unsecured claims including bonds, GUCs, bank deficiency claim | | 695,000 | 1.000000 |
| Total estate claims (hypothetical estimate) | | 790,000 | |

1. The calculations in this exhibit are based on assumed, hypothetical amounts. Parties acknowledge that actual amounts will vary and new calculations will be required based on actual values.
2. Amounts used in this exhibit are used solely for purposes of describing and illustrating the application of the formulas contained in the Plan.
3. The 4 spreadsheets that comprise this exhibit describe four scenarios, with GUCs ranging in value from $44.5MM, $144.5MM, $244.5MM and $344.5MM.