# Exhibit A, Part I

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Le-Nature's, Inc., *et al.*,<br><br><br><br>                       Debtors. | Chapter 11<br>Case No. 06-25454 (MBM)<br><br>Jointly Administered |

DISCLOSURE STATEMENT
WITH RESPECT TO SECOND AMENDED JOINT CHAPTER 11 PLAN OF
LIQUIDATION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
THE *AD HOC* COMMITTEE OF SECURED LENDERS, AND
THE *AD HOC* COMMITTEE OF SENIOR SUBORDINATED NOTEHOLDERS

Dated November 27, 2007

**RUDOV & STEIN, P.C.**

David K. Rudov
100 First Avenue, Suite 500
Pittsburgh, PA 15222
(412) 281-7300

-and-

**LOWENSTEIN SANDLER PC**

Kenneth A. Rosen
John K. Sherwood
Sharon L. Levine
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500

Co-Counsel to the Official
Committee of Unsecured Creditors

**MANION MCDONOUGH
& LUCAS P.C.**
James G. McLean
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200

-and-

**BROWN RUDNICK BERLACK
ISRAELS LLP**

Edward S. Weisfelner
Robert J. Stark
Daniel J. Saval
7 Times Square
New York, NY 10036
(212) 209-4800

Co-Counsel to the *Ad Hoc*
Committee of Secured Lenders

**DUANE MORRIS LLP**
Joel Walker
Jeffrey Spear
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2811
(412) 497-1000

-and-

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**
Thomas Moers Mayer
Matthew J. Williams
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Co-Counsel to the *Ad Hoc* Committee of
Senior Subordinated Noteholders

THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR

REJECTION OF THE PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY
THE BANKRUPTCY COURT

THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT BEEN APPROVED BY THE COURT

THIS DISCLOSURE STATEMENT IS SUBMITTED IN ACCORDANCE WITH THE
COURT'S ORDER DATED NOVEMBER 19, 2007 SCHEDULING A HEARING ON
THE DISCLOSURE STATEMENT FOR JANUARY 3, 2008.

ALL CAPITALIZED TERMS USED IN THIS AMENDED DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") THAT ARE NOT DEFINED HEREIN BUT THAT ARE DEFINED IN ARTICLE I OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION (ATTACHED HERETO AS EXHIBIT A) (THE "PLAN") SHALL HAVE THE MEANINGS ASCRIBED TO SUCH TERMS BY THE PLAN AND SUCH DEFINITIONS ARE INCORPORATED HEREIN BY REFERENCE.

### ****NOTICE****

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. CREDITORS AND INTEREST HOLDERS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR INTERESTS. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ALTHOUGH GREAT EFFORT WAS TAKEN TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE PROPONENTS NOR THEIR RESPECTIVE PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS. INDEED, MUCH OF THE INFORMATION CONTAINED HEREIN WAS PROVIDED TO THE PROPONENTS BY THE CHAPTER 11 TRUSTEE AND BY OTHER PARTIES-IN-INTEREST.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS CONTAINING INFORMATION THAT HAVE BEEN AUTHORIZED TO BE DISTRIBUTED TO CREDITORS AND INTEREST HOLDERS. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THE DISCLOSURE STATEMENT OR THE PLAN IN CONSIDERING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE PROPONENTS STRONGLY URGE YOU TO READ THIS DISCLOSURE STATEMENT BECAUSE IT CONTAINS A SUMMARY OF THE PLAN AND IMPORTANT INFORMATION CONCERNING THE DEBTORS' HISTORY AND OPERATIONS. THE DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN. A COPY OF THE PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT. THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES ONLY CERTAIN PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN. COPIES OF THIS DISCLOSURE STATEMENT AND THE PLAN ARE BEING PROVIDED TO ALL KNOWN CREDITORS AND INTEREST HOLDERS. THE PLAN SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT. YOU SHOULD CONSULT YOUR OWN COUNSEL AND/OR FINANCIAL ADVISOR IN CONNECTION WITH YOUR CLAIM AGAINST OR

INTEREST IN THE DEBTORS AND THE TREATMENT ACCORDED YOUR CLAIM(S) OR INTEREST(S) UNDER THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS' ESTATES, THE LIQUIDATION TRUST OR ANY OTHER PARTY. NO REPRESENTATIONS BY ANY PERSON CONCERNING THE DEBTORS (PARTICULARLY AS TO ITS BUSINESS OPERATIONS, OR THE VALUE OF THEIR PROPERTIES) ARE AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION.

## TABLE OF CONTENTS

**Page**

ARTICLE I      Introduction ................................................................. 1
     Section 1.01    Disclosure Statement Enclosures................................... 1
     Section 1.02    Summary of Treatment of Claims and Interests Under the Plan. ........ 2
ARTICLE II     Historical Information................................................ 7
     Section 2.01    Description of the Debtors' Business. ........................... 7
     Section 2.02    Prepetition Ownership and Capital Structure of the Debtors Prior
                  to the Chapter 11 Case. .................................................. 8
            a.     Secured Credit Facility ..................................... 8
            b.     Senior Subordinated Notes ................................. 8
            c.     Equity.......................................................... 9
     Section 2.03    Events Leading to the Chapter 11 Filing. ..................... 9
ARTICLE III    The Debtors' Chapter 11 Bankruptcy Cases.................... 10
     Section 3.01    Brief Explanation of Chapter 11. ............................. 10
     Section 3.02    Commencement of the Chapter 11 Cases. ................... 10
     Section 3.03    Transition Motions............................................. 11
     Section 3.04    Cash Collateral Stipulations................................... 11
     Section 3.05    Retention Applications........................................ 12
     Section 3.06    Appointment of a Creditors' Committee. ................... 12
     Section 3.07    Formation of the Ad Hoc Lenders' Committee. ............ 12
     Section 3.08    Formation of the Ad Hoc Noteholders' Committee. ....... 13
     Section 3.09    Appointment of a Chapter 11 Trustee........................ 13
     Section 3.10    Other Significant Events During the Chapter 11 Cases....... 13
            a.     Discontinuing of Business ................................ 13
            b.     Sale of the Latrobe Bottling Facility..................... 13
            c.     Rule 2004 Investigations................................... 15
            d.     Litigation Against Federal Insurance Company ......... 16
            e.     The Delaware Action ...................................... 17
            f.     Merrill Lynch Motion to Convert Cases to Chapter 7 ...... 18
            g.     Order To Show Cause...................................... 18
            h.     Wachovia Motion to Convert to Chapter................. 18
            i.     Sale of Ligonier Property.................................. 18
            j.     IRS Proof of Claim for Federal Taxes.................... 19
            k.     Liquidation of Other Assets................................ 19
            l.     Recovery of Jewelry........................................ 19
     Section 3.11    Schedules and Statement of Financial Affairs/Asserted Claims......... 19
     Section 3.12    Monthly Financial Reports. .................................. 23
     Section 3.13    Lenders Collateral Stipulation ............................... 24
ARTICLE IV    General Information on Confirmation Procedure and Voting ........... 24
     Section 4.01    Purpose of Disclosure Statement. ........................... 24
     Section 4.02    Voting On the Plan............................................ 25
            a.     Who May Vote. ............................................. 24
            b.     Eligibility. .................................................. 24
            c.     Binding Effect............................................... 25

i

|  |  | d. | Procedure/Voting Deadlines. | 25 |
| Section 4.03 |  | Plan Confirmation Process. | | 26 |
|  |  | a. | Requirements. | 26 |
|  |  |  | (i) Acceptance by Impaired Classes. | 26 |
|  |  |  | (ii) Feasibility. | 26 |
|  |  |  | (iii) "Best Interests" Test. | 26 |
|  |  |  | (iv) "Cramdown" Provisions. | 26 |
|  |  | b. | Confirmation Hearing. | 26 |
|  |  | c. | Objections to Confirmation. | 27 |
|  |  | d. | Effect of Confirmation. | 28 |
| ARTICLE V |  | The Plan of Liquidation | | 29 |
| Section 5.01 |  | Plan Objectives. | | 29 |
| Section 5.02 |  | Overview of the Plan. | | 29 |
| Section 5.03 |  | Administrative Claims, Priority Tax Claims, and Fee Claims. | | 30 |
| Section 5.04 |  | Classification and Treatment of Claims and Interests. | | 31 |
|  |  | a. | Class 1: Lenders Secured Claims. | 32 |
|  |  | b. | Class 2: Other Secured Claims. | 34 |
|  |  | c. | Class 3: Priority Non-Tax Claims. | 34 |
|  |  | d. | Class 4A: Lenders Unsecured Claims. | 34 |
|  |  | e. | Class 4B: General Unsecured Claims. | 35 |
|  |  | f. | Class 4C: Unsecured Subordinated Note Claims. | 35 |
|  |  | g. | Class 5: Subordinated Litigation Claims. | 37 |
|  |  | h. | Class 6: Interests. | 38 |
| ARTICLE VI |  | Implementation of the Plan | | 38 |
| Section 6.01 |  | Implementation on the Effective Date. | | 38 |
| Section 6.02 |  | Substantive Consolidation. | | 38 |
|  |  | a. | Effect of Consolidation. | 39 |
|  |  | b. | Assets and Liabilities of TSI and Le-Nature's Holdings | 39 |
|  |  | c. | Plan Treatment for TSI/Holdings Property | 39 |
|  |  | d. | Legal and Factual Justification for Consolidation | 40 |
| Section 6.03 |  | Creation of Liquidation Trust. | | 41 |
| Section 6.04 |  | Liquidation Trust – Vesting. | | 43 |
| Section 6.05 |  | Appointment of the Liquidation Trustee. | | 43 |
| Section 6.06 |  | Liquidation Trust – Governance. | | 43 |
| Section 6.07 |  | Liquidation Trust – Trust Fees and Expenses. | | 44 |
| Section 6.08 |  | Investigations Aiding Administration of the Estates. | | 44 |
|  |  | a. | Continuation of Rights Under Federal Rule of Bankruptcy Procedure 2004. | 44 |
|  |  | b. | Approval of "Joint Interest" Agreement. | 44 |
| Section 6.09 |  | Prosecution and Resolution of Estate Causes of Action. | | 45 |
|  |  | a. | The Liquidation Trust's Exclusive Authority to Pursue, Settle, or Abandon Estate Causes of Action. | 45 |
|  |  | b. | Settlement of Estate Causes of Action. | 45 |
|  |  | c. | Authority of Members of the Liquidation Trust Oversight Board to Retain Attorneys to Oppose Settlements. | 45 |
| Section 6.10 |  | Approval of Exit Financing. | | 46 |

ii

Section 6.11     Delivery of the Lenders Distribution Agreement. .............................. 47
Section 6.12     Release of Liens and Perfection of Liens. ..................................... 47
Section 6.13     Cancellation of Documents. .................................................... 48
Section 6.14     Termination of Official Creditors' Committee and Chapter
                 11 Trustee. .................................................................... 48
Section 6.15     Preservation of Estate Causes of Action. ....................................... 48
Section 6.16     Preservation of Causes of Action Not Expressly Settled and
                 Released. ...................................................................... 50
ARTICLE VII      Provisions Governing Distributions. ............................................ 52
Section 7.01     Distributions to Holders of Lenders Claims and
                 Subordinated Notes. ........................................................... 52
                 a.     Distributions Through the Lenders Distribution Agent and
                        the Senior Subordinated Notes Indenture Trustee. .................... 52
                 b.     Satisfaction of Charging Liens. ..................................... 52
                 c.     Distributions of the Proceeds of TSI/Holdings
                        Property. ..........................................................53
Section 7.02     Provisions Concerning Distributions to Holders of Allowed
                 Class 1 and Class 4A Claims. .................................................. 53
Section 7.03     Disputed Claim Reserves. ..................................................... 53
                 a.     Establishment of Disputed Claim Reserves. ........................... 53
                 b.     Amounts to Be Reserved. ............................................. 54
                 c.     Distributions. ...................................................... 54
                 d.     Termination of Disputed Claim Reserve. .............................. 54
                 e.     Limitation of Liability for Funding the Disputed
                        Claim Reserve. ...................................................... 55
Section 7.04     Setoffs. ...................................................................... 55
Section 7.05     Withholding Taxes and Expenses of Distribution. ............................... 55
Section 7.06     Allocation of Plan Distributions Between Principal and Interest. ....... 55
Section 7.07     Disputed Identity of Holder. .................................................. 55
Section 7.08     Transfers of Claims. .......................................................... 55
Section 7.09     Method of Cash Distributions. ................................................. 56
Section 7.10     De Minimis Distributions. ..................................................... 56
Section 7.11     No Distribution in Excess of Allowed Amount of Claim. ................. 56
Section 7.12     Exemption from Certain Transfer Taxes. ........................................ 56
ARTICLE VIII     Conditions to Effectiveness of Plan. .......................................... 57
Section 8.01     Conditions to Confirmation. ................................................... 57
Section 8.02     Conditions to the Effective Date. ............................................. 59
ARTICLE IX       Effects of Confirmation of the Plan. .......................................... 60
                 (i)    Binding Effect. ..................................................... 60
                 (ii)   Retention of Estate Causes of Action/Reservation
                        of Rights. .......................................................... 60
                 (iii)  Direct Causes of Action. ............................................ 60
                 (iv)   Compromise of Controversies. ........................................ 61
                 (v)    Preservation of Insurance. .......................................... 61
                 (vi)   Term of Injunctions or Stays. ....................................... 61
                 (vii)  EXCULPATION. ........................................................ 61

iii

|  |  |  |
|---|---|---|
| | (viii) INJUNCTION. | 62 |
| | (ix)  No Releases for Specified Parties. | 63 |
| | (x)  Subrogation. | 63 |
| ARTICLE X | Executory Contracts and Leases | 63 |
| Section 10.1 | Rejection of Contracts and Leases. | 63 |
| Section 10.2 | Bar Date for Rejection Damages. | 63 |
| ARTICLE XI | Disputed, Contingent and Unliquidated Claims and Interests | 64 |
| Section 11.1 | Certain Disputed Claims and Interests. | 64 |
| Section 11.2 | Objections to Other Claims and Interests | 65 |
| Section 11.3 | Estimation of Claims or Interests. | 66 |
| Section 11.4 | Alleged Equipment Leases. | 67 |
| Section 11.5 | Amendments to Claims or Interests. | 67 |
| Section 11.6 | Authority to Settle Disputed Claims or Interests. | 67 |
| Section 11.7 | No Recourse | 67 |
| ARTICLE XII | Retention of Jurisdiction | 68 |
| Section 12.1 | Retention of Exclusive Jurisdiction by the Bankruptcy Court. | 68 |
| Section 12.2 | Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court. | 70 |
| ARTICLE XIII | Best Interests Test | 70 |
| ARTICLE XIV | Feasibility of the Plan | 72 |
| ARTICLE XV | Risk Factors | 73 |
| ARTICLE XVI | Certain Federal Income Tax Consequences | 75 |
| ARTICLE XVII | Alternatives to the Plan | 76 |
| | a.  Alternative Plan. | 76 |
| | b.  Chapter 7 Liquidation. | 76 |
| | c.  Dismissal. | 76 |
| ARTICLE XVIII | Recommendations | 77 |
| ARTICLE XIX | Conclusion | 78 |

EXHIBITS

| | |
|---|---|
| A | The Plan |
| B | Notice Fixing Time For Casting Ballots, Deadline for Objections and Hearing on Confirmation |
| C | Order Approving the Disclosure Statement |
| D | Ballot |
| E | Order with attendant Lessor Term Sheet |
| F | Liquidation Trust Agreement |
| G | Identification and Curriculum Vitae of the Liquidation Trustee |
| H | Initial Members of the Liquidation Trust Oversight Board |

I       Joint Interest Agreement

J       Exit Facility Agreement and Commitment Letter

K      Lenders Distribution Agreement

L       Cash Flow Projections

M     Hypothetical Recoveries/Assumptions – Submitted Only to Describe Applications of Formulas Contained In The Plan.

N      Liquidation Trust Reserve

# ARTICLE I
## Introduction

**General.**  The Official Creditors' Committee, the Ad Hoc Lenders' Committee and the Ad Hoc Noteholders' Committee propose the Plan, as it may be modified or amended from time to time, for the liquidation of Estate Assets, the resolution of Estate Causes of Action, the distribution of value to holders of Claims and Interests, and the efficient and cost effective resolution of all administrative matters relating to these Chapter 11 cases.  This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan.  Simultaneously with the filing of this Disclosure Statement, the Proponents are filing the Plan that is discussed and described in this Disclosure Statement.

On November 1, 2006, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against Le-Nature's.  On November 3, 2006, the Le-Nature's case was converted to a case under Chapter 11 of the Bankruptcy Code.  On November 5, 2006, Le-Nature's Holdings and TSI each filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  By order dated November 7, 2006, the Debtors' Chapter 11 cases were procedurally consolidated, and are being jointly administered.  This solicitation is being conducted to obtain sufficient acceptances of the Plan and contains information relevant to a decision to accept or reject the Plan.  This Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of Section 1125(a) of the Bankruptcy Code.

**Section 1.01 Disclosure Statement Enclosures.**  Accompanying this Disclosure Statement are copies of:

      1.    the Plan, which is attached hereto as Exhibit "A";

      2.    a notice (the "Notice"): (a) fixing the time for casting ballots either accepting or rejecting the Plan; (b) fixing the deadline for filing objections to Confirmation of the Plan; and (c) scheduling a hearing on Confirmation of the Plan, which is attached hereto as Exhibit "B";

      3.    the Order approving this Disclosure Statement, which is attached hereto as Exhibit "C";

      4.    for holders of Impaired Claims and Interests, a ballot for acceptance or rejection of the Plan (the "Ballot"), which is attached hereto as Exhibit "D";

      5.    the Lessor Term Sheet (as such term is defined in Section 11.4 of the Disclosure Statement), which is attached hereto as Exhibit "E";

      6.    the Liquidation Trust Agreement, which is attached hereto as Exhibit "F";

      7.    Identification and Curriculum Vitae of the Liquidation Trustee, which is attached hererto as Exhibit "G";

8.    Initial Members of the Liquidation Trust Oversight Board, which is attached hereto as Exhibit "H";

9.    The form of the Joint Interest Agreement, which is attached hereto as Exhibit "I";

10.    The form of the Exit Facility Agreement and Commitment Letter, which are attached hereto as Exhibit "J";

11.    The form of the Lenders Distribution Agreement, which is attached hereto as Exhibit "K";

12.    Cash Flow Projections, which are attached hereto as Exhibit "L";

13.    Hypothetical Recoveries/Assumptions – Submitted Only to Describe Applications of Formulas Contained In The Plan, which are attached hereto as Exhibit "M"; and

14.    The Budget for the Liquidation Trust Reserve, which is attached hereto as Exhibit N.

**Section 1.02 Summary of Treatment of Claims and Interests Under the Plan.**  Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan.

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN |
| --- | --- |
| Unclassified: Administrative Claims | Allowed Administrative Claims shall be paid in full, in Cash on the later of the Effective Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as reasonably practicable. |
| Unclassified: Priority Tax Claims. | Allowed Priority Tax Claims shall be paid either in full, in Cash on the Effective of the Plan or shall receive deferred Cash payments in equal annual installments through the date that is the fifth anniversary of the Petition Date (or the date on which holders of Class 4A claims are paid in full, whichever earlier), plus interest at the rate of 6% per annum. |

Unclassified: Fee Claims

Holders of Allowed Fee Claims shall be paid in full, in Cash on the date that the claim is Allowed by Final Order (or by an Order that is appealed but not stayed) or becomes Allowed after the Effective Date, or as soon thereafter as reasonably practicable.

Class 1: Lenders Secured Claims.

Holders of Allowed Claims in this Class (subject to the provisions of the Plan on Allowance of Class 1 Claims) shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims: (a) Tier One Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 1; (b) additional Tier One Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 1, as a result of the Disallowance of any Disputed Claim in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement

Class 2: Other Secured Claims

Holders of Allowed Claims in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the option of the Liquidation Trust, one or a combination of the following (net of any applicable rights to surcharge, including rights arising under Bankruptcy Code Section 506(c)): (i) payment in Cash from proceeds from the sale or disposition of the collateral securing the Allowed Other Secured Claims to the extent of the value of any holder's Lien on such property; (ii) surrender of the collateral securing the Allowed Other Secured Claims; or (iii) such other distributions as shall satisfy the requirements of Bankruptcy Code Section 1129.

Class 3: Priority Non-Tax Claims

Holders of Allowed Priority Non-Tax Claims shall be paid in full, in Cash on the date that is the later of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable.

Class 4A: Lenders Unsecured Claims

Holders of Allowed Lenders Unsecured Claims (subject to the provisions of the Plan on Allowance of Class 4A Claims) shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C; (c) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 4A, as a result of Turnover Enforcement of Class 4C distributions; (d) all proceeds of the foregoing distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement and (e) a percentage of the proceeds of the TSI/Holdings Property to other holders of Allowed Claims in Class 4A and Class 4C, subject to the (i) use of such proceeds to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) reallocation of such proceeds to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan.

Class 4B: General Unsecured Claims

Holders of Allowed General Unsecured Claims shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and

Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C; (c) distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement and (d) a percentage of the proceeds of the TSI/Holdings Property Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, but only to the extent (i) such proceeds are not used to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) such proceeds are reallocated to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan.

Class 4C: Unsecured Senior Subordinated Notes Claims

Holders of Allowed Unsecured Subordinated Note Claims (subject to the provisions of the Plan on Allowance of Class 4C Claims) shall be entitled to receive: (a) Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C; (b) additional Tier Two Trust Beneficial Interests in a percentage Ratable to other holders of Allowed Claims in Class 4A, Class 4B, and Class 4C, as a result of the Disallowance of any Disputed Claim in Class 4A, Class 4B, or Class 4C; (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement; and (d) a percentage of the proceeds of the TSI/Holdings Property Ratable to other holders of Allowed Claims in Class 4A and Class 4C, subject to the (i) use of such proceeds to fund the Initial Trust Funding and/or the Liquidation Trust Reserve and (ii) reallocation of such proceeds to holders of Allowed Claims in Class 4A, Class 4B, and Class 4C pursuant to Section 8.01(c) of the Plan; *provided, however,* that certain such distributions shall be deemed reallocated and distributed on account of Claims in Class 4A, as a settlement of potential claims by Lenders for enforcement of contractual subordination provisions in the Senior Subordinated Notes Indenture, in accordance with "Turnover Enforcement" (as defined in the Plan and summarized further in this Disclosure Statement).

| | |
|---|---|
| Class 5: -Subordinated Litigation Claims | Holders of Allowed Litigation Claims shall be entitled to receive: (a) Tier Three Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 5; (b) additional Tier Three Trust Beneficial Interests in a percentage Ratable to other Allowed Claims in Class 5, as a result of the Disallowance of any Disputed Claim in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement; |
| Class 6: Interests | Holders of Allowed Interests shall be entitled to receive: (a) Tier Four Trust Beneficial Interests in a percentage Ratable to other Allowed Interests in Class 6; (b) additional Tier Four Trust Beneficial Interests in a percentage Ratable to other Allowed Interests in Class 6, as a result of the Disallowance of any Disputed Interest in this Class; and (c) all proceeds thereof distributed pursuant to the terms of the Plan and the Liquidation Trust Agreement |

## ARTICLE II
## Historical Information[1]

**Section 2.01    Description of the Debtors' Business**. The Debtors' business began in 1992 and consisted of the production and marketing of all-natural, non-carbonated beverage products that were sold under the Le-Nature's brand name. The products sold by the Debtors included bottled water, flavored water, and tea drinks. The company initially operated its business at a facility located at Latrobe, Pennsylvania and sold its products primarily in the northeast and mid-atlantic regions of the United States. Its corporate headquarters were also located in Latrobe. In 2004, the Debtors expanded their operations by leasing a facility in Phoenix, Arizona, which enabled the Debtors to market their products in the southwest United States. Le-Nature's is a private company incorporated in Delaware and is the direct parent of each of the other Debtors. The Debtors employed approximately 200 employees as of the Petition Date.

---

[1] As indicated in Section 2.03 of this Disclosure Statement, substantial questions exist about the veracity of all information concerning the Debtors' pre-petition conduct and business activities. The information contained herein is based on representations made by the Chapter 11 Trustee and other sources of information deemed by the Proponents more trustworthy than the Debtors' pre-petition disclosures.

The audited financial statements of Le-Nature's prepared by BDO Seidman represented that the Debtors' gross revenue for 2005 was $287,233,880. However, in October 2006, evidence surfaced that Gregory Podlucky, the company's chairman and CEO ("Podlucky"), with the likely assistance of other Insiders, had engaged in massive corporate wrongdoing. In October 2006, pursuant to an order of the Delaware Chancery Court, existing management was replaced by Kroll Zolfo Cooper LLC ("Kroll"), as Custodian. Kroll found evidence of widespread fraudulent activity, and that the company's 2005 revenues were more likely close to $30 million. Shortly after these discoveries, Kroll made the decision to discontinue the Debtors' business operations.

**Section 2.02    Prepetition Ownership and Capital Structure of the Debtors Prior to the Chapter 11 Cases.**

　　a.　　**Secured Credit Facility**

On September 1, 2006, the Debtors entered into the Pre-Petition Secured Credit Agreement, dated as of September 1, 2006, with Wachovia Bank, as administrative agent, and the Lenders party thereto.

The Pre-Petition Secured Credit Agreement provided for a revolving loan in an amount of $20 million and a Tranche B term loan facility in the amount of $265 million. As of the Petition Date, there was approximately $278 million, plus interest, outstanding under the Pre-Petition Secured Credit Agreement.

To secure their obligations under the Pre-Petition Secured Credit Agreement, the Debtors also entered into that certain Amended and Restated Security Agreement, dated as of September 1, 2006, with Wachovia (the "Security Agreement"), and certain other collateral documents (the "Collateral Documents"). Under the Security Agreement and the Collateral Documents, the Debtors purported to grant Wachovia, for the benefit of the Lenders, a security interest in substantially all of their assets.

Borrowings under the Pre-Petition Secured Credit Agreement bore interest at either an alternative base rate or rates calculated by reference to LIBOR. The Pre-Petition Secured Credit Agreement also contains restrictive covenants that, among other things, limited indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

　　b.　　**Senior Subordinated Notes**

On or about June 23, 2003, the Debtors issued or guaranteed $150 million in aggregate principal amount of 9% Senior Subordinated Notes due June 15, 2013 pursuant to the Senior Subordinated Notes Indenture among the Debtors, Manufacturers and Traders Trust Company, as indenture trustee, dated as of June 23, 2003.

The Senior Subordinated Notes are unsecured, and arguably subordinated in right of payment to all existing and future "Senior Indebtedness" (as such term is defined in the

Indenture). As of the Petition Date, there was approximately $150 million plus interest, outstanding on the Senior Subordinated Notes.

### c.    Equity

The approximately 19 million outstanding voting shares of Le-Nature's stock are privately held. Approximately 54% of the outstanding shares are owned by Podlucky, and 45% are collectively owned by three financial institutions.

### Section 2.03    Events Leading to the Chapter 11 Filing.

Prior to the commencement of these bankruptcy cases, evidence surfaced that a massive corporate fraud had occurred. In or about June 2006, certain minority shareholders of Le-Nature's commenced an action in the Delaware Court of Chancery styled as *George K. Baum Capital Partners, et al. v. Le-Nature's, Inc., f/k/a Global Beverage Systems, Inc. et al.,* Civil Action No. 2158-N (the "Delaware Action"). In the Delaware Action, the minority shareholders sought to enforce their rights against Podlucky and other Board members designated by Podlucky. In their Second Amended Verified Complaint, the minority shareholder-plaintiffs allege that the defendants, among other things, sabotaged a process to sell the company.

After the commencement of the Delaware Action, the minority shareholders purportedly discovered the first traces of corporate wrongdoing. Specifically, the minority shareholders purportedly learned from one of Le-Nature's equipment financiers, AIG Commercial Equipment Finance, Inc. ("AIG"), that the company allegedly (a) fraudulently induced AIG to deposit more than $25 million with an equipment manufacturer ("Krones") to purchase certain equipment that was to be leased by the company; and (b) thereafter, through the use of one or more forged documents, caused Krones to remit more than $20 million of those funds to the company without AIG's knowledge. The whereabouts of those funds, along with more than $100 million of similar deposits, remains unknown.

In light of this discovery and its potential effect on the day-to-day operations of the company, the plaintiffs in the Delaware Action petitioned for the appointment of a receiver *pendente lite* to manage Le-Nature's ordinary course operations pending a final ruling in the Delaware Action. On or about October 27, 2006, the Delaware Court of Chancery entered an order appointing Kroll, as custodian, charged with administering Le-Nature's affairs and overseeing its day-to-day business activities.

Upon its arrival at Le-Nature's headquarters, Kroll found evidence that the company was in serious financial distress and uncovered additional evidence of massive corporate wrongdoing. Specifically, Kroll discovered evidence of (a) rampant document destruction, (b) significant accounting discrepancies, and (c) falsification of the company's books and records. This evidence is disclosed in the *Affidavit of Steven G. Panagos*, dated November 1, 2006 (the "Panagos Affidavit"), submitted in support of a motion filed by Kroll in the Delaware Action to expand Kroll's authority as custodian. The Panagos Affidavit disclosed, among other things, the following:

- Kroll discovered evidence of rampant document destruction. Specifically, Le-Nature's employees witnessed (a) Podlucky and other company employees shredding corporate documents and (b) Podlucky's bodyguard loading a large number of boxes of corporate documents into a dump truck for disposal.

- Kroll's investigation uncovered significant discrepancies between (a) customer shipments and accounts receivable information it found at the company and (b) the company's 2005 audited financial statements and unaudited financial statements as of June 30, 2006. Although Le-Nature's 2005 audited financial statements show annual revenues of $275 million, Kroll found information suggesting that the actual 2005 revenues may be as low as $32 million.

- An accounting department employee admitted to Mr. Panagos that the books and records of the company had been falsified at the direction of Podlucky. That employee explained that the false entries were made in order to meet certain revenue targets, and that the company's 2005 audited financial statements were based on such falsified information.

Shortly thereafter, the involuntary bankruptcy petition was filed by four trade creditors against Le-Nature's, as described above.

## ARTICLE III
## The Debtors' Chapter 11 Bankruptcy Cases

**Section 3.01 Brief Explanation of Chapter 11.** The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.

The confirmation of a plan of reorganization or liquidation is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

**Section 3.02 Commencement of the Chapter 11 Cases.** On the Petition Date, an involuntary petition for relief under Section 303 of the Bankruptcy Code was filed against Le-Nature's by four of its unsecured trade creditors. On November 3, 2006, the Bankruptcy Court appointed Salvatore LoBiondo, Jr. as Le-Nature's Responsible Officer. On that same

10

date, Le-Nature's consented to the filing and elected to have the case administered under Chapter 11 of the Bankruptcy Code. On November 6, 2006, Le-Nature's caused its wholly-owned subsidiaries, Le-Nature's Holdings and TSI, to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On November 7, 2006, the Bankruptcy Court ordered that the Debtors' three Chapter 11 Cases be jointly administered.

**Section 3.03 Transition Motions.**   Shortly after the Petition Date, the Debtors filed a number of motions with the Bankruptcy Court, seeking various forms of relief that the Debtors deemed essential to facilitating its transition to Chapter 11.   Among the orders sought by the Debtors were, without limitation, the following: Emergency Motion of Custodian for Order Authorizing It to Continue in Possession, Custody and Control of Property of the Estate and Granting It Relief From the Automatic Stay; Motion for an Order Authorizing the Debtors to Pay Prepetition Premiums Necessary to Maintain Insurance Coverage Currently in Effect and Certain Expenses Related Thereto; Motion for an Order Authorizing Continued Use of Existing Cash Management System, Bank Accounts and Business Forms and Motion to Pay (A) Certain Prepetition Claims for (I) Wages, Salaries and Other Compensation, (II) Withholdings and Deductions and (III) Reimbursable Employee Expenses; Motion to Continue Employee Benefits in the Ordinary Course, (C) Related Costs and Expenses; and (D) Motion Authorizing and Directing Banks and Other Financial Institutions, to Pay All Checks and Electronic Payment Requests Made by Debtors Relating to the Foregoing.

**Section 3.04 Cash Collateral Stipulations.**   Cash Collateral has been used to fund postpetition activities, including efforts to sell the Latrobe facility and other hard assets, creating an understanding of the Debtors' books and records, pursuing discovery of Estate Causes of Action, and performing administrative tasks in connection with the Plan. The Bankruptcy Court has approved eight stipulations and/or orders authorizing the use the Lenders' Cash Collateral. The first three Cash Collateral stipulations, entered into between the Custodian and Wachovia, as administrative agent, provided for the Custodian's use of Cash Collateral in the aggregate amount of $1,050,000. The fourth Cash Collateral stipulation, approved by the Bankruptcy Court on December 7, 2006, authorized the Custodian to utilize Cash Collateral pursuant to a budget consented to by the Ad Hoc Lenders' Committee. On February 14, 2007, the Chapter 11 Trustee filed an emergency motion for use of Cash Collateral, including a request for an interim order for authority to use $220,000 through March 15, 2007, and a final order to utilize Cash Collateral through June 30, 2007, in accordance with a proposed budget. The fifth Cash Collateral order, approved by the Bankruptcy Court on March 5, 2007, authorized the Chapter 11 Trustee to use Cash Collateral of up to $220,000 through March 15, 2007. The Sixth Order Regarding Use of Collateral by Trustee and Granting Adequate Protection (the "Sixth Order") was entered by the Bankruptcy Court on March 21, 2007, and authorizes the Chapter 11 Trustee to continue to use Cash Collateral in accordance with a budget attached to the order until June 30, 2007, or the earlier occurrence of certain specified events, including a dismissal of the cases or conversion to Chapter 7. On May 25, 2007, the Chapter 11 Trustee, with the consent of the Lenders, submitted the Seventh Order Regarding Use of Collateral by Trustee and Granting Adequate Protection (the "Seventh Order"). On June 26, 2007 the Court entered the Seventh Order. By its terms, the Seventh Order terminated as of September 30, 2007. On September 28, 2007, the Court entered the Eighth Order Regarding Use of Cash Collateral by Trustee

11

and Granting Adequate Protection that terminates as of December 31, 2007, however the Court stipulated in the order that the extension of the use of cash collateral did not signal its consent to the budgets of professionals.

As adequate protection for the aggregate diminution in the value of collateral and as security for the use of the collateral, the Sixth Order authorized the grant to Wachovia, as administrative agent, and to the Lenders of a security interest and lien upon all of the Debtors' assets, subject only to certain pre-petition liens and payments specified in the Sixth Order and subject to the rights of the Chapter 11 Trustee and the Official Creditors Committee under that Stipulation and Order dated March 13, 2007. The Sixth Order also authorized and the Chapter 11 Trustee granted to the Lenders, pursuant to Section 507(b) of the Code, administrative claims with priority over any and all administrative claims, diminution claims and all other claims against the Debtors.

**Section 3.05 Retention Applications.** The Custodian requested authorization to retain various professionals to provide services in these Chapter 11 cases. These professionals included Kirkland & Ellis LLP and Campbell & Levine LLC, which acted as counsel, and Kroll, which provided management and forensic accounting services. After the appointment of the Chapter 11 Trustee in these cases, the Chapter 11 Trustee employed his own professionals, as discussed in Section 3.08.

**Section 3.06   Appointment of a Creditors' Committee.** On November 15, 2006, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Creditors' Committee to represent the interests of the unsecured creditors. The Official Creditors' Committee's members are as follows: (1) Manufacturers and Traders Trust Company, as Trustee, Corporate Trust Services, 25 S. Charles Street, 16th Floor, Baltimore, MD 21201; (2) Canusa Hershman Recycling, LLC, 9 Business Park Drive, Branford, CT 06405; (3) Bishof+Klein GmbH & Co. KG, Rabestrabe 47, Lengerich/Germany D-49525; (4) Starpet, Inc., 801 Pineview Road, Asheboro, NC 27203; (5) Owens Illinois Closure Inc., One Michael Owens Way, Perrysburg, OH 43551; (6) CIT Group/Equipment Financing, Inc., 1540 Fountainhead Parkway, Tempe, AZ 85282; (7) Davis Gardner Gannon Pope Architecture, LLC, 2325 East Carson Street, Suite 100, Pittsburgh, PA 15203; (8) General Press Corporation, 110 Allegheny Drive, P.O. Box 316, Natrona Heights, PA 15065; and (9) AIG Commercial Equipment Finance Inc. (AIGCEF), 5700 Granite Parkway, Suite 850, Plano, TX 75025.

Shortly after its formation, the Official Creditors' Committee applied for Bankruptcy Court authorization to retain Lowenstein Sandler PC and Rudov & Stein PC as its co-counsel. The retention applications of Lowenstein Sandler and Rudov & Stein, PC were granted by the Bankruptcy Court with an effective date of November 15, 2006.

**Section 3.07 Formation of the Ad Hoc Lenders' Committee.** Shortly after the Petition Date, the Ad Hoc Lenders' Committee was formed. The members of the Ad Hoc Lenders' Committee collectively hold approximately 62% of the outstanding indebtedness under the Pre-Petition Secured Credit Agreement and approximately 48% of the Senior Subordinated

Notes. The Ad Hoc Lenders' Committee has appeared in these cases through its co-counsel, Manion McDonough & Lucas, P.C. and Brown Rudnick Berlack Israels LLP.

**Section 3.08   Formation of the Ad Hoc Noteholders' Committee.**   Shortly after the Petition Date, the Ad Hoc Noteholders' Committee was formed. The members of the Ad Hoc Noteholders' Committee hold approximately $4,000,000 or about 1.5% of the outstanding indebtedness under the Pre-Petition Secured Credit Agreement and hold approximately 26% of the Senior Subordinated Notes. The Ad Hoc Noteholders' Committee has appeared in these cases through its co-counsel, Duane Morris LLP and Kramer Levin Naftalis & Frankel LLP.

**Section 3.09 Appointment of a Chapter 11 Trustee.**   On January 9, 2007, the U.S. Trustee appointed E. Todd Neilson (the "Chapter 11 Trustee") to act as the fiduciary for the Estates. Shortly after his appointment, the Chapter 11 Trustee filed applications seeking Bankruptcy Court authorization to retain Pachulski Stang Ziehl Young Jones & Weintraub PC (name was later changed to Pachulski Stang Ziehl & Jones LLP) as his general counsel and LECG, LLC as his accountants and financial advisor. By orders dated March 2, 2007, the Bankruptcy Court approved the retentions. The Chapter 11 Trustee filed an application to retain Spilman, Thomas & Battle, PLLC as co-counsel, which application was granted by order dated June 5, 2007.

**Section 3.10   Other Significant Events During the Chapter 11 Cases.**

      **a.**      **Discontinuing of Business**

Following the appointment of Kroll, as Custodian, the Debtors' business operations were terminated except for such operations necessary for an orderly wind-down of the Debtors' affairs and liquidation of assets.

      **b.**      **Sale of the Latrobe Bottling Facility.**

In December 2006, the Custodian began exploring the retention of a broker to sell the Latrobe plant in a turnkey sale. Due to the projected depletion of Cash in January 2007, Kroll's discussions with potential brokers also involved the provision of a Cash advance to be repaid upon the sale. In mid-January, the Chapter 11 Trustee took over efforts to retain a broker to sell the Latrobe plant, including owned and leased equipment and the warehouse facility. These efforts included extensive negotiations with potential brokers regarding the sale and a cash advance and negotiations with Wachovia, the Ad Hoc Lenders' Committee, the Official Creditors' Committee, and equipment lessors relating to the sale of the plant and equipment in either a turnkey or auction sale, equipment ownership disputes, allocation of sale expenses, and repayment of the cash advance from the sale proceeds. On February 12, 2007, the Chapter 11 Trustee filed a motion to sell the Latrobe facility free and clear of liens and interests and to authorize entry into an agreement with Gordon Brothers Industrial LLC and Harry Davis & Company ("Gordon Brothers/Harry Davis" or the "Broker") to act as the exclusive selling agent and to advance $8 million to fund the sale and liquidation activities. Under the agreement, Gordon Brothers/Harry Davis would market and conduct a sale of the

Latrobe facility, including both owned and leased equipment at the Latrobe plant and the real estate and warehouse facilities used in the operations in a turnkey sale. Following the filing of the motion to employ the Broker and sell the Latrobe plant, the Chapter 11 Trustee, Wachovia, the Ad Hoc Lenders' Committee, and equipment lessors continued with extensive negotiations regarding the sale and related issues and disputes. A hearing on the motion to employ the Broker and sell the Latrobe plant was held on March 13, 2007. The Bankruptcy Court considered a competing broker proposal at the March 13 hearing and Gordon Brothers/Harry Davis proposed to reduce their commissions and compensation to match the competing offer. Following further bidding resulting in further reductions in the proposed commissions and compensation, Gordon Brothers/Harry Davis was approved as the broker and sale of the Latrobe plant was authorized subject to finalizing an agreement with equipment lessors under a "Lessor Term Sheet" that provided for consents of alleged equipment lessors to selling equipment that they claimed was leased. The Lessor Term Sheet, which also provided for procedures to address allocation and ownership dispute issues, was finalized and submitted to the Bankruptcy Court on March 27, 2007. A copy of the Order, with attendant Lessor Term Sheet, is attached hereto as Exhibit "E". By an order filed April 12, 2007, the Bankruptcy Court authorized the retention of Gordon Brothers/Harry Davis as broker and authorized the sale of the Latrobe plant on the terms set forth in the Order and the Lessor Term Sheet.

On June 28, 2007 the Chapter 11 Trustee and Giant Eagle, Inc. ("Giant Eagle") entered into an Asset Purchase Agreement for the sale of the Latrobe property. Pursuant to that Agreement, Giant Eagle advanced a "stalking horse" offer for the property, subject to higher or better offers at an auction to be conducted by the Bankruptcy Court. The Court granted the Chapter 11's Trustee's motion to sell the Latrobe property as an intact bottling facility, free and clear of all liens on July 13, 2007. The order set the auction date for August 9, 2007 with the deadline for submitting bids three days prior to the auction. Giant Eagle's initial bid was $18.9 million subject to a $2 million holdback for specified indemnifications. On August 3, 2007, Cadbury Schweppes Bottling Group, Inc. ("Cadbury") advanced a competing bid of $19 million. At the auction on August 9, 2007, Giant Eagle outbid Cadbury with a bid of $20 million. The Court's order on August 9, 2007 approved the sale of the Latrobe property to Giant Eagle, as a good faith purchaser.

Shortly after the auction, a local Pittsburgh newspaper reporter received an anonymous tip that, prior to the auction, Giant Eagle had sent a letter to Cadbury threatening to pull its merchandise from the store's shelves. The Chapter 11 Trustee investigated the matter and filed an emergency motion to revoke the finding of Giant Eagle as a good faith purchaser and instead confirm Cadbury as the successful bidder for the property. After an emergency hearing on August 30, 2007, the Court found that Giant Eagle did, in fact, attempt to chill bidding on the Latrobe property. Based on its finding that Giant Eagle acted in bad faith, the Court amended its order approving the sale of the Latrobe property and named Cadbury the good faith purchaser.

The Chapter 11 Trustee, Giant Eagle, and Cadbury then entered into negotiations for a resolution of the matter in the best interests of the creditors. To avoid litigation, delay and difficulties in collection, the parties agreed on terms of settlement as to the sale of the facility, the deposit paid by Giant Eagle and the estate's claims against Giant Eagle. Under

14

the terms of the parties' September 11, 2007 agreement, (1) Giant Eagle forfeited its $2 million deposit and agreed to pay the Chapter 11 Trustee's fees and expenses incurred; (2) Giant Eagle and Cadbury withdrew motions and waived rights to reconsider or appeal the amended sale order; (3) Cadbury would purchase the Latrobe property for $19 million and waive the $2 million holdback; (4) the Chapter 11 Trustee would not oppose a sale of the Latrobe property by Cadbury to Giant Eagle; (5) Giant Eagle would pay $2.25 million to settle claims for misconduct in the bidding procedure; and (6) the parties mutually released claims related to the auction and sale of the Latrobe property. Merrill Lynch Capital, later joined by National City Commercial Capital Company, LLC, objected to the settlement agreement on the basis that it failed to mention the division of the proceeds between the estate and the equipment lessors. By Order dated September 26, 2007, the Court approved the settlement agreement and left the division of proceeds to be resolved when the Chapter 11 Trustee filed a motion for distribution of the proceeds, which the Chapter 11 Trustee filed on November 5, 2007 (Docket # 1690) and which has been scheduled for hearing on December 4, 2007.

The sale of the Latrobe property to Cadbury was completed on October 9, 2007 for a purchase price of $19 million. That same day, Giant Eagle paid to the Chapter 11 Trustee $4,273,346.69 representing the forfeiture of the $2 million deposit plus accrued interest of $23,346.69 and the $2.25 million settlement payment. In accordance with the Court's October 4, 2007 order $8 million of the sale proceeds went to the Brokers as repayment for the advance paid to fund the sale. The Chapter 11 Trustee paid additional closing costs of $205,371.43. The total net consideration received to date from the sale is $15,145,040.27 with an additional $248.88 due from Giant Eagle for additional accrued interest.

      c.    **Rule 2004 Investigations.** Shortly after its formation, the Ad Hoc Lenders' Committee initiated an investigation into Estate Causes of Action arising out of the pre-petition activity that occurred at Le-Nature's. The Ad Hoc Lenders' Committee furthered this investigation by serving subpoenas pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004 Subpoenas") on the following parties: Wachovia Bank, N.A., Wachovia Capital Markets, LLC, Wachovia Securities, Ernst & Young, BDO Seidman LLP, Andrew Murin, Robert B. Lynn, Jonathan E. Podlucky, Gregory J. Podlucky, and David E. Getzik. The Ad Hoc Lenders' Committee's investigation has been supported by the Official Creditors' Committee. In addition, the Ad Hoc Lenders' Committee, consistent with the local rules of the Bankruptcy Court, conferred with other parties with potentially relevant information, including minority shareholders of Le-Nature's and a former consultant to Le-Nature's, Executive Sounding Board Associates, and negotiated voluntary production of documents relating to Le-Nature's.

On December 26, 2006, Wachovia filed a motion to quash the Rule 2004 Subpoenas ("Motion") on grounds that the subpoenas were premature and improperly related to private claims against Wachovia. The Debtors, Official Creditors' Committee, Ad Hoc Lenders' Committee, and the Jointly Represented Initial/Par Purchasers objected to the Motion. The

Motion was continued until the Chapter 11 Trustee had an opportunity to present his position. On January 18, 2007, the Chapter 11 Trustee filed his statement requesting that the Bankruptcy Court deny the Motion and order that all of the document discovery requested in the subpoenas be delivered to him, and stated that he would subsequently make such discovery available to the parties in interest. Subsequently, Wachovia withdrew its Motion. The Chapter 11 Trustee has been coordinating discovery responses, document production, and document management. In that regard, the Chapter 11 Trustee negotiated a form of confidentiality agreement to govern the production and sharing of documents and discovery materials. The Ad Hoc Lenders' Committee, Official Creditors' Committee and Ad Hoc Noteholders' Committee provided comments to the confidentiality agreement and the confidentiality agreement was ultimately approved by the Bankruptcy Court on March 28, 2007. Over the past few months, the Chapter 11 Trustee has been working with the Ad Hoc Lenders' Committee, Official Creditors' Committee and Ad Hoc Noteholders' Committee to preserve and protect the Debtors' books and records, including electronic documents and information. In addition, the Chapter 11 Trustee has also begun a forensic analysis of the Debtors' books and records.

On April 25, 2007, the Chapter 11 Trustee issued a subpoena to Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch Pierce") pursuant to Rule 2004. After Merrill Lynch Peirce's failed to produce documents in response to the subpoena, the Chapter 11 Trustee filed a motion to compel document production on November 19, 2007, and the Court granted the motion by Order dated November 20, 2007 (Docket # 1736).

d.    **Litigation Against Federal Insurance Company**

On or about December 28, 2006, Federal Insurance Company ("Federal Insurance") filed the Motion of Federal Insurance Company to Lift the Automatic Stay, to the Extent Applicable, to Permit Advancement of Defense Costs Under the Debtor's Directors and Officers Liability Insurance Policy (the "D&O Policy Lift Stay Motion"). Prior to the Petition Date, Federal Insurance issued Forefront Portfolio Insurance Policy No. 8181-1088 to Le-Nature's (the "Federal D&O Policy"). Through the D&O Policy Lift Stay Motion, Federal Insurance sought authorization to advance defense costs to certain of the Debtors' former officers and directors for costs incurred in defending the Delaware Action. The Official Creditors' Committee filed an objection to the D&O Policy Lift Stay Motion, and the Ad Hoc Lenders' Committee and the Chapter 11 Trustee joined in the Official Creditors' Committee's objection. In addition, the Debtors, Podlucky, Jonathan Podlucky and Andrew Murin filed a joint objection to the Motion. The parties settled the matter and agreed to entry of an order authorizing Federal Insurance to advance up to $759,039.51 in defense costs, subject to certain reporting provisions described in the Order (A) Authorizing Federal Insurance Company to Advance Defense Costs Up To $759,039.51, and (B) Requiring Federal Insurance Company to File Monthly Reports of Defense Costs Advanced entered on March 21, 2007 (Docket No. 1021).

Also on December 28, 2006, Federal Insurance filed its Motion to Lift the Automatic Stay to Permit Determination of Validity of Insurance Policy (the "Rescission Lift Stay Motion"). The Official Creditors' Committee objected to the Rescission Lift Stay Motion, and the Chapter 11 Trustee and the Ad Hoc Lenders Committee joined in the objection. On

February 20, 2007, the Bankruptcy Court held a hearing on the Rescission Lift Stay Motion. On February 1, 2007, the Bankruptcy Court entered an order denying the Rescission Lift Stay Motion (Docket No. 842).

On March 30, 2007, Federal Insurance commenced the adversary proceeding encaptioned *Federal Insurance Company v. Le-Nature's, Inc., R. Todd Neilson, as Chapter 11 Trustee of Le-Nature's, Inc., and Gregory J. Podlucky,* Adv. Pro. No. 07-02138-MBM (the "Federal Insurance Proceeding"). Through the Federal Insurance Proceeding, Federal Insurance seeks an order of the Court, *inter alia,* rescinding the Federal D&O Policy. Concurrently with commencing the Federal Insurance Proceeding, Federal Insurance moved to withdraw the reference for the proceeding to the United States District Court for the Western District of Pennsylvania ("District Court.") On April 20, 2007, the District Court entered an Order requiring that responsive briefs shall be filed on April 30, 2007. The Chapter 11 Trustee, the Official Creditors Committee, the Ad Hoc Lenders and Podlucky filed responses objecting to the motion for withdrawal of the reference. A status conference was held before the District Court on May 15, 2007. By Order entered June 1, 2007, the District Court denied the motion to withdraw the reference and reinstated the reference of jurisdiction in the case to the Bankruptcy Court.

On June 29, 2007, the Chapter 11 Trustee filed an answer to Federal's complaint. Since that time, the parties have been conducting document discovery, and the Chapter 11 Trustee is providing documents to Federal as part of the discovery process. In addition, Federal propounded requests for admissions and interrogatories, which the Chapter 11 Trustee is responding to. In addition, the Chapter 11 Trustee has analyzed the Federal D&O Policy in order to determine whether and to what extent coverage is available. On September 11, 2007, the Chapter 11 Trustee served a notice of facts or circumstances which may reasonably be expected to give rise to a claim under the Federal D&O Policy. On October 3, 2007, the Chapter 11 Trustee purchased a "tail" for the Federal D&O Policy.

e.    **The Delaware Action**

As is discussed previously at Section 2.03, approximately six months prior to the Petition Date, certain of Le-Nature's minority shareholders commenced an action in Court of Chancery of the State of Delaware encaptioned *George K. Delaware Capital Partners, et al. v. Le-Nature's, Inc., et al.,* Civil Action No. 2158-N (the "Delaware Action"). On November 3, 2006, Le-Nature's removed the Delaware Action to the Bankruptcy Court, where it is currently pending as Adversary Proceeding No. 06-02756–MBM. On December 1, 2006, the Plaintiffs in the Delaware Action moved to remand the action back to the Delaware Chancery Court. The Official Creditors Committee objected to the motion to remand the Delaware Action, and the Chapter 11 Trustee and the Ad Hoc Lenders' Committee joined in the objection. In addition, certain of the nondebtor defendants in the Delaware Action objected to the motion for remand. At a hearing held on March 27, 2007, the Bankruptcy Court directed that the parties submit post-hearing briefs on whether the Bankruptcy Court should stay the Delaware Action. On April 9, 2007, the Delaware Plaintiffs filed their Supplemental Brief/Memorandum in Support of Plaintiffs' Motion to Remand. On April 23, 2007, the

Official creditors Committee and the Chapter 11 Trustee filed pleadings requesting that the Bankruptcy Court deny the motion or stay the Delaware Action. The matter is currently under submission. On May 16, 2007, the Bankruptcy Court entered an order directing the Chapter 11 Trustee to file by May 25, 2007 an adversary proceeding seeking the entry of an injunction as to the plaintiff's removed action. The Chapter 11 Trustee commenced an adversary proceeding at Adversary Proceeding # 07-02241-MBM and filed a complaint as directed on May 25, 2007. The Bankruptcy Court has set a status conference in the Baum Adversary Proceeding for December 4, 2007.

 

### f.    Merrill Lynch Motion to Convert Cases to Chapter 7

On February 15, 2007, Merrill Lynch filed a motion to convert the Debtors' cases to proceedings under Chapter 7. While supporting efforts to pursue a sale process in which the Latrobe facility is sold in a turnkey operation or in an orderly liquidation, Merrill Lynch expressed concerns with the costs of the Chapter 11 cases and sale expenses allocated to equipment lessors. Based on the resolution of issues relating to the sale of the Latrobe plant and equipment under the Lessor Term Sheet, Merrill Lynch withdrew its motion to convert on April 2, 2007.

### g.    Order To Show Cause.

On May 31, 2007, the Bankruptcy Court signed an Order directing that the Debtor and/or Debtors' Counsel; Chapter 11 Trustee and any other party that wishes to appear to show cause why the Cases should not be dismissed since the case is serving a purpose to secured creditors and has and will never serve any benefit to unsecured creditors. The hearing on the Rule to Show Cause is scheduled for December 20, 2007.

### h.    Wachovia Motion to Convert to Chapter 7.

On June 12, 2007, Wachovia filed a Motion to Convert Case from Chapter 11 to Chapter 7. The motion is scheduled to be heard by the Court on December 20, 2007.

### i.    Sale of the Ligonier Property

On , 2007, the Court authorized the retention of Gordon Brothers Industrial, LLC and Harry Davis & Company for the sale of a 167.98-acre property located in Ligonier Township, Westmoreland County, Pennsylvania. The Court set the date of the auction for August 9, 2007, pursuant to a July 13, 2007 order. On October 11, 2007 the Chapter 11 Trustee filed a motion for an order authorizing the sale of the Ligonier property to The Buncher Company for $1,427,830.00. The Chapter 11 Trustee entered a Notice of Sale of the Ligonier property on October 19, 2007, announcing the date set by the Court for the auction as November 13, 2007. Pursuant to the auction on that day, the highest bidder for the Ligonier property was Joshua C. Whetzel for a purchase price of $1.45 million. The sale to Joshua C. Whetzel was approved by Order dated November 13, 2007 (Docket # 1719).

### j.    IRS Proof of Claim for Federal Taxes

On April 19, 2007, the Internal Revenue Service ("IRS") filed a proof of claim for federal taxes from 2002-2005 allegedly owed by Le-Nature's in the amount of $32,502,935.87, including $11,656,223.70 as a general unsecured claim and $20,846,712.17 as a priority claim. The Chapter 11 Trustee has investigated the IRS claim, concluding that the total income Le-Nature's reported during the period in dispute was overstated and filed an amended tax return on June 20, 2007. Accordingly, the Chapter 11 Trustee filed an objection to the IRS's claim on June 25, 2007, as the claim was based on the incorrect information contained in Le-Nature's' tax returns. In fact, the amended tax returns reflect that the estate is entitled to a refund for overpayment of taxes. The Court held a hearing on October 30, 2007 regarding the Chapter 11 Trustee's objection to the IRS's claim and set a status conference for December 6, 2007. On November 6, 2007 the IRS filed a motion for summary judgment claiming the Chapter 11 Trustee failed to substantiate its amended returns. On November 14, 2007, the IRS withdrew its proof of claim, and confirmed the withdrawal in a letter to the Court dated November 15, 2007 (Docket # 1723).

### k.    Liquidation of Other Assets

The Chapter 11 Trustee has also negotiated the sale of various other assets of the Debtors. On August 28, 2007, the Court authorized auctions including the sale of various model trains for $680,000.00 to Groyzboski Trains, 302,000 pounds of bulk black and green dry tea for $100,000.00, and miscellaneous personal property from the Arizona facility totaling $569,950 (not including the buyer's premium of $56,995).

### l.    Recovery of Jewelry

The Chapter 11 Trustee is working to recover jewelry – or any proceeds thereof – that was seized by the government from the Latrobe facility, the home of Podlucky, and other locations. Although the value of the jewelry has not been established because it is in possession of the government, the jewelry has an approximate value of $30 million. On September 26, 2007, the government filed an action for forfeiture against the jewelry, and the Chapter 11 Trustee is responding to that action and negotiating with the government to assure that the estate's interests in the jewelry are protected. The government has agreed to work out a process with the Chapter 11 Trustee that will allow the jewelry to be sold through an auctioneer approved by the Chapter 11 Trustee and allow the Chapter 11 Trustee to participate in the sale process. In addition, after extensive negotiations between the Chapter 11 Trustee and the government, the government is likely to enter into an agreement with the Chapter 11 Trustee to return the proceeds of sale of the jewelry to the estate for the benefit of creditors. The Chapter 11 Trustee is continuing his investigation to identify jewelry, to trace funds used to purchase the jewelry and to gain access to and appraise the jewelry.

**Section 3.11    Schedules and Statement of Financial Affairs/Asserted Claims.** On January 8, 2007, the Debtors filed their Schedules of assets and statement of financial affairs.

As discussed above in Section 2.03, upon its appointment as custodian, Kroll found that records of the Debtors had been destroyed or removed and that available information was in many instances unreliable. Kroll was able through its work over the ensuing months to reconstruct certain financial information for the Debtors and did file Schedules for the Debtors on January 8, 2007. The Schedules and Statement of Financial Affairs for each Debtor were filed with the following Addendum:

> "Please be advised that, as it may pertain to each of Le-Nature's, Inc. Le-Nature's Holdings, Inc. and Tea Systems International, LLC (collectively the "Debtors" and each, a "Debtor"), (i) the information contained in the schedules, statement of financial affairs, and any related documents (the "schedules"), was obtained from the affected Debtor's available records (the "Records"); (ii) as a result of what is believed to be massive fraud, including but not limited to, one or more of the Debtors maintaining at least two sets of books, one containing fraudulent information, and the other containing information that may or may not be reliable or verifiable, the information contained in the Schedules, as reflected from the Records, may not be accurate"

Neither the Proponents nor the Chapter 11 Trustee have verified the accuracy of the Schedules and given the serious discrepancies with the Debtors' record keeping, they cannot be relied upon. As filed, the Schedules showed assets of $40,149,242.19 for Debtor Le-Nature's and liabilities of $453,314,099.49. The Schedules for Debtor TSI showed assets of $2,768,146.46 and liabilities of $278,000,000. Debtor Le-Nature Holdings was scheduled with no assets and no liabilities. Due to the state of the Debtors' records, serious questions remain regarding the completeness and accuracy of the Schedules as to the type, nature and value of the Debtors' assets. As explained further below, the $40 million in assets for Debtor Le-Nature's does not include any value for the owned real estate and equipment (since the Schedules listed value of these items as "unknown") and does not include any estimate of the value of Causes of Action of the Debtors' Estates.

The filed Schedules indicate that the assets of Debtor Le-Nature's, as of the Petition Date, consisted of owned real estate in Latrobe, Pennsylvania, and Ligonier, Pennsylvania, equipment used in the bottling operations at the Latrobe facility, cash on hand of approximately $2,000,000, accounts receivable estimated at $5,289,354.00, finished goods valued at approximately $1,200,000, and new material inventory of approximately $20,500,000. In addition, following its appointment, Kroll discovered at the Debtors' facility in Latrobe large quantities of jewelry and precious stones and an inventory of collectible trains, all of an undetermined value. The jewelry and precious stones were seized initially by the U.S. Postal Inspection Service pending investigation and determination of ownership. The Assistant United States Attorney has advised the Chapter 11 Trustee that he or the United States Postal Inspector have seized over 2,000 pieces or jewelry or stones, including pieces that were on consignment with various jewelry stores and pieces that were in Podlucky's possession. The jewelry, stones and collectible trains belong to the Debtors and are subject to the liens and security interests of the Lenders. The collectible trains were sold on August 28, 2007 for $680,000 to Groyzboski Trains. The Assistant United States

Attorney has indicated a willingness to turn the Debtors' seized assets over to the Chapter 11 Trustee for valuation and sale once he has completed the necessary tasks to establish an evidentiary record.

According to the Schedules, Debtor Le-Nature's had ownership of various parcels of real estate located in Latrobe, Westmoreland County, Pennsylvania. The Schedules list the real property to be of unknown value, and subject to the liens of the Debtors' Lenders. The parcels comprise the land on which Debtor Le-Nature's bottling and beverage production in Latrobe is located and associated warehouse facilities. As described in Section 3.10(b) above, The sale of the Latrobe facility to Cadbury was completed on October 9, 2007 for a purchase price of $19 million, and on that same day, Giant Eagle paid to the Chapter 11 Trustee $4,273,346.69 representing the forfeiture of its $2 million deposit plus accrued interest of $23,346.69 and the $2.25 million settlement payment. The Schedules filed for Debtor TSI list ownership of unimproved real estate located in Ligonier, Pennsylvania, of an undetermined value. The real property had been acquired in 2006 for a purchase price of $2,750,000. As set forth in Section 3.10(i) above, pursuant to the auction held on November 13, 2007, the Bankruptcy Court approved the sale of the Ligonier property to Joshua C. Whetzel for a purchase price of $1.45 million. The Schedules also identify a bank account for TSI with a balance of approximately $18,000.00. No other assets were identified for Debtor TSI. The Schedules filed for Debtor Le-Nature's Holdings did not list it as owning any assets.

During the Bankruptcy Cases, Kroll, as the Custodian, and thereafter, following its appointment, the Chapter 11 Trustee, has collected the accounts receivable, and made sales of the Debtors' inventory and raw materials. As of the date of this Disclosure Statement, a total of approximately $3,290,000 in accounts receivable have been collected and approximately $970,000 in accounts receivable remain outstanding, the collectibility of which is largely questionable. Finished goods inventory has been sold for an aggregate sale price of approximately $2,400,000.

In addition to the assets discussed above, the Debtors' Estates hold various Causes of Action and claims, the successful pursuit of which will provide recoveries for distribution to creditors as outlined in the Plan. The nature of these Causes of Action and potential defendants are discussed further in this Disclosure Statement below in Sections 6.16 and 6.17. None of these Causes of Action had been filed by the Debtors prior to the filing of the petition in bankruptcy. The Causes of Action are the subject of on-going and continuing investigation and it is not possible at this time to specify which specific Causes of Action or defendants will be pursued, to predict the outcome of the actions that will be pursued or to estimate the amount of the recoveries. (*See* Article XV below discussing *Risk Factors*)

As to liabilities, the Schedules filed on behalf of the Debtors listed total liabilities for Debtor Le-Nature's of $453,314,099.49, total liabilities for TSI of $278,000,000, and no liabilities for Le-Nature's Holdings. Given the circumstances of the books and records of the Debtors, it cannot be known whether the information in the Schedules contain all of the liabilities of the Debtors or whether that information is fully accurate and it may be changed as additional information is found and/or records reconstructed. The liabilities of Debtor Le-Nature's shown on the Schedules include indebtedness to lenders in an aggregate estimated

amount of $278,000,000 plus interest, fees, costs, expenses, and claims under the Pre-Petition Secured Credit Agreement, indebtedness to Noteholders of $150,000,000, indebtedness owed to equipment lessors in an undetermined amount due to issues as to ownership and validity of leases, but believed to be as much as $300,000,000 and indebtedness to unsecured trade creditors estimated to be approximately $30 million.

The "bar date" for filing of proofs of claim in the bankruptcy cases was March 21, 2007 for nongovernmental creditors and was May 7, 2007 for governmental unit claims. The aggregate amount for filed proofs of claim by nongovernmental creditors in each case is as follows:

| | |
|---|---|
| Le-Nature's | $1,043,490,402.99 |
| TSI | $ 437,123,852.09 |
| Le-Nature's Holdings | $ 411,322,334.69 |

Proofs of claims filed by governmental units are as follows:

| | |
|---|---|
| Administrative | $ 1,000.00 |
| Secured | $ 7,170.00 |
| Unsecured Priority | $ 20,907,820.11 |
| General Unsecured | $ 11,689,124.71 |

The proofs of claim filed by governmental units include a claim filed by the Internal Revenue Service ("IRS") on April 17, 2007. The IRS filed a claim for $32,502,935.87, broken down as follows:

| | PRIORITY UNSECURED | GENERAL UNSECURED |
|---|---|---|
| Income Tax – 2001 (including interest) | $ 399.00 | |
| Income Tax – 2002 (including interest) | 3,678,162.00 | |
| Income Tax – 2004 (including interest) | 11,840,913.00 | |
| Income Tax – 2005 (including interest) | 5,284,149.00 | |
| FICA Tax – 2004 (including interest) | 43,089.17 | |
| Penalties (including interest) | | $11,656,223.70 |
| TOTAL | $ 20,846,712.17 | $11,656,223.70 |

The IRS' claim was based on income tax returns filed by Le-Nature's, as adjusted pursuant to IRS examination. The Chapter 11 Trustee reviewed the claim and it was the Chapter 11 Trustee's belief that the income tax returns filed by Le-Nature's were prepared from falsified financial information which grossly overstated revenues and other financial activity. The Chapter 11 Trustee objected to the IRS' proof of claim and amended the income tax returns for the years in question in order to properly quantify the IRS' claim, if any. On November 14, 2007, the IRS withdrew its proof of claim.

After a preliminary reconciliation by the Chapter 11 Trustee to account for superseded and duplicate Claims (including claims filed against multiple entities), payments made on administrative claims, stipulations entered into with claimants, claim withdrawals and after adjustment for the withdrawal of the IRS proof of claim, the adjusted amount of Claims filed against the Estates is:

|  | Le-Nature's | Tea System | Le Nature's Holdings | Total |
|---|---|---|---|---|
| Administrative | 2,355,906.62 | 00 | 1,000.00 | 2,356,906.62 |
| Secured | 314,17,016.79 | 7,170.00 | 152,706.99 | 314,336,893.78 |
| Priority | 2,320,372.03 | 170.00 | 3,861.70 | 2,324,403.73 |
| General Unsecured | 510,499,678.83 | 502,574.76 | 1,486,413.36 | 512,488,666.95 |

Under the Plan, certain Claims are unclassified: 1) Administrative Claims; 2) Priority Tax Claims, and 3) Fee Claims. The Administrative Claims are estimated by the Chapter 11 Trustee to be $2,500,000, and Priority Tax Claims (other than the IRS claim discussed above) are estimated by the Chapter 11 Trustee to be $70,000. Fee Claims are subject to submissions of applications and fee petitions, to objection by parties in interest and to approval by the Bankruptcy Court; based on current information and subject to the approval process, Fee Claims are estimated by the Chapter 11 Trustee to be approximately $14,737,000 in the aggregate.

**Section 3.12   Monthly Financial Reports.**  A monthly financial report was filed by the Debtors on December 20, 2007, for the period ending November 30, 2006. The Chapter 11 Trustee filed a monthly financial report on January 23, 2007 for the period from December 1, through December 31, 2006,  filed a monthly financial report on February 21, 2007, for the period of January 2007, and filed a monthly financial report on March 23, 2007, for the period  from February 1 through February 28, 2007 ( Docket # 1035), filed a monthly financial report on April 25, 2007 for the period from March 1 through March 31, 2007 (Docket # 1170), filed a monthly financial report on May 23, 2007 for the period April 1 through April 30, 2007 (Docket # 1262), filed a monthly financial report on June 20, 2007, for the period from May 1 through May 31, 2007 (Docket # 1402), filed a monthly financial report on July 20, 2007, for the period from June 1 through June 30, 2007 (Docket # 1476), filed a monthly financial report on August 21, 2007, for the period from July 1 through July 31, 2007 (Docket # 1540), filed a monthly financial report on September 20, 2007, for the period from August 1 through August 30, 2007 (Docket # 1603), filed a monthly financial report on October 11, 2007, for the period from September 1 through September 30, 2007 (Docket # 1651) and filed a monthly financial report on November 20, 2007 for the period October 1 through October 31, 2007 (Docket # 1735). .

23

**Section 3.13  Lenders Collateral Stipulation.**    The Proponents and the Chapter 11 Trustee entered into a *Stipulation and Order (I) Extending the Time to Challenge the Validity, Extent, Enforceability and Perfection of Certain Liens, Security Interests and Pledges Granted to and Held by the Agent for the Benefit of the Pre-Petition Secured Lenders and (II) Memorializing Stipulation as to Perfection of Liens and Security Interests as to Certain Assets*, which was entered by the Bankruptcy Court on or about March 13, 2007 (Docket Number 993).  On October 1, 2007, the Court entered an order approving the amended stipulation, extending the time to challenge the validity to December 17, 2007.  The parties may agree to further extensions of this deadline in advance of the Plan's Effective Date.


# ARTICLE IV
## General Information on Confirmation Procedure and Voting

**Section 4.01  Purpose of Disclosure Statement.**    The Bankruptcy Code requires the provisions of this Disclosure Statement to all holders of Claims and Interests in the Debtor entitled to vote upon the Plan pursuant to Section 1125 of the Bankruptcy Code to enable such holders of Claims and Interests to make an informed judgment concerning the Debtor's solicitation of acceptances of the Plan.    After notice and a hearing conducted on _____, the Bankruptcy Court by Final Order dated _____, approved this Disclosure Statement as containing "adequate information" (as defined in §Section 1125(a) of the Bankruptcy Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the holders of Claims against and Interests in the Debtor to make an informed judgment in voting to accept or reject the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation to accept or reject the Plan.

-**Section 4.02 Voting On the Plan**

a.    **Who May Vote.**  Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims or Interests in Classes that are Impaired by the Plan may vote on the Plan. Holders of Claims or Interests *not* Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  Administrative Claims and Priority Tax Claims are not generally classified for purposes of voting or receiving Distributions under the Plan.  In this case, holders of Claims in the following Classes are entitled to vote to accept or reject the Plan: Class 1, Class 2, Class 4A, Class 4B, Class 4C, Class 5 and Class 6.  This Disclosure Statement is being distributed for informational purposes to all Creditors, the Interest holders and parties-in-interest without regard to their right to vote.  If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting.

b.    **Eligibility.**  In order to vote on the Plan, a Creditor must have timely filed or been assigned a timely filed proof of claim, unless its Claim is listed on the Debtors' Schedules and is not identified as disputed, unliquidated, or contingent or has been objected to prior to the Confirmation Hearing.  Creditors having an Allowed Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each

Class. The General Claims Bar Date set by the Bankruptcy Court for filing proofs of claim for general claims was March 21, 2007, and the Governmental Unit Claims Bar Date was May 5, 2007.

c.    **Binding Effect.** Whether a Creditor votes on the Plan or not, such person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Unless a Ballot is completed and returned in accordance with approved Bankruptcy Court procedures, a Creditor will not be included in the vote for purposes of accepting or rejecting the Plan or for purposes of determining the number of Persons voting on the Plan.

d.    **Procedure/Voting Deadlines.** In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to the following:

[ATTORNEY NAME]
[ADDRESS]

Pursuant to Federal Rule of Bankruptcy Procedure 3017, the Bankruptcy Court ordered that **original** Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery to the address set forth above on or before _____ **p.m., (Prevailing Eastern Time) on** _____ **(the "Voting Deadline"). Facsimile or electronically submitted Ballots will not be counted.** Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

(i)    Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim shall be completed or corrected, as the case may be, based upon the following hierarchy: (i) the claim amount temporarily Allowed by Court order for voting purposes pursuant to Bankruptcy Rule 3018; (ii) the amounts of any timely filed proofs of Claim which have not been objected to prior to the Voting Deadline; and (iii) the claim amount listed on the Schedules if no proof of Claim has been filed by such Creditor, and counted as a vote to accept or reject the Plan;

(ii)    Ballots received that do not identify the Creditor, whether or not signed by the Creditor, shall not be counted as a vote to accept or reject the Plan;

(iii)    Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim and that are otherwise properly completed shall be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan; and

(iv)    Ballots that are completed, except that such Creditor failed to vote to accept or reject the Plan, shall be completed and counted as a vote to accept the Plan.

25

You are urged to timely complete, date, sign and promptly mail the enclosed Ballot. **BALLOTS TRANSMITTED BY FACSIMILE, TELEX, ELECTRONICALLY (E-MAIL) OR TELECOPIER WILL NOT BE ACCEPTED.** Please be sure to complete the Ballot properly and legibly identifying the exact amount of your Claim, the Class(es) in which the Claims(s) is/are classified under the Plan and the name of the Creditor.

**Section 4.03 Plan Confirmation Process.**

    **a.**    **Requirements.** The requirements for confirmation of the Plan are set forth in detail in Section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

    **(i)**    **Acceptance by Impaired Classes.** Except as noted below, each Impaired Class of Claims and the Class of Interests must either vote to accept the Plan or be deemed to accept the Plan. "Impaired" is defined in Section 1124 of the Bankruptcy Code. A Claim or Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the holder. Under the Plan, Class 1, Class 2, Class 4A, Class 4B, Class 4C, Class 5 and Class 6 are Impaired. The holders of Claims in Class 1, Class 2, Class 4A, Class 4B, Class 4C, Class 5 and Class 6 are entitled to vote, separately, to accept or reject the Plan. As a voting Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number holding two-thirds in dollar amount of the Claims voting (of such Impaired class of Claims) must vote to accept the Plan. At least one Impaired Class of Claims must accept the Plan for it to be confirmed by the Court.

    **(ii)**    **Feasibility.** The Bankruptcy Court is required to find that the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan will be able to do so.

    **(iii)**    **"Best Interests" Test.** The Bankruptcy Court must find that the Plan is in the "best interests" of Creditors and Interest Holders. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the Debtors: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property that, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property were liquidated under Chapter 7 of the Bankruptcy Code on that date.

    **(iv)**    **"Cramdown" Provisions.** Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though a Class of Claims or Interests has not voted to accept the Plan, so long as one Impaired class of Claims has accepted the Plan (excluding the votes of Insiders) and the Plan is fair and equitable and does not discriminate unfairly against the non-accepting Classes. The Proponents may invoke the "cramdown" provisions of §Section 1129(b) of the Bankruptcy Code should any voting class fail to accept the Plan.

    **b.**    **Confirmation Hearing.** To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Section 1129 of the

Bankruptcy Code (the "Confirmation Hearing").    The Bankruptcy Court has set
_____ **(Prevailing Eastern Time)** for the Confirmation Hearing. The
Confirmation hearing will be conducted in the courtroom of the Honorable M. Bruce
McCullough, United States Bankruptcy Court for the Western District of Pennsylvania, 54th
Floor, US Steel Tower, Pittsburgh, Pennsylvania 15219.

      c.    **Objections to Confirmation**.  Any party in interest may object to
confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.
The Bankruptcy Court has set _____ as the deadline for filing and serving
Objection upon Proponents' attorneys.   Objections to confirmation must also be filed
electronically with the Bankruptcy Court located at the following address:

United States Bankruptcy Court Clerk
Western District of Pennsylvania
54th Floor, US Steel Tower
Pittsburgh, Pennsylvania 15219

with a copy served upon attorneys for the following at the addresses below:

      To the Chapter 11 Trustee:

      Richard M. Pachulski, Esq.
      Pachulski Stang Ziehl & Jones LLP
      10100 Santa Monica Boulevard
      11th Floor
      Los Angeles, California  90067

      Debra Grassgreen, Esq.
      Pachulski Stang Ziehl & Jones LLP
      150 California Street
      15th Floor
      San Francisco, California  94111

    To the Ad Hoc Lenders' Committee:

      Edward S. Weisfelner, Esq.
      Robert J. Stark, Esq.
      Daniel J. Saval, Esq.
      Brown Rudnick Berlack Israels LLP
      7 Times Square
      New York, NY 10036

          and –

      James G. McLean, Esq.
      Manion McDonough & Lucas P.C.
      600 Grant Street

27

Suite 1414
Pittsburgh, Pennsylvania  15219

To the Official Creditors' Committee:

John K. Sherwood, Esq.
Sharon L. Levine, Esq.
Kenneth A. Rosen, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey  07068

and –

David K. Rudov, Esq.
Rudov & Stein, P.C.
100 First Avenue
Suite 500
Pittsburgh, Pennsylvania  15222

To the Ad Hoc Noteholders' Committee

**DUANE MORRIS LLP**
Joel Walker
Jeffrey Spear
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2811
(412) 497-1000

-and-

Thomas Moers Mayer, Esq.
Matthew J. Williams, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

To Office of the United States Trustee:

Liberty Center
1001 Liberty Avenue, Suite 970
Pittsburgh, PA 15222

   **d.      Effect of Confirmation.**   The effects of a confirmation of the Plan are
summarized in Article VIII below and in the Plan.

28

## ARTICLE V
### The Plan of Liquidation

**Section 5.01 Plan Objectives.**  The primary objectives of the Plan are to:  (i) liquidate the Assets of the Estates and prosecute Estate Causes of Action, (ii) maximize the value of the ultimate recovery to all Creditors and Interest holders on a fair and equitable basis, compared to the value they would receive if the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code; and (iii) settle, compromise, or otherwise dispose of certain disputes.

**Section 5.02 Overview of the Plan.**  The Proponents believe that the Plan provides the best and most prompt recovery to holders of Claims and Interests and is supported by the Official Creditors' Committee, the Ad Hoc Lenders' Committee, and the Ad Hoc Noteholders Committee.  Under the Plan, Claims against and Interests in the Debtors are divided into different classes.  Under the Bankruptcy Code, "claims" and "interests" are classified rather than "creditors" and "shareholders" because such entities may hold Claims or Interests in more than one Class.  If the Plan is confirmed by the Bankruptcy Court and consummated, then on the Effective Date or as soon as practicable thereafter, the Liquidation Trust shall be formed and shall make distributions in respect of certain Classes of Claims and Interests as provided for in the Plan.  In addition, distributions will be funded from the proceeds of any Causes of Action.  The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and distributions to be made under the Plan are described below.

The Plan provides for the liquidation of Assets of the Estates, including the investigation and prosecution of Estate Causes of Action, by a Liquidation Trust to be formed pursuant to the Plan, and a Liquidation Trust Agreement.  The Liquidation Trust is to be managed by a Liquidation Trustee, as well as by a Liquidation Trust Oversight Board selected by the Official Creditors' Committee, the Ad Hoc Lenders' Committee, and the Ad Hoc Noteholders' Committee.  The Liquidation Trust shall be responsible for making distributions to holders of Claims and Interests, as well as all other administrative tasks necessary for ultimate resolution of the Chapter 11 Cases, per the terms of the Plan and the Liquidation Trust Agreement.  Distributions otherwise allocable on account of Disputed Claims shall be placed in Disputed Claims Reserves pending adjudication of the Claim.

At the heart of the Plan are compromises regarding, among other things: (a) the Allowed amount and priority of the Lenders Secured Claims; (b) the extent to which holders of Lenders Secured Claims may successfully assert that they hold Liens on Assets of the Estates or the proceeds thereof, including Estate Causes of Action; and (c) the extent to which Claims held by holders of Senior Subordinated Notes are structurally and/or contractually subordinated the Claims held by Lenders.  As part of this compromise, the Allowed amount, as well as seniority (both structural and contractual), of Lenders Claims is fixed by the Plan and, after the Effective Date, shall be not be subject to objection, defense, avoidance, offset, subordination, or reduction of any kind (subject to Wachovia Claims being deemed Disputed Claims as provided in the Plan).  The Plan also contemplates a sharing of distributions allocable to holders of Senior Subordinated Notes with the Lenders, on account of their unsecured deficiency Claims, if any.

The issues involved in the settlements and compromises contained in the Plan relate to a number of substantive issues between several creditor constituencies. The Ad Hoc Lenders' Committee, the Ad Hoc Noteholders Committee and the Official Creditors' Committee addressed the Allowed amount of the Lenders' Claims and the extent to which the Lenders' Liens and security interests extended to assets of the Debtors and the Estate Causes of Action. Based upon information provided with respect to the amount of the Lenders Secured Claims, the Plan provides for Allowed Lenders' Claims in the aggregate amount of $278,000,000 in principal, plus interest and costs. The Plan also resolves a number of discrete issues as to the applicability of the Lenders' Liens and security interests to assets of the Debtors. Specifically, the Official Creditors' Committee and the Ad Hoc Noteholders Committee questioned whether the Lenders' security interest in "commercial tort actions" extended to the tort Causes of Action held by the Debtors against third parties, including professionals. The Ad Hoc Lenders' Committee contends that the Lien did extend to these types of Causes of Action either directly or to the proceeds thereof and also contends that the tort actions are subject to the Liens in favor of the Lenders for general intangibles. Each creditor constituency provided legal argument and support for their respective positions. To avoid the substantial cost and expense that would be required to adjudicate these issues, and remove for each creditor group the uncertainty of outcome, the Plan reflects a compromise under which based upon and subject to the terms and provisions of the Plan, and the Confirmation of the Plan, and subject to certain reservations specified in the Plan (*see specifically*, definition of "Lenders Secured Causes of Action"), the Lenders agreed that the Lenders would retain the argument that the Lenders' Liens attached to certain Estate Causes of Action but not to other Estate Causes of Action.

The Plan also resolves disputed issues between the Ad Hoc Lenders' Committee and the Ad Hoc Noteholders' Committee. The Ad Hoc Lenders' Committee contended, based on legal and contractual subordination, that the Claims of the Senior Subordinated Noteholders were subordinated to all Claims of the Lenders and the Lenders were entitled to a priority of recovery and payment with respect to their Claims and to payment in full before any payments to the Senior Subordinated Noteholders. The Ad Hoc Noteholders' Committee disputed the Lenders' entitlement to any subordination. This dispute is compromised in the Plan by provisions providing for an agreed-upon scale for turnover by the Senior Subordinated Noteholders of recoveries to the Lenders. The Plan provides for the Lenders to receive repayment of $110 million before any payments to the Senior Subordinated Noteholders, and as to amounts above $110 million provides for a partial turnover of proceeds by the Senior Subordinated Noteholders but less than the 100%. Thus, the rate of turnover based on subordination under the Plan is less than the full subordination the Lenders contended was required by its interpretation of the applicable law and documents but more than the Senior Subordinated Noteholders argued they were obligated to provide.

**Section 5.03  Administrative Claims, Priority Tax Claims, and Fee Claims.** Administrative Claims, Priority Tax Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article IV of the Plan in accordance with Bankruptcy Code Section 1123(a)(1).

Each holder of an Allowed Administrative Claim shall be paid 100% of the unpaid amount of such Claim in Cash on the date that is the later of (i) the Effective Date, (ii) the

date such Claims become Allowed Claims or otherwise become payable under the Plan, and (iii) as soon thereafter as is reasonably practicable; *provided, however,* that Allowed Administrative Claims of the United States Trustee for fees pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid on the Effective Date (and, thereafter, as such fees may thereafter accrue and be due and payable) in accordance with the applicable schedule for payment of such fees.    The Liquidation Trust may satisfy, in the ordinary course of business, any Administrative Claim incurred in the ordinary course of business by the Chapter 11 Trustee or any other Debtor representative after the Petition Date and before the Effective Date.

Subject to the terms herein, and unless the holder of an Allowed Priority Tax Claim agrees to receive other less favorable treatment, each holder of an Allowed Priority Tax Claim shall be entitled to receive, at the option of the Liquidation Trust: (1) 100% of the unpaid amount of such Claim in Cash on the date that is the latest of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan, and (iii) as soon thereafter as is reasonably practicable; or (ii) deferred Cash payments in an aggregate principal amount equal to the amount of the Allowed Claim plus interest on the unpaid portion thereof at the rate of 6% per annum from the Effective Date through the date of payment thereof, which payments (i) shall be made in equal annual installments through the date that is the fifth anniversary of the Petition Date, but (ii) shall become accelerated and immediately due and payable on the date all Allowed Claims in Class 4A are fully satisfied.  Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Bankruptcy Code Section 507(a)(8)(G)) shall be Disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Estates, the Liquidation Trust, or any of their respecting Assets or property.

Each holder of an Allowed Fee Claim shall be paid 100% of the unpaid amount of such Claim in Cash on the date, or as soon thereafter as is reasonably practicable, that such Claim (i) is Allowed by Final Order (or an order that is appealed but not stayed) or (ii) becomes Allowed after the Effective Date.

**Section 5.04   Classification and Treatment of Claims and Interests.**  The categories of Claims and Interests and their treatment listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

31