UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.; AURELIUS CAPITAL MASTER, LTD.; AURELIUS CAPITAL PARTNERS, LP; ARROW DISTRESSED SECURITIES FUND; SCHULTZE MASTER FUND, LTD.; LATIGO MASTER FUND, LTD.; UBS WILLOW FUND, LLC; MISSOURI STATE EMPLOYEES' RETIREMENT SYSTEM; BLACKROCK GLOBAL FLOATING RATE INCOME TRUST; BLACKROCK LIMITED DURATION INCOME TRUST; BLACKROCK SENIOR INCOME SERIES; BLACKROCK SENIOR INCOME SERIES II; BLACKROCK SENIOR INCOME SERIES III PLC; MAGNETITE V CLO, LIMITED; BLACKROCK SENIOR LOAN PORTFOLIO; HARCH CLO II, LTD.; and RZB FINANCE LLC, | No. 07 Civ. 8139 (DC)  **AMENDED COMPLAINT**  **Jury Trial Demanded** |
| Plaintiffs, | |
| -against- | |
| WACHOVIA CAPITAL MARKETS, LLC d/b/a WACHOVIA SECURITIES, BDO SEIDMAN, LLP, GREGORY J. PODLUCKY, and ROBERT LYNN, | |
| Defendants. | |

Plaintiffs, by their attorneys Quinn Emanuel Urquhart Oliver & Hedges, LLP, for their Amended Complaint against Defendants Wachovia Capital Markets, LLC d/b/a Wachovia Securities ("Wachovia"), BDO Seidman, LLP ("BDO"), Gregory J. Podlucky, and Robert Lynn (collectively, the "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.       Le Nature's, Inc. ("Le Nature's" or the "Company"), a beverage manufacturer, bottler, and distributor based in Latrobe, Pennsylvania, orchestrated a massive and now widely acknowledged fraud that led to the Company's bankruptcy and ultimate demise.  For the year 2005, Le Nature's reported net sales of over $275 million.  As a court-appointed custodian discovered, however, Le Nature's' actual revenues were as little as *$32 million*.  On November 1, 2006, just after the public revelation of Le Nature's' fraud, a group of Le Nature's' creditors placed the Company in involuntary bankruptcy.  Not long thereafter, the Company ceased operations altogether.  The chapter 11 trustee, following further investigation, has determined that Le Nature's' revenues in 2005 were just *$28.2 million*.

2.       Le Nature's' massive revenues inflation, which was accompanied by overstated and false profit reports, had gone on for years – a fact confirmed by the chapter 11 trustee.  The Company had long been reporting sales numbers that had no relation whatsoever to its actual results.  Indeed, as early as 2000, the Company was reporting revenues in excess of $32 million, a number that it approached only years later, after the Company's production capacity was substantially enhanced with the introduction of a new facility in Phoenix, Arizona.  For many years prior to completion of the Phoenix facility, the Company falsely reported revenues *well in excess of its 2005 post-expansion revenues*.  The extent of the overstatement is startling:



**Le Nature's -- Reported Versus Actual Sales**
**Millions of Dollars**

3.      Just 60 days before the bankruptcy proceedings commenced, on or about September 1, 2006, Le Nature's borrowed $285 million in a loan administered by Wachovia Bank, N.A. ("Wachovia Bank"), an affiliate of defendant Wachovia.  Wachovia arranged the loan, underwrote the loan, and orchestrated the "syndication" of the loan – that is, sale of the indebtedness to an array of banks and other investors.  Through the syndication process, these other banks and investors became lenders to Le Nature's.  As a result of the syndication, Wachovia Bank ended up owning – and thus, being at risk with respect to – only a small fraction (approximately $7 million) of the overall loan.

4.      Each Plaintiff in this action owns a portion of the $285 million Le Nature's bank debt, having either purchased an interest directly from Wachovia in the syndication process or from a subsequent holder of the debt.  In total, Plaintiffs own more than $165 million of debt issued pursuant to the Credit Facility.  Other third-parties – i.e., *not* Wachovia – own the vast bulk of the remaining debt.  Because of Le Nature's' financial distress, the Company is unable to repay the loan, including interest thereon.

5.      It is now clear that Wachovia, unlike Plaintiffs or their predecessors, knew about Le Nature's' improper practices and struggling finances long before completion of the September 1, 2006 Credit Facility (the "Credit Facility"), yet chose to press forward with the loan and its syndication to advance its own agenda, as well as that of its affiliates. Wachovia had, by its own design, become a trusted advisor and confidant to the Company and its executives, and had secured tens of millions of dollars in fees over several years by structuring, underwriting, syndicating, and managing (both directly and through its affiliates) at least six Le Nature's bank facilities and securities issuances. Together with Le Nature's' management, Wachovia also engaged in extensive efforts, over several years, to sell the Company, a process through which Wachovia's investment bankers learned even more details about the Company's fraudulent reporting and management practices. For many years, Wachovia served as Le Nature's' facilitator and arranger for all major financial undertakings.

6.      Among other things, Wachovia knew – but did not disclose to the solicited unsuspecting lenders – that (i) Le Nature's systematically had been unable to make timely interest payments, a fact that Wachovia hid from present and potential lenders by covertly fronting the payments for Le Nature's, (ii) Le Nature's was reporting sales data that could not possibly be accurate based on information readily available to, but purposefully ignored by, Wachovia, (iii) Le Nature's had improperly recorded more than $200 million in capital leases as operating leases, thereby removing these massive liabilities from its balance sheet in order to comply with its debt covenants, (iv) Le Nature's convened a special committee to investigate the sudden resignation of the Company's chief financial officer and other senior financial managers, resulting in a report identifying serious issues with the Company's financial reporting and the CEO's unchecked control over *all* of the Company's operations, (v) Le Nature's' management was habitually dismissive of requests for information and disregarded specific mandates to

improve accounting, inventory, and other financial safeguards, and (vi) Le Nature's' products were being pulled from the shelves at retailers. None of this information, all of which was material and known to Wachovia, was disclosed to lenders. Wachovia knew that Le Nature's was engaging in fraud.

7.      Rather than disclose these important shortcomings, Wachovia published and disseminated to potential lenders, including Plaintiffs or their predecessors, Le Nature's' outrageously inflated revenue and profit numbers in marketing materials and research reports that Wachovia drafted. Wachovia knew that, had the real situation at Le Nature's been revealed, it would have been unable to syndicate the September 2006 loan. But Wachovia's motivation to hide the true facts, and to structure, fund, and syndicate the Credit Facility, was strong. The benefits for Wachovia of completing the new facility included:

- Reducing the credit exposure of its affiliates to Le Nature's by replacing Wachovia Bank's lending commitment to the Company with commitments from unrelated third-parties (such as Plaintiffs or their predecessors);

- Enabling Le Nature's, which could not meet its obligations under the pre-existing credit facility, to perpetuate its operations, and thereby seek a potential acquirer of the Company (a process in which Wachovia as financial advisor would earn many millions of dollars more in fees);

- Generating a substantial banking fee for Wachovia, in excess of $7 million for the September 2006 facility alone; and

- Garnering additional banking work for a mid-market company and improving its high-yield debt resumé, further breaking into a market that Wachovia had been struggling to obtain exposure in.

8.      Remarkably frank internal correspondence within Wachovia reveals Wachovia's true motivations for structuring and marketing the Credit Facility. ***On the very day that the Credit Facility was fully funded, Wachovia's bankers boasted that their exposure to Le Nature's was being slashed from $19 million drawn on the pre-existing facility all the way***

*down to $0 drawn on the new facility.*  The bankers also celebrated the massive *$7.125 million* fee – what they termed the "skim" – obtained by Wachovia as a result of the new Credit Facility.

9.      Wachovia's improper conduct was not limited to the concealment of information that it knew would be essential to unsuspecting syndicate members.  Wachovia also affirmatively conveyed false information about Le Nature's and its operations to the initial lenders under the Credit Facility, including Plaintiffs or their predecessors.  Among other things, Wachovia provided documents to the initial lenders that stated false and vastly over-inflated revenues, EBITDA, and growth rates for several years prior to completion of the Credit Facility. Wachovia also presented false asset coverage data to the lenders based on Le Nature's' deflated liabilities resulting from hidden lease obligations.  Wachovia's marketing materials falsely described Le Nature's as a strong, competitively positioned company that was capable of taking on even more debt.  Moreover, Wachovia's periodic market analyst reports, which were issued many times prior to completion of the Credit Facility and provided by Wachovia to the incoming lenders, gave the Company consistently positive reviews and assigned a strong "outperform" rating to Le Nature's.

10.      Wachovia was not alone in defrauding, and in assisting Le Nature's to defraud, Plaintiffs or their predecessors into extending credit in connection with the new facility.  To the contrary, BDO – as the outside, purportedly independent auditor for the Company – played an equally essential role in misrepresenting Le Nature's' financial health.  For the year ended 2005, for example, BDO issued a clean audit opinion to accompany Le Nature's' financial statements – the very statements that falsely reflected net sales in excess of $275 million (nearly *ten* times the sales level determined by the court-appointed custodian).  BDO also assisted Le Nature's in misclassifying its massive capital lease obligations as operating leases, thereby keeping more than $200 million of liabilities off the Company's balance sheet, and in hiding rental expenses

for production equipment, thereby overstating the Company's net income by more than 37%. BDO's conduct enabled Le Nature's falsely to claim that it had complied with financial ratios mandated in the loan documents. Absent such purported compliance, the Credit Facility never would have closed in the first place. BDO knew, or purposefully refused to determine, that the financial statements were grossly misleading.

11.     Indeed, from the very outset of its engagement by Le Nature's in 2004, BDO knew that the Company was hampered by severe accounting problems. BDO was initially hired just after (i) Le Nature's' chief financial officer and two other key accounting personnel resigned and submitted letters detailing the Company's serious financial integrity issues – issues that they had previously identified and that the Company refused to remedy, (ii) a law firm issued a report identifying numerous deficiencies in the Company's accounting methods and internal controls, and (iii) the Company's previous auditor, Ernst & Young LLP, was abruptly terminated. Although BDO never disclosed any of these facts in any of its audit reports, BDO knew that the enhanced risk of fraudulent conduct at the Company rendered Le Nature's' audits sensitive. Nevertheless, during three years of audit work, BDO ignored numerous glaring red flags demonstrating the Company's falsification efforts, assisted in the misclassification of liabilities, and issued reports – which it knew that lenders would rely upon – confirming and validating the misstated results. BDO's stamp of approval was a key component of the fraud perpetrated on the lenders.

12.     Through their conduct described in detail in this Amended Complaint, Wachovia and BDO engaged in fraud and aided and abetted the fraud conducted by Le Nature's and its inside management. Wachovia and BDO also conspired with and assisted the Le Nature's executives in their use of Le Nature's as the vehicle for the commission of numerous federal offenses, including multiple acts of wire fraud and bank fraud. With the active assistance of

Wachovia and BDO, the Le Nature's' executives, through the Le Nature's enterprise, fraudulently misled Plaintiffs or their predecessors, thereby generating hundreds of millions of dollars in fraudulent financing. As a result, Wachovia, BDO and the Le Nature's executives agreed to and did violate the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

13.    Plaintiffs in this action are Allowed Parties in the Le Nature's bankruptcy cases. As a result, they have been permitted access to documents produced by various parties in the bankruptcy discovery process. Those documents provide further details regarding Defendants' fraudulent activities. The allegations in this Amended Complaint, however, are not based on documents produced in the bankruptcy cases that have been designated as "confidential" by the producing parties. When those documents become available for use in this proceeding, Plaintiffs will further amend this Amended Complaint to provide further details regarding Defendants' knowledge and conduct.

## PARTIES

### Plaintiffs

14.    Plaintiffs in this action own interests in the Credit Facility, either as the initial purchasers from Wachovia or as the successors-in-interest to such initial lenders. As alleged in more detail below, in accordance with standard practice in the secondary market for loans, such successors-in-interest acquired not only their predecessor lenders' interests in the Credit Facility, but also any and all other rights and claims the predecessor lenders had against all persons and entities related to the same debt. Accordingly, all Plaintiffs in this action have standing to assert the claims set forth in this Amended Complaint.

15.    Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

16.    Aurelius Capital Master, Ltd. ("Aurelius Master"), an exempted company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

17.    Aurelius Capital Partners, LP ("Aurelius Partners"), a Delaware limited partnership, holds interests in the Credit Facility.

18.    Arrow Distressed Securities Fund ("Arrow"), a company organized under the laws of Canada, holds interests in the Credit Facility.

19.    Schultze Master Fund, Ltd. ("Schultze"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

20.    Latigo Master Fund, Ltd. ("Latigo"), an exempted company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

21.    UBS Willow Fund, LLC ("UBS Willow"), a Delaware limited liability company, holds interests in the Credit Facility.

22.    Missouri State Employees' Retirement System ("MOSERS") is a body corporate and an instrumentality of the state of Missouri.  MOSERS operates as a trust fund for purposes of providing retirement benefits to its membership and holds interests in the Credit Facility.

23.    BlackRock Global Floating Rate Income Trust ("BlackRock Global"), a Delaware statutory trust, holds interests in the Credit Facility.

24.    BlackRock Limited Duration Income Trust ("BlackRock LDI"), a Delaware statutory trust, holds interests in the Credit Facility.

25.    BlackRock Senior Income Series ("BlackRock Senior"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

26.    BlackRock Senior Income Series II ("BlackRock Senior II"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

27.     BlackRock Senior Income Series III PLC ("BlackRock Senior III"), a company organized under the laws of Ireland, holds interests in the Credit Facility.

28.     Magnetite V CLO, Limited ("Magnetite"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

29.     BlackRock Senior Loan Portfolio ("BlackRock SLP"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

30.     Harch CLO II, Ltd. ("Harch"), a company organized under the laws of the Cayman Islands, holds interests in the Credit Facility.

31.     RZB Finance LLC ("RZB"), a Delaware limited liability company, holds interests in the Credit Facility.

**<u>Defendants</u>**

32.     Wachovia is a Delaware limited liability company that conducts substantial business and maintains an office in New York.  According to its website, Wachovia offers "debt and equity underwriting, trading, research and sales, loan syndications agent services, and corporate finance and M&A advisory services."  Wachovia provides these services under the trade name "Wachovia Securities," which is the trade name for all of the corporate and investment banking services of Wachovia Corporation and its subsidiaries (including Wachovia Capital Markets, LLC).  At all times relevant to this Amended Complaint, Wachovia was the principal investment banker and financial advisor to Le Nature's, and it arranged, promoted, and performed other services in connection with multiple credit facilities and securities issuances for Le Nature's, totaling hundreds of millions of dollars.  Wachovia arranged, promoted, and syndicated the $285 million Credit Facility specifically at issue in this action.

33.     BDO is a New York limited liability partnership that conducts substantial business and maintains an office in New York.  BDO was Le Nature's' outside accountant and

auditor for the years 2003 through 2006, and issued audit reports with respect to Le Nature's' financial statements for the years ended December 31, 2003, 2004, and 2005.

34.    Gregory J. Podlucky ("Podlucky") is an individual who resides in Pennsylvania. At all times relevant hereto, he was the majority and controlling shareholder of Le Nature's and its Chairman and Chief Executive Officer. Podlucky traveled to New York on several occasions to market Le Nature's bank debt to potential lenders.

35.    Robert Lynn ("Lynn") is an individual who resides in Pennsylvania. At all times relevant hereto, he was an Executive Vice President of Le Nature's and was Podlucky's nominee to, and a member of, Le Nature's' Board of Directors. Lynn traveled to New York on several occasions to market Le Nature's' bank debt to potential lenders. Podlucky and Lynn are referred to collectively as the "Le Nature's Executives."

**Selected Relevant Non-Parties**

36.    Le Nature's is a Delaware corporation with its principal place of business in Latrobe, Pennsylvania. Le Nature's was in the business of manufacturing, bottling, and distributing an array of non-carbonated beverages. Le Nature's was placed in involuntary bankruptcy on November 1, 2006.

37.    Wachovia Bank, a national banking association, conducts business in and maintains a substantial number of offices in New York. At all times relevant hereto, Wachovia Bank administered hundreds of millions of dollars of loans to Le Nature's.

38.    Jonathan Podlucky ("Jonathan Podlucky"), the brother of Gregory Podlucky, is an individual who resides in Pennsylvania. At all times relevant hereto, he was the Chief Operating Officer of Le Nature's and was Podlucky's nominee to, and a member of, Le Nature's' Board of Directors.

39.    Andrew Murin ("Murin") is an individual who resides in Pennsylvania.  At all times relevant hereto, he was Podlucky's nominee to, and a member of, Le Nature's' Board of Directors.

## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. §§ 1331, 1334(b), and 1367.  The causes of action alleged herein arise under, *inter alia*, sections 1962 and 1964 of the RICO Act.

41.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.  Among other things, Wachovia met with certain Plaintiffs or their predecessors in New York to induce them to invest in the Credit Facility, and Le Nature's' audited and unaudited financial statements were sent to investors in New York, including certain Plaintiffs or their predecessors.  Wachovia and BDO maintain substantial operations and offices in this District.

## BACKGROUND

**History of Le Nature's:  A Rapid Rise and Dramatic Fall**

42.    Le Nature's was founded by Podlucky in 1989 and produced its first product – a carbonated flavored water called Le*Nature's Sparkler – in 1992.  Within a year, the Company expanded its line of products to include iced teas, lemonades, and a juice-based line of drinks called Dazzlers.  By 2005, the Company claimed to be producing nearly 60 different non-carbonated beverage products.

43.    Le Nature's styled itself an innovator in the beverage industry and touted its alleged use of cutting-edge technologies and distribution methods.  In the 1990's, Le Nature's purported to be one of the first beverage companies to move its products into environmentally safer PET plastic bottles, to patent a method by which beverages could be pasteurized in the

bottle itself, and to develop new technologies for brewing iced tea.  Indeed, Le Nature's

described itself as having "one of America's most advanced beverage manufacturing facilities."

44.     According to its annual financial statements, public pronouncements, and

marketing materials, Le Nature's was a remarkably successful company.  The growth in its array

of products was purportedly coupled with even more impressive growth in its gross sales, net

sales, and profits.  The year-to-year increases in financial performance were purportedly as

follows:

| Year | Reported Gross Sales | Reported Net Sales | Reported Net Income |
|------|----------------------|--------------------|---------------------|
| 2000[*] | $40,658,000 | $40,405,000 | $953,000 |
| 2001[*] | $85,094,000 | $83,961,000 | $1,350,000 |
| 2002 | $143,766,705 | $135,650,095 | $9,458,809 |
| 2003 | $179,905,164 | $155,746,687 | $13,268,578 |
| 2004 | $228,812,363 | $207,069,179 | $22,010,988 |
| 2005 | $287,233,880 | $275,089,169 | $22,916,977 |

[*]Indicated amounts for 2000 and 2001 are rounded to the nearest thousand.

45.     In 2005, Le Nature's commenced operations at a new, 500,000 square foot state-

of-the-art facility in Phoenix, Arizona.  The new facility substantially expanded Le Nature's'

production capacity, enabling (according to the Company) the production of 32 million more

cases per year.  According to the Company, in a presentation that its executives and Wachovia

representatives made to potential lenders, by December 2005 Le Nature's had "expanded from 1

production facility with a total of 2 lines in 2003, to currently 2 production facilities with a total

of 7 lines in operation."

46.     The reported financial information, as well as the news of expanded production

capacity and plans for additional facilities, falsely painted the picture of a booming company.  In

May 2006, however, several minority shareholders in the Company – essentially, early investors

who provided seed capital in exchange for preferred shares of stock and representation on the

board of directors – initiated an action in Delaware Chancery Court against Le Nature's and four

of its inside directors (Podlucky, Jonathan Podlucky, Murin, and Lynn) (the "Delaware Action"). The Delaware Action involved various corporate governance disputes, including claims against the inside directors for failing to actively maximize value and pursue a sale of the company in a manner consistent with their fiduciary duties.

47.    In the Delaware Action, the minority preferred shareholders obtained several orders prohibiting the inside directors from, *inter alia*, incurring non-ordinary capital expenditures and performing certain actions without the board of directors' unanimous consent. In June 2006, the Chancery Court entered a preliminary injunction restraining the Company from taking certain steps, such as making capital expenditures outside the ordinary course of business, without the minority shareholders' approval.  On October 20, 2006, the Court issued an order prohibiting the inside directors from accessing, tampering with, or destroying any Company property, books, or records.

48.    Months after filing their initial complaint seeking the restraining order and the appointment of a custodian to preserve Le Nature's' assets, the Company's minority preferred shareholders were advised that, through the use of forged documents, Le Nature's had converted funds placed on deposit by one of its lessors.  Specifically, American International Group, Inc. ("AIG") had agreed to provide equipment lease financing for production lines at a planned Florida facility.  To that end, in late 2005 and early 2006, AIG deposited approximately $26 million with Krones, Inc., the equipment manufacturer.  When AIG sent a representative to the Krones plant to inspect the equipment, it learned that manufacturing had barely begun, and that Krones had forwarded nearly $20 million of AIG's deposit to Le Nature's, supposedly based on written instructions from AIG.  Having given no such instruction, AIG asked for copies of the relevant documents.  Among other documents, Krones produced a letter, purportedly written on AIG letterhead and purportedly signed by AIG, authorizing release of funds to Le Nature's.

According to AIG, the letter was a forgery, and AIG retained an expert opinion attesting to the letter's falsification.

49.     Following revelation of the forgery, on October 27, 2006, the Delaware Chancery Court approved the minority preferred shareholders' request for the appointment of a custodian and appointed Kroll Zolfo Cooper ("KZC") as custodian for Le Nature's.  KZC took possession and control of the company that same day at 5:30 p.m.  Over the next few days, several Company employees informed KZC that they had witnessed individuals, including Podlucky, shredding documents.  An accounting employee advised KZC that false entries were made in order to meet revenue targets and that the 2005 audited financial statements were based on falsified information.  KZC also was advised that over the weekend of October 21 and 22, 2006, a dump truck arrived at the Company and unloaded a large volume of documents into the trash compactor, and that several employees witnessed Podlucky's personal bodyguard depositing various bundles of documents into the trash compactor.

50.     On November 1, 2006, Steven G. Panagos, a KZC managing director, filed an affidavit with the Delaware Chancery Court detailing some of KZC's findings in its first few days at Le Nature's.  Among other things:

- Information at the Company indicated that actual 2005 revenues were as low as $32 million, as compared to the $275 million reported in Le Nature's' audited financial statements;

- Significant discrepancies existed between customer shipment and accounts receivable information located at the Company and the Company's (a) 2005 audited financial statements, and (b) unaudited financial statements as of June 30, 2006;

- Le Nature's had $1.8 million in available cash reserves, against which it had $2.9 million in outstanding checks; and

- Vendors were making demands on the Company for past due payments in excess of $10 million.

51.     The custodian's findings clearly indicated that Le Nature's had engaged in massive overstatement of its revenues, not only for 2005 but for many years leading up to the Company's bankruptcy.  The meager $32 million in revenues (as determined by the custodian) was achieved only *after* the Company brought into operation several of its production lines at the brand new Phoenix facility.

52.     On November 1, 2006, several of Le Nature's' creditors initiated involuntary bankruptcy liquidation proceedings under chapter 7 of the Bankruptcy Code.  On November 3, 2006, the Bankruptcy Court for the Western District of Pennsylvania put Le Nature's into chapter 11 bankruptcy, thereby giving the Company an opportunity to reorganize.

53.     Almost immediately after the initiation of bankruptcy proceedings, Le Nature's ceased operations at its Phoenix facility.  On November 13, 2006, employees who reported to work at the Latrobe plant were sent home and told that the plant would be temporarily closed. Production never resumed thereafter.

54.     Since initiation of the bankruptcy proceedings, the chapter 11 trustee, together with his consultants and advisors, has initiated an intensive investigation regarding Le Nature's' actual revenues during the years 2002 through 2005.  The investigation, which is ongoing, has been more detailed than the preliminary investigation performed by the custodian.  In part, the investigation has been undertaken to submit amended tax returns for those years that reflect Le Nature's' actual revenues, rather than the inflated revenues reported by Le Nature's, Wachovia, and the company's auditors.  The results, which are reflected in signed tax returns submitted by the trustee, demonstrate the magnitude of the Company's revenues overstatements:

| Year | Le Nature's Reported Net Sales | Actual Net Sales (on tax returns) |
|------|-------------------------------|-----------------------------------|
| **2002** | $135,650,095 | $4,404,899 |
| **2003** | $155,746,687 | $9,812,559 |
| **2004** | $207,069,179 | $12,760,760 |
| **2005** | $275,089,169 | $28,284,230 |

Shown graphically:



55.      Facts that have been publicly revealed since the filing of Le Nature's' bankruptcy indicate that the Company's seemingly constant capital raising efforts, which purportedly were to generate funds to expand the Company's production and distribution lines, actually were undertaken to finance the extravagant lifestyles and bizarre spending habits of the Le Nature's Executives.  For example, upon information and belief, although Podlucky earned a salary of only $50,000, he was building a mansion worth in excess of $20 million.  Podlucky also purchased millions of dollars worth of jewelry, art, and toy trains with the Company's money. The items that Podlucky purchased with money that he diverted from the Company – including the funds raised by sale of the Notes – included watches from Piaget, Harry Winston, Van Cleef & Arpels, and Rolex, necklaces and earrings containing diamonds, sapphires and other gems,

and mounted and unmounted gems. According to a complaint filed by the federal government, Podlucky transferred money from the Company's accounts to his personal accounts over a six-year period.

56. When the original complaint in this action was filed, Le Nature's' website stated: "Le-Nature's has filed [for] bankruptcy and is no longer producing or selling its products. Unfortunately, the company is also unable to honor any promotions advertised online or elsewhere. We apologize for any inconvenience." It appears that the website is no longer operational.

**Wachovia Was Le Nature's' Trusted Advisor and Banker**

57. For several years leading up to the September 2006 Credit Facility, Wachovia was the exclusive financial advisor to, and investment banker for, Le Nature's. In this role, Wachovia was responsible for arranging, funding, syndicating, and selling an array of credit facilities and a substantial notes offering, all to raise more money to fund Le Nature's' purportedly expanding production and sales. Wachovia was also retained, prior to the Credit Facility, to explore a possible sale of the Company, a process through which it obtained even greater access to, and knowledge of, the Company's operations and finances (as well as bidders' reactions to the information they were provided). As the result of its multiple roles, Wachovia was provided with access to Le Nature's' financial records, personnel, and outside accounting and legal firms.

### 1) *April 2003 Credit Facility*

58. In April 2003, Wachovia was the co-lead arranger for a $150 million credit facility for Le Nature's (the "April 2003 Credit Facility"). Wachovia Bank acted as the administrative agent. As set forth below, the April 2003 Credit Facility was repaid only two months later with funds raised, again by Wachovia, in a bond offering.

**2)** ***June 2003 Notes Offering – Wachovia's "Reach" to Break Into the High Yield Market***

59.    In or about June 2003, Wachovia arranged the issuance and placement, and acted as the initial purchaser, of $150 million in senior subordinated notes (the "Notes Offering"). Wachovia marketed the Notes Offering to investors through a detailed Offering Memorandum drafted by Wachovia and bearing the "Wachovia Securities" name on its cover.  The proceeds of the offering were used to satisfy Le Nature's' obligations under the April 2003 credit facility.

60.    The relationship between Wachovia and Le Nature's was unusual with respect to the June 2003 Notes in that Wachovia screened all information distributed by the Company to the holders of the notes.  Income statements, balance sheets, cash flow statements, and other reports containing financial information, were all distributed first to Wachovia, and then to noteholders by Wachovia.  In a typical deal, all investors, including the underwriter, would see this type of information at the same time.  Some of the noteholders complained that they were getting the information a day late from Wachovia, but Wachovia insisted on controlling the information flow.  All correspondence between Le Nature's and the noteholders ran through Wachovia.

61.    Even by the time of the June 2003 Notes Offering, Wachovia knew that Le Nature's was a troubled company.  Motivated by (i) fees to be generated by the Notes Offering, (ii) the solidification of an on-going investment banking relationship with Le Nature's, and (iii) relief of the credit exposure that its affiliate, Wachovia Bank, had incurred under the April 2003 credit facility, however, Wachovia pressed forward with the Notes Offering.  The result was placement of the notes with an array of investors who also would fall victim to Le Nature's' fraud.

62.      One of Wachovia's principal motivations for participating in Le Nature's' fraud, and facilitating placement of the June 2003 Notes, was its strong desire to build up its fledgling high-yield bond business, which was dependent on generating financing transactions for mid-market companies such as Le Nature's.  In early 2003, Wachovia was still a comparatively new player in the high-yield underwriting business.  In 2000, Wachovia underwrote only one issue.  In 2001 and 2002, it underwrote only four and 10 issues (respectively), increasing the total issue amount from $200 million in 2000 to $476.6 million in 2001 and $960.3 million in 2002.  In 2003, the year of the Le Nature's' Notes Offering, Wachovia underwrote considerably more:  38 issues valued at $2.7 billion, earning fees of $58 million (up from $23 million in 2002, $9.9 million in 2001, and $4 million in 2000).  Compared to other investment banks, however, Wachovia remained a minor player in the sector.  In 2003 alone, for example, Credit Suisse First Boston ("CSFB") underwrote 127 issues, valued at more than $21.6 billion.

63.      Struggling to compete with more established investment banks, Wachovia was not as selective in choosing which high-yield issuances to pursue.  Large and more established bond issuers were unlikely to choose a fledgling underwriter like Wachovia.  As a result, Wachovia sought to expand its high-yield underwriting business through *quantity*, rather than quality, and was willing to underwrite deals that other banks were not even willing to consider.  The Le Nature's Notes Offering was just such a deal.  In May 2003, Wachovia's High-Yield Capital Markets Division (the "Origination Division"), which acted as an investment bank charged with originating and underwriting investment opportunities, approached its publicly trading counterpart, the High-Yield Sales (Trading and Research) Division (the "Sales Division"), with the Le Nature's transaction.  On information and belief, within Wachovia, the Sales Division expressed misgivings about the Notes Offering, specifically questioning the accuracy of Le Nature's' recent sales trajectory.  Moreover, a senior Wachovia executive had

warned at the time that the Company "had hair on it" – a colloquial term indicating challenges at Le Nature's.  As one former senior member of the Sales Division acknowledged, the Sales Division was very concerned about moving forward with the transaction and hoped that it would simply "go away."

64.    In light of its concerns, the Sales Division tried to push off the transaction by advising the Origination Division that, based on its review of the Notes Offering, it believed additional due diligence was needed.  The Origination Division, hungry to complete the transaction and further cement Wachovia's relationship with Le Nature's, instead advised the Sales Division simply to "trust" the Origination Division's due diligence and move forward in selling the Notes.

65.    As a result, on information and belief, Wachovia pushed forward with the Notes Offering even though it was well aware that additional due diligence, requested by its own Sales Division, had purposefully not been done.  And lack of due diligence was only part of the picture.  Even in early 2003, Wachovia had direct information about the troubled state of affairs at Le Nature's.  Grant Rice, a senior manager within the Origination Division and Wachovia's principal contact with Le Nature's, worked at Bank of America before joining Wachovia.  Like Wachovia, Bank of America considered the possibility of raising financing for Le Nature's.  On information and belief, that bank, unlike Wachovia, cut off its efforts based on its uneasiness with the Company and the Company's lack of openness in the due diligence process.  Bank of America recognized that Le Nature's' management could not be trusted, and thus that a financing transaction should not be completed.  Rice arrived at Wachovia armed with the knowledge that Le Nature's' managers lacked integrity.  But he brought Le Nature's with him as a client, and worked with fellow Wachovia employees to complete the Notes Offering, knowing

all along that his former employer was unwilling to complete a transaction with Le Nature's because of the financial integrity issues it had identified.

66.    The same concerns were reiterated by the Sales Division only months later, following the abrupt and unexpected resignation of Le Nature's' chief financial officer, John Higbee, in August 2003.  Higbee, who had worked for decades as an auditor at Arthur Andersen LLP, was hired by Le Nature's (along with a colleague from Andersen) in 2002 to lend credibility to the Company's management team.  News of his resignation sent shockwaves through Wachovia's Sales Division.  As one former senior member of the Division explained, "it is always pretty horrifying" when a chief financial officer leaves for no reason.  Higbee's departure was even more disturbing, given his role in providing legitimacy to Le Nature's' financial management team and his expressly articulated concerns with Le Nature's' accounting practices in his resignation letter.  ***As explained by a Wachovia Sales Division manager, Higbee's departure was a "very scary event."***

67.    The Wachovia Sales Division, which was at that time making a market by actively trading Le Nature's notes, brought its concerns to the Origination Division.  The Sales Division knew that noteholders and potential investors would raise questions about Le Nature's, and it knew that it would be making representations to those investors regarding Le Nature's' financial health and integrity.  Because the Origination Division (and, in particular, Grant Rice) had the closest relationship with Le Nature's, the Sales Division sought its assistance to obtain the best information concerning Higbee's resignation.  But when the Sales Division questioned the bankers in the Origination Division about the departure, it was, once again, told simply to "trust" Origination's view that the chief financial officer's departure was being adequately handled by the Company.  The Sales Division, which was admittedly "scared" about the developments at Le Nature's, had hit a stone wall; Wachovia simply would not provide its own

salesmen with further information that was already in Wachovia's possession and easily within

its ability to obtain from the Company. Notwithstanding these serious issues, the Sales Division

continued to sell Le Nature's' bonds, and Wachovia continued to structure and place a series of

further financings for the Company.

### 3) *June 2003 Credit Facility*

68.     Coupled with the Notes Offering, Wachovia arranged a replacement $100 million

credit facility in June 2003. Wachovia was the sole lead arranger and bookrunner. And, once

again, its affiliate, Wachovia Bank, served as administrative agent for a fee. Wachovia

syndicated the $100 million credit facility – which consisted of a $100 million revolving line of

credit senior to the bonds – to multiple lenders. Wachovia Bank, which also participated as a

lender, capped its exposure in this senior facility at $25 million.

69.     As demonstrated by the several transactions that Wachovia arranged in early

2003, from the very outset of its relationship with Le Nature's, Wachovia turned a blind eye to

Le Nature's' substantial infirmities in order to obtain massive fees, generate substantial public

exposure, and develop its high yield banking business. Indeed, in a widely circulated e-mail of

July 1, 2003, Wachovia's bankers congratulated themselves on their close relationship with Le

Nature's management, and celebrated the fees and publicity generated by that relationship. The

e-mail highlighted Wachovia's ability to purposefully ignore "internal issues," such as the

integrity and due diligence issues raised by its Sales Division, in order to achieve such results.

As the e-mail makes clear, Wachovia was willing to sacrifice its own integrity, and adapt to Le

Nature's' "ever-changing" deal, in order to promote its own business and financial success:

> . . . . The recent transaction is receiving a lot of publicity here in
> Charlotte and everyone is aware that the recent bank/bond deal
> would not have happened without our prior support of the
> company via the previous bank deal and the rapport developed
> with management in the process. . . .  As a result of your ability to

adapt to an *ever-changing deal* and willingness to work in concert with CIB [a division within Wachovia], we have recognized *total fees of nearly $7.5MM* between the two bank deals and the high yield issuance. ***This deal has become a poster child for what we can get done when we don't get hung up on internal issues*** and do what is best for the client and our firm as a whole.

### 4)  *May 2004 "Add-On" Facility*

70.    In May 2004, Wachovia arranged and marketed another $75 million loan facility to be added to the pre-existing $100 million revolver.  In connection with the new loan and its syndication, Wachovia prepared a Confidential Information Memorandum that it distributed to potential lenders.  The memorandum touted Le Nature's' purported net sales from 1999 through 2003:  $28 million in 1999, $40 million in 2000, $84 million in 2001, $135 million in 2002, and $159 million in 2003.

71.    The net sales figures in the Wachovia materials were materially false.  As uncovered by the court-appointed custodian in October 2006, Le Nature's' net sales were as low as $32 million *even after the expansion of the Company's production capacity* with the completion and operation of its Phoenix facility.  Clearly, net sales could not have reached anything even close to the levels reported by Wachovia in earlier years.  Sales in excess of $100 million, such as Wachovia reported for 2002 and 2003, were simply fanciful.  Wachovia's memorandum further stated that the Company's 2003 EBITDA was $61.1 million, reflecting a compound annual growth rate of 55.0% since 1999.  These numbers were also without basis in reality.

72.    On April 20, 2004, Wachovia and Le Nature's made a presentation in New York City to potential lenders with respect to the May 2004 Add-On Facility.  The cover slide for the presentation proudly showed authorship by "Wachovia Securities."  Jerry Hullinger, a Wachovia director, initiated the presentation by providing a "Transaction Overview."  He was accompanied

by several Le Nature's executives, including Podlucky, David Getzik (then chief financial officer), and Robert Lynn (general manager), who reiterated the financial results set forth in the Wachovia marketing materials.  Following this presentation, Ted Swimmer, a Wachovia managing director, provided a "Syndication Overview," in which he discussed the logistics of the loan and its anticipated closing.  As part of his presentation, Swimmer reviewed an "asset coverage calculation" detailing the available collateral for the loan, including a description of Le Nature's' purportedly then-existing accounts receivable and inventory.  The financial information presented by Wachovia and Le Nature's' managers was materially flawed, including a substantial overstatement of the asset-to-debt ratio.

73.    In May 2004, Wachovia originated and provided the $75 million add-on term loan to Le-Nature's, which was used to pay outstanding debt due to Wachovia Bank under the pre-existing revolver.

### 5)  *December 2005 "Add-On" Facility*

74.    In late 2005, Le Nature's again called upon its investment bankers at Wachovia to raise new capital for the Company; this time, a $100 million add-on term loan facility to supplement the pre-existing loans.  Once again, Wachovia prepared a detailed Confidential Information Memorandum, which it distributed to potential lenders in the new facility.  Among other things, the offering memorandum made specific representations regarding Le-Nature's net sales, gross profit, EBITDA, accounts receivable, inventory, debt, and debt service obligations, much of which was false.  For example, Wachovia's offering memorandum reported:

- For the 12 months leading up to September 30, 2005, Le Nature's generated net sales of $271.6 million and EBITDA of $112.3 million, "resulting in an EBITDA margin of 41.4%, its highest level since the Company began operations."

- Compound annual net sales growth from 2000 through the last twelve months period ending September 30, 2005, was 49.3%.

- Since 2003, EBITDA has increased by 98%.

- For the 12-month period ending on September 30, 2005, Le Nature's sold 69.2 million cases of its product, reflecting compound annual growth of 70.9% from 2001.

75.     On December 6, 2005, Wachovia and Le Nature's made a presentation to potential lenders, at the New York Palace Hotel, similar to the April 2004 presentation.  As with other presentations, the cover slide proudly displayed the "Wachovia Securities" name and logo. Wachovia's Jerry Hullinger again initiated the presentation, which was organized and run by Wachovia, with a "Transaction Overview" that touted the strength of asset coverage for the loan (based, in part, on Le Nature's' then-existing accounts receivable and inventory).  Hullinger also emphasized the Company's strong sales growth and continued margin improvement.  During the presentation, prospective lenders were provided with information similar to that set forth in Wachovia's offering memorandum, including the exaggerated sales and EBITDA numbers. Podlucky, Lynn, and David Getzik attended the presentation on behalf of Le Nature's and helped Wachovia present extensive and materially false financial information to the lenders.

76.     As a consequence of Wachovia's efforts, Le Nature's was successful in obtaining the $100 million add-on loan in December 2005, and Wachovia earned millions of dollars in fees in connection therewith.  From and after December 2005, Wachovia's affiliate, Wachovia Bank, continued to act as administrative agent for Le Nature's' secured lending facilities, which thereafter totaled $275 million dollars.

77.     The proceeds of the $100 million add-on loan were used to pay and satisfy the then approximately $83 million in outstanding indebtedness due under Le Nature's' $100 million revolver, including debt due to Wachovia Bank.  Thus, Wachovia Bank's previously capped $25 million exposure under the revolver was eliminated by funding of the new term loan.

78.     As the direct result of Wachovia's efforts, Le Nature's' long-term secured debt increased from approximately $40 million in 2003 to $171 million in 2005.  This lending substantially leveraged Le Nature's' assets and balance sheet and permitted it to continue funding its operations and purported expansion, to present the image of a thriving, growing company to the public and the business community, and to fuel its ever-expanding fraud.

**Le Nature's' Key Financial Managers Identify Fraud at the Company**

79.     On August 14, 2003, shortly after Wachovia completed Le Nature's' $150 million Notes Offering and new $100 million credit facility, John Higbee, Le Nature's' chief financial officer, abruptly resigned.  Higbee was a veteran auditor – with more than 20 years of experience as an audit partner at Arthur Andersen – who was hired by Le Nature's in 2002 to provide legitimacy to Le Nature's' financial management team.  Prior to joining Le Nature's, Higbee had been a member of the Arthur Andersen team that audited Le Nature's' financial statements and had done independent consulting work for Le Nature's.

80.     In his detailed resignation letter, Higbee explained that he repeatedly had requested direct access to the Company's general ledger detail.  As set forth in the letter, however, Podlucky refused to grant Higbee access to the general ledger, a remarkable position for any chief executive to take with respect to a company's chief financial officer.  Among other things, Higbee further explained that Podlucky's completion of business transactions "without any normal review by others, such as the CFO," had made it impossible for Higbee to fulfill his responsibilities to the Company.  Higbee concluded his letter by explaining the complete control – and the impropriety of such complete control – that Podlucky exercised over Le Nature's:

> I consider 1) *the absolute control you maintain over the Company's detail financial records* 2) the *lack of checks and balances* related to deposits on equipment 3) the *lack of checks and balances* related to deposits on tea leaf 4) the *lack of checks and balances* related to the sale of bulk tea concentrate and bulk

tea leaf to be ***material weaknesses in the Company's internal controls***.

81.     Higbee was not alone in his concerns and his willingness to express them.  The same day, Jennifer Fabry, the Company's chief administrative officer (who had recently been given the title of chief financial officer in Higbee's place), and Stacy Juchno, the vice president of administration, submitted their resignations.  Both Fabry and Juchno wrote, ***"I have seen inconsistencies with how business is conducted and do not agree with such behavior."***

82.     Higbee alerted the Company's auditors at Ernst & Young LLP to the resignations.  In a letter dated August 22, 2003, Ernst & Young, which had audited the Company's financials for the previous two years and issued clean audit reports, requested that the Company "engage immediately competent independent legal counsel to conduct a thorough and complete investigation of the allegations made by the former employees."  Ernst & Young further explained that it would be "unable to be associated with any unaudited interim financial statements or historical audited financial statements, including issuing any consents or comfort letters, until the allegations are investigated thoroughly by independent counsel, we complete our review of the report of the investigation, we perform any additional procedures we consider necessary in the circumstances, and we interview the former employees."

83.     In response to Ernst & Young's demands, Le Nature's purported to create a special committee of its board of directors (the "Special Committee") to investigate certain business transactions identified by Higbee, Fabry, and Juchno.  The committee, in turn, retained the law firm Kirkpatrick & Lockhart LLP ("K&L") to conduct the investigation.  Both the Special Committee and K&L, while purporting to conduct an independent investigation, limited the scope of the investigation to seven specific transactions identified by the resigning managers.  With respect to these transactions, the resigning employees had expressed their concerns that:

- Podlucky exercised exclusive control over significant aspects of Le Nature's' business, including equipment deposits and purchases, the purchase of tealeaf, and the sale of Bulk Tea Products;

- Podlucky refused to explain his relationship with Lawrence Wooten, who they suspected controlled both (i) the sole supplier of tealeaf to Le Nature's, and (ii) Le Nature's' principal purchasers of Bulk Tea Products; and

- Podlucky's flamboyant lifestyle was not consistent with his purported annual income of $50,000.

84.     K&L's resulting report (the "Report") demonstrates that the law firm, while purporting to be an "independent" examiner of the resigning managers' allegations, was beholden to the corrupt management that had hired it and thus failed to conduct an adequate investigation.  The Report repeatedly noted the unavailability of supporting information and documentation, the lack of Le Nature's' (and, specifically, Podlucky's) cooperation, and the insufficiency of Le Nature's' almost nonexistent internal financial controls.  Among other things, the Report revealed the following startling facts, all of which provide a glimpse into the perverse way in which Le Nature's was being managed:

- Andrew Murin (formerly president of Le Nature's) and Edward Reeves (the owner of the sole supplier of tealeaf to Le Nature's) were not "forthcoming" in their interviews.  When K&L requested an opportunity to interview each of them again, "Le-Nature's refused to make either individual available."

- "In many instances, Counsel was unable to obtain external supporting documentation relating to the Bulk Tea Products transactions reviewed by it.  This is ***particularly problematic*** in view of the substance of the interviews of Messrs. Murin and Reeves."

- Counsel sought to interview Lawrence Wooten, the owner of Le Nature's' principal Bulk Tea Products customer.  In the first half of 2003, Wooten's companies supposedly purchased $34.2 million of such products from Le Nature's and received trade credits of $3.95 million that were approved by Podlucky *without any involvement of any other Le Nature's employee.* Wooten declined to be interviewed.

- Le Nature's did not enable Counsel to interview a representative of Vistar, a substantial Le Nature's customer that received a large refund for tea concentrate in the first half of 2003.

- Le Nature's inexplicably agreed to increase Wachovia's fee in connection with the June 2003 Notes Offering even though the offering was "oversubscribed at the time of Wachovia Securities' proposal to revise the fee."

- Le Nature's was unable to provide reliable documentation "evidencing the shipping or receiving" of bartered items.

- "Counsel was unable to independently verify receipts and shipments related to Le-Nature's reported purchases of tealeaf and sales of Bulk Tea Products because the third party documents reflecting these transactions are illegible, unreliable, or non-existent."

85.    Among the many other deficiencies in the Report, K&L utterly failed to obtain supporting documentation and information concerning bulk tea concentrate and bulk tealeaf sales.  Documents were missing, key customers (with connections to Podlucky) refused to be interviewed, and receipts and shipments could not be verified.  The insufficiency of the Report in this regard is jarring, given that problems in this specific area were identified by Higbee in his resignation letter.  Indeed, even K&L recognized that "there are significant internal control weaknesses relating to the tealeaf inventory, including the lack of valid third party shipping documents and inadequate segregation of duties."  But based on its determination that Podlucky's "explanation for Le-Nature's Bulk Tea Product activity" was "plausible," K&L concluded that Le Nature's' bulk tea sales and purchases were sufficiently identified.

86.    Although refusing to acknowledge fraud at Le Nature's, K&L's Report did identify a number of significant shortcomings in Le Nature's' internal procedures, all of which made the Company more susceptible to fraudulent activities.  Thus, K&L recommended that remedial action be taken to improve, among other things, (i) the segregation of duties at Le Nature's, so that Podlucky would not continue to exercise virtually exclusive control over

multiple aspects of the business, and (ii) documentation practices, so that assertions reflected in the financial statements could be supported by competent evidential matter.

87.     With K&L's Report in hand, Le Nature's' managers and inside directors continued on, largely undisturbed, in their improper practices.  Most significantly, Podlucky continued to exercise unfettered control over all key aspects of the Company's operations.  And the Company continued to report revenues that had no relation to the Company's actual level of sales.

88.     The Company provided K&L's Report to BDO, which reviewed the report in conjunction with its audit of the Company's 2003 financials.  Upon information and belief, the Report also was provided to Wachovia, which, as the result of its multiple transactions on behalf of Le Nature's, was already familiar with many of the shortcomings identified in the report.  In contrast, neither the Report, nor the facts, conclusions, and recommendations contained therein, were ever disclosed to the lenders prior to the closing of the $285 million Credit Facility.  Indeed, the lenders were never even advised of, and were not aware of, the existence of the Le Nature's Special Committee that investigated the employee resignations.

**Le Nature's Terminates Ernst & Young and Installs a New "Independent" Auditor, BDO**

89.     On or about January 13, 2004, after reviewing the K&L Report, Ernst & Young sent a letter to Podlucky indicating that, in light of the Report, Ernst & Young had to perform additional procedures in order to resolve a series of concerns raised by Ernst & Young before the Report was issued, when Ernst & Young disavowed its earlier audit report.  Ernst & Young explained that only after it performed these procedures would it be able to "evaluate whether the concerns raised in [its earlier] letter have been addressed and we can rescind the limitations on the use of our previously issued reports."

90.     In its January 2004 letter, Ernst & Young indicated that a "tea leaf inventory rollfoward" was necessary.  Ernst & Young proposed that its own representatives both prepare and mail confirmations of tealeaf transactions.  The confirmations would then be used to reconcile the inventory rollforwards.  Ernst & Young further indicated the need for additional information regarding the barter transactions.

91.     Ernst & Young never received the information required for a new inventory rollforward or independent corroboration of the bulk tea transactions.  Ernst & Young *never* got the required information from Le Nature's, *never* performed a new inventory rollforward, *never* sent out new confirmations for the bulk tea transactions, and *never* got the required information for the purported barter transactions.

92.     Indeed, far from providing additional information to Ernst & Young, Le Nature's terminated Ernst & Young as its auditor.  Ernst & Young was abruptly removed, and Le Nature's brought in BDO as its new auditor.

93.     On information and belief, BDO was aware of the reasons for, and the circumstances surrounding, the removal and replacement of Ernst & Young as the Company's auditor.  In particular, BDO knew that Ernst & Young was terminated after it requested – and because it requested – that the Company provide additional information.  Indeed, to comply with GAAS, BDO was required to communicate with Ernst & Young prior to accepting the Le Nature's engagement.  (AU § 315)  BDO was required to be mindful that "the predecessor auditor and the client may have disagreed about accounting principles, auditing procedures, or similarly significant matters."  BDO was required to "make specific and reasonable inquiries" of Ernst & Young, including inquiries regarding:

- "Information that might bear on the integrity of management;"

- "Disagreements with management as to accounting principles, auditing procedures, or other similarly significant matters;"

- Communications regarding "fraud, illegal acts by clients, and internal-control-related matters;" and

- Ernst & Young's "understanding as to the reasons for the change of auditors."

(AU § 315.09)  Had BDO made these inquiries, as it was required to do, it would have known about serious issues with management's integrity and the Company's reporting of financial results, including problems with the reporting of bulk tea and associated barter transactions.

### 1) *BDO Failed to Disclose Material Shortcomings in Its 2003 Audit Report*

94.    In March 2004, Le Nature's engaged BDO to audit the Company's year-end 2003 financial statements.  BDO purported to conduct the audit in accordance with "auditing standards generally accepted in the United States of America [i.e., "GAAS"]."

95.    From the outset, BDO acknowledged that – based on the fraud allegations asserted by the former Le Nature's employees, its audit of Le Nature's would be classified as "sensitive."  As a result, BDO was required to undertake appropriate procedures to identify fraud and other possible sources of material misstatements in the Company's financial statements.

96.    Indeed, as part of its audit, BDO reviewed the K&L Report, its recommendations, and Le Nature's' failure to implement the recommended steps.  On information and belief, BDO would have noted Le Nature's' failure to adopt even the limited procedures recommended in the Report.

97.    Additionally, BDO could see from the Report that Le Nature's had engaged in fraudulent conduct with respect to its bulk tea transactions.  Upon reading the Report, and in reviewing the Report as part of its audit, BDO understood that the Company lacked reliable evidence for its tealeaf inventories, the bulk tea purchases and sales, and the purportedly related

barter transaction for bottles.  BDO knew that witnesses who were interviewed about the bulk tea

transactions were not "forthcoming" and that documents reflecting the transactions were

"illegible, unreliable, or non-existent."  BDO also knew that Podlucky exercised unilateral,

unchecked control over the transactions.

98.    Notwithstanding Le Nature's' obvious failures to comply with the Report's

recommendations, and the obviously inappropriate reporting of bulk tea transactions referenced

in the Report, BDO issued an unqualified report (a "clean audit opinion") on Le Nature's'

financial statements:

> In our opinion, the 2003 financial statements referred to above
> present fairly, in all material respects, the financial position of Le-
> Nature's, Inc. at December 31, 2003, and the results of its opera-
> tions and its cash flows for the year then ended in conformity with
> accounting principles generally accepted in the United States of
> America [i.e., "GAAP"].

### 2)    BDO Knew and Intended that Its Audit Reports Would Be Provided to, and Relied Upon by, Le Nature's' Lenders

99.    BDO conveyed each set of Le Nature's financial statements, together with its

clean audit opinions, to the Company (and, upon information and belief, to Wachovia or

Wachovia Bank, as administrative agent) with the knowledge and intent that the audited financial

statements would be provided directly to existing and potential lenders to Le Nature's.  Indeed,

the Company's financing agreements *required* that audited annual financial statements be

provided to the Company's lenders.  That requirement was first set forth in section 5.1(a) of the

original June 2003 credit agreement (which all later loans to Le Nature's either supplemented,

amended, or restated), which mandated provision of:

> Annual Financial Statements.  As soon as available, but in any
> event within ninety (90) days after the end of each fiscal year of
> the Borrower, a copy of the consolidated balance sheet of the
> Borrower and its consolidated Subsidiaries as at the end of such
> fiscal year . . . including notes thereto and audited . . . by a firm of

independent certified public accountants of nationally recognized
standing . . . .

100.    Later versions of the credit agreement include nearly identical language, including

in section 5.1(a) of the May 2004 and December 2005 amendments to the credit agreement, and

in section 5.1(a) of the September 2006 Credit Facility at issue in this action.  As part of its audit

work, BDO must have reviewed and become familiar with the terms of Le Nature's' credit

facilities.  Thus, BDO *knew* that the audited financials would be provided – and permitted them

to be provided – to lenders and potential lenders to Le Nature's.

101.    Moreover, section 3.1 of the Credit Facility expressly states that, ***"to induce the***

***Lenders to enter into this Agreement and to make the Extensions of Credit herein provided***

***for,"*** the Company had provided its audited financials and management letters prepared by BDO

to the lenders.  The section states:

> The Borrower has delivered to the Administrative Agent and the
> Lenders (a) the balance sheets and related statements of income
> and of cash flows of the Borrower and its Subsidiaries for the fiscal
> years ended December 31, 2003, December 31, 2004 and
> December 31, 2005 audited by BDO Seidman, LLP, (b) an
> unaudited balance sheet and related statement of income and of
> cash flows for the six months ending June 30, 2006 reviewed, (c)
> to the extent prepared and received by the Borrower, management
> letters prepared by BDO Seidman, LLP for the fiscal years ended
> December 31, 2003, December 31, 2004 and December 31, 2005,
> and (d) the six year projections of the Borrower which have been
> prepared in good faith based upon reasonable assumptions.  The
> financial statements referred to in clause (a) above are complete
> and correct in all material respects and present fairly the financial
> condition of the Borrower and its Subsidiaries as of such dates.
> The financial statements referred to in clause (a) above, including
> the related schedules and notes thereto, have been prepared in
> accordance with GAAP applied consistently throughout the
> periods involved (except as disclosed therein).

102.    Similar provisions appear in earlier versions of the credit facility and the

amendments thereto as well.  Accordingly, BDO knew not only that its audit opinions would be

provided to the lenders, but that lenders would directly and expressly rely on the content of those reports in determining to provide credit to Le Nature's and participate in the Credit Facility.

103.    Additionally, BDO knew that the lenders would rely on its work product beyond the annual audit reports.  Section 5.14(h) of the Credit Facility requires the Company to deliver, within 30 days of the closing of the facility, "an unaudited balance sheet and related statement of income and of cash flows for the six months ending June 30, 2006 reviewed by BDO Seidman, LLP in accordance with SAS 100."

### 3)    *BDO Issued Defective and False Audit Reports for the Years 2003, 2004, and 2005*

#### a.    *The Requirements of GAAS*

104.    Each of BDO's audit reports plainly states that the audit at issue was performed in accordance with GAAS, and sets forth a basic description of GAAS requirements.  Specifically, each report states:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

105.    To conduct an audit in compliance with GAAS, an auditor is not permitted to simply accept financial information provided to it by its client.  Rather, as set forth in the codification of auditing standards by the American Institute of Certified Public Accountants ("AICPA"), an "auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether

caused by error or fraud."  (AU § 110.02)  (Citations to "AU" refer to the codification assembled

by the AICPA.)  "The independent auditor's objective is to obtain sufficient competent evidential

matter to provide him or her with a reasonable basis for forming an opinion."  (AU § 230.11)

106.    In addition, due professional care requires the auditor to exercise professional

skepticism, defined as "an attitude that includes a questioning mind and a critical assessment of

audit evidence. . . .  Gathering and objectively evaluating audit evidence requires the auditor to

consider the competency and sufficiency of the evidence. . . .  [T]he auditor should not be

satisfied with less than persuasive evidence because of a belief that management is honest."  (AU

§ 230.07-.09)

107.    Auditors are also required to assess the risk of material misstatement of the

financial statements due to fraud.  (AU § 316)  Based upon that assessment:

> The *nature* of auditing procedures performed may need to be
> changed to obtain evidence that is more reliable or to obtain
> additional corroborative information.  For example, more
> evidential matter may be needed from independent sources outside
> the entity, such as public-record information about the existence
> and nature of key customers [and] vendors . . . The *extent* of the
> procedures applied should reflect the assessment of the risks of
> material misstatement due to fraud.  For example, increasing
> sample sizes or performing analytical procedures at a more
> detailed level may be appropriate.  (AU § 316.52)

108.    Additionally, for audits of financial statements for periods beginning on or after

December 15, 2002, the AICPA's Auditing Standards Board released Statement on Auditing

Standards ("SAS") 99, titled "Consideration of Fraud in a Financial Statement Audit."  Because

BDO's audits concerned fiscal years 2003, 2004, and 2005, each audit was subject to the newly

adopted SAS 99.

109.    The requirements for assessing fraud are especially important for a company such as Le Nature's, where the auditors acknowledged that management had overridden controls.  For example, BDO's "GRA Summary Report" for the 2004 audit stated:

> ! **Overriding of controls**
> Greg Podlucky, CEO, has overridden controls in place.  This is documented in the special committee report. . . .

In its SAS 99 Memo for the same audit, BDO noted, "The CEO has overridden controls in the past and has control over the Company's operations."

110.    BDO's recognition that Podlucky overrode controls necessitated additional testing.  SAS 99 specifically cautions that "management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively."  (AU § 316.57)  Accordingly, GAAS provides a series of procedures to be performed "to further address the risk of management override of controls."  (AU § 316.58-67) Having acknowledged that management override of controls was more than a risk – indeed, it had already materialized – BDO should have implemented additional testing to discern continued problems and ensure that management override of controls had not led to material reporting issues.

111.    Inquiries of management alone are insufficient, under such circumstances, to assess fraud risk.  "Making inquiries of others within the entity, in addition to management, may be useful in providing the auditor with a perspective that is different from that of individuals involved in the financial reporting process.  The responses to these other inquiries . . . might provide information regarding the possibility of management override of controls."  (AU § 316.26)  Moreover, when "evaluating management's responses to the inquiries," auditors

should be aware "that management  is often in the best position to perpetrate fraud."  (AU § 316.27)

### b.  *BDO Failed to Comply with GAAS in Performing Its Audits*

112.    The applicable standards make clear an auditor's duty, in the exercise of professional skepticism, to question financial data provided by the company it is auditing, to take steps to verify that data with independent sources outside of the company, and to question the reliability of information received from management where management itself may be involved in misconduct.  BDO failed to follow even these basic standards in conducting its audits for each of the years 2003, 2004, and 2005.

### i.    Failure to Test Sales

113.    For purposes of obtaining information needed to identify the risk of fraud, including the risk that a company's sales and revenues may be overstated, GAAS requires the auditor to perform the following analytical procedures:

> In planning the audit, the auditor also should perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that may indicate a material misstatement due to fraudulent financial reporting.  An example of such an analytical procedure that addresses this objective is a comparison of sales volume, as determined from recorded revenue amounts, with production capacity.  An excess of sales volume over production capacity may be indicative of recording fictitious sales.  (AU § 316.29)

114.    On information and belief, BDO did not perform the required analytical procedures needed to identify the risk of material misstatement of Le Nature's' revenues.  SAS 99 requires the auditor to presume that improper revenue recognition is a fraud risk.  (AU § 316.41)  Based on this presumption, the auditor is expected to plan and perform the audit to address this specific risk of fraud.  Not only did BDO fail to perform the required analytical procedures designed to identify unusual or unexpected relationships involving revenue accounts,

it failed to perform any direct substantive audit tests of Le Nature's' excessively inflated sales figures in 2003, 2004, and 2005, and falsely certified those sales amounts in each of the annual financial statements that it audited.

### ii. Failure to Assess Fraud Risk With Non-Executive Employees

115.    When the management of a company may itself engage in fraud, and when management is known to be in a position to override controls (to the extent there are any controls in place), GAAS requires auditors to interview non-management employees regarding the possible existence of fraud.  (AU §§ 316.26, 316.27)

116.    Indeed, with respect to Le Nature's, had BDO interviewed several non-management employees – as the custodian did immediately after it was installed at the Company – BDO would have learned specific information regarding the Company's (and Podlucky's) inappropriate conduct.  Notwithstanding its knowledge of Podlucky's management style and his disregard for controls, however, BDO chose not to interview non-management employees.

117.    In connection with the 2004 audit, BDO met with four people at Le Nature's to discuss the likelihood of fraud:  Podlucky (CEO), Jonathan Podlucky (COO), Lynn (chief revenue officer), and Getzik (CFO).  BDO did not make inquiries to *even one* non-management employee.  In selecting this group, BDO failed to heed the applicable audit standards, as well as its own recognition of Le Nature's' structure and lack of effective controls.

118.    For the 2005 audit, BDO again spoke with a handful of individuals:  Podlucky, Getzik, Lynn, and Mae Constantine of accounts payable.  Outside of the Company's three top-ranking managers, BDO did not speak with anyone familiar with production, shipping, sales, accounts receivable, or a range of other issues clearly relevant to the audit.

iii.    Gross Misclassification of Leases, Thereby Vastly Reducing
the Stated Amount of Liabilities

119.    In 2005, Le Nature's substantially increased the amount of property and

equipment that it was leasing, largely in connection with its new Phoenix facility.  According to

the 2005 audited financials, Le Nature's' *operating* lease obligations jumped from $37.8 million

at the end of 2004 to over $413 million at the end of 2005.  Over the same period of time, Le

Nature's' *capital* lease obligations, as reported on the audited financials, fell from $7.4 million to

$5.0 million.

120.    The distinction between capital leases and operating leases is important.  In

essence, the lessee in a capital lease – much like an owner of property – assumes the risk that the

value of the asset will change over time.  Thus, capital lease payments are akin to repayment of

debt to acquire property.  Capital lease obligations must be disclosed as liabilities on a

company's balance sheets.  In contrast, operating lease expenses are typical expenses incurred

during the course of a year that do not impact a company's balance sheet.

121.    In performing its audit for the year ended December 31, 2005, BDO recognized

the importance of the capital versus operating lease classification.  Indeed, BDO understood and

expressly acknowledged that Le Nature's was motivated to improperly classify capital leases as

operating leases in order to avoid any balance sheet impact.  In setting forth fraud risk factors in

connection with the audit, BDO stated:

> ➢ Leases – risk of the company not correctly accounting for their
> lease obligations and identifying capital leases as operating leases.
> *The risk would be the company improperly records leases as*
> *operating so the debt does not get recorded and affect their*
> *compliance with financial covenants.*

122.    In identifying factors that purportedly mitigated the recognized risk, BDO stated

that "the Company structures a majority of their leases as operating (synthetic) leases to keep the

debt off the books and not affect financial covenants." Contrary to BDO's suggestion, the Company's attempt to structure operating leases did not play any role in mitigating the risk that such leases would be improperly classified. Indeed, given BDO's recognition that the Company *wanted* its leases to be categorized as operating leases – in order to keep them off the Company's balance sheet – BDO was acutely aware that Le Nature's was motivated to *misstate* the character of the leases. BDO also committed to review new leases entered into in 2005 and determine if they were properly recorded.

123.    BDO's review of Le Nature's' leases – to the extent any such review was actually conducted – was necessarily flawed because its ultimate approval of the Company's classification of hundreds of millions of dollars of leases as operating leases was incorrect. Statement of Financial Accounting Standards No. 13 ("FAS 13"), titled "Accounting for Leases," provides that "a lease shall be classified as a capital lease by the lessee" if the present value of the minimum lease payments equals or exceeds 90 percent of the fair value of the leased property (in excess of any related investment tax credit). Applying this test (which constitutes the GAAP standard for reporting by lessees like Le Nature's), the vast majority of the nearly $400 million in new leases obtained by Le Nature's in 2005 were, in fact, capital leases. Specifically, with respect to at least $200 million of the new leases, the lease payments were structured to amount to 90% (and, in many cases, far more) of the fair value of the property.

124.    Having specifically identified this as a significant audit issue, and as a potential motivation to commit fraud, BDO was required to take steps to make a proper determination. In determining that the leases were properly classified as *operating* leases, BDO either knowingly bowed to Le Nature's' misclassification of the leases or refused to make a proper determination on its own, thereby willfully blinding itself to the economic substance of the leases in question.

125.     Indeed, *even Wachovia was aware of the lease misclassification issue*, so much so that it retained the independent services of another major auditing firm to review the very same leases.  In the fall of 2006, on the heels of its syndication of the new Credit Facility, Wachovia retained the services of PricewaterhouseCoopers LLP ("PwC") to assist Wachovia in its own evaluation of Le Nature's.  Among other things, Wachovia specifically instructed PwC to:

> Perform and prepare an analysis of debt and debt-like items, as well as identify other significant commitments and contingencies including developing an understanding of the nature of the expense and related commitments behind the operating lease agreements and deposits.

As part of its analysis, PwC reviewed, among other documents, BDO's audit workpapers in connection with the 2005 audit.  PwC also held conversations with the BDO audit team.

126.     Le Nature's' and BDO's misclassification of capital leases as operating leases was not limited to the leases for equipment to be installed in the Phoenix facility.  Le Nature's also entered into a $65 million lease for the real estate – the plant and property – in Phoenix.  As with the equipment leases, Le Nature's, with BDO's approval, classified the real estate lease as an operating lease, thereby keeping yet another $65 million liability off of the balance sheet.  Once again, however, the lease should have been classified as a capital lease, and the full amount of the lease should have been reflected as a liability on Le Nature's' balance sheet.

127.     Additionally, the property lease required Le Nature's to pay for the cost of electrical wiring and heating and air conditioning systems in the Phoenix facility.  GAAP, specifically EITF 97-10, prohibits a lessee from paying for structural costs, and expressly identifies electrical wiring and air conditioning.

128.     In total, between the equipment leases and the real estate lease, Le Nature's hid more than $200 million in liabilities from its balance sheet, all with BDO's knowledge and approval.

129.    BDO's errors in validating the misclassification of more than $200 million in liabilities were patent; indeed, the only explanation is that BDO was complicit in Le Nature's' efforts to misstate its liabilities, thereby enabling the Company to take on additional and excessive loans, such as the September 2006 Credit Facility.  By permitting Le Nature's to hide a massive amount of debt, BDO approved fundamentally false – let alone materially misstated – financial statements.

130.    The misclassification of capital leases as operating leases had a direct impact on Le Nature's' ability to obtain, and Wachovia's efforts to syndicate, the very debt at issue in this action.  The Credit Facility includes various financial covenants that Le Nature's was required to satisfy in order to obtain the financing.  Had Le Nature's been unable to satisfy these covenants – as would have been the case had the capital leases been included, as required, on the balance sheet – the loan never would have been consummated.

131.    For example, the very first financial covenant, set forth in section 5.9(a) of the Credit Facility, required Le Nature's to maintain a Leverage Ratio – i.e., the ratio between "Funded Debt" (which includes capital leases) and EBITDA – of no more than 4.25 to 1.0. Adding $200 million to the capital leases would render Le Nature's incapable of satisfying this covenant – the Leverage Ratio would have jumped to higher than 5.0.  At that level of debt to EBITDA, the Credit Facility never would have been completed.

132.    Moreover, by enabling Le Nature's to borrow ever increasing amounts, the improper classification and off-balance sheet treatment of capital leases enabled Le Nature's to bring in more cash that could be used to fraudulently pay invoices to customers creating the appearance that the customers themselves had made those payments, thereby perpetuating the Company's revenues fraud.

iv.     Failure to Expense Rental Payments

133.    BDO failed to comply with GAAP not only by classifying Le Nature's'

equipment and property leases as operating leases, but also in failing to reflect substantial

payments under those leases as expenses chargeable against Le Nature's' income.  As a result,

the 2005 audited financial statements that BDO confirmed substantially overstated Le Nature's'

net income.

134.    Specifically, Le Nature's planned to install four production lines at the Phoenix

facility.  The equipment for each line was financed through the leases referenced above (which

Le Nature's and BDO improperly treated as operating leases).  Accounting standards make clear

that, when the equipment subject to such a lease comes under the control of the lessee (i.e., Le

Nature's) and the lease has been classified as an operating lease, rental payments under the lease

must be accounted for as expenses.  Such expenses, in turn, are included in the company's

statement of income, and therefore reduce the bottom-line net income reflected in the financial

statements.

135.    In its December 2005 presentation to potential lenders, Wachovia reported that

the Company had "a total of 7 lines in operation."  Because four of those lines were in Latrobe,

three of the production lines at the Phoenix plant must have been operational by the end of 2005.

Accordingly, rental payments for three of the Phoenix lines should have been recorded as an

expense in 2005.

136.    Rent payments for the Phoenix equipment lines totaled approximately $12 million

in 2005.  Of this, BDO failed properly to expense rent payments for the second and third

production lines.  Those payments amounted to $8.6 million in 2005, or more than 37% of Le

Nature's' reported $22.9 million net income.  Applying the operating lease treatment that Le

Nature's and BDO themselves adopted, the full $8.6 million should have been expensed.  Even if

Le Nature's had properly classified the leases as capital leases – which it failed to do – its income would have been reduced by a similar amount.   Had proper capital lease treatment been used, income would have been reduced by depreciation of the assets subject to the leases and by interest expenses under the leases.  Yet no such expenses were recorded on Le Nature's' financial statements, and no such depreciation was taken.

137.    This material overstatement of net income, in turn, affected Le Nature's purported compliance with the financial ratios covenanted in the Credit Facility.  Moreover, because Le Nature's was already overstating its income – e.g., by reporting inflated revenues – the improperly omitted expenses had an even greater impact, on a percentage basis, on the actual income level.  Had Le Nature's' net income properly been reflected on the financial statements audited by BDO, the initial lenders would not have loaned money to the Company.

**Wachovia Was Aware of Le Nature's' Financial Problems Prior to September 2006**

*1)    Wachovia Was Directly Advised of Le Nature's' Problems in Trying to Sell the Company*

138.    In 2005 and 2006, Podlucky, Le Nature's, and Wachovia initiated efforts to pursue a liquidity event that would result in the sale of Le Nature's, satisfaction of the Company's secured debt, a payout to its shareholders, and even more millions of dollars in fees for Wachovia.

139.    To that end, in April 2005, the Le Nature's board of directors established the Project Palmer Committee and charged it with reviewing and maintaining information regarding proposed sale transactions.  Podlucky and the Project Palmer Committee worked closely with Wachovia to solicit potential buyers for Le Nature's.  In connection with the effort, Wachovia convened its own team of senior officers to work with Le Nature's on a sale of the Company, hoping to achieve another substantial fee for Wachovia.

140.    Throughout the second half of 2005 and into early 2006, Wachovia solicited potential buyers and conducted presentations to many potential acquirers. Several of the potential buyers undertook due diligence on Le Nature's and directed their questions and concerns to Wachovia. At least one of the potential buyers, GTCR Golder Rauner, LLC ("GTCR"), raised serious concerns about Le Nature's including, on information and belief, issues with its reported wholesale product pricing.

141.    Although, on information and belief, GTCR raised the pricing issue directly with Wachovia, Wachovia knew that Le Nature's would never be able to provide answers to GTCR's issues. Rather, in April 2006, Podlucky reported that GTCR "was not going to provide [the] value we were looking for" and broke off discussions with GTCR. On information and belief, other potential buyers identified similar price discrepancies.

142.    Accordingly, in its attempt to solicit buyers for Le Nature's prior to consummation of the Credit Facility, Wachovia was presented with serious and disturbing questions from potential buyers that directly challenged the Company's financial and managerial integrity. Although Wachovia was aware of these problems, it did not disclose them to Le Nature's' lenders or potential lenders.

### 2)    *Wachovia Encouraged Its Bank Affiliate to Hide Le Nature's' Dire Financial Situation by Fronting Interest Payments to Syndicate Lenders*

143.    Throughout 2006, Wachovia was also acutely aware – and concealed from other existing lenders to Le Nature's – that Le Nature's was suffering serious cash flow problems. As the Administrative Agent for the existing credit facility, Wachovia's banking affiliate, Wachovia Bank, was charged with collecting interest payments from Le Nature's and distributing them to the syndicate lenders. Le Nature's, however, was habitually late with the interest payments – it was unable to timely satisfy obligations on its most senior credit facility. Wachovia knew that

disclosure of such payment problems would jeopardize any future financings, issuances, or deals for Le Nature's (and thereby jeopardize the associated fees for Wachovia).  To hide the problem from the other lenders, Wachovia actually fronted the interest payments to the syndicate lenders; that is, it paid out interest before collecting the payments from Le Nature's.  This procedure was remarkably atypical, and was motivated solely by Wachovia's desire to keep Le Nature's' financial straits hidden from the other lenders.

144.    In March 2006, for example, Wachovia Bank paid out nearly $1.9 million in interest, despite failing to obtain the payment from Le Nature's.  Sue Patterson, the Wachovia Bank employee charged with collecting interest from Le Nature's (who apparently was not advised of Wachovia Bank's purpose in fronting the payments), complained that "[a]nytime there is LIBOR interest due or interim interest due the company does not seem to be in a big hurry to pay me."  She noted her frustration with the situation:  "It's very frustrating when I have to pay the bank group on the payment due dates and then try to recover funds WBNA is out for the time period in which we are awaiting the funds."

145.    Even Patterson, however, was not fully in the dark.  In an e-mail complaint about the interest situation, which was forwarded to bankers in Wachovia's Origination Division, Patterson explained, "I try to jump through hoops for this company to keep Greg [Podlucky] happy so I would appreciate it if they could pay on time."

146.    Le Nature's' failure to make timely interest payments was not an isolated event; it continued throughout 2006.  Indeed, on August 29, 2006 – just days before Wachovia put the new Credit Facility into effect – Le Nature's was still behind on its interest payments.  Although the problem persisted on the eve of closing the new and even larger facility, Wachovia never advised the other lenders of this serious indication that Le Nature's was struggling to stay afloat.

### 3)  Wachovia's Own Analysts Were Identifying Disturbing Issues

147.    In the years leading up to the September 2006 Credit Facility, analysts in Wachovia's Sales Division regularly issued glowing reports about Le Nature's' business, repeatedly assigning an "Outperform" rating to the Company.  Wachovia's analysts were aware of Le Nature's' problems, however, long before September 2006.  And the analysts' questions to Origination Division bankers *in the days just before completion of the Credit Facility* make clear that the Sales Division was aware of Le Nature's' improper conduct and ailing financial situation before the Credit Facility was completed.

148.    In April 2006, several months before the Credit Facility closed, Bryan Hunt, a Wachovia director and the head of high-yield research for Food & Beverage, Food Retailing, and Restaurants, sent an e-mail to Le Nature's' executive vice president noting that Le Nature's' products were not being stocked in retail stores.  Among other things, Hunt noted that (i) flavored water had been removed from the shelves at southeast Kroger stores, (ii) Dazzlers were removed at Target stores, (iii) and other stores were showing weak "sales tempo" and "very little product" for Le Nature's.

149.    On August 29, 2006 – the day before Wachovia actively sought lenders to buy up the new Credit Facility – Hunt sent an e-mail to several investment bankers in Wachovia's Origination Division highlighting more (and more severe) problems at Le Nature's.  Titled "Questions that need to be answered . . . .," Hunt's e-mail stated, among other things:

- "Why is the company's interest exposure roughly $4MM a quarter over the last 10 quarters, while debt has increased every quarter?"

- "How does a company of this scale have zero payables?"

- "Why did the company suddenly re-enter the commercial tea business after exiting the business a year ago?"

150.    Hunt also noted, "*I find it hard to believe* that Le Nature's EBITDA margins are a full 10% higher than any other company in the space."

151.    The Origination Division did not answer Hunt's questions.  Rather, it obtained commitments from lenders for the full amount of the new Credit Facility.  Only after those commitments were obtained, those very questions, and many more, were forwarded on to Podlucky at Le Nature's.  Simply put, rather than answer the troubling questions raised by its own analyst, Wachovia purposefully brushed the questions aside long enough to enable funding of the new Credit Facility it was peddling.

### 4)    Wachovia's Trading Desk Sold Off Its Le Nature's Bonds by September 2006

152.    For several years following issuance of Le Nature's bonds in June 2003, Wachovia maintained an inventory of the bonds both to "make a market" – that is, to provide liquidity for other parties interested in buying or selling the bonds – and for its own proprietary trading purposes.  The market-making function was typical for banks underwriting such notes, and the broader market would expect Wachovia to fulfill that function.  This was an important component of Wachovia's attempt to become a meaningful dealer in the high yield bond market.

153.    On information and belief, at some point in 2006, well before completion of the new Credit Facility, Wachovia's trading desk stopped committing *any* capital to investments in Le Nature's.  Moreover, the trading desk sold off all of its holdings in Le Nature's bonds, including the market making inventory and the bonds held for proprietary purposes.  The trading desk chose to forego the market-making role notwithstanding market expectations of purchasers in private placements like the Notes Offering.

154.    Wachovia's trading desk position was flatly inconsistent with the research reports being published and distributed by Wachovia (assigning ratings such as "outperform" to Le Nature's).  While Wachovia was publicly distributing materials touting Le Nature's' financial

performance, including the Company's sales and profit growth, the actions of Wachovia's

trading desk belied any true belief at Wachovia that Le Nature's was performing well.

**The September 2006 Credit Facility**

> ### 1) *Wachovia's Strategy for Refinancing the Company, Reducing Its Own Exposure, and Dumping Risk on Other Lenders*

155.    By August 2006, Wachovia was deeply troubled by Le Nature's' financial

problems and growing disputes between management and the minority preferred shareholders.

Wachovia's efforts to sell the Company had proven unsuccessful with bidders walking away, and

the Company desperately needed a cash infusion to meet its obligations and continue as a going

concern.  Wachovia was aware of these issues, but had to devise a strategy to achieve an array of

competing goals: (i) obtain a short-term cash infusion to keep the Company afloat, (ii) enable the

Company to continue its marketing and longer term refinancing efforts, both to take out the

minority preferred shareholders and to achieve a sale, (iii) substantially reduce Wachovia's credit

exposure to the Company, and (iv) generate additional significant fees for Wachovia.  Moreover,

Wachovia had to meet these goals without conveying the message to investors that reduction of

its own exposure was, from Wachovia's perspective, essential.

156.    Privy to knowledge of Le Nature's' problems, Wachovia, together with Le

Nature's, devised a plan to achieve their joint goals.  Specifically, Wachovia determined to

launch a new larger credit facility that would completely replace the facility that was then in

place.  The new facility could be funded by the pre-existing lenders to which Wachovia had

made complete presentations in December 2005.  By following this route, Wachovia could (i) get

a quick cash infusion for Le Nature's, (ii) avoid producing a new array of documents and

inviting new due diligence by relying principally on the fraudulent materials that were already

created and distributed for the pre-existing facility, and (iii) induce the other lenders to increase their commitments and thereby reduce Wachovia's exposure on the loan.

157.     At the very end of August 2006, Wachovia informed the pre-existing lenders that a technical event of default had occurred under the existing Le Nature's credit facility, requiring that a new loan be substituted in its place.  Specifically, Wachovia explained that the minority preferred shareholders' lawsuit in Delaware, which requested the appointment of a custodian, gave rise to an event of default because, notwithstanding a settlement between the Company and the minority shareholders, the case had not been formally dismissed.  Wachovia explained that the default could be waived with 100% lender approval, but that getting unanimous approval from a large group is always a time consuming, unwieldy process.  Wachovia told the lenders that the new facility had to be funded by September 1, only a few days (and, in many cases, one day) after Wachovia informed the lenders of the proposal.

158.     Wachovia pitched the new facility to the lenders by explaining that they would get an enhanced yield – i.e., the interest rate was being increased – even though Le Nature's remained the same strong, growing company that it was in December 2005.  Le Nature's still had a positive credit rating and was reporting increasing revenues and climbing EBITDA.  As one Wachovia salesman explained in an e-mail of August 30, 2006, participating in the new facility was a "no brainer."

159.     Wachovia also pitched the new facility by claiming that lenders would be able to get an increased, long-term yield, even though the facility would turn out to be a short-term, and thus less risky, loan.  Wachovia salesmen told lenders that Le Nature's would soon be obtaining new financing (from Wachovia) to take out the Company's minority preferred shareholders.  As a result, the $285 million Credit Facility, according to Wachovia, would be of limited duration, lasting perhaps only a few months.

**2)  *Wachovia Disseminated False Information to, and Withheld Material Adverse Information from, the Credit Facility Lenders***

160.    Wachovia authored and distributed a limited set of new materials to the lenders in connection with the new Credit Facility, relying to a large extent on the fraudulent documents prepared for the December 2005 Add-On Facility, which also had been drafted by Wachovia.  To justify the sparse documentation, Wachovia cited the need to complete the refinancing on an expedited basis because of the purported technical event of default.  Wachovia turned to many of its frequent customers, repeatedly telling them to "trust us" rather than require a comprehensive set of contemporaneous documents.

161.    Wachovia did, however, provide some documents to the lenders, both newly prepared documents and documents drafted in connection with the prior facility.  All of these documents contained material misrepresentations regarding Le Nature's' business.  The lenders thus based their decisions to participate in the Credit Facility – generally at *higher* levels than their participation in the previous facility – on false information provided to them by Wachovia. Among other documents, the lenders were provided, and reasonably relied upon:

- Audited financials for the years 2004 and 2005, which, among other things, overstated Le Nature's' revenues, understated Le Nature's' liabilities, and included BDO's stamp of approval;

- The December 2005 Confidential Information Memorandum drafted by Wachovia, which, among other issues, overstated the Company's revenues, understated liabilities, and misreported the Company's growth rate; and

- Unaudited financial statements for March 31, 2006 and June 30, 2006, both of which overstated revenues and understated liabilities.

162.    Wachovia also provided to the lenders a series of research reports authored by its Sales Division, touting Le Nature's as a sound investment.  (As participants in previous debt facilities, the lenders had already seen many of these reports.)  The information reported to the

lenders (and to other investors) was inconsistent with Wachovia's actual knowledge and internal

but undisclosed behavior, and was riddled with materially inaccurate statements. Wachovia

distributed these reports periodically from August 2003 (just after it assisted Le Nature's issue its

June 2003 Notes) all the way up through issuance of the Credit Facility in September 2006:

163.    ***August 18, 2003 – "Initiation of Coverage with a Buy."***  On August 18, 2003,

Wachovia published a "High Yield Research" report authored by Bryan Hunt titled "Initiation of

Coverage With a Buy" (the "August 2003 Report"). "Wachovia Securities" appeared

prominently throughout the document.

164.    In the August 2003 Report, Wachovia stated, "We like Le*Nature's 9% senior

subordinated notes for the following reasons," which included, *inter alia*, that "Le*Nature's has

significant free cash flow generating potential," and "[o]ver the intermediate term, we believe

Le*Nature's could complete an initial public offering (IPO) or sell to a larger diversified

beverage company."  In comparing Le Nature's to, among others, Coca-Cola Enterprises Inc.,

Pepsi Bottling Group, Inc., and Coca-Cola Bottling Co., the report claimed that "Le*Nature's has

the highest EBIT and EBITDA margins in the industry."

165.    The August 2003 Report included numerous material misrepresentations

regarding Le Nature's' financial performance and status, including the following:

- For the twelve-month period leading up to April 30, 2003, "Le*Nature's generated net sales and EBITDA of $151.6 million and $58.2 million, respectively, representing an EBITDA margin of 38.4%."

- "From 1998 to 2002, net sales and EBITDA increased at a CAGR of 63.1% and 64.8%, respectively."

- "Since 1999, Le*Nature's has increased its sales at a 68% CAGR to $152 million for LTM April 30.  The company has achieved this improvement due to industry growth, the company's differentiated product and low-cost vertically integrated operations."

- "Le*Nature's generates sales per employee of $1.81 million, more than double its closest competitor."

- Based on multiples of EBITDA, Le Nature's' value ranged from $268 million to $541 million.

166.    Given Le Nature's actual 2002 net sales of $4.4 million, all of the information set forth above was materially incorrect and misleading when reported by Wachovia.

167.    *October 3, 2003 – "Maintaining Buy Rating."*  On October 3, 2003, Wachovia Securities published a "High Yield Bulletin" authored by Hunt with the title "Reports Better-than-Expected Q2 Results; Maintaining Buy Rating" (the "October 2003 Bulletin").  "Wachovia Securities" appeared prominently throughout the document.

168.    Once again, in light of the Company's actual financial performance in 2003, it is now clear that the October 2003 Bulletin included a series of material misrepresentations.  Among other false statements, the October 2003 Bulletin indicated:

- "EBITDA for Q2 was $19.4 million, which compared favorable with adjusted EBITDA of $16.5 million in the year-earlier period and our estimate of $18.2 million."

- "Sales increased 46.4% to $59.4 million compared with $40.5 million in the year-earlier period."

- "Gross profit improved 19.5% to $21.8 million from the year-earlier period."

- The significant sales of tealeaf product in the second quarter of 2003 was to prepare for the formation of a new subsidiary to sell "higher-margin tea concentrate and tea by-products."

169.    Among other deficiencies, the results reported by Wachovia in the October 2003 Bulletin are completely inconsistent with the Company's actual net sales of $9.8 million in 2003.

170.    *November 19, 2003 – "Bonds Are Attractive."*  On November 19, 2003, Wachovia released another High Yield Bulletin ("November 2003 Bulletin").  As before, the November 2003 Bulletin was authored by Hunt and is on "Wachovia Securities" letterhead.  The

bulletin concludes with Wachovia's maintenance of its "buy rating" for notes issued by Le Nature's.

171.    In the November 2003 Bulletin, Wachovia made several material misstatements, including the following (a) "Q3 EBITDA was $17.8 million, which compared favorably with $11.7 million in the year-earlier period and was generally in line with our estimate"; (b) "Gross profit rose 9.9% to $19.6 million from a year earlier"; and (c) "On a dollar basis, sales growth was $38.1 million year to date, and accounts receivable growth was $25.9 million."

172.    ***February 20, 2004 – "Strong Growth Ahead; Maintaining Our Outperform Recommendation."***  On February 20, 2004, Wachovia issued a High Yield Bulletin authored by Hunt ("February 2004 Bulletin").  Written on "Wachovia Securities" letterhead, the February 2004 Bulletin continued to paint a rosy picture of Le Nature's.  Wachovia maintained its "outperform" rating for Le Nature's, indicating its purported belief that the Company's notes remained a sound investment.

173.    In the February 2004 Bulletin, Wachovia made a series of material misstatements, including: (a) the Company achieved sales of $28 million in the fourth quarter of 2003; (b) gross margin improved "to 46.5% from 33.7% for the quarter"; and (c) "Gross profit increased 19.3% to $19.6 million versus a year earlier."

174.    ***April 19, 2005 – "Maintaining Outperform Rating."***  On April 19, 2005, Wachovia issued a High Yield Research report authored by Hunt and printed on "Wachovia Securities" letterhead ("April 2005 Report").  Following the same course as earlier reports and bulletins, Wachovia continued to assign an "outperform" rating to Le Nature's, notwithstanding Wachovia's knowledge of the Company's financial and managerial difficulties throughout 2003 and 2004.

175.    Like earlier reports and bulletins, the April 2005 Report contained a series of material misrepresentations that were wholly inconsistent with the Company's actual performance.  Among other false statements, Wachovia stated in the report that:

- EBITDA in the fourth quarter of 2004 was $12.2 million, "which compared favorably with $5.3 million in the year-earlier period."

- "FY2004 EBITDA, before $8.4 million of expenses associated with a flood, was $84.7 million."

- "Sales increased 78.1% from the year-earlier period to $43.1 million due to stronger case volume, the return of commercial tea sales and reduced trade spending."

- "For FY2004, net sales increased 33.0% to $207.1 million.  Sales growth, which was higher than we expected and above management's $205.0 million guidance, was impressive given the fact that trade spending declined to 9.5% of sales in FY2004 from 13.4% in FY2003."

- "Strong sales leverage and trade spending reductions fueled Q4 gross margin improvement to 47.5% from 38.1% a year earlier."

176.    In maintaining its "outperform" rating for Le Nature's Notes, Wachovia was reporting 2004 net sales of over $200 million, when actual 2004 net sales were less than $13 million.  Wachovia was overstating Le Nature's' sales by *more than 16 times.*

177.    ***June 15, 2005 – "Reiterate Outperform Rating."***  On June 15, 2005, Wachovia again issued a High Yield Research report authored by Hunt and printed on "Wachovia Securities" letterhead ("June 2005 Report").  Once again, Wachovia reiterated its "outperform" rating for Le Nature's.  In touting the Company yet again, Wachovia asserted that "our investment thesis remains intact."

178.    Like the other reports issued by Wachovia, the June 2005 Report is riddled with material misstatements that have virtually no relation to Le Nature's' actual financial performance.  Among other false statements, Wachovia reported:  (a) EBITDA for the first quarter of 2005 was $21.5 million, comparing favorably to $20.4 million in the year-earlier

period; (b) gross sales increased 24.3% from the year-earlier period to $59.8 million (including $6 million of tea concentrate sales); and (c) net sales increased 21.9% to $54.2 million.

179.    ***August 30, 2005 – "Maintaining Outperform Rating."***  On August 30, 2005, in the same format as previous High Yield Research reports, Wachovia again reiterated its "outperform" rating for Le Nature's ("August 2005 Report").  Wachovia asserted in the August 2005 Report that second quarter 2005 results "far exceed[ed] our expectations."  Among other false statements, all of which were inconsistent with Le Nature's' actual revenues in 2004, Wachovia reported:

> Q2 [2005] EBITDA was $49.1 million, which compared favorably to $26.3 million in the year-earlier period.  EBITDA handily beat our estimate due to the significant increase in sales levels and the reduction of trade spending expenses.  EBITDA margin increased 495 bps from the year earlier period to 50.3% due to greater sales levels and reduced expenses.

180.    The report further and falsely asserted that Le Nature's' gross sales had increased 44.9% from the year earlier period to $94.6 million for the second quarter of 2005.

181.    ***April 13, 2006 – "Maintaining Outperform Rating."***  Following the completion of 2005, in which Le Nature's' actual net revenues totaled less than $30 million for the year, Wachovia continued to publish research reports indicating that Le Nature's' revenues were *far* higher.  On April 13, 2006, for example, Wachovia published a High Yield Research report, in the typical format, maintaining its "outperform" rating for Le Nature's ("April 2006 Report").  In the April 2006 Report, Wachovia indicated revenues of $275.1 million and gross profit of $134.3 million for 2005.

182.    In addition to grossly misstating the Company's annual sales, Wachovia made several other material misstatements in the April 2006 Report, including: (a) gross sales for the fourth quarter of 2005 increased 14.6% from the year earlier period to $54.1 million; (b) net sales

for the quarter increased 8.2% to $46.6 million; and (c) the Company "has generated case volume sales growth of 57%-90% annually over the past five years."

183.    *June 6, 2006 – "Q1 Results Ahead of Our Estimates; Reiterate Outperform."* On June 6, 2006, just a few months before the Credit Facility was completed and Le Nature's was forced into bankruptcy, Wachovia released another High Yield Research report, again on "Wachovia Securities" letterhead, reiterating its "outperform" rating for Le Nature's  ("June 2006 Report").  Following on the heels of the minority preferred shareholders' initiation of the Delaware Action, the June 2006 Report was glowing in its review of Le Nature's' performance.

184.    Among other false information, Wachovia stated in the June 2006 Report that, for the first quarter of 2006, EBITDA increased $18.4 million to $39.9 million (surpassing Wachovia's estimate of $25.0 million), and bottled case volume increased 80.3%.  The June 2006 Report also falsely reported that the Company generated case volume sales growth of 57 to 90% annually over the last five years.

185.    In the June 2006 Report, Wachovia opined that, "[i]n 2006, we forecast Le-Nature could grow sales by 45.6% or $125.3 million to $400.4 million."  Given Wachovia's extensive knowledge of Le Nature's' struggling finances by the time the June 2006 Report was issued, Wachovia's prediction – like many of its predictions in earlier bulletins and research reports – was false at the time it was made.  Wachovia made similar inflated and false predictions of Le Nature's' expected performance in earlier reports, including the August 2003 Report, the November 2003 Bulletin, the February 2004 Bulletin, the June 2005 Report, and the April 2006 Report.

186.    While  providing the lenders with documents and information containing false information, Wachovia failed to disclose its knowledge of Le Nature's' financial problems and

misconduct.  Wachovia did not tell any of the lenders (other than its affiliate, Wachovia Bank)

that:

- Wachovia Bank was secretly fronting interest payments for Le Nature's, which was incapable of making timely payments;

- Le Nature's was classifying more than $200 million of capital leases as operating leases, in order to keep liabilities off its balance sheet and enable compliance with mandated financial ratios in the loan documents;

- Following the abrupt resignation of the Company's chief financial officer and other most senior financial managers, a law firm had drafted a report making it clear that Le Nature's was dominated by a chief executive officer who made unilateral decisions without input or oversight from other Company employees, the Company failed to maintain documentation supporting its reported financial results, the Company was unable to produce verification for many of its most significant purported transactions, the Company was operated without any meaningful controls, and the Company's employees and key vendors were unwilling to participate in a meaningful investigation of the Company's operations;

- Le Nature's' management was both uncooperative and failed to provide requested financial information; and

- Wachovia's own analysts were uncomfortable with Le Nature's, but Wachovia's investment bankers put off their questions – rather than attempt to obtain answers – until after completion of the Credit Facility.

187.    Wachovia also failed to disclose that a true purpose in arranging the Credit

Facility was to reduce Wachovia Bank's financial exposure to Le Nature's.  Despite hiding this

fact from the lenders, Wachovia's bankers celebrated the reduction in exposure when the Credit

Facility was fully funded.  ***While Wachovia pitched participation in the new loan to the other***

***lenders as a "no brainer," it used the new Credit Facility as an opportunity to dump its own***

***exposure to Le Nature's onto other, unsuspecting lenders, including many of its own best***

***customers.***

188.    Specifically, on September 1, 2006, a Wachovia vice president e-mailed his

colleagues that Le Nature's was funded.  He added, "At the end of the day, we reduce our

exposure from $19MM drawn against our $25MM commitment to $0 drawn against what we expect to be a final commitment of under $10mm (target of $7MM, which is inside of our skim of $7.125MM)." In simple English, Wachovia had (i) reduced its affiliate's existing exposure by $19 million, all the way down to zero; (ii) reduced its affiliate's potential exposure from $25 million to approximately $7 million; and (iii) earned a massive fee of $7.125 million for its few days of work.

189.     There can be no question that Wachovia knew about – or, at the very least, willfully blinded itself to – the massive and ongoing financial fraud being perpetrated by Le Nature's management, including the specific issues that Wachovia failed to disclose to the lenders. First, Wachovia knew that its bank affiliate was fronting interest payments on the existing credit facility to hide from the other lenders the Company's inability to pay.

190.     Second, at the time it arranged the new Credit Facility, Wachovia plainly was aware of Le Nature's' misclassification of more than $200 million of capital leases, and of the effect that this misclassification had on Le Nature's' purported compliance with financial ratios covenanted in the Credit Facility. Wachovia identified *this very issue* for PwC to review in the days immediately following completion of the Credit Facility. In hiring PwC to perform due diligence – in itself, an unusual action for a bank that had spent years working closely with Le Nature's – Wachovia directed PwC to "develop[] an understanding of the nature of the expense and related commitments behind the operating lease agreements and deposits."

191.     Following disclosure of the fraud, word leaked to some of the lenders that Wachovia had retained PwC, a fact that Wachovia failed to share prior to the Company's bankruptcy. Even then, Wachovia was unwilling to disclose the truth, or to explain the nature of the work that PwC was retained to perform. Instead, Wachovia continued to actively mislead

lenders by offering the lame excuse that PwC was hired merely to perform "ticking and tying" work.

192.    Third, potential acquirers had directly advised Wachovia of issues with Le Nature's' sales and revenues reporting.  In completing the Credit Facility, and shifting risk from its own affiliate to third-party lenders, Wachovia simply brushed these issues aside.

193.    Fourth, Wachovia knew that its "technical event of default" justification for the new Credit Facility was a sham.  To begin with, the original action seeking appointment of the custodian was filed in Delaware on May 16, 2006.  Documents prepared by Wachovia asserted that the pendency of such an action for 60 days would constitute an event of default.  If accurate, then the default occurred in the middle of July 2006; the rush to close a new facility in the beginning of September made no sense.  Yet Wachovia purposefully led the lenders to believe that time was of the essence to resolve the "technical" default.  Moreover, Wachovia knew that the debt was trading above par.  Under those circumstances, getting approval from the lenders to waive the event of default should have been no problem.  In all events, it should not have been more difficult to obtain approval from all of the lenders than to implement an entirely new credit facility – unless, of course, Wachovia believed that some of the lenders (specifically, the lenders that did *not* participate in the new Credit Facility) were aware of Le Nature's' real state of affairs.

### 3)    *Wachovia Moves On to Earn Yet Another Fee from Le Nature's*

194.    Immediately after completing the syndication and funding of the new Credit Facility, Wachovia turned its efforts back to arranging yet another refinancing for Le Nature's and generating another huge fee for Wachovia.  Merely a week before Le Nature's entered bankruptcy, Wachovia was contemplating a new $340 million bridge financing to buy out the minority preferred shareholders, as part of a recapitalization involving a new *$500 million* credit

facility and $340 million in notes. Once again, Wachovia anticipated a huge fee for its assistance to Le Nature's.

**Each Plaintiff Has Standing to Assert Claims Against Defendants**

195.    Through the distribution of materially false information and the purposeful omission of other material information, Wachovia, BDO, and the Le Nature's Executives played essential roles in fraudulently inducing the lenders to participate in the September 2006 Credit Facility. As such, each of the initial lenders – that is, the lenders that purchased their interests in the Credit Facility directly from Wachovia Bank – possessed rights to assert claims against Wachovia, BDO, the Le Nature's Executives, and others based on the lenders' purchase of interests in the Credit Facility.

196.    Ten of the Plaintiffs in this action are initial lenders under the Credit Facility, and thus assert claims they have possessed since the placement and syndication of the Credit Facility. These Plaintiffs are MOSERS, BlackRock Global, BlackRock LDI, BlackRock Senior, BlackRock Senior II, BlackRock Senior III, Magnetite, BlackRock SLP, Harch, and RZB. These initial lenders may be referred to as the "Initial Lender Plaintiffs."

197.    The remaining seven Plaintiffs – the "Successor Lender Plaintiffs" – purchased interests in the Credit Facility on the secondary market. The transfer of interests in syndicated credit facilities is a standard practice in the United States syndicated loan market. The trading of interests in syndicated credit facilities in the United States is a mature, sophisticated market comprised of the nation's major commercial banks, investment banks, hedge funds, mutual funds, and other major financial organizations.

198.    Here, the credit agreement specifically contemplated that participating lenders might sell their interests in the Credit Facility to other lenders. Indeed, Wachovia was a regular

buyer and seller of interests in the Credit Facility (as well as interests in the previous Le Nature's credit facilities).

199.    Many of the participants in the syndicated loan market – including Wachovia Bank – are members of the Loan Syndications and Trading Association (the "LSTA"), a trade association dedicated to the promotion and orderly development of a fair, efficient, liquid, and professional trading market for commercial loans.  Barry Bobrow, a managing director at Wachovia, sits on the LSTA's 20-member board of directors.

200.    Among other things, the LSTA has developed – and the market has adopted for use – standard documentation for the sale of interests in various types of syndicated loans including so-called distressed debt, which is debt of a company perceived to be in some degree of financial distress that impairs the prospects of full and timely payment.  This standard documentation includes a standard Purchase and Sale Agreement for Distressed Trades ("LSTA Purchase Agreement") and an accompanying set of Standard Terms and Conditions ("LSTA Standard Terms").

201.    The LSTA Standard Terms make it clear that, when interests in a distressed credit facility are sold, *all* of the seller's interests are conveyed, including any rights to assert tort or other legal claims against third-parties relating to the debt at issue.  Specifically, the Standard Terms provide:

> **"Transferred Rights"** means any and all of Seller's right, title, and interest in, to and under the Loans and the Commitments (if any) and, to the extent related thereto, the following . . . .
>
> (e) all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of Seller or any Prior Seller, whether known or unknown, against Borrower, any Obligor, or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under

> applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of Seller or any Prior Seller against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby . . . .

202.    The LSTA Standard Terms provide that New York law governs transfers effected pursuant to the LSTA Purchase Agreement:

> THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

The LSTA Standard Terms further mandate that the parties submit to the exclusive jurisdiction and venue of courts in New York County for all actions arising out of or relating to transfers effected under the LSTA Purchase Agreement.

203.    Pursuant to a series of purchases executed almost exclusively using the LSTA Purchase Agreement and accompanying LSTA Standard Terms, the Successor Lender Plaintiffs acquired interests in the Credit Facility and all associated and/or related rights of the initial lenders under the Credit Facility that first held those interests. Accordingly, these Plaintiffs are permitted to assert claims against the Defendants (and other parties) as if they were original participants in the loan syndicate.

204.     Harbinger directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility:  (1) Madison Park Funding IV, Ltd., (2) Madison Park Funding V, Ltd., (3) CSAM Funding II, (4) Landmark IX CDO Ltd., (5) LCF2 Funding LLC, (6) 1888 Fund Ltd., (7) Green Lane CLO Ltd., (8) Kennecott Funding Ltd., (9) Sands Point Funding Ltd., (10) Copper River CLO Ltd., (11) Grand Central Asset Trust, BDC Series, (12) Goldentree Loan Opportunities I, (13) Stone Tower CLO V Ltd., (14) Venture VII CDO Limited, (15) Eaton Vance CDO VI Ltd., (16) Eaton Vance CDO VIII, Ltd., (17) Eaton Vance CDO X PLC, (18) Eaton Vance Credit Opportunities Fund, (19) Harbourview CLO IV, Ltd., (20) Oppenheimer Senior Floating Rate Fund, (21) WhiteHorse I, Ltd., (22) WhiteHorse II, Ltd., (23) WhiteHorse III, Ltd.(24) Van Kampen Senior Loan Fund, (25) Van Kampen Senior Income Trust, (26) Carlyle High Yield Partners IV, Ltd., (27) Carlyle High Yield Partners VI, Ltd., (28) Carlyle High Yield Partners VII, Ltd., (29) Carlyle High Yield Partners VIII, Ltd., (30) Carlyle High Yield Partners IX, Ltd., (31) Carlyle Loan Investment Ltd., (32) General Electric Capital Corporation, (33) Grayson CLO, Ltd., (34) Brentwood CLO, Ltd., (35) CSAM Funding I, (36) CSAM Funding III, (37) CSAM Funding IV, (38) Atrium CDO, (39) Castle Garden Funding, (40) CS Credit Strategies Master Fund, Ltd., (41) Galaxy CLO 2003-1, Ltd., (42) Highland Credit Strategies Fund, (43) Highland Floating Rate Advantage Fund, and (44) Omega Bank, N.A.

205.     Aurelius Master directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Venture V CDO Limited, (2) Venture VI CDO Limited, (3) Vista Leveraged Income Fund, (4) Grand Central Asset Trust, BDC Series, (5) Galaxy V CLO, Ltd., (6) American International Group, Inc., (7) BlackRock Senior Income Series II, (8) BlackRock Senior Income Series III, (9) The Missouri State Employees' Retirement System, (10) Senior Loan Portfolio, (11) Eaton Vance CDO VI,

Ltd., (12) Eaton Vance CDO VIII, Ltd., (13) Eaton Vance CDO X PLC, (14) Eaton Vance Credit Opportunities Fund, (15) Eaton Vance Floating-Rate Income Trust, (16) Eaton Vance Institutional Senior Loan Fund, (17) Eaton Vance Limited Duration Income Fund, (18) AgFirst Farm Credit Bank, (19) Carlyle Loan Investment Ltd., and (20) Landmark IX CDO, Ltd.

206.    Aurelius Partners directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Venture CDO 2002, Limited, (2) Venture II CDO 2002, Limited, (3) Venture III CDO Limited, (4) Venture IV CDO Limited, (5) Venture V CDO Limited, (6) Grand Central Asset Trust, BDC Series, (7) Galaxy V CLO, Ltd., (8) BlackRock Senior Income Series, (9) BlackRock Limited Duration Income Trust, (10) BlackRock Global Floating Rate Income Trust, (11) Senior Loan Portfolio, (12) Eaton Vance Senior Floating-Rate Trust, (13) Eaton Vance Senior Income Trust, (14) Eaton Vance Variable Leverage Fund Ltd., (15) Eaton Vance VT Floating-Rate Income Fund, (16) Eaton Vance Limited Duration Income Fund, (17) ORIX Finance Corporation, (18) Waterville Funding LLC, (19) AgFirst Farm Credit Bank, (20) Landmark IX CDO, Ltd., (21) Grayson CLO, Ltd., and (22) Brentwood CLO, Ltd.

207.    Arrow directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Eaton Vance Senior Floating-Rate Trust and (2) Carlyle High Yield Partners IX, Ltd.

208.    Schultze directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Eaton Vance Credit Opportunities Fund, (2) Eaton Vance Floating-Rate Income Trust, (3) Eaton Vance Institutional Senior Loan Fund, (4) Eaton Vance Limited Duration Income Fund, (5) Eaton Vance Senior Floating-Rate Trust, (6) Carlyle High Yield Partners IV, Ltd., (7) Carlyle High

Yield Partners VI, Ltd., (8) Carlyle High Yield Partners VII, Ltd., (9) Carlyle High Yield Partners VIII, Ltd., and (10) Carlyle High Yield Partners IX, Ltd.

209.    Latigo directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) AgStar Financial Services, PCA/FLCA, (2) Grand Central Asset Trust, BDC Series, (3) CSAM Funding I, (4) CSAM Funding II, (5) CSAM Funding III, (6) CSAM Funding IV, (7) Atrium CDO, (8) Atrium II, (9) Castle Garden Funding, (10) CS Credit Strategies Master Fund, Ltd., (11) NYLIM High Yield CDO 2001, Ltd., (12) US Bank National Association, (13) Stone Tower CLO III, Ltd., (14) Stone Tower CLO VI Ltd., (15) Carlyle Loan Investment Ltd., (16) Grayson CLO Ltd., (17) Landmark IX CDO Ltd., (18) LFC2 Loan Funding LLC, (19) Vista Leveraged Income Fund, (20) Venture CDO 2002, Limited, (21) Venture II CDO 2002, Limited, (22) Venture III CDO Limited, (23) Venture IV CDO Limited, (24) Venture V CDO Limited, and (25) Venture VI CDO Limited.

210.    UBS Willow directly and/or indirectly acquired interests originally held by the following entities, all of which were initial lenders under the Credit Facility: (1) Harbourview CLO 2006-1, Ltd., (2) Granite Ventures I Ltd., (3) Stone Tower CLO II, Ltd., (4) Stone Tower CLO III, Ltd., and (5) Stone Tower CLO VI, Ltd.

211.    Each transfer of interests in the Credit Facility once the debt became distressed (which constitutes nearly all of the transfers of Credit Facility interests) was accomplished using the LSTA Purchase Agreement and LSTA Standard Terms.  The parties to each such transfer also executed a ministerial two-page Commitment Transfer Supplement, which was appended to the Credit Agreement and required by Wachovia Bank in order to register new holders of record for interests in the Credit Facility.  The transferors (i.e., not the Plaintiffs in this action) were required to submit the Commitment Transfer Supplements to Wachovia for its records.  For the

short period when the debt was trading at par, transfers were generally accomplished using the Commitment Transfer Supplements.

212.    Wachovia and its banking affiliate are aware that the LSTA Purchase Agreements, and not the Commitment Transfer Supplements, effected the transfer of the claims at issue in this action.  Wachovia Bank receives copies of each completed and executed Commitment Transfer Supplement (from the transferors) so that it can update its records of Credit Facility lenders.  In a recent filing in the Le Nature's bankruptcy proceedings, Wachovia Bank explained that, as a result, it has the names of the holders and the amount of claims held by each holder.  It further explained that it does *not* have "the precise acquisition date for such claims."  Wachovia Bank does not have the acquisition dates for such claims because those dates are on the LSTA Purchase Agreements, which are not provided to Wachovia Bank.

**Wachovia's Preemptive Action in North Carolina**

213.    On March 14, 2007, Wachovia (together with its affiliate, Wachovia Bank) filed a strategic, defensive action in North Carolina state court attempting to prevent many of the Plaintiffs from asserting their rights against Wachovia.  In a transparent forum-shopping effort, Wachovia's action asserts that the Successor Lender Plaintiffs engaged in champerty by buying interests in the Credit Facility because, Wachovia asserts, personal tort claims cannot be assigned *under North Carolina law*.  At the time Wachovia asserted champerty, Plaintiffs had not yet filed any claims against Wachovia.  Thus, Wachovia contended that Plaintiffs *intended* to file claims against Wachovia.

214.    Wachovia asserted its claim in North Carolina state court, even though none of the Successor Lender Plaintiffs has any presence in North Carolina.  Wachovia claims that the action is properly venued there because the Credit Facility "originated" out of North Carolina and because the two-page ministerial supplements executed after the transfer documents were

completed provide for the application of North Carolina law. (The Successor Lender Plaintiffs are challenging the North Carolina court's ability to exercise personal jurisdiction over them.) Wachovia has attempted to secure a North Carolina forum based on its beliefs that North Carolina champerty law is more favorable to its position and, more important, that Wachovia will receive a warmer reception in its home state and city.

215.   Even the ministerial Commitment Transfer Supplement – a form drafted by Wachovia and its affiliates – contemplates that claims such as those asserted in this action could be assigned by the initial lenders to subsequent purchasers of their interests. The document states that, among other things, the seller assigns:

> to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, *including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity* related to the rights and obligations sold and assigned . . . . (emphasis added)

216.   Wachovia initiated the North Carolina action by obtaining an *ex parte* temporary restraining order prohibiting the Successor Lender Plaintiffs (who are defendants in that action) from asserting claims against Wachovia. On April 12, 2007, without deciding whether it had personal jurisdiction over all of the parties, the North Carolina court entered a preliminary injunction, specifically superseding the factual findings set forth in the temporary restraining order, barring the same parties from asserting state law tort claims against Wachovia in any court. The North Carolina court did not take any position with respect to Wachovia's substantive champerty claims; rather, it sought to prevent a multiplicity of lawsuits by holders of Le Nature's bank debt by requiring all such holders to assert any state law claims against Wachovia (but not

against any other defendants) as counterclaims in the North Carolina action that Wachovia initiated.

217.    On March 13, 2008, the North Carolina court issued an order staying the action filed there by Wachovia.  In issuing the stay, the court recognized that the action before it was "primarily a preemptive declaratory judgment action."  The North Carolina court stayed the case filed by Wachovia to permit this Court to proceed with the claims set forth in this Amended Complaint.

218.    In addition to staying the action before it, the North Carolina court modified the preliminary injunction it earlier had entered to make clear that *all* claims – including state law claims – can be asserted by the Successor Lender Plaintiffs against Wachovia in this action. Accordingly, in this Amended Complaint, the Successor Lender Plaintiffs now join the Initial Lender Plaintiffs in asserting state law claims against Wachovia.

## FIRST CLAIM FOR RELIEF

### (All Plaintiffs Against the Le Nature's Executives for Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

219.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

220.    The Le Nature's Executives were and are "persons" within the meaning of 18 U.S.C. 1961(3).

221.    During the period from 2002 through 2006 (the "Scheme Period"), Le Nature's was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which was engaged in, or the activities of which affected, interstate or foreign commerce.

222.    During the "Scheme Period," the Le Nature's Executives were high-ranking officers and employees of Le Natures who conducted the affairs of that enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).

223.    The Le Nature's Executives' conduct and acts in furtherance of the scheme described above (the "Scheme") included, but were not limited to, (i) misrepresenting the nature and extent of Le Nature's' revenues, operations, profits, liabilities, and prospects to investors and prospective investors by the creation and dissemination of false and fraudulent financial statements; (ii) arranging for and entering into transactions with investors, including the various credit transactions sponsored, originated, and syndicated by Wachovia, under false pretenses; (iii) engaging in fraudulent transactions with purported suppliers, customers and other complicit third parties, and employing other means to wrongfully divert to their own use funds received from investors for use in Le Nature's' business and operations; and (iv) concealing from investors and others the misappropriation of funds obtained from investors and the true financial condition of Le Nature's, its assets, business, and operations.

224.    The racketeering activity of the Le Nature's Executives included, but was not limited to, the use of interstate wires for the purpose of executing a scheme to obtain money or property by means of false pretenses, representations or promises.  Accordingly, the racketeering activity consisted of multiple, related acts perpetrated during the Scheme Period that are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank fraud) that are within the scope of 18 U.S.C. § 1961(1)(B) and (5).

225.    Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Le Nature's Executives, for the purpose of executing the Scheme and with the intent to defraud the Plaintiffs or their predecessors:

(a)      BDO's delivery of materially false and misleading audit reports and accompanying financial statements for each of the years 2003, 2004, and 2005, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(b)      Wachovia's distribution of materially false and misleading offering memoranda in connection with the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(c)      Wachovia's distribution of materially false and misleading written "slide" presentations and term sheets for the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(d)      Wachovia's distribution of materially false and misleading high-yield research bulletins and reports on or about August 18, 2003, October 3, 2003, November 9, 2003, February 20, 2004, June 15, 2005, August 30, 2005, April 13, 2006, and June 6, 2006, which were either (i) sent via interstate e-mail to Wachovia customers, such as the initial lenders (including Plaintiffs or their predecessors), or (ii) transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to the initial lenders, including Plaintiffs or their predecessors;

(e)      Le Nature's' delivery of materially false and misleading unaudited quarterly financial statements, which were transmitted over interstate wires by Wachovia on SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs

or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006;

(f)     Le Nature's' delivery of materially false and misleading quarterly Management's Discussions and Analyses of Financial Condition and Results of Operation, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006; and

(g)     Le Nature's' delivery of materially false and misleading quarterly Compliance Certificates required by the credit facilities to confirm compliance with ratios included in the financial covenants in those facilities, which were transmitted by interstate wire by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006.

226.    Plaintiffs or their predecessors justifiably, reasonably, and foreseeably relied on the false statements and misrepresentations contained in these materials.

227.    The pattern of racketeering activity also involved a course of conduct that was intended to, and did in fact, deceive federally chartered and/or federally insured financial institutions into releasing property with the intent to victimize those institutions.  Accordingly, the racketeering activity included acts constituting bank fraud under 18 U.S.C. § 1344.  Federally chartered and/or federally insured lenders that were fraudulently induced to participate in the Credit Facility, and thereby to extend credit to Le Nature's, included without limitation (i) US Bank, which is a member of the Federal Deposit Insurance Corporation, (ii) AgFirst Farm Credit

Bank, which is subject to the protections of the Farm Credit Act of 1971, and (iii) AgStar

Financial Services, which is subject to the protections of the Farm Credit Act of 1971.

228.    Each of the predicate acts referred to in the preceding paragraphs was for the

purpose of executing the Scheme and the Le Nature's Executives engaged in such acts with the

specific intent of furthering the Scheme.

229.    The pattern of racketeering consisted of multiple acts of racketeering by each

member of the Le Nature's enterprise.  The activity was interrelated, not isolated, and was

perpetrated for the same or similar purposes by the same people.  The activity extended for a

period of several years, up to the commencement of the Le Nature's involuntary bankruptcy

proceedings in November 2006.

230.    The conduct of the Scheme was continuous and of substantial duration.  The

activity occurred after the effective date of 18 U.S.C. § 1961 *et seq.*, and the last act occurred

within 10 years after the commission of a prior act of racketeering activity.  During the Scheme

Period, the Le Nature's Executives engaged in numerous acts of wire and bank fraud that were

directed at numerous lenders and investors, including Plaintiffs or their predecessors, and that

caused numerous separate and distinct injuries.  But for the exposure of the Scheme following

appointment of a custodian for the Company as the result of the Delaware Action, the Scheme

would have continued indefinitely.

231.    Plaintiffs have been injured in their business or property as a direct and proximate

result of the Le Nature's Executives' violations of 18 U.S.C. § 1962(c), including injury by

reason of the predicate acts constituting the pattern of racketeering activity set forth above.

232.    As a result of the violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered

substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c),

Plaintiffs are entitled to recover treble their general and special compensatory damages, plus

interests, costs, and attorney's fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## SECOND CLAIM FOR RELIEF

### (All Plaintiffs Against All Defendants for Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))

233.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

234.    Beginning in or about 2002 and through and until the commencement of Le Nature's' involuntary bankruptcy proceedings, Defendants willfully, knowingly, and unlawfully did conspire, combine, confederate, and agree together to violate 18 U.S.C. § 1962(c) by enabling the Le Nature's Executives to conduct the affairs of the Le Nature's enterprise through a pattern of racketeering activity.

235.    It was specifically agreed by the Defendants that the pattern of racketeering activity would include acts in violation of 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank fraud).  Specifically, in furtherance of the conspiracy and to effect its objectives, each of the defendants agreed that the following predicate acts, among others, would be committed by one or more of the members of the conspiracy:

(a)    BDO's delivery of materially false and misleading audit reports and accompanying financial statements for each of the years 2003, 2004, and 2005, which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors;

(b)    Wachovia's distribution of materially false and misleading offering memoranda in connection with the various credit facilities, including but not limited to the December 2005 Add-On Facility and the September 2006 Credit Facility, which were

transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible

to each of the initial lenders, including Plaintiffs or their predecessors;

(c)     Wachovia's distribution of materially false and misleading written "slide"

presentations and term sheets for the various credit facilities, including but not limited to the

December 2005 Add-On Facility and the September 2006 Credit Facility, which were

transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made accessible

to each of the initial lenders, including Plaintiffs or their predecessors;

(d)     Wachovia's distribution of materially false and misleading high-yield

research bulletins and reports on or about August 18, 2003, October 3, 2003, November 9, 2003,

February 20, 2004, June 15, 2005, August 30, 2005, April 13, 2006, and June 6, 2006, which

were either (i) sent via interstate e-mail to Wachovia customers, such as the initial lenders

(including Plaintiffs or their predecessors), or (ii) transmitted over interstate wires by Wachovia

to SyndTrak Online and thereby made accessible to the initial lenders, including Plaintiffs or

their predecessors;

(e)     Le Nature's' delivery of materially false and misleading unaudited

quarterly financial statements, which were transmitted over interstate wires by Wachovia on

SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs

or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30,

2005, December 31, 2005, March 31, 2006, and June 30, 2006;

(f)     Le Nature's' delivery of materially false and misleading quarterly

Management's Discussions and Analyses of Financial Condition and Results of Operation,

which were transmitted over interstate wires by Wachovia to SyndTrak Online and thereby made

accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among

other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006; and

(g)    Le Nature's' delivery of materially false and misleading quarterly Compliance Certificates required by the credit facilities to confirm compliance with ratios included in the financial covenants in those facilities, which were transmitted by interstate wire by Wachovia to SyndTrak Online and thereby made accessible to each of the initial lenders, including Plaintiffs or their predecessors, for (among other periods) the quarters ended June 30, 2005, September 30, 2005, December 31, 2005, March 31, 2006, and June 30, 2006.

236.    Plaintiffs or their predecessors justifiably, reasonably and foreseeably relied on the false statements and misrepresentations contained in these materials.

237.    Each of the Defendants also agreed that the pattern of racketeering activity would involve a course of conduct that was intended to, and did in fact, deceive federally chartered and/or federally insured financial institutions into releasing property with the intent to victimize those institutions. Accordingly, the Defendants agreed that the racketeering activity would include acts constituting bank fraud under 18 U.S.C. § 1344. Federally chartered and/or federally insured lenders that were fraudulently induced to participate in the Credit Facility, and thereby to extend credit to Le Nature's, included without limitation (i) US Bank, which is a member of the Federal Deposit Insurance Corporation, (ii) AgFirst Farm Credit Bank, which is subject to the protections of the Farm Credit Act of 1971, and (iii) AgStar Financial Services, which is subject to the protections of the Farm Credit Act of 1971.

238.    It was specifically intended and foreseen by the Defendants that the Le Nature's enterprise would engage in, and conduct activities which affected, interstate commerce.

239.    Plaintiffs have been injured in their business or property as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

240.    As a result of the conspiracy between and among Defendants to violate 18 U.S.C. § 1962(c), Plaintiffs have suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs, and attorneys fees, incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

### THIRD CLAIM FOR RELIEF

### (All Plaintiffs Against Wachovia for Fraud)

241.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

242.    As set forth more fully above, Wachovia knowingly or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

243.    Wachovia materially misrepresented, among other things, the amount of Le Nature's' revenues, profits, liabilities, sales volume, and annual growth rates.  Wachovia made these misrepresentations in, among other places and documents, offering memoranda, research reports, written and oral presentations, and e-mails to the lenders as alleged in detail above.

244.    Among the other misrepresentations identified above, Wachovia made affirmative and material misrepresentations in its various research reports and bulletins.  In those reports, Wachovia repeatedly overstated Le Nature's' revenues, profits, and growth.  Wachovia falsely depicted Le Nature's as a successful company worthy of additional investment by consistently assigning very positive "buy" and "outperform" ratings to the Company.  The numbers included

in Wachovia's various reports, as well as the investment ratings selected by Wachovia, painted

an utterly false and misleading picture of Le Nature's.

245.    Of particular importance, Wachovia grossly misrepresented to Plaintiffs Le

Nature's' net sales for 2002 as $135.6 million, when they were actually only $4.4 million; net

sales for 2003 as $155.7 million, when they were actually only $9.8 million; net sales for 2004 as

$207.1 million, when they were actually only $12.8 million; and net sales for 2005 as $275.1

million when they were actually only $28.3 million.  Wachovia made additional false

representations to Plaintiffs, as detailed above, concerning Le Nature's' profits, sales volume,

and growth rates for each of the fiscal years 2001 through and including 2005.

246.    Wachovia also failed to disclose material information known only to Wachovia,

and specifically not known to the other lenders to Le Nature's, which, under the circumstances,

Wachovia was under a duty to disclose.  Wachovia failed to disclose, among other things,

Wachovia Bank's fronting of interest payments to lenders to hide Le Nature's' inability to make

the payments, the existence of a Special Committee convened after the resignation of Le

Nature's' CFO and the results of the Committee's report, the misclassification of massive

amounts of leases to keep them off of Le Nature's' balance sheets, and Wachovia's own

identification of serious issues involving Le Nature's' organizational structure, sales, and

financial reporting.

247.    Wachovia was required to disclose these facts to the lenders because, *inter alia*,

(i) the absence of such disclosure rendered prior statements false and misleading or half-truths,

(ii) Wachovia had special knowledge regarding Le Nature's that was not available to the other

lenders, (iii) Wachovia had access to Le Nature's' management by virtue of its multi-year

investment banking and advisory relationship with Le Nature's, (iv) Wachovia's affiliate

(Wachovia Bank) was designated as the administrative agent charged with acting in the interests

of the lender group (including Plaintiffs or their predecessors), and (v) Wachovia had arranged for a portion of the $285 million Credit Facility to be used to satisfy and discharge Le Nature's' obligations to Wachovia Bank under the pre-existing credit facility.

248.    Wachovia knew, or was reckless in not knowing, that its conduct constituted a fraud on the Plaintiffs or their predecessors and would result in, and did result in, the purchase of interests in the Credit Facility by the Plaintiffs or their predecessors and the subsequent loss of a substantial portion of the value of these interests.

249.    Wachovia made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing the Plaintiffs or their predecessors to purchase interests in the Credit Facility in reliance thereon, and the Plaintiffs or their predecessors did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said interests.

250.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by Wachovia's wrongful conduct, which caused each of them to purchase interests in the Credit Facility.

251.    Wachovia's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors.  Wachovia's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

252.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Wachovia awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FOURTH CLAIM FOR RELIEF

### (All Plaintiffs Against Wachovia for Aiding and Abetting Fraud)

253.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

254.    As alleged in detail above, Le Nature's engaged in a what is now a widely acknowledged fraud with respect to, among other things, the operation of its business and the reporting of its financial results.  Le Nature's then fraudulently induced banks and other investors (including Plaintiffs or their predecessors) to invest in the Company, through the purchase of notes and interests in the various credit facilities extended to Le Nature's, based on information that Le Nature's knowingly created and falsified.

255.    Le Nature's fraud included, but was not limited to, its massive overstatement of revenues, reporting more than $275 million in net sales for 2005, when its actual revenues were as low as $32 million.  Le Nature's also overstated its profits, its sales volume, and its growth rate.

256.    Le Nature's acted knowingly or recklessly in creating and disseminating its falsified financial results.  Le Nature's' principal executives, including Podlucky, orchestrated the misstatements.  Le Nature's prepared these false records, including its financial statements, for the very purpose of inducing banks and other investors to participate in Le Nature's' financing activities.

257.    Le Nature's also concealed from Plaintiffs or their predecessors material information concerning the true nature of Le Nature's, its business, assets, and operations, including, but not limited to, the determinations of the Special Committee that was convened after the resignation of the Company's key financial managers and the extent of the Company's liabilities that were kept off the books through the massive misclassifications of capital leases.

258.    By the foregoing conduct and by its other conduct and omissions, Le Nature's willfully and intentionally misrepresented to and concealed from Plaintiffs or their predecessors the true financial condition, business, operations and assets of Le Nature's for the purpose of inducing the Plaintiffs or their predecessors to purchase interests in the Credit Facility.

259.    As set forth in detail above, Wachovia was aware of, or consciously disregarded, the fact that Le Nature's was conducting a fraud on investors, including specifically lenders that participated in the Credit Facility.  Wachovia knew, among other things, that (i) its bank affiliate was fronting interests payments to lenders on behalf of Le Nature's, (ii) Le Nature's had misclassified more than $200 million in capital leases, (iii) Le Nature's was basing its revenues on improper sales prices, and (iv) Le Nature's had convened a Special Committee that drafted a report highlighting operating deficiencies that the Company did not subsequently address. Wachovia also knew that disclosing any of these facts to Plaintiffs or their predecessors would disrupt funding of the Credit Facility, thereby depriving Wachovia of a transaction fee of more than $7 million and preventing Wachovia from reducing its credit risk.

260.    Wachovia substantially assisted the fraud committed by Le Nature's by providing financing to Le Nature's, lending its name and credibility to Le Nature's, disseminating false information to induce Plaintiffs or their predecessors to participate in the Credit Facility, and withholding material and damaging information from Plaintiffs or their predecessors. Wachovia's assistance included, among other things, (i) directly disseminating materials to lenders and potential lenders, (ii) posting materials (including the audited financial statements and other documents) on a website for access by lenders and potential lenders, (iii) orchestrating and participating in in-person presentations directly to lenders and potential lenders, (iv) compiling, drafting, and producing written presentation materials for lenders and potential

lenders, and (v) actively marketing, by telephone, e-mail, and otherwise, interests in the Credit Facility to the lenders.

261.    Absent Wachovia's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated.  As a direct and proximate result of Wachovia's actions, Plaintiffs or their predecessors suffered damages.

262.    Wachovia's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. Wachovia's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

263.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Wachovia awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FIFTH CLAIM FOR RELIEF

### (All Plaintiffs Against Wachovia for Negligent Misrepresentation)

264.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

265.    In connection with the decisions by Plaintiffs or their predecessors to acquire interests in the Credit Facility, Wachovia made numerous representations to the lenders about Le Nature's depicting Le Nature's as a strong company, with a history of substantial revenues and profits growth.  In the materials that it distributed and the presentations that it made, Wachovia misrepresented, among other things, the amount of Le Nature's' revenue, profits, and liabilities.

266.    Wachovia should have known, and negligently disregarded, the falsity of these material misrepresentations, concealing from the lenders, including Plaintiffs and their predecessors, among other things, that (i) its bank affiliate was fronting interests payments to

lenders on behalf of Le Nature's, (ii) Le Nature's had misclassified more than $200 million in capital leases, (iii) Le Nature's was basing its revenues on improper wholesale prices, and (iv) Le Nature's had convened a Special Committee that drafted a report highlighting operating deficiencies that the Company did not subsequently address.

267.    Wachovia negligently made these material misrepresentations and/or omissions, which induced Plaintiffs or their predecessors to extend credit to Le Nature's by participating in the syndication of the Credit Facility.

268.    The lenders who were members of the Credit Facility syndicate, including Plaintiffs or their predecessors, enjoyed a special relationship of trust with Wachovia. Wachovia actively solicited the lenders to purchase their interests in the Credit Facility. Wachovia knew that the lenders were dependent on it and relied on it to disclose material facts, such as those concerning Wachovia's negligent misrepresentations and omissions. At various points, Wachovia specifically told the lenders to "trust us" in connection with the lenders' agreements to purchase interests in the Credit Facility. Wachovia knew that the lenders received most of their information about Le Nature's from Wachovia's postings to a website accessible by the lenders. Wachovia also knew that this information, including Wachovia's misrepresentations and omissions, was material, and that the lenders were relying on such representations and omissions in choosing to participate in the Credit Facility.

269.    Wachovia was in a position of unique and superior knowledge to the lenders regarding information about the operations and financial condition of Le Nature's. As the long-time advisor and investment banker to Le Nature's, Wachovia had substantial access to Le Nature's' management and financial records. The lenders, including Plaintiffs and their predecessors, did not have access to similar information.

270.    In September 2006, when Plaintiffs or their predecessors purchased interests in the Credit Facility from Wachovia, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions.  Plaintiffs or their predecessors did not learn, and could not have learned, the true facts concerning the foregoing material misrepresentations until the collapse of Le Nature's in November 2006.

271.    In purchasing interests in the Credit Facility, Plaintiffs or their predecessors reasonably relied upon and were induced to proceed by the foregoing negligent misrepresentations and/or omissions.  The lenders justifiably relied on Wachovia's representations regarding the financial health and strength of Le Nature's.

272.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by Wachovia's misrepresentations and omissions, which caused each of them to purchase interests in the Credit Facility.

273.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Wachovia awarding Plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SIXTH CLAIM FOR RELIEF

### (All Plaintiffs Against BDO for Fraud)

274.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

275.    Le Nature's engaged BDO to perform an audit of its balance sheet and related financial statements as of December 31, 2003.  BDO was similarly engaged to perform audits for the years ended December 31, 2004 and December 31, 2005.  As part of its audits, BDO was required to undertake extensive auditing and accounting work sufficient to comply with its GAAS duties and to ensure that the financial statements were presented in compliance with

GAAP. BDO was engaged by the Company to do additional work, including review of its unaudited quarterly financial reports.

276.     As set forth above, BDO understood and acknowledged from the outset of its engagements that the Le Nature's audit was "sensitive." BDO was aware of the history leading to its engagement, including the resignation of Le Nature's' most senior financial managers and Le Nature's' termination of its relationship with Ernst & Young. BDO also acknowledged specific and significant fraud risks at Le Nature's, including Podlucky's control over the Company's activities and his history of overriding controls. As such, BDO was required to undertake steps to determine whether fraud had occurred at Le Nature's, including specific review procedures for the financial statements and conducting interviews with non-management employees of Le Nature's.

277.     Rather than undertake the mandated steps, including compliance with the GAAS provisions set forth in detail above, BDO failed to conduct complete and independent audits and instead issued and executed clean audit reports accompanying materially false financial statements. As a result, as set forth more fully above, BDO knowingly or recklessly made false and misleading statements of material fact and omitted to state material facts regarding Le Nature's' finances and operations.

278.     The financial statements certified by BDO and accompanied by BDO's audit reports grossly overstated Le Nature's' revenues and profits. Specifically, BDO certified that Le Nature's generated net sales of $155.7 million in 2003, when net sales that year were only $9.8 million; that Le Nature's generated net sales of $207.1 million in 2004, when net sales that year were only $12.8 million; and that Le Nature's generated net sales of $275.1 million in 2005, when net sales that year were only $28.3 million. BDO knowingly or recklessly certified these erroneous financials rather than complete appropriate verifications of sales levels and revenues.

279.    The balance sheets included within the financial statements certified by BDO and accompanied by BDO's audit reports materially understated Le Nature's' liabilities.  For the year ended December 31, 2005, in particular, the balance sheet failed to include more than $200 million in capital leases.  BDO was responsible for determining, in conjunction with Le Nature's, the classification of these leases and knowingly or recklessly classified the lease obligations as operating leases so that they would not be included on the balance sheet and in calculating the financial ratios mandated by the Credit Facility.

280.    In addition to overstating revenues, the income statement for the year ended December 31, 2005, which was also included within the financial statements certified by BDO and accompanied by BDO's audit report for that year, substantially understated Le Nature's' expenses due to the improper characterization of rental expenses under equipment leases for the Phoenix facility.  As a result, net income was further exaggerated.

281.    BDO also knowingly or recklessly failed to disclose the Company's inadequate internal controls and the CEO's domination of Le Nature's' finances in its audit reports.  BDO was required to disclose such material facts because it had special knowledge regarding Le Nature's that was not available to the lenders.  In its capacity as auditor and advisor to the Company, BDO had access to Le Nature's' management and was privy to Le Nature's' financial information, controls, and internal accounting books, records, and methods.

282.    Notwithstanding its awareness of material discrepancies in Le Nature's' financial records and the absence of adequate internal financial controls at the Company, BDO falsely certified that Le Nature's' financial statements for each of the fiscal years ended December 31, 2003 through December 31, 2005 were in compliance with GAAP and that its audits of the financial statements complied with GAAS.

283.    BDO knew, by virtue of express provisions in the Credit Facility and otherwise, that its audit reports and the accompanying financial statements, and the unaudited quarterly financial statements that it reviewed, would be distributed to and relied upon by the lenders, including Plaintiffs or their predecessors.

284.    BDO knew, or was reckless in not knowing, that its conduct constituted a fraud on the Plaintiffs or their predecessors and would result in, and did result in, the purchase of interests in the Credit Facility by the Plaintiffs or their predecessors and the subsequent loss of a substantial portion of the value of these interests.

285.    BDO made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing the Plaintiffs or their predecessors to purchase interests in the Credit Facility in reliance thereon, and the Plaintiffs or their predecessors did reasonably and justifiably rely on the misrepresentations and omissions in purchasing and retaining said interests.

286.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by BDO's wrongful conduct, which caused each of them to purchase interests in the Credit Facility.

287.    BDO's fraudulent conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. BDO's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

288.    By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SEVENTH CLAIM FOR RELIEF

### (All Plaintiffs Against BDO for Aiding and Abetting Fraud)

289.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

290.    As set forth in detail above, and as specifically reiterated in paragraphs 254 through 258, Le Nature's engaged in a massive fraud that included, among other things, the gross overstatement of revenues and profits in order to induce lenders, including Plaintiffs or their predecessors, to extend credit to Le Nature's.

291.    BDO was aware or consciously disregarded the fact that Le Nature's was conducting a fraud on investors, including specifically lenders that participated in the Credit Facility. BDO knew, among other things, that (i) Le Nature's had misclassified more than $200 million of capital leases as operating leases, thereby keeping that amount off of the Company's balance sheet as liabilities and enabling the Company falsely to report compliance with ratios set forth in the Credit Facility's financial covenants, (ii) Le Nature's had mischaracterized more than $8.5 million in expenses in 2005, thereby falsely inflating net income by more than 37%, and (iii) Le Nature's' chief executive completely dominated the Company and ignored and overrode the limited set of controls that were in place. BDO also knew that disclosing these facts, in the audit reports it drafted or otherwise, would disrupt funding of the Credit Facility, thereby preventing consummation of the facility and jeopardizing BDO's relationship with Le Nature's management.

292.    BDO substantially assisted the fraud committed by Le Nature's by certifying patently false financial statements and permitting those statements, with its signature and approval, to be distributed to lenders and potential lenders. By issuing such clean audit reports attesting to the fair presentation of Le Nature's' financial statements in conformity with GAAP,

BDO enabled Le Nature's to perpetrate its fraud.  BDO's assistance included, among other things, (i) issuing clean audit reports to accompany Le Nature's annual financial statements for 2003, 2004, and 2005 even though BDO did not undertake the steps required to determine the veracity of those statements, (ii) determining on behalf of Le Nature's that the Company's lease obligations with respect to property and equipment for the Phoenix facility were operating leases, rather than capital leases, notwithstanding the applicable GAAP standards mandating their designation as capital leases, (iii) determining on behalf of Le Nature's that rental payments under operating leases should not be reflected as expenses, and (iv) failing to inquire of non-management employees whether they were aware of fraudulent conduct at the Company, notwithstanding BDO's knowledge of Podlucky's history of ignoring controls and his degree of control over the Company's finances.

293.    Absent BDO's active and knowing participation, Le Nature's' fraudulent scheme could not have been perpetrated.  As a direct and proximate result of BDO's actions, Plaintiffs or their predecessors suffered damages.

294.    BDO's conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors.  BDO's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

295.    By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## EIGHTH CLAIM FOR RELIEF

### (All Plaintiffs Against BDO for Negligent Misrepresentation)

296.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

297.    BDO held and continues to hold itself out as a professional accounting firm qualified to perform public accounting services, including independent audits.  BDO has a duty to maintain, and should be held to, the generally accepted auditing and accounting standards by which an auditor is obligated to conduct an audit.

298.    BDO executed engagement letters with Le Nature's with respect to its audits of Le Nature's' financial statements for each of the years 2003, 2004, and 2005.  In each such letter, BDO stated that it would conduct its audit in accordance with GAAS, and that the objective was to express an opinion on Le Nature's' financial statements in conformity with GAAP.

299.    BDO owed the duty to perform its audit work in accordance with GAAS not only to Le Nature's, but also to Le Nature's lenders, including those that participated in the Le Nature's Credit Facility.  BDO knew that its audit reports were being provided directly to these lenders in connection with their extensions of credit to Le Nature's.  BDO knew that section 5.1 the Credit Facility itself (like earlier credit facilities that it replaced) required the Company to provide BDO's audit reports to the lenders.  BDO further knew that section 3.1 of the Credit facility (like earlier credit facilties that it replaced) expressly stated that, to induce the lenders to extend credit to Le Nature's, the Company was providing the lenders with its audited financial statements, and the accompanying BDO audit reports, for each of the years 2003, 2004, and 2005. Thus, BDO knew and expected that its audit reports were being provided to a select group – i.e., the lenders and potential lenders to Le Nature's – specifically for those lenders to use and rely upon in determining whether to participate in Le Nature's' financing transactions.

300.    Additionally, in the course of their work for Le Nature's, Wachovia and BDO had extensive contacts with each other to discuss various issues relating to Le Nature's' financial condition, financial statements, and even the drafting of confidential information memoranda in connection with the various Le Nature's financing transactions.  As BDO was aware, Wachovia Bank was the administrative agent for all of the lenders under each of the credit facilities, and thus BDO was further linked to the lenders by providing and sharing information with Wachovia Bank.

301.    BDO knew that its audit reports and the accompanying financial statements were being provided to the lenders, knew that the lenders would rely on those audit reports and the accompanying financial statements, and was further linked to the lenders through direct contact with their agent and otherwise.

302.    Additionally, BDO was in a position of unique and superior knowledge to the lenders regarding information about the operations and financial condition of Le Nature's.  As the auditor and advisor to Le Nature's, BDO had substantial access to Le Nature's' management and financial records.  The lenders, including Plaintiffs and their predecessors, did not have access to similar information.

303.    Notwithstanding its professional obligation to audit Le Nature's in accordance with GAAS, BDO failed to do so.  BDO did not exercise the professional skepticism that is a central element of a proper GAAS audit.  Instead, BDO accepted, without adequate questioning or corroboration, information provided to it by Podlucky and other senior executives at Le Nature's.  BDO knew that these few individuals, more than anyone else, would be motivated to, and were in a position to, misrepresent Le Nature's' finances, sales, and profits.  Nonetheless, BDO failed adequately to question the information provided by these few executives, as is required of an auditor acting in accordance with GAAS.

304.    BDO's negligent conduct is demonstrated by the firm's many failings in connection with its audits of Le Nature's, including:

- BDO assisted Le Nature's in misclassifying more than $200 million in capital leases as operating leases, enabling the Company to keep the leases off of its balance sheet and thereby to represent that it was in compliance with mandated financial ratios;

- BDO assisted Le Nature's in misclassifying more than $8.5 million in rental expenses for fiscal year 2005, preventing the inclusion of those expenses on the income statement and falsely inflating the Company's net income;

- BDO failed to make fraud inquiries to non-executive employees, although it acknowledged that the executive employees were the most likely individuals to engage in substantial fraudulent conduct;

- BDO failed to report any findings with respect to the Report of the Special Committee that was convened following the resignation of the Company's CFO; and

- BDO failed, on information and belief, to obtain sufficient corroborating evidence from external sources.

305.    As a result of its negligent conduct in performing the audits, BDO, contrary to its professional obligations, certified financial statements that were grossly incorrect, issued an improper clean audit report, and failed to advise the lenders of the massive fraud that was being committed at Le Nature's.

306.    In September 2006, when Plaintiffs or their predecessors purchased interests in the Credit Facility, they did not know, and could not have learned, the true facts concerning the foregoing material misrepresentations and omissions.  Plaintiffs or their predecessors did not learn, and could not have learned, the true facts concerning the foregoing material misrepresentations until the collapse of Le Nature's in November 2006.

307.    In purchasing interests in the Credit Facility, Plaintiffs or their predecessors reasonably relied upon and were induced to proceed by the foregoing negligent

misrepresentations and/or omissions.  The lenders justifiably relied on BDO's representations regarding the financial health and strength of Le Nature's and BDO's certification of Le Nature's' financial statements as being in compliance with GAAP.

308.    Each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged by BDO's negligent conduct, misrepresentations, and omissions, which caused each of them to purchase interests in the Credit Facility.

309.    By reason of the foregoing, Plaintiffs are entitled to a judgment against BDO awarding Plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## NINTH CLAIM FOR RELIEF

### (All Plaintiffs Against All Defendants for Civil Conspiracy)

310.    Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

311.    Defendants and Le Nature's conspired to accomplish an unlawful objective; i.e., to defraud Le Nature's' lenders, creditors, and investors regarding Le Nature's business, assets, liabilities, operations, and true financial condition.  The conspiracy was aimed at defrauding, among others, lenders participating in the Credit Facility, including Plaintiffs or their predecessors.

312.    The conspirators agreed to conceal from the lenders the full extent of Le Nature's' liabilities, to inflate its revenues, and to disguise the diversion and dissipation of misappropriated corporate funds.

313.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it.

314.     Wachovia furthered the conspiracy by, among other things, the following overt acts: (i) acting as Le Nature's' principal advisor and investment banker over a period of more than three years, during which time it assisted Le Nature's in raising several hundred million dollars through the use of materially false offering materials, (ii) directly disseminating materials to lenders and potential lenders that misrepresented Le Nature's' revenues, assets, liabilities, and financial stability, (iii) orchestrating and participating in in-person presentations directly to lenders and potential lenders, (iv) compiling, drafting, and producing written presentation materials for lenders and potential lenders, and (v) actively marketing, by telephone, e-mail, and otherwise, interests in the Credit Facility to the lenders.  Wachovia also furthered the conspiracy by concealing material facts, such as the Company's inability to make timely interest payments, its calculation of revenues based on improper product prices, and its lack of internal controls capable of controlling its own management.

315.     BDO furthered the conspiracy by, among other things, certifying materially false financial statements, issuing clean audit reports in connection with those financial statements, and assisting Le Nature's to hide massive amounts of debt by classifying capital lease obligations as operating leases.  BDO was aware and intended that the lenders would rely on these audit reports and financial statements in deciding to extend credit to Le Nature's.  BDO also concealed material information regarding Le Nature's, including the existence and results of the Special Committee Report.

316.     The Le Nature's Executives furthered the conspiracy by, among other things, publishing false financial results, including inflated revenues and income, and concealing material information regarding the operations and financial integrity of Le Nature's for the purpose of inducing Plaintiffs and their predecessors to acquire interests in the Credit Facility.

317.    As a direct and proximate result of the foregoing conduct, each of the Plaintiffs (or, in the case of the Successor Lender Plaintiffs, their predecessors) has been damaged.

318.    Defendants' conspiracy was intended to, and in fact did, (i) deceive the public about Le Nature's' financial condition, including its revenues and liabilities, and (ii) induce agencies to issue incorrect credit ratings for the Company.  As a result, thousands of investors, vendors, lenders, and the Company's employees collectively have lost hundreds of millions of dollars.

319.    Defendants' conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the Plaintiffs or their predecessors. Defendants' conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

320.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

WHEREFORE, Plaintiffs demand judgment as follows:

A.  On the First and Second Claims for Relief, directing Defendants to pay all Plaintiffs treble damages, pursuant to 18 U.S.C. § 1964(c), for losses caused by defendants' violations of the Racketeer Influenced and Corrupt Organization Act;

B.  On the Third, Fourth, Fifth, and Ninth Claims for Relief, directing Wachovia to pay all Plaintiffs compensatory damages in an amount not less than the principal and accrued interest of their respective loan positions to be determined at trial;

C.  On the Third, Fourth, and Ninth Claims for Relief, directing Wachovia to pay all Plaintiffs punitive damages in an amount to be determined at trial;

D.  On the Sixth, Seventh, Eighth, and Ninth Claims for Relief, directing BDO to pay all Plaintiffs compensatory damages in an amount not less than the principal and accrued interest of their respective loan positions to be determined at trial;

E.  On the Sixth, Seventh, and Ninth Claims for Relief, directing BDO to pay all Plaintiffs punitive damages in an amount to be determined at trial;

F.  On the Ninth Claim for Relief, directing the Le Nature's Executives to pay all Plaintiffs compensatory damages in an amount not less than the principal and accrued interest of their respective loan positions to be determined at trial, as well as punitive damages in an amount to be determined at trial;

G.  Awarding Plaintiffs pre- and post-judgment interest at the rate allowed by law; and

H.  Granting Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims so triable.

DATED:    New York, New York
          March 17, 2008

> QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
>
> By:/s/ Robert S. Loigman
>     Michael B. Carlinsky (MC-6594)
>     Richard I. Werder (RW-5601)
>     Robert S. Loigman (RL-0675)
>     Susheel Kirpalani (SK-8926)
>
> 51 Madison Avenue, 22nd Floor
> New York, New York  10010-1601
> (212) 849-7000
>
> Attorneys for Plaintiffs