UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

HARBINGER CAPITAL PARTNERS MASTER    :
FUND I, LTD.; AURELIUS CAPITAL
MASTER, LTD.; AURELIUS CAPITAL       :
PARTNERS, LP; ARROW DISTRESSED
SECURITIES FUND; SCHULTZE MASTER     :
FUND, LTD.; LATIGO MASTER FUND,
LTD.; UBS WILLOW FUND, LLC;          :
MISSOURI STATE EMPLOYEES'
RETIREMENT SYSTEM; BLACKROCK         :
GLOBAL FLOATING RATE INCOME TRUST;
BLACKROCK LIMITED DURATION INCOME    :
TRUST; BLACKROCK SENIOR INCOME
SERIES; BLACKROCK SENIOR INCOME      :
SERIES II; BLACKROCK SENIOR INCOME
SERIES III PLC; MAGNETITE V CLO,     :
LTD; BLACKROCK SENIOR LOAN
PORTFOLIO; HARCH CLO II, LTD.;       :
and RZB FINANCE LLC,
                                     :
                  Plaintiffs,
                                     :
          - against -
                                     :
WACHOVIA CAPITAL MARKETS, LLC
D/B/A WACHOVIA SECURITIES; BDO       :
SEIDMAN, LLP; GREGORY J. PODLUCKY;
and ROBERT LYNN,                     :

                  Defendants.        :

- - - - - - - - - - - - - - - - - -x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED:** 8/26/08

**MEMORANDUM DECISION**

07 Civ. 8139 (DC)

**APPEARANCES:**   (see last page)

**CHIN, District Judge**

In this case, plaintiffs, various creditors of beverage manufacturer Le Nature's, Inc. ("Le Nature's"), sue defendants Wachovia Capital Markets, LLC ("Wachovia"), BDO Seidman, LLP ("BDO"), Gregory Podlucky, and Robert Lynn, for damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and state law. The complaint alleges that defendants conspired to fraudulently induce plaintiffs to invest in Le Nature's by

grossly misrepresenting the company's finances. Wachovia and BDO move to dismiss the complaint on grounds that plaintiffs lack standing as their federal claims are not ripe.[1] For the reasons that follow, the motions are granted.

### BACKGROUND

#### A. Facts

For purposes of these motions, the facts alleged in the amended complaint are assumed to be true. The following facts are drawn from the amended complaint and the documents incorporated by reference.[2]

#### 1. The Parties

Plaintiffs are members of a consortium of creditors who own interests in a $285 million loan made to Le Nature's by Wachovia Bank, N.A. ("Wachovia Bank"), an affiliate of Wachovia. (Am. Compl. ¶¶ 3-4, 14).

Wachovia is a limited liability company that offers corporate and investment banking services under the trade name "Wachovia Securities." (Id. ¶ 32). At all times relevant, it

---

[1] Podlucky joins in the motions' requests for relief without "adopt[ing] the factual averments set forth therein as they relate to allegations of misconduct" on his part. (Podlucky Joinder 2). It does not appear from the docket that Lynn has answered or otherwise appeared in the action.

[2] The Court also takes judicial notice of the parties' public filings in the bankruptcy proceeding. See Pani v. Empire Blue Cross Blue Shield, 152 F.3d. 67, 75 (2d Cir. 1998), cert. denied, 525 U.S. 1103 (1999) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6).").

served as principal investment banker and financial advisor to Le Nature's. (Id.). From 2003 to 2006, it underwrote and syndicated a series of loans to Le Nature's, including the $285 million loan in 2006. (Id. ¶¶ 32, 57-78).

BDO is a New York accounting firm that served as Le Nature's' outside accountant and auditor from 2003 through 2006. (Id. ¶ 33).

Podlucky is Le Nature's' founder and served at all times relevant as the company's Chairman and Chief Executive Officer; he was also the majority shareholder. (Id. ¶ 34). Lynn is a member of Le Nature's' Board of Directors and served at all times relevant as the company's Executive Vice President. (Id.).

2. **Le Nature's Financial Troubles**

Founded in 1989, Le Nature's made its name producing and selling a wide variety of beverages, from iced teas and lemonades to juice drinks and flavored water. (Id. ¶ 42). Throughout the 1990s and early 2000s, the company touted itself as an innovator in the beverage industry, developing new pasteurization technologies, promoting environmentally sound bottling practices, and maintaining, in its words, "one of America's most advanced manufacturing facilities." (Id. ¶ 43). Indeed, based on its financial statements, public pronouncements, and marketing materials, Le Nature's appeared by 2005 to have developed into an extremely profitable company. (Id. ¶ 44).

Notwithstanding its apparent success, however, Le Nature's suffered a series of internal setbacks between 2003 and

2006, arising from conflicts over its bookkeeping practices. On August 14, 2003, its Chief Financial Advisor, John Higbee, abruptly resigned, declaring that Podlucky's "absolute control" over Le Nature's' finances and failure to maintain detailed records evidenced "material weaknesses in the [c]ompany's internal controls." (Id. ¶ 80). The same day, two additional officers resigned, each citing concerns over "inconsistencies with how business [wa]s conducted" at Le Nature's. (Id. ¶ 81). In response to the sudden upheaval, the company's auditor, then Ernst & Young LLP ("Ernst & Young"), advised Le Nature's to hire independent counsel to investigate the allegations of mismanagement. (Id. ¶ 82). The company subsequently retained Kirkpatrick & Lockhart LLP ("K&L"), which recommended, after completing an investigation, that Le Nature's take remedial action to improve its segregation of duties and record-keeping practices. (Id. ¶¶ 83-86).

In January 2004, after reviewing the K&L report, Ernst & Young declared that it would have to conduct additional review to address its own concerns over Le Nature's' record-keeping practices. (Id. ¶¶ 89-90). Before any such review could take place, however, Le Nature's terminated its relationship with Ernst & Young and in March 2004 hired BDO to audit its 2003 financial statements. (Id. ¶¶ 91-94). Notwithstanding the concerns raised by its predecessor, BDO issued Le Nature's a "clean audit opinion," declaring that the company's 2003 financial statements fairly represented, "in all material

- 4 -

respects, the financial position of Le Nature's, Inc." (Id. ¶ 98). BDO later conducted similar audits of Le Nature's' 2004 and 2005 fiscal records, each time approving the company's financial statements without reporting evidence of fraud or deliberate mismanagement. (Id. ¶¶ 11, 104-137).

### 3. The Delaware Action

In May 2006, several minority shareholders filed suit against Le Nature's and four of its directors, including Podlucky and Lynn, in the Delaware Chancery Court for failing to maximize the company's value in a manner consistent with their fiduciary duties (the "Delaware Action"). (Id. ¶ 46). Months later, while the action was still pending, the shareholders learned that the Le Nature's had used forged documents to convert funds placed on deposit by American International Group, Inc., one of its lessors. (Id. ¶ 48). The Delaware Chancery Court subsequently appointed a custodian to oversee Le Nature's' finances, who in turn reported significant discrepancies between the company's actual and reported revenues. (Id. ¶¶ 49-50).

### 4. The Credit Facility

Notwithstanding the Delaware Action, Wachovia underwrote a $285 million dollar loan to Le Nature's in September 2006. (Id. ¶ 3). As it had in the past, Wachovia subsequently syndicated the loan to an array of banks and other investors (the "Credit Facility"), thereby reducing its own share of the loan to $7 million. (Id.).

In soliciting lenders, Wachovia published positive marketing reports (id. ¶ 9), and advised investors that their participation in the Credit Facility was a "no-brainer." (Id. ¶ 158). Wachovia made these recommendations without publicly detailing potential areas of concern, including: Wachovia's lack of success in facilitating the sale of the company in 2005 and 2006; Le Nature's' failure to make timely interest payments on its loans from Wachovia; and reports from within Wachovia that Le Nature's' products were selling poorly at various locations. (Id. ¶¶ 138-54). Nevertheless, unaware of the extent of Le Nature's financial woes, plaintiffs purchased more than $165 million of Le Nature's' debt through the Credit Facility, either as direct purchasers from Wachovia or as successors-in-interest to the initial lenders. (Id. ¶¶ 4-5).

### 5. Le Nature's Bankruptcy

On November 1, 2006, as news of Le Nature's' financial discrepancies came to light, a group of Le Nature's' creditors initiated involuntary bankruptcy proceedings against it in the Western District of Pennsylvania. (Id. ¶¶ 1, 52). Thereafter, the Chapter 11 trustee commenced an investigation of the company's actual revenues for the years 2002 through 2005 and determined that Le Nature's had overstated its revenues by well over $100 million each year -- and by over $200 million in 2005. (Id. ¶ 54).

On June 18, 2007, plaintiffs, along with other Le Nature's creditors, submitted a joint proposed reorganization

plan (the "Plan") that would, among other things, appoint a "Liquidation Trustee" charged with marshaling assets for the bankruptcy estate by asserting claims against third parties "responsible for the collapse of Le Nature's." (Samowitz Decl. Ex. 3 at 6; see Kurzweil Aff. Ex. G). In their supplemental response in support of the Plan, the Plan's proponents asserted that it "provide[d] an opportunity for all creditors . . . to recover what was lost in the massive fraud that led to Le-Nature's momentous collapse," and in particular, that the prosecution of tort claims against third parties would result in "substantial estate recoveries." (Samowitz Decl. Ex. 3 at 6). The bankruptcy court approved the Plan on July 8, 2008.

B.  **Procedural History**

Plaintiffs commenced the instant action on September 17, 2007, charging Podlucky and Lynn with RICO violations (count one) and all defendants with conspiracy to violate RICO (count two), and asserting pendent state law claims against Wachovia and BDO for fraud, aiding and abetting fraud, negligent misrepresentation, and civil conspiracy (counts three through nine).[3] Wachovia and BDO each moved to dismiss the complaint for

---

[3]   In advance of the instant action, on March 14, 2007, Wachovia filed suit in North Carolina state court, charging the successor lender plaintiffs with champerty for buying interests in the Credit Facility as a means to "acquire" tort claims against Wachovia. (Am. Compl. ¶ 214; see Wachovia Mem. 3 n.2). The North Carolina court initially entered a preliminary injunction prohibiting the successor lenders from asserting personal tort claims against Wachovia outside of North Carolina. (Am. Compl. ¶ 216). On March 13, 2008, however, the North Carolina Court stayed the case before it and modified its

failure to state a claim and lack of subject matter jurisdiction, asserting that (1) plaintiffs lacked statutory standing under RICO because their claims were unripe (2) the Court should decline to exercise supplemental jurisdiction over plaintiffs' pendent state claims.

## DISCUSSION

A. **The RICO Claim**

   1. **Applicable Law**

      a. **12(b)(6) Motion to Dismiss**

On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see Erickson v. Pardus, 127 S. Ct. 2197, 2199 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

In its recent decision in Bell Atlantic Corp., the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from Conley v. Gibson, 355 U.S. 41, 45-47 (1957), adopting in its place a "plausibility" standard. Bell Atl. Corp., 127 S. Ct. at 1969. As interpreted by the Second Circuit, Bell Atlantic Corp. did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a

---

preliminary injunction to allow the successor lenders to participate in the action before this Court. (Id. ¶¶ 217-18).

pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'" Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Bell Atl. Corp., 127 S. Ct. at 1974).

b. **Statutory Standing under RICO**

Section 1964(c) of RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). To satisfy RICO's statutory standing requirements, "a plaintiff must demonstrate, '(1) a violation of section 1962; (2) an injury to business or property; and (3) causation of the injury by the violation.'" Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003) (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990)).[4]

With respect to the injury element, "'a cause of action does not accrue under RICO until the amount of damages becomes clear and definite.'" Id. (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994), cert. denied, 513

---

[4] Defendants do not challenge plaintiffs' Article III standing. The Court notes, however, that establishing "RICO standing is a more rigorous matter than [establishing] standing under Article III." Denney v. Deutsche Bank AG, 443 F.3d 253, 266 (2d Cir. 2006) (citing Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123 (2d Cir. 2003)).

U.S. 1079 (1995)). Accordingly, "a creditor claiming that its ability to collect its debt has been impaired or frustrated by a RICO violation lacks standing to sue under RICO for the amount of the debt as long as the extent of the loss remains uncertain, as for example where collection efforts continue." First Capital Asset Mgmt., Inc., v. Brickellbush, Inc., 219 F. Supp. 2d 576, 578 (S.D.N.Y. 2002).

### 2. Application

Plaintiffs lack statutory standing to sue under RICO for their damages have yet to become "clear and definite" and are thus unripe. Because collection efforts in the ongoing bankruptcy proceeding have not been completed, whether and to what extent the estate's recovery against third parties may offset plaintiffs' damages remains uncertain.

In this case, the Plan -- which was sponsored by plaintiffs, among others -- specifically called for the appointment of a Liquidation Trustee to prosecute claims on behalf of the estate against those parties "responsible for the collapse of Le Nature's." (Samowitz Decl. Ex 3 at 6). The Plan contemplated that proceeds from the estate's recovery would go towards satisfying Le Nature's' debts to its creditors. Accordingly, until the Liquidation Trustee has prosecuted those claims, the amount of plaintiffs' loss remains indefinite and therefore plaintiffs lack standing. See Bankers Trust Co. v. Rhodes, 859 F.2d 1096, 1106 (2d Cir. 1988) (while bankruptcy trustee pursued recovery, plaintiff's RICO damages were

"speculative" and "unprovable" because, if trustee succeeded, plaintiff "would benefit along with [the debtor's] other creditors and its injury would decrease").

Plaintiffs assert that they have stated a claim for "clear and definite" damages because (1) their complaint seeks the recovery of a sum certain (the loan debt plus interest) and (2) they possess no direct means of mitigating their losses, as their collateral has already been liquidated.[5] (Pl. Mem. at 1). Their injuries are no less certain, they argue, simply because the estate's potential claims against third parties raise the "possibility of a derivative recovery." (Id. at 7).

These arguments fail. First, the liquidation of collateral does not itself render plaintiffs' damages "clear and definite" for plaintiffs may still look to sources beyond their collateral on the bank debt to offset their damages. See Motorola, 322 F.3d at 135 ("The 'clear and definite' amount of damages suffered by a secured creditor who is fraudulently induced to make a loan . . . 'cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much' . . . because the RICO damages are netted against recovery obtained from collateral

---

[5] With respect to their collateral on the bank debt, plaintiffs offer two interrelated arguments: (1) they stand to recover, if anything, "only a token amount" of the proceeds from the liquidation and (2) the liquidation of the collateral exhausted plaintiffs' contractual remedies ("The parties [had] agreed that if the loan [was] not repaid, the lender would obtain specific rights in collateral."), leaving them no alternative but to pursue this action. (Pl. Mem. at 1, 15).

and other sources.") (emphasis added and internal citations omitted). Here, plaintiffs may yet offset their damages by looking to another such source expressly contemplated by the Plan -- the estate's recovery against third-party tortfeasors.

Second, for the same reason, even assuming the liquidation of plaintiffs' collateral extinguished their contractual remedies, plaintiffs' opportunity to recover has not been foreclosed. See id. ("[W]hen a creditor alleges he has been defrauded[, his] RICO injury is speculative when contractual or other legal remedies remain which hold out the real possibility that the debt . . . may be eliminated or significantly reduced." (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 59 (2d Cir. 1998)). The ongoing bankruptcy proceeding, in which plaintiffs are participating, provides plaintiffs an alternative "legal" remedy for the satisfaction of their debts. In submitting their Plan, the Plan's proponents, plaintiffs included, stated that the "the Plan provides an opportunity for all creditors -- secured and unsecured alike -- to recover what was lost in the massive fraud that led to Le Nature's momentous collapse." (Samowitz Decl. Ex 3 at 2). Those recovery efforts have yet to run their course and, accordingly, plaintiffs' RICO claims are unripe.

**B. The State Claims**

Counts three through nine assert various state claims against defendants Wachovia and BDO. Because jurisdiction in this case is not based on diversity, this Court has jurisdiction

over the state claims only if there is supplemental jurisdiction. See 28 U.S.C. § 1367(a).

Here, I decline to exercise supplemental jurisdiction over plaintiffs' state law claims, as I am dismissing all federal claims well before trial. Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund, 937 F.2d 752, 758 (2d Cir. 1991) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966))). Accordingly, the state claims are dismissed as well.[6]

### CONCLUSION

For the foregoing reasons, defendants' motions are granted. The Clerk of the Court shall enter judgment dismissing the amended complaint without prejudice to refiling when plaintiffs' damages become "clear and definite."

SO ORDERED.

Dated:   New York, New York
         August 26, 2008

                                    _____
                                    DENNY CHIN
                                    United States District Judge

---

[6] Plaintiffs also contend that this Court should exercise jurisdiction over their state claims pursuant to 28 U.S.C. § 1334(b), which gives district courts "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." They assert that the Court should exercise "related to" jurisdiction over their claims because "any recovery by Plaintiffs here will reduce the ultimate amount they can recover from the bankruptcy estate." (Pl. Mem. at 17). I disagree. Absent their RICO claim, plaintiffs' action involves purely state law issues and no claims by or against Le Nature's.

- 13 -

**APPEARANCES:**

For Plaintiffs:

    QUINN EMANUEL URQUHART OLIVER & HEDGES
        By:  Michael B. Carlinsky, Esq.
            Susheel Kirpalani, Esq.
            Robert S. Loigman, Esq.
            Richard I. Werder, Jr., Esq.
    51 Madison Avenue, 22nd Floor
    New York, NY  10010

For Defendant BDO Seidman, LLP:

    DLA PIPER US LLP
        By:  Palmina M. Fava, Esq.
            Matthew Hiller, Esq.
            Thomas F. O'Neil, III, Esq.
            Michael S. Poulos, Esq.
            Cary B. Samowitz , Esq.
    1251 Avenue of the Americas
    New York, NY  10020

For Defendant Wachovia Capital Markets, LLC:

    DEWEY & LEBOEUF LLP
        By:  William T. Conway, III, Esq.
            Harvey Kurzweil, Esq.
            Richard W. Reinthaler, Esq.
            James P. Smith, III, Esq.
            Jennifer O. Whitener, Esq.
    1301 Avenue of the Americas
    New York, NY  10019

    ROBINSON, BRADSHAW & HINSON, P.A.
        By:  Robert W. Fuller, Esq.
            Katherine G. Maynard, Esq.
    101 North Tryon Street, Suite 1900
    Charlotte, NC  28246